## Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT

 2        FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 3              -   -   -

 4   JOHN VANDINE and RENEE VANDINE,:NO. 2:23-cv-00027

 5          Plaintiffs,:

 6        vs.          :CIVIL ACTION

 7   SUMMIT TREESTANDS, LLC, and   :
     DICK'S SPORTING GOODS, INC.,
 8                    :

 9          Defendants.:

10              -   -   -

11        THURSDAY, FEBRUARY, 7, 2024

12              -   -   -

13

14        Deposition of JARRETT WATERS,

15   held at the offices of Feldman Shepherd,

16   1845 Walnut Street, 21st Floor,

17   Philadelphia, Pennsylvania 19103,

18   commencing at 9:00 a.m., on the above

19   date, before Lisa Claud Neal, R.P.R. and

20   Notary Public in the Commonwealth of

21   Pennsylvania.

22              -   -   -

23

24

25
```

## Page 2

```
 1   A P P E A R A N C E S :

 2   FELDMAN SHEPHERD, LLP
     BY:  Jason A. Daria, Esquire
 3   1845 Walnut Street
     21st Floor
 4   Philadelphia, Pennsylvania  19103
     (877) 594-5785
 5   Jdaria@feldmanshepherd.com

 6   -- For Plaintiffs,
        John Vandine and Renee Vandine
 7

 8
     CLARK HILL, PLC
 9   BY: Barry B. Sutton, Admitted Pro Hac Vice
     220 Park Street
10   Suite 200
     Birmingham, Missouri  48098
11   (313) 965-8577
     Bsutton@clarkhill.com
12
     -- For Defendant, Summit Treestands, LLC
13      and Dick's Sporting Goods, Inc.
              -   -   -
14

15

16

17

18

19

20

21

22

23

24

25
```

## Page 3

```
 1              I N D E X

 2

 3   DEFENDANT'S EVIDENCE

 4   WITNESS:                     PAGE:

 5     JARRETT WATERS

 6       EXAMINATION BY MR. SUTTON      6

 7       EXAMINATION BY MR. DARIA     351

 8

 9              -   -   -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

## Page 4

```
 1              E X H I B I T S

 2

 3   DEFENDANT'S

 4   NUMBER    DESCRIPTION        MARKED

 5     1     Notice of Deposition      9

 6     2     List of testimony given    26

 7     3     Report           27

 8     4     Standard Practice for     157
            Treestand Labels
 9
      5     Instruction Manual       183
10

11              -   -   -

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

MSJ_JA000186

Transcript of Jarrett Waters
Conducted on February 7, 2024

---

**5**

```
1              DEPOSITION SUPPORT INDEX
2
3  DIRECTIONS NOT TO ANSWER
4  PAGES:  None
5
6
7  REQUESTS FOR DOCUMENTS OR INFORMATION
8  PAGES:  None
9
10
11 STIPULATIONS AND/OR STATEMENTS
12 PAGES:  None
13
14
15 MARKED QUESTIONS/OBJECTIONS
16 PAGES/LINE
17  15/3    116/17   266/19   329/3    348/2
18  65/15   150/25   272/20   329/13   349/16
19  65/24   157/24   273/1    333/17
20  66/5    248/14   307/9    339/2
21  72/5    250/18   307/16   341/2
22  83/17   259/2    311/21   341/18
23  96/23   264/14   314/20   342/11
24  107/11  266/8    321/2    346/3
25
```

---

**6**

```
1                 -  -  -
2         P R O C E E D I N G S
3                 -  -  -
4
5          JARRETT DOUGLAS WATERS, having
6      been duly sworn, was examined and
7      testified as follows:
8          MR. SUTTON: Please state your
9  full name, for the record.
10         THE WITNESS:  Jarrett Waters.
11         MR. SUTTON:  What's your middle
12 name?
13         THE WITNESS:  Douglas.
14         MR. SUTTON:  Let the record
15 reflect that this is the deposition of
16 Jarrett Douglas Waters, taken pursuant to
17 the federal rules of civil procedure.
18                 -  -  -
19         EXAMINATION
20                 -  -  -
21 BY MR. SUTTON:
22    Q.    Good morning, Mr. Waters.  Are you
23 ready to begin, or do you need more time?
24    A.    No, I'm ready to begin.
25    Q.    Did you understand what I meant by
```

---

**7**

```
1  that sentence?
2     A.    (No audible response.)
3     Q.    That question I just asked you.
4     A.    Yes, I understood.
5     Q.    The question was asked in a
6  conjunctive form; right?  Do you know what I
7  mean?
8     A.    Would you explain.
9     Q.    It has a choice.  I gave you two
10 choices, whether you are ready for the
11 deposition or whether you need more time;
12 right?
13    A.    Okay.
14    Q.    Do you understand that?
15    A.    Yes.
16    Q.    And I used the term "or," right?
17    A.    Okay.  Yes.
18    Q.    And the term "or" connotes choice,
19 right, or alternatives?
20    A.    It gives an option.
21    Q.    Okay.  And that's the plain
22 meaning of the word "or"; right?
23    A.    Okay.
24    Q.    Do you agree with that?
25    A.    Yes.
```

---

**8**

```
1     Q.    Now, I understand that you've been
2  deposed, is it three times before; is that
3  right?
4     A.    Two times, I believe.  One trial.
5     Q.    You've been deposed twice and you
6  went through one trial; is that right?
7     A.    Correct.
8     Q.    And two of those related to
9  this -- is it Jesus Gonzales?
10    A.    That is correct.
11    Q.    And those depositions were in '21
12 or '23; right?
13    A.    That is correct.
14    Q.    You've probably read a lot of
15 depositions in your career?
16    A.    That's correct.
17    Q.    You know the ground rules of a
18 deposition?
19    A.    I do.
20    Q.    Any time I ask you a question you
21 don't understand, just let me know and I'll
22 rephrase it, okay?
23    A.    Okay.
24    Q.    From time to time you're going to
25 get in a rhythm and you're going to nod your
```

---

MSJ_JA000187

Transcript of Jarrett Waters
Conducted on February 7, 2024

---

9

1  head like you just did, but I need an out
2  loud response because Ms. Neal is extremely
3  gifted as a court reporter, but she can only
4  take down what we say out loud, okay?
5  **A.  Okay.**
6  Q.   Any time you need a break I'm fine
7  with it as long as we finish the line of
8  questioning; is that okay?
9  **A.  That's fine.**
10  Q.   And, if you can just please let me
11  finish the question before you respond,
12  Ms. Neal, as gifted as she is, can only take
13  down one person talking at a time, okay?
14  **A.  Okay.**
15  Q.   Now, I've marked as Deposition
16  Exhibit No. 1, which is the Notice of
17  Deposition for today, and it has a list of
18  27 things, correct?
19  **A.  Correct.**
20     (Notice of Deposition, marked
21     Defendant's Exhibit No. 1, for
22     identification.)
23  BY MR. SUTTON:
24  Q.   And I received a response
25  yesterday afternoon.  Unfortunately, I no

---

10

1  longer had a printer because I was already
2  here.  But I will say, for the record, that
3  Mr. Daria did respond to it.  Subject to the
4  responses and the objections placed in that,
5  have you produced your complete file?
6  **A.  Yes, I have.**
7  Q.   Is there anything missing from
8  your file whatsoever?
9  **A.  There was an addition of two**
10  **photographs and a video, but I believe that**
11  **would have been given to you as of**
12  **yesterday.**
13  Q.   So I received, just for the
14  record, on Monday I received what I was told
15  was your complete file, and then last night,
16  probably around dinnertime I received two
17  additional photographs and a video; is that
18  right?
19  **A.  That's correct.**
20  Q.   When were those photographs and
21  video taken?
22  **A.  Those were taken Monday of this**
23  **week.**
24  Q.   And where were they taken?
25  **A.  At my office, in Fishers, Indiana.**

---

11

1  Q.   Are there any other videos or
2  photographs that you've taken on this case,
3  whatsoever, that you have not produced?
4  **A.  No.**
5  Q.   Have any photographs of any
6  testing or videos of any testing been
7  deleted whatsoever?
8  **A.  No.**
9  Q.   Were those the only photographs of
10  what was shown in the video taken, those two
11  photographs?
12  **A.  Those two photographs and the**
13  **video were of that testing.**
14  Q.   And those are the only ones that
15  were taken?
16  **A.  On Monday, yes.**
17  Q.   Well, I have your complete file.
18  And I notice you've got a number of
19  photographs.  I've deposed your office --
20  you're at Wolf Technologies; right?
21  **A.  Wolf Technical Services.**
22  Q.   I'm sorry.  Wolf Technical
23  Services.  And I've taken the deposition of
24  your partner, William Dickinson, multiple
25  types so I'm generally familiar how you put

---

12

1  together your files.
2     Typically when you guys do testing
3  at Wolf Technical Services, you take
4  photographs of the testing, the setup and
5  everything like that.  Right?
6  **A.  That's correct.**
7  Q.   And you've produced a bunch of
8  photographs -- some of which we'll get to
9  later -- of, for instance, pull tests you
10  did on the QuickDraw spring, right?
11  **A.  Yes.**
12  Q.   And you took photographs showing
13  your setup and your results, et cetera,
14  right?
15  **A.  Yes.**
16  Q.   Is there a reason why you only
17  took two photographs of this test?
18  **A.  The setup was similar to the**
19  **photographs that were already represented in**
20  **the file.**
21  Q.   In the photograph, and we'll get
22  to this in a little bit, there is a cable
23  attached to the back of a pole, right?
24  **A.  That's correct.**
25  Q.   And on the back of the pole, one

---

MSJ_JA000188

13

1  of the photographs shows that that cable has
2  been what appears to be nailed to that; is
3  that right?
4      **A.    It is secured via two screws, and**
5  **it is to represent the testing that**
6  **Mr. Saunders conducted with a climbing cable**
7  **nailed to the back of the tree.**
8          **It should be noted that the cable**
9  **was free to slide left and right through**
10 **those screws and they simply restrain it to**
11 **the back of the tree.**
12     Q.    Well, in all fairness to
13 Mr. Saunders -- first of all, in all
14 fairness to me, this testing was not part of
15 any of your report which was issued on
16 November 22nd, 2023, right?
17     **A.    That's correct.**
18     Q.    In all fairness to Mr. Saunders,
19 Mr. Saunders' report references one in which
20 he tests the product in a tree while the
21 spring is intact, right?
22     **A.    That's correct.  Oh, well, I'll**
23 **follow up and say I haven't seen photos or**
24 **videos of his testing, so I'm relying on the**
25 **words in his report.**

14

1      Q.    And the words in his report
2  discuss the fact that he's testing the
3  performance of the spring to keep that cable
4  in place during ordinary use, right?
5      **A.    The testing he describes has the**
6  **QuickDraw spring in its -- in its position**
7  **behind the cable stop, and has not been**
8  **activated or inadvertently released from**
9  **behind the cable stop.**
10     Q.    Well, I haven't looked at the
11 video.  You're not suggesting the video that
12 you have inadvertently released the --
13     **A.    I'm not suggesting that video is**
14 **inadvertent contact with the spring.  I'm**
15 **suggesting that should that spring be**
16 **released and the cable be adhered, snagged,**
17 **connected somehow to the tree, it is**
18 **possible for the cable to slide axially**
19 **within the cable bracket.**
20     Q.    My question was simply, you're not
21 suggesting you didn't intentionally
22 manipulate the QuickDraw spring in that
23 test, right?
24     **A.    Repeat the question, please.**
25     Q.    You're not suggesting that you did

15

1  not intentionally manipulate the spring in
2  that test?
3          MR. DARIA:  Note my objection to
4  the form.
5          THE WITNESS:  I intentionally
6  disengaged the QuickDraw spring for that
7  test.
8  BY MR. SUTTON:
9      Q.    So the test, and we'll get more
10 into this test later, but the test basically
11 shows a disabled QuickDraw spring, one that
12 you've intentionally taken out of its
13 function to hold the cable in place, right?
14     **A.    I -- I lowered the QuickDraw**
15 **spring with my finger, which would be a use**
16 **that a hunter would use while setting up or**
17 **potentially inadvertently grasping the**
18 **spring during the climbing phase of the**
19 **setup of the treestand.**
20     Q.    Well, that's how you put the stand
21 on the tree and how you take it off is you
22 have to pull the trigger, right?
23     **A.    You do not have to pull the**
24 **trigger to engage the cable into the stand.**
25     Q.    Well, in order to take it off you

16

1  have to pull the trigger, right?
2      **A.    On a normal functioning spring,**
3  **yes, you would have to disengage the spring**
4  **in order to remove the cable stop from the**
5  **cable bracket.**
6      Q.    And that test shows you doing
7  exactly that, intentionally pulling the
8  trigger to remove the cable stop, right?
9      **A.    Yes.  That shows me disengaging**
10 **the cable or the QuickDraw spring, and**
11 **allowing the natural stability or**
12 **flexibility of the cable, on a cable that is**
13 **restrained to the tree, to drive axially**
14 **rearward into the cable.  But, yes, I**
15 **intentionally and actively disengaged the**
16 **spring to represent that scenario.**
17     Q.    And then in the middle of it you
18 also intentionally changed your grip on --
19 is that your hand in the video, by the way?
20     **A.    That is my hand.**
21     Q.    You intentionally change the grip
22 on that to then push the cable out of the
23 cable bracket, right?
24     **A.    I did.  The motion -- the motion**
25 **secondarily would be a second grasp which**

MSJ_JA000189

Transcript of Jarrett Waters
Conducted on February 7, 2024

---

**17**

1  drives the QuickDraw spring upward.
2  Q.    But you did that intentionally,
3  right?
4  A.    I did, yeah.
5  Q.    So in order for you to get that
6  cable to come out of the spring you had to
7  first nail it to the back of the tree,
8  right?
9  A.    The fixing to the tree represents
10 multiple scenarios of a snag or bark contact
11 or contact with the limb.  But, yes, for
12 that specific test scenario I fixed the
13 cable to the tree so that it could not come
14 off the back of the tree.
15 Q.    Did you do any testing with just
16 bark?
17 A.    I have previously, and in use of
18 the treestands many years ago, just through
19 normal use, but none represented in this
20 case.
21 Q.    Are you suggesting that you
22 previously used the cable and the cable came
23 out in a Viper yourself?
24 A.    The Vipers that I have include
25 safety covers.  And those safety covers

**18**

1  block the open keyway on the top of the
2  cable bracket.  And regardless of any axial
3  movement of the cable within those brackets,
4  the cable was not able to bypass or exit the
5  keyway bracket due to that cover being
6  closed.
7  Q.    So at no time in your personal use
8  of a Viper treestand has the cable ever come
9  out?
10 A.    No, it has not.  But my personal
11 use of Viper treestands are of 2002 Viper
12 treestands that include safety covers.
13 Q.    And secondarily, for the Viper
14 design that's been used since about 2004
15 with a QuickDraw spring, did you do any
16 testing to determine whether you could move
17 the cable axially by hooking it in bark?
18 A.    I did not.
19 Q.    What about on the subject tree,
20 did you do any testing on the subject tree
21 to see if the subject tree had bark that was
22 strong enough to move the cable axially?
23 A.    I did not.
24 Q.    So back to the test, if I
25 understand the test.  In order for that test

**19**

1  to get the cable to move, you had to first
2  disengage the QuickDraw spring, right?
3  A.    Yes, I disengaged the QuickDraw
4  spring.
5  Q.    Did you try to push it against the
6  back of the tree when it was nailed to
7  the -- the cable to the back of the tree
8  when it was nailed to there?  Did you try to
9  push that backwards while the spring was
10 present to see what happens?
11 A.    I did not.
12 Q.    And that's because you know that
13 when the QuickDraw spring is present, the
14 cable will just bend out of shape, it won't
15 push to overcome the spring, right?
16 A.    If the QuickDraw spring is in its
17 proper position and behind the cable stop,
18 it would be very difficult for the cable to
19 overcome the spring.
20 Q.    So what you're saying is that as
21 far as the actual test that Mr. Saunders
22 did, which -- to try to overcome the spring
23 by nailing it to the back of the tree, you
24 agree with him, you agree with those results
25 that you can't do that?

**20**

1  A.    I would agree with those results.
2  I have not seen his photos or videos to know
3  his exact test setup.  His results do
4  discuss bowing or flexing the cable away
5  from the -- from the tree.  Whereas, you
6  know, there is essentially a quarter inch or
7  so of play between the back of the cable
8  stop and the retention spring.  That
9  distance would be taken up during that
10 movement.
11 Q.    In other words, you can -- there's
12 some ability to move about a quarter of an
13 inch that cable stop within that bracket,
14 before it hits the spring when it moves
15 backwards?
16 A.    If the spring is properly
17 positioned, yes.
18 Q.    But other than that, my question
19 was, do you agree with the results of his
20 test, that you cannot push that cable stop
21 past the QuickDraw spring in use, even if
22 the cable is stapled to the back of the
23 tree?
24 A.    Pending review of his photos and
25 videos, based on what he presented in his

MSJ_JA000190

21
1  report, yes, I would likely believe that.
2  Q.   Now, you just mentioned something
3  about the cable bending axially, so let's
4  talk about that for a moment, okay?
5  A.   Okay.
6  Q.   Now, we have a cable used in this
7  design, which is a -- it's the 1-by-19
8  strand; is that what it is?
9  A.   I don't recall the exact count,
10 but that sounds familiar.
11 Q.   And the strand has some stiffness,
12 as noted in your report, right?
13 A.   It does have some inherent
14 stiffness.  That -- observations throughout
15 the report also discuss that inherent
16 stiffness will be potentially degraded over
17 time through use on different diameter trees
18 allowing that cable to take a different
19 permanent shape or set over time.
20 Q.   Well, there was some discussion
21 about a kink, I think you called it, in your
22 report, of the subject cable; is that right?
23 A.   Yes, that's correct.
24 Q.   And that's what your talking
25 about, there is -- sometimes you can

22
1  overload a cable to some extent so that you
2  can put a permanent set or kink into it?
3  A.   The kink is actually not what I'm
4  referring to by that permanent set.  If you
5  envision a U-shape where the legs of the U
6  are parallel to one another, that is what
7  I'm referring to by a more permanent set.
8  The cable begins to take a tighter radius in
9  its natural shape as compared to a new cable
10 out of the box.
11 Q.   Regardless of the tighter radius
12 that it's taken, it still wants to push the
13 cable to the outside of the cable brackets
14 in use on any size tree, right?
15 A.   The permanent set reduces the
16 ability or reduces the outward force as that
17 cable pushes against those cable brackets.
18 Q.   But there is still a force there,
19 is what my question is.
20 A.   There is a force, but it is
21 reduced as that cable takes a more permanent
22 U-shape.
23 Q.   Did you do any testing to
24 determine how the force is reduced?
25 A.   The -- the test that was just

23
1  discussed in the video is a representation
2  of that.  The cable has a tendency to want
3  to slide axially as opposed to outward into
4  the cable bracket.
5       Photos in my report do highlight
6  different shapes of a cable based on new,
7  used on larger diameter trees and used on
8  smaller diameter trees, simply as an
9  observation that these shapes will reduce
10 that outward -- outward force that the cable
11 exerts into the cable bracket.
12 Q.   So I would appreciate it if you
13 answer the question I asked though, which
14 is: Did you do testing of the force to
15 determine how it was diminished in any way,
16 over time or over use?
17 A.   I did not physically measure the
18 force of the load cell.
19 Q.   Okay.  Now, that cable system is
20 done so there is a stiffness in the cable,
21 as we just discussed, right?
22 A.   Correct.
23 Q.   And that stiffness allows that
24 cable to be used in this system so that when
25 you push it back away from the tree, if it's

24
1  not stapled there like it was in your tests
2  that it moves off into space, right?
3  A.   Yes, it would.
4  Q.   And that's a design function of
5  this cable, right?
6  A.   Should it not be hindered by
7  anything else on the tree or an obstruction,
8  yes, that's the design of the cable that
9  allows it to freely and not -- freely
10 support itself and not sag during climbing
11 operations.
12 Q.   And you don't want it to sag
13 during climbing operations so it doesn't get
14 further caught on any type stobs or bark or
15 anything like that, right?
16 A.   It does hinder the climbing should
17 it snag or sag.
18 Q.   So that's a good feature of this
19 treestand, right?
20 A.   That is a benefit of this
21 treestand.
22 Q.   Now, the cable also is a column
23 that can bend out of shape if too much force
24 is placed on it, right?
25 A.   In essence, yes.

Transcript of Jarrett Waters
Conducted on February 7, 2024

---

25

1    Q.    So earlier we talked about the
2    fact that Mr. Saunders did some tests that
3    you agree are likely appropriate. You
4    haven't seen the photographs and the videos
5    yet, but the description seems to be likely
6    appropriate, that show that even if you
7    stapled this cable to the back of the tree
8    and you try to push it to overcome the
9    spring, you can't do that. Right?
10   **A.    The testing seems consistent with**
11   **that you will not be able to overcome the**
12   **spring.**
13   Q.    And one of the things that you
14   said earlier on is that there is some
15   bending moment in these cables that will
16   start to push the cables out of shape rather
17   than push the spring back, or push the cable
18   past the spring, right?
19   **A.    There is some flex that occurs in**
20   **those cables during that specific scenario**
21   **where it's affixed to the back of the tree.**
22   **That flex is determined upon the initial**
23   **state of the cable on whether what shape or**
24   **how parallel the legs are naturally.**
25   **Additionally, the diameter of tree**

---

26

1    **can affect its natural tangent as it comes**
2    **off the tree and change the angle that it**
3    **acts on the cable bracket.**
4    Q.    But one of the design features of
5    the cable assembly is that as you push back
6    away from the tree and toward the user, that
7    if as you apply more force those cables will
8    bend out of line, right?
9    **A.    If the QuickDraw spring is**
10   **properly positioned behind cable stop, yes.**
11   Q.    In other words, the springs will
12   hold the cable in place, and the cable will
13   then bend, right?
14   **A.    Correct.**
15   Q.    Okay. Now, I want to show you
16   what we've marked as Exhibit 2, which was
17   sent to me as your list of testimony that
18   you've given. That's complete, right?
19   **A.    Yes, that's complete.**
20   (List of testimony given, marked
21   Defendant's Exhibit No. 2, for
22   identification.)
23   BY MR. SUTTON:
24   Q.    Now, I show you Exhibit 3 that
25   we've marked which is your report in this

---

27

1    case. And does that appear to be complete?
2    **A.    (No audible response.)**
3    Q.    And I do note that you're looking
4    at added to the report -- if you give me
5    that copy -- is your C.V. and your --
6    **A.    It also includes Mr. Dickinson's**
7    **C.V.**
8    Q.    Yeah. So let me remove those
9    parts.
10   It's also your rate. I think
11   there's a statement of rate in here. So let
12   me remove those parts so you just have the
13   report which you can look at if you need to.
14   I see that you have one in front of you that
15   may be easier for you to go through, but I
16   wanted to make sure you have that copy as
17   well as I ask questions. Okay?
18   **A.    Okay. Thank you.**
19   (Report, marked Defendant's
20   Exhibit No. 3, for identification.)
21   BY MR. SUTTON:
22   Q.    Now, if you looked through the
23   report, we get to page 10 -- before we get
24   there. Were you given a copy of the
25   protective order in this case?

---

28

1    **A.    I don't recall.**
2    Q.    Okay. Because I note on page 10
3    you have copied one of the drawings directly
4    into your report. And the drawing is listed
5    as confidential; do you see that?
6    **A.    I do see that.**
7    Q.    Is there any reason why you didn't
8    mark your report, which includes some
9    confidential information of my client,
10   Summit Treestands, as confidential?
11   **A.    The report was prepared for**
12   **Mr. Daria and not a public report that was**
13   **disseminated across public outlet. The**
14   **provided drawing was included in the**
15   **defense's production and was a part of my**
16   **file.**
17   Q.    Well, I understand that it was
18   included in the defense's production, but it
19   was included as part -- under a protective
20   order to keep, maintain its confidentiality;
21   do you understand that?
22   **A.    I understand that.**
23   Q.    And as part of the confidentiality
24   order you were allowed to have access to it
25   because you're an expert witness for the

---

MSJ_JA000192

Transcript of Jarrett Waters
Conducted on February 7, 2024

---

29

1  plaintiffs; do you understand that?
2  **A.    I do not recall seeing a copy of**
3  **this confidential order.  I understand the**
4  **premise of one, but, as far as the exact**
5  **words of the order you are referencing, I'm**
6  **not familiar with it.**
7      Q.    Well, since this document includes
8  confidential design drawings from my client,
9  I would ask that it be marked confidential
10 and kept by your office confidential as
11 required under the protective order.  Is
12 that okay?
13 **A.    That's fine.**
14      MR. DARIA:  And I'll note, for
15 the record, that this report has not been
16 disseminated to any place or anyone other
17 than defense counsel and my office in
18 accordance with the confidentiality order.
19      MR. SUTTON:  And folks at Wolf
20 Technologies, right?
21      THE WITNESS:  Correct.  It has
22 not left the office or our servers.
23 BY MR. SUTTON:
24      Q.    And just so we are on the same
25 page you will advise Wolf Technical Services

---

30

1  that this is confidential and can't be
2  disseminated, right?
3  **A.    I will be happy to.**
4      Q.    Thank you.
5      Now, there is mention in here of
6  ASTM.  In your report, I mean.
7  **A.    That's correct.**
8      Q.    Are you familiar with ASTM?
9  **A.    I am familiar with their standards**
10 **and the application of their standards and**
11 **have used their standard for application of**
12 **safety, warnings, decals and informational**
13 **placards.**
14      Q.    ASTM is an international standards
15 organization; is it not?
16 **A.    Yes, I believe it is.**
17      Q.    One of the largest in world,
18 right?
19 **A.    Yes.**
20      Q.    Been around for over a hundred
21 years, right?
22 **A.    I'm not familiar with their**
23 **inception date, but I would believe it if**
24 **you told me.**
25      Q.    Are you a member?

---

31

1  **A.    I am not a member.**
2      Q.    You understand, do you not, that
3  ASTM has a specific subcommittee that
4  promulgates standards pertaining to
5  treestands and treestand-related products?
6  **A.    I understand that ASTM has adopted**
7  **and worked in conjunction with many of the**
8  **older TMS standards and a lot of the**
9  **verbiage is consistent through those.  I'm**
10 **assuming that it is through a subcommittee**
11 **within ASTM.**
12      Q.    Do you know one way or the other
13 how ASTM works to develop its standards?
14 **A.    I do not know their specific**
15 **procedure for developing standards.**
16      Q.    Do you understand, generally, that
17 they are a peer reviewed standard
18 organization?
19 **A.    Yes, I do.**
20      Q.    That it requires publication and
21 comment of its members to pass a standard?
22 **A.    Yes, I do.**
23      Q.    And that ASTM is made up of over
24 20,000 members?
25 **A.    I am not familiar with how many**

---

32

1  **members there are, but I would believe that.**
2      Q.    Do you understand that ASTM
3  subcommittees are set and allow people to
4  take part in the subcommittees if they
5  apply?
6  **A.    That seems reasonable.**
7      Q.    Have you ever applied to take part
8  of any of the ASTM subcommittees relating to
9  treestands?
10 **A.    I have not.**
11      Q.    Have you ever attempted to comment
12 or write the subcommittee related to any
13 comments on any ASTM standards?
14 **A.    I have not.**
15      Q.    Now, you indicated that the ASTM
16 worked in conjunction with, is it the
17 Treestand Manufacturer's Association?
18 **A.    I believe that's the correct**
19 **acronym.  It was the original set of**
20 **standards providing recommendations and**
21 **governance for the treestand community.  But**
22 **I believe TMA and TMS had a conjunction of**
23 **standards that were later adopted and**
24 **converted into ASTM standards.**
25      Q.    Do you know who wrote the original

---

MSJ_JA000193

33

1 standards?
2    A.    I do not know the original author.
3    Q.    Do you have any criticisms of
4 those standards?
5    A.    I think the standards are a
6 minimum, as far as safety concerns go.  I
7 think that the standards are a
8 recommendation to the manufacturer of what
9 the first step should be in determining
10 proper and safe care as far as the design
11 and then the application of instructions and
12 labels and warnings are adhered to the
13 product.
14        I do know the standards often use
15 verbiage that say it is up to the
16 manufacturer to assess these standards for
17 their specific design and how these
18 standards could be furthered based on that
19 design, and that these standards are the
20 bare minimum for safety recommendations.
21    Q.    Does the phrase "bare minimum"
22 appear in any of the treestand standards?
23    A.    I do not believe the phrase "bare
24 minimum" is verbatim from those standards.
25    Q.    And that wasn't my question, in

34

1 any event.  My question was:  Do you have
2 any criticism of the treestand related
3 standards of ASTM?
4    A.    I do not have any direct criticism
5 of the standards themselves.  I have
6 criticisms on how manufacturers choose to
7 interpret the standards and apply them to
8 their products.
9    Q.    But the standards themselves you
10 do not have any criticisms of, fair?
11    A.    Correct.
12    Q.    Now, you're not suggesting that
13 ASTM is promulgating standards that they
14 believe don't help manufacturers make safe
15 products, do you?
16    A.    They set guidelines and
17 recommendations for safe products.  The
18 standards do not cover all design scenarios
19 and therefore there's verbiage in several of
20 the standards that rely or instruct the
21 manufacturer to adhere to these and take
22 further steps based on those specific
23 designs.
24    Q.    Well, they're performance
25 standards not design standards, right?

35

1    A.    The standards regarding safety and
2 safety devices I would argue affect the
3 design of the stand.
4    Q.    Well, isn't it true that the
5 standards give -- leave the design up to the
6 manufacturer?
7    A.    The standard does not tell you how
8 to design a product, that is correct.  The
9 manufacturer is required to review the
10 standard and interpret and apply that to
11 their designs.
12    Q.    And their standards have a
13 requirement for performance criteria, right?
14    A.    There is a set of performance
15 criteria that the standards do outline.
16    Q.    For instance, they have repetitive
17 load tests for climbing stands, right?
18    A.    They have repetitive -- and I will
19 call them static load tests.  Not all of the
20 functions of the stand are actuated during
21 those repetitive tests.
22    Q.    Okay.  But I just asked you
23 whether they had repetitive load tests.
24 They do, right?
25    A.    Yes.

36

1    Q.    Where they repetitively load the
2 product thousands of times, right?
3    A.    That's correct.
4    Q.    They also have load tests, right?
5    A.    Yes.
6    Q.    And they include a factor of
7 safety in the industry of 2.0, right?
8    A.    That sounds correct.
9    Q.    And that's reasonable in this
10 industry, right?
11    A.    I would argue that it could be
12 higher given that this is an aerial platform
13 and it is something somebody is relying on
14 for their safety and securement from an
15 aerial position, but 2.0 is definitely a
16 good starting point.
17    Q.    Well, that's a standard that the
18 ASTM subcommittee subjected to peer review
19 in their industry and asked for comment, and
20 that's what they determined, 2.0 was a
21 required factor of safety in this specific
22 industry.  And that's from the folks that
23 work in this industry, right?
24    A.    That sounds appropriate.
25    Q.    Okay.  And you don't disagree that

MSJ_JA000194

Transcript of Jarrett Waters
Conducted on February 7, 2024

37

1  they set that factor of safety
2  appropriately, do you?
3  **A.    I think it is a good minimum**
4  **standard and it is up to the manufacturer to**
5  **determine whether the factor of safety is**
6  **applicable to their design, and that they**
7  **should be going above and beyond what the**
8  **recommended minimum set forth by the**
9  **standards are.**
10  Q.    You're not suggesting to the jury
11  that ASTM would promulgate or adopt
12  standards that would allow product that was
13  not safe for its intended use to be placed
14  on the market?
15  **A.    Please repeat the question.**
16  Q.    You're not suggesting that ASTM
17  would promulgate or adopt standards that
18  would allow a product that was not safe for
19  its intended use to be placed on the market?
20  **A.    I'm not suggesting that ASTM set**
21  **forth standards that were dangerous, or**
22  **allow for designs to be inadequate. These**
23  **are minimums that the manufacturer should**
24  **rely on in order to guide their designs.**
25  **And the standards cannot address all of the**

38

1  **intricacies or design features of each**
2  **specific manufactured product.**
3  Q.    Would you agree with me that the
4  whole point of industry standards such as
5  those adopted by ASTM is to provide guidance
6  to manufacturers in making safe products?
7  **A.    Yes, I would.**
8  Q.    And it also is to provide
9  manufacturers with guidelines for good
10  engineering and design practices?
11  **A.    Yes.**
12  Q.    Have you ever in your career been
13  involved in the development of any
14  standards?
15  **A.    Of standards, no.**
16  Q.    Now, we talked a little bit about
17  factor of safety and we talked a little bit
18  about the cable assembly. You have, in
19  fact, in other cases, tested the Summit
20  Viper cable to determine its factor of
21  safety; have you not?
22  **A.    I have assisted in testing of**
23  **Summit climbing cable and their factor of**
24  **safety or their overall tensile strength.**
25  Q.    And their factor of safety was

39

1  well over five, was it not?
2  **A.    I recall it being high. I do not**
3  **recall the exact number for that testing.**
4  Q.    Let's talk a little bit about the
5  ASTM certification process used by the
6  Treestand Manufacturers Association. Are
7  you familiar with that?
8  **A.    I am familiar with the documents**
9  **provided today regarding the scientific**
10  **laboratory -- not -- sorry.**
11  Q.    Scientific testing labs?
12  **A.    Yes. But you did not -- those**
13  **documents were not provided today. They**
14  **were provided originally in discovery. I am**
15  **familiar with those documents. I am not**
16  **familiar with the intricacies of that**
17  **process.**
18  Q.    Have you ever been involved in the
19  certification process of any treestand?
20  **A.    I have not.**
21  Q.    Do you know how that process
22  works?
23  **A.    I have not been involved with that**
24  **process.**
25  Q.    That's not my question. My

40

1  question is: Do you know how the process
2  works?
3  **A.    It is my understanding that it is**
4  **a process where a product is sent to an**
5  **independent laboratory for evaluation. That**
6  **independent laboratory provides a report,**
7  **and based on some of the discovery materials**
8  **provided, it essentially winds up being a**
9  **self-certification of adherence to the**
10  **provided standards.**
11  Q.    Why do you say
12  "self-certification"?
13  **A.    I believe Summit's name is on the**
14  **provided report. So they are a part of the**
15  **evaluation, as far as the certification**
16  **goes.**
17  Q.    Mr. Waters, you know, do you not,
18  that these products are sent to third-party
19  testing labs, right?
20  **A.    That's what the photos suggest,**
21  **yes.**
22  Q.    That these are engineering labs
23  that specialize in testing, right?
24  **A.    Yes.**
25  Q.    That that product is reviewed for

MSJ_JA000195

Transcript of Jarrett Waters
Conducted on February 7, 2024

41

1  performance testing pursuant to the ASTM
2  standards?
3     **A.    To the provided standards, yes.**
4     Q.    The harness is subjected to
5  testing, true?
6     **A.    I believe it is.**
7     Q.    It has its own set of standards
8  for performance, right?
9     **A.    That's correct.**
10    Q.    Quality control plan of the
11 manufacturer is reviewed, true?
12    **A.    It should be, yes.**
13    Q.    The instruction manual and
14 warnings are reviewed, true?
15    **A.    That's my understanding.**
16    Q.    And the certification process at
17 the end of which that lab signs a report
18 certifying that that treestand meets or
19 exceeds industry standards which are ASTM
20 standards, right?
21    **A.    I believe they do, yes.**
22    Q.    And those are testing labs that
23 specialize in testing goods such as
24 treestands, right?
25    **A.    They test according to the**

42

1  **standards.  They do not test all the design**
2  **features within an existing product.**
3     Q.    I'm talking about the ASTM
4  certification process.  These are labs that
5  are set up and specifically outlined to be
6  companies that can certify these products,
7  right?
8     **A.    That's my understanding.**
9     Q.    Now, are you aware that the
10 testing process allows substitution of test
11 results?
12    **A.    I am not aware.**
13    Q.    So for instance if we say -- let's
14 say I have a manufacturer, ABC, that's
15 manufacturing a series of Hang-On
16 treestands.  Do you know what a Hang-On
17 treestand is?
18    **A.    I do.**
19    Q.    A Hang-On treestand is a treestand
20 which has a platform and a seat that's
21 attached to a tree and you need to climb it
22 to get up into, right?
23    **A.    That's correct.**
24    Q.    Let's say they submit it, and they
25 have got six different models of that stand;

43

1  are you with me?
2     **A.    I'm with you.**
3     Q.    Each of them uses the same
4  harness, right?
5     **A.    Okay.**
6     Q.    The lab tests the harness because
7  it's the same.  It doesn't have to test six
8  different harnesses because they're all the
9  same model that's being used, right?
10    **A.    Okay.**
11    Q.    Does that make sense?
12    **A.    That makes sense.  However, the**
13 **testing for -- the harness has its own model**
14 **number as compared to each one of the model**
15 **treestands that has a different model**
16 **number, and so if a set or an assembled**
17 **product includes that model number of**
18 **harness then it would make sense that that**
19 **model number would be certified via these**
20 **testings and be applicable to all these**
21 **different products.**
22    Q.    I'm just giving you an example of
23 a certification where one product that's now
24 used in multiple different models, they
25 don't retest six times.  They just use the

44

1  one test for that representative sample,
2  right?
3     **A.    As long as the model number**
4  **doesn't change, the product doesn't change.**
5     Q.    Well, are you familiar with the
6  treestand industry?
7     **A.    I am familiar with using products**
8  **from the treestand industry.**
9     Q.    What about the automotive
10 industry?
11    **A.    Familiar with the automotive**
12 **industry as well.**
13    Q.    So are you familiar with the
14 automotive industry where they may test,
15 let's say, a seatbelt to meet certain
16 specifications and then it's used in
17 multiple different vehicles and those tests
18 are substituted in rather than retested
19 every time?
20    **A.    That seatbelt has a model number**
21 **and it's carried through all the different**
22 **units that it's installed in so that model**
23 **number has been certified, that specific**
24 **model of seatbelt.**
25    Q.    Well, aren't you aware that in

Transcript of Jarrett Waters
Conducted on February 7, 2024

45

1  some situations the exact same one is just
2  given a different model number or part
3  number because it's used in a different
4  vehicle but it's structurally exactly the
5  same?
6    **A.    It may be assigned a different**
7  **part number from the automaker that installs**
8  **it as it is their OMA part number, but**
9  **whichever vender supplies that seatbelt to**
10 **that automaker can sell it under the same**
11 **part number.**
12   Q.    Okay. Let's back up a little bit,
13 back to the treestand industry.  Are you
14 aware that the treestand industry -- we were
15 using a hypothetical company called ABC
16 Manufacturing which sells certain fixed
17 position stands, right?
18   **A.    Okay.**
19   Q.    Do you understand that that
20 company may sell the exact same stand under
21 three different or more model numbers?
22   **A.    That seems logical.**
23   Q.    For instance, it might sell one
24 that has a -- an attachment that has -- for
25 a rifle, or to hold a bow, and sell it as a

46

1  different be model number?
2    **A.    Okay.**
3    Q.    It might sell one that has a Mossy
4  Oak pattern in it and one that has a
5  Realtree pattern under different model
6  numbers, right?
7    **A.    Okay.**
8    Q.    It may offer the same model number
9  under different names to different
10 manufacturers -- I'm sorry, to different
11 retailers; you understand that?
12   **A.    I believe I do.**
13   Q.    And you're aware, are you not,
14 because if you worked on other cases, that
15 if the structure is the exact same on these
16 stands you do not have to retest every
17 single model number even though these are
18 different named products or different model
19 products?
20   **A.    In the industries I'm familiar**
21 **with a model number change indicates a**
22 **change in form, fit or function of the**
23 **product.  And when we change model numbers,**
24 **that implies a new testing regime, and a new**
25 **set of evaluations for that product because**

47

1  **its form, fit or function has changed.**
2    Q.    Well, I'm not talking about other
3  industries.  I'm talking about this
4  industry.  You don't know whether or not
5  that's allowed, right?
6    **A.    I'm saying from an engineering**
7  **perspective --**
8    Q.    That's not my question.  I'm
9  asking you about whether or not in this
10 industry do you know that that's allowed?
11   **A.    I do not know what the standard**
12 **practice is for reusing model numbers or**
13 **changing model numbers on treestand**
14 **products.**
15   Q.    Let me ask you this question:  You
16 said in other industries that if the fit,
17 form or function changes, a model has to be
18 retested, right?
19   **A.    That is my familiarity with**
20 **different industries, yes.**
21   Q.    So if I change the camouflage
22 pattern on a seat, in a Viper treestand,
23 from Realtree to Mossy Oak, how does the
24 fit, form or function of that stand change?
25   **A.    So the way that would be addressed**

48

1  **in industries I'm familiar with that would a**
2  **revision.  So let's say you have a Revision**
3  **A that was released to the public.  That**
4  **would go to Revision B if something**
5  **aesthetically is changed.**
6    **The model number would still stay**
7  **the same.  The revision would be upgraded or**
8  **rolled to the next Rev because that**
9  **component could still be a direct**
10 **replacement for the component that it**
11 **originally was tested as.**
12   **I'm familiar with model number**
13 **changes as a form, fit or function change**
14 **and, therefore, something -- something has**
15 **changed on the product that does not allow**
16 **the new product to take the place of the old**
17 **product.  It is not a drop-in replacement.**
18   Q.    Okay.  But that's not my question.
19 My question was specific to this industry,
20 and the change of a pattern on a seat.  Do
21 you understand what I mean, the difference
22 between Mossy Oak and Realtree?
23   **A.    I do understand that.**
24   Q.    Are you a hunter?
25   **A.    I am.**

MSJ_JA000197

Transcript of Jarrett Waters
Conducted on February 7, 2024

49

1    Q.    You understand that there's two
2  different most popular camo patterns, right?
3    **A.    There's a lot more than two, but**
4  **yes.**
5    Q.    But the two most popular are
6  Realtree and Mossy Oak, right?
7    **A.    Depending on the part of the**
8  **country you're in, yes.**
9    Q.    And so some folks may want a stand
10  with Mossy Oak seat or camouflage and some
11  may want it with Realtree, right?
12   **A.    Okay.**
13   Q.    Do you understand?
14   **A.    I understand that.**
15   Q.    And that is something that happens
16  in this industry, right?
17   **A.    I understand that.**
18   Q.    Okay.  So my question to you is if
19  I'm merely changing the camo pattern on the
20  seat, how does that change the fit, form or
21  function of the treestand itself?
22   **A.    The camo pattern does not change**
23  **the performance of the structure of the**
24  **stand.  I agree to that.**
25        **The issue becomes if we are not**

50

1  **tracking components with a model number that**
2  **is consistent with what is in the testing,**
3  **there is no transparency for the testing and**
4  **folks that receive the paperwork don't have**
5  **an understanding of what product was**
6  **actually tested or model was tested.**
7    Q.    But you've had the opportunity to
8  be produced in this case to look at the
9  design drawings for the Viper, right?
10   **A.    That's correct.**
11   Q.    And the Viper with the QuickDraw
12  spring and the bracket has been in existence
13  since about 2004, right?
14   **A.    Yes.**
15   Q.    The actual design of the treestand
16  itself hasn't changed much since that time,
17  right?
18   **A.    The physical design of the stand,**
19  **no, has not changed much over time.**
20   Q.    And you're aware that that design
21  has been tested multiple times, well over
22  ten times by different companies
23  specializing in testing to industry
24  standards, right?
25   **A.    That's what you're representing to**

51

1  me.  I don't have access to all those other
2  tests.
3    Q.    You're not aware of that, that
4  that's the case?
5    **A.    It would make sense that they're**
6  **tested in that manner.  I have not seen**
7  **documents that prove that.**
8    Q.    Okay.  And those companies have
9  always universally certified the Viper
10  product as passing industry standards, true?
11   **A.    That would be my understanding**
12  **given that there are labeling on the product**
13  **that says that it passed those standards.**
14   Q.    Now, let's talk a little bit for a
15  second about the certification of warning
16  labels which you have in your report.  Do
17  you know how that process works?
18   **A.    The process of selecting warning**
19  **labels or the process of how the standard**
20  **was developed?**
21   Q.    Either.
22   **A.    I have experience selecting**
23  **warning labels for applicable uses and**
24  **applying them to products, yes.**
25   Q.    Do you have any experience in this

52

1  particular industry in the selection of
2  warnings?
3    **A.    I have not selected warnings for a**
4  **treestand, if that's what you're asking.**
5    Q.    Okay.  Now, you understand that
6  there is a process by which ASTM has the
7  testing lab certify the warnings and
8  instructions in a given stand, right?
9    **A.    Okay.**
10   Q.    You understand that?
11   **A.    I do.**
12   Q.    And one of the criticisms in the
13  report relates to the placement of the
14  warning label on the Summit Treestand?
15   **A.    That's correct.**
16   Q.    Are you aware that that's been
17  placed in that location for well over a
18  decade?
19   **A.    Yes.**
20   Q.    Are you aware that that's been
21  certified to pass ASTM standards by multiple
22  testing labs who specialize in certification
23  of that ASTM products?
24   **A.    It appears that it has, however it**
25  **does not coincide or match the verbiage**

Transcript of Jarrett Waters
Conducted on February 7, 2024

53

1  provided in the ASTM standard.
2  Q.    We'll get to that again because we
3  have a disagreement on that. My question
4  relates to the folks that are specifically
5  asked to look at this and understand the
6  certification process and have the
7  experience, which you do not, in certifying
8  this product have looked at that, and
9  repeatedly passed this under the ASTM
10 standards, true?
11 A.    That is true.
12 Q.    And also the TMS standards that
13 existed before the ASTM standards?
14 A.    They did pass it, yes.
15 Q.    And you would acknowledge that
16 although you disagree with them, that they
17 believe it does meet the standard, right?
18 A.    I would acknowledge at the time
19 they believe -- it met the standard, yet I
20 will bring up that it is interesting that
21 treestands and Summit, in general, have gone
22 to a fixed position warning label that is on
23 the V brace and it's upright in a manner
24 that would comply more with the verbiage
25 outlined in the ASTM standard.

54

1  Q.    In actuality, you're talking about
2  what's known as an interactive warning
3  system; are you aware of that?
4  A.    The one that includes the QR code?
5  Q.    Yes.
6  A.    Yes.
7  Q.    In fact, as an engineer you know
8  that many warnings are going to QR codes
9  because they're very easily accessible on
10 cell phones, et cetera, right?
11 A.    I do understand that.
12 Q.    In fact, if you take your iPhone
13 and you use the camera function and you
14 highlight a QR code with it, it gives you
15 the link to pull up those instructions and
16 warnings, right?
17 A.    For folks that have an iPhone or a
18 smartphone, yes.
19 Q.    And that's something that's been
20 developed in the last five or six years
21 that's really been pushed home, right?
22 A.    I believe so, yes.
23 Q.    And you're not critical of a
24 manufacturer moving with the system or the
25 industry and the times and updating its

55

1  warnings and instructions so that they meet
2  new trends?
3  A.    I am suggesting that if Summit
4  thought their warning was adequate or
5  complied with these standards they would
6  have simply added the QR code to the label
7  on the seat as opposed to addressing a new
8  version of label that's adhered to the
9  structure of the stand.
10 Q.    Let's talk about that for a
11 second. Do you know who develops that, you
12 know, whether it's a third party that
13 develops and sells that specific QR code and
14 access system?
15 A.    I do not know the development of
16 the QR code.
17 Q.    Do you know if they're even
18 capable of putting it on a label like that?
19 A.    I would assume they are.
20 Q.    Okay. Have you seen a QR code
21 that looks any different than what's on the
22 present day products which were well after
23 the 2015 manufacture of this product on any
24 other treestands?
25 A.    I'm sorry, can you rephrase that?

56

1  Q.    This new QR interactive warning
2  system --
3  A.    Correct.
4  Q.    -- is something that's not
5  prevalently used in the industry, that's
6  only been developed in the last few years.
7  Are you aware of that?
8  A.    I'm aware that it's not on older
9  treestands, but it is on treestands of
10 multiple brands.
11 Q.    Did you know it didn't exist in
12 2015 when this product was manufactured?
13 A.    I do not know if it existed or not
14 in 2015, the QR code.
15 Q.    Now, do you know whether anybody
16 in the industry had used a QR code back in
17 2015?
18 A.    I do not know.
19 Q.    Now, I've read through your
20 report, and it appears that as to warnings
21 and instructions, the only criticism you
22 have on any of the warnings and instructions
23 is the placement of that warning label on
24 the seat, true?
25 A.    With regards to the application of

MSJ_JA000199

Transcript of Jarrett Waters
Conducted on February 7, 2024

15 (57 to 60)

---

**57**

1  that standard, yes.  The verbiage within the
2  **standard was not adhered to as far as where**
3  **the warning was positioned on the climbing**
4  **treestand.**
5      Q.    We'll get to that in a moment
6  because frankly, I think that you're
7  misreading the standard, but regardless of
8  that I'm asking you about the content.  You
9  don't have any criticisms of the content of
10 the warnings given by Summit whatsoever, do
11 you?
12     **A.    The content on the seat label?**
13     Q.    Or on the instruction manuals.
14     **A.    I feel like the content on the**
15 **seat label does not address some of specific**
16 **instructions that is highlighted within the**
17 **instruction manual, such as the inspection**
18 **of the cable stops within the cable bracket,**
19 **and I feel like the warning label doesn't**
20 **address the -- doesn't address and doesn't**
21 **instruct the user to avoid contact with the**
22 **QuickDraw retention spring through the use**
23 **of the product.**
24     Q.    Is that anywhere in Exhibit 3 of
25 your report anywhere?  What you just said

---

**58**

1  about the content, is that anywhere in this?
2      **A.    Page 23, the 2015 Summit Viper**
3  **failed to provide any additional safety**
4  **precautions that were feasible and**
5  **incorporated in the previous designs.**
6      Q.    You're talking about the hatch
7  cover, though?
8      **A.    Strike that.  Wrong paragraph.**
9      Q.    Maybe I can short circuit this,
10 but you're certainly welcome to go through
11 as I've read this multiple times and I
12 didn't see what you said about the content
13 anywhere in here.
14     **A.    Specifically referencing the seat**
15 **label.  I believe I do address in the report**
16 **that there is no warning against the user**
17 **inadvertently placing their hand or engaging**
18 **the QuickDraw spring.**
19     Q.    I didn't see that in there either.
20 So I just -- I don't see it in your report
21 so let's go on.  Is there anything else
22 that's not in your report that you need to
23 add?
24     **A.    Not that I'm aware of.**
25     Q.    Now, let's go back for a second

---

**59**

1  and talk a little bit about your opinion
2  that you're saying this doesn't need any
3  more additions.  You have no opinions about
4  manufacturing defects whatsoever, right?
5      **A.    Manufacturing defect.**
6      Q.    In other words, you're not
7  claiming that the product wasn't
8  manufactured in accordance with the design
9  drawings, right?
10     **A.    That's correct.**
11     Q.    Incidentally, the 2002 Viper, how
12 many of those did you personally own?
13     **A.    I have two that I possess.**
14     Q.    And have you used those in
15 hunting?
16     **A.    I have.**
17     Q.    How long have you used those in
18 hunting?
19     **A.    I probably have not used them in**
20 **the last ten years.  But I used them from**
21 **the time of their acquisition or purchase up**
22 **until that point.  So that would be --**
23     Q.    About 12 years.
24     **A.    Yeah.**
25     Q.    Did you use them regularly?

---

**60**

1      **A.    They would be used multiple times**
2  **during the hunting season.**
3      Q.    Were they your go-to climbing
4  stand?
5      **A.    As far as a climbing stand went**
6  **they would be interchanged with the**
7  **Treewalker that's discussed in my report.**
8  **But a fixed position stand is often my go-to**
9  **selection.**
10     Q.    That's why I asked about climbing
11 stands.  Were they mainly, those two and the
12 Treewalker stand were your go-to climbing
13 stands; is that right?
14     **A.    Those are the only climbing stands**
15 **that I possess.**
16     Q.    And you used them about a dozen
17 years; is that right?
18     **A.    Correct.**
19     Q.    At any point in time did you have
20 any problems with those stands?
21     **A.    None that I recall.**
22     Q.    Any point in time did the cable
23 come out on those stands at all?
24     **A.    I did not ever have a cable**
25 **detach.  It should be noted that those did**

---

MSJ_JA000200

Transcript of Jarrett Waters
Conducted on February 7, 2024

61

1  include the safety covers that allowed me to
2  verify that the cable was properly
3  positioned within the cable bracket.
4      Q.   And did those stands have the
5  warning label in the same location?
6      A.   They do have the warning label
7  sewn into the seat, correct.
8      Q.   So you know that the warning
9  labels have been used in that area for
10 Summit Treestands since -- at least 22
11 years?
12     A.   That sounds correct.
13     Q.   Now, I don't know that you have
14 any expert opinion about treestand safety.
15 I didn't see any.  Do you have any?
16     A.   Do I have any expert opinions
17 regarding treestand safety?
18     Q.   Yes.
19     A.   None that I'm offering, no.
20     Q.   You're not offering any opinions
21 about materials, in other words, different
22 materials should have been used by Summit?
23     A.   Materials in the sense of the raw
24 material, no, I'm not offering that
25 different raw materials should have been

62

1  used.  I do offer suggestions of alternate
2  designs that would include different
3  materials or more material, but as far as
4  the raw material goes or components
5  selected.
6      Q.   I'm talking about there is a whole
7  component of engineering called material
8  engineering and part of what they do is
9  discuss the selection of the materials, in
10 other words, if it's stainless steel or
11 aluminum or steel or what grade of steel, et
12 cetera.
13     A.   Correct.
14     Q.   You don't have any opinions with
15 regard to the type of materials used in this
16 product?
17     A.   I do not.
18     Q.   I noticed that there is no
19 discussion whatsoever in your report about
20 the Summit safety harness that came in the
21 stand; is that true?
22     A.   I do not discuss that in my
23 report, no.
24     Q.   Have you ever seen it?
25     A.   Have I ever seen a provided Summit

63

1  harness or Mr. -- or the tree -- sorry.
2      Q.   The actual harness that came with
3  this stand.
4      A.   I have not seen a harness that
5  came with this specific -- Mr. Vandine's
6  subject treestand.
7      Q.   Have you seen any harness owned by
8  Mr. Vandine?
9      A.   I don't believe a harness was
10 provided at the time of the inspection.
11     Q.   When you first received your
12 Summit Viper in 2002 it came with a harness,
13 right?
14     A.   It likely did.
15     Q.   And did you use that harness?
16     A.   I have never used a harness that
17 was provided by the treestand manufacturer.
18 I've always purchased aftermarket harnesses.
19     Q.   I notice that one of the ones that
20 you purchased was Hunter Safety Systems, is
21 it X-1; is that right?
22     A.   That's correct.
23     Q.   What did you use before that?
24     A.   I've had several variations or
25 versions of the Hunter Safety Systems X-1.

64

1  And those have been my primary harness, I
2  believe, over the last 10, 15 years.
3      Q.   Do those come in a package that
4  had a DVD in it?
5      A.   I believe so.
6      Q.   Written instructions and warnings,
7  right?
8      A.   I believe so.
9      Q.   Those came with instructions and
10 warnings that were also sewn into the
11 labels, right?
12     A.   There are warnings and
13 instructions and expiration dates sewn into
14 some of the labels, yes.
15     Q.   You didn't have any problem
16 reading those or looking at those, right?
17     A.   With the specific ones I have
18 received, no.  I have seen wear and
19 degradation over those labels over time, and
20 then subsequently frustration as a consumer
21 of products, in an attempt to stay with the
22 expiration dates provided on the harnesses.
23 I would purchase a harness and its
24 manufacturing date would already be two or
25 three years in the past, and could be a

Transcript of Jarrett Waters
Conducted on February 7, 2024

---

65

1 frustration to the consumer as multiple
2 years have already been removed from the
3 serviceable life of that harness.
4     Q.   Certainly you know you could call
5 Hunter Safety System, provide them with your
6 date of purchase, and they would extend that
7 out for you?
8     A.   I'm not aware of that.
9     Q.   You didn't try that on any of your
10 Hunter Safety System harness?
11    A.   No.
12    Q.   On the Summit Treestands you
13 purchased, they also came with written
14 instructions and warnings, did they not?
15        MR. DARIA:  Objection to the
16 form.
17        THE WITNESS:  I would --
18        MR. SUTTON:  Let me rephrase
19 that.
20 BY MR. SUTTON:
21    Q.   The Summit Treestands that you
22 owned did they also come with instructions
23 and warnings?
24        MR. DARIA:  Same objection.
25 Barry, not to interrupt, I think his

---

66

1 testimony was he tested it.  I don't
2 believe he purchased it.
3        MR. SUTTON:  We're going to get
4 into that in a second.
5        MR. DARIA:  That's my objection.
6        THE WITNESS:  So, the treestands
7 were received as a gift and already
8 unpacked from the original packaging and I
9 don't recall what the contents of the
10 original packaging was at the time.
11 I will offer that it is likely
12 that they included warnings and
13 instructions, but I do not recall whether
14 those specific treestands included those.
15 BY MR. SUTTON:
16    Q.   Would you have read them before
17 you used the product?
18    A.   I don't know if I would have read
19 the entirety of the warnings.  I do recall
20 watching a DVD at the time.  And if I
21 remember correctly, that DVD content has not
22 changed much over the subsequent years.
23    Q.   At the time in 2002, Summit was
24 providing a DVD which was basically just
25 Summit itself showing you how to use its

---

67

1 product, right?
2     A.   It's been a long time ago, I don't
3 know if I recall exactly which product video
4 I watched.
5     Q.   Okay.  And did you watch the video
6 that was co-packaged with this stand?
7     A.   With Mr. Vandine's stand?
8     Q.   Yes.
9     A.   That DVD was not provided to me to
10 watch.
11    Q.   Okay.  Are you aware of whether or
12 not it includes both the National Bow Hunter
13 Education Foundation video and Summit video
14 showing how to use the product?
15    A.   I am not aware one way or the
16 other.
17    Q.   You have no opinions based upon
18 your report by review of any violation of
19 any express warranty, true?
20    A.   Would you mind defining express
21 warranty.
22    Q.   You know what an express warranty
23 is, don't you?
24    A.   I understand what a warranty is,
25 but I'm not sure if I understand express

---

68

1 warranty.
2     Q.   Express warranty is a warranty
3 given to somebody in writing, that says hey,
4 we're going to warrant this for a period,
5 one, two, five years or whatever.  You have
6 no opinions whatever, I didn't see addressed
7 anywhere, about any violation of any express
8 warranty?
9     A.   I have no opinions regarding the
10 warranty in that report.
11    Q.   What about implied warranty?
12    A.   I believe my opinions may relate
13 to implied warranty.  Mr. Vandine believed
14 and relied upon his stand to be safe and
15 followed what he believed were the
16 appropriate measures to inspect and ensure
17 that the cable assembly was properly secured
18 and the design inherently allowed him to be
19 misled and position the cable stop in a
20 manner that may not fully support his
21 climbing of the treestand.
22        Then additionally, the warnings
23 and the design of the treestand had the
24 ability for a climber to grasp and engage
25 and disengage which Summit refers to as a

---

MSJ_JA000202

Transcript of Jarrett Waters
Conducted on February 7, 2024

---

69

1  safety locking device.
2  Q.    Anything else?
3  A.    Not regarding that.
4        MR. SUTTON:  This is a great
5  time for a quick break, if you don't mind.
6        - - -
7        (Recess.)
8        - - -
9        MR. SUTTON:  All right.  We're
10 back on the record.
11       - - -
12       EXAMINATION (Cont'd)
13       - - -
14 BY MR. SUTTON:
15 Q.    Let's delve a little bit into your
16 background here.  It appears that you -- you
17 prepared a C.V.; is that right?
18 A.    Correct.
19 Q.    And you listed in your
20 professional competency as manufacturing --
21 or, oh, I'm sorry, as a mechanical engineer
22 who investigates vehicle and tractor trailer
23 accidents -- true?
24 A.    Correct.
25 Q.    -- vehicle systems and component

---

70

1  failures -- true?
2  A.    Correct.
3  Q.    -- industrial workplace
4  accident -- true?
5  A.    Correct.
6  Q.    -- agricultural vehicle and
7  implemented accidents -- true?
8  A.    Yes.
9  Q.    -- and generically product defect
10 and failures -- true?
11 A.    Correct.
12 Q.    You don't list any type of hunting
13 products in there, do you?
14 A.    I do not specifically list hunting
15 products, however hunting products like
16 other products can be investigated in
17 similar manners, and the same manners and
18 techniques that I would use in an automobile
19 reconstruction or in an auto investigation
20 applied to the investigation and analysis of
21 multiple products including treestands.
22 Q.    I'm just reading from your C.V.,
23 and it's a very easy question.  You don't
24 list any hunting products as being a
25 professional competency, true?

---

71

1  A.    I do not specifically list hunting
2  products, correct.
3  Q.    In addition, you list some product
4  design -- product design engineering with
5  certain expertise and you also don't list
6  any hunting products, true?
7  A.    That's correct.
8  Q.    It appears from my review of your
9  C.V. that you've worked at Wolf Technologies
10 since about 2018; is that right?
11 A.    Wolf Technical Services, yes,
12 2018.
13 Q.    I keep call it technologies, I
14 apologize.  Okay?
15 A.    Wolf is fine.
16 Q.    And this is the first treestand
17 case in which you've testified as an expert;
18 is that right?
19 A.    That is correct.
20 Q.    Now, I know you've reviewed or
21 co-signed other reports for Wolf Technical
22 Services, right?
23 A.    That is correct.
24 Q.    Do you know how many?
25 A.    I do not have a specific number.

---

72

1  I believe it's likely in the neighborhood of
2  three to six.
3  Q.    Well, I asked you to bring those
4  reports with you, and I got a -- an
5  objection based upon not being limited to
6  the time.  Is that something that you could
7  look up?
8  A.    I cannot currently look that up.
9  As we sit here, I don't have access to that
10 information.
11 Q.    I'm not saying that you have to do
12 it right here as we sit here today, I'm
13 asking if you could go back to Wolf and look
14 it up?
15 A.    I could likely determine how many
16 reports I've technically reviewed or
17 assisted in the testing for.
18 Q.    I know, for instance, of several,
19 so, I know that there with us a Lucien Lee
20 case; do you recall that?
21 A.    I do not recall the matter name.
22 If you tell me a -- a product and a
23 complaint I might be able to remember.
24 Q.    Millennium Outdoors?
25 A.    It's still not ringing a bell.

---

Transcript of Jarrett Waters
Conducted on February 7, 2024

---

73

1    Q.    There was a -- there was three
2  cases against Alliance Outdoor products for
3  Walker, Clayton, and Edwards.  Do you
4  remember those?
5    **A.    I do recall those.**
6    Q.    Any other ones that you can
7  recall?
8    **A.    There is an ongoing case that we**
9  **just received, however, I do not know the**
10 **status of any filing.  It's strictly a**
11 **consulting analysis at this point.**
12   Q.    Do you know what the manufacturer
13 is?
14   **A.    I don't know if I'm allowed to**
15 **discuss that.  I would have to discuss that**
16 **with the client that retained us first.**
17   Q.    Is it Summit?
18   **A.    It is not Summit.**
19   Q.    It looks like previous to working
20 at Wolf Technologies you worked at a company
21 called Ring-Co, LLC; is that correct?
22   **A.    That's correct.**
23   Q.    And this was the design of an
24 off-road on-road terminal tract system?
25   **A.    There was -- there were a couple**

---

74

1  **of designs that I worked on through my time**
2  **with Ring-Co.  One was the licensing of**
3  **manufacture of an on-road off-road terminal**
4  **tractor, terminal truck.  It's the -- kind**
5  **of described it as the half cab semi used to**
6  **move trailers around warehouses.  Also while**
7  **at my time at Ring-Co developed and built,**
8  **prototype, a mobile utility tract chair.**
9    Q.    What was your reason for leaving
10 Ring-Co?
11   **A.    I did assist in cofounding that**
12 **company, and the cofounders and I as a group**
13 **were going different directions, and I chose**
14 **to walk away.**
15   Q.    Did you have an ownership
16 interest?
17   **A.    I did.**
18   Q.    Did you tender that back?
19   **A.    I walked away from it.**
20   Q.    Were you terminated?
21   **A.    I was not.**
22   Q.    Were you asked to leave?
23   **A.    I was not.**
24   Q.    Who were the other individuals
25 involved in Ring-Co?

---

75

1    **A.    Chad and Trisha Ringer were the**
2  **other individuals.**
3    Q.    Prior to that, it looks like, or
4  maybe at the same time it looks like you
5  also worked at Smart Guided Systems in
6  Columbus, Indiana?
7    **A.    Yes, there is overlap in the --**
8  **Smart Guided Systems was the application and**
9  **integration of GPS guidance to turf care**
10 **products.  Essentially auto steer for low**
11 **tech lawnmowers.**
12   Q.    Neither Ring-Co nor Smart Guidance
13 Systems had anything to do with the hunting
14 field, true?
15   **A.    That is correct.**
16   Q.    Prior to that it looks like out of
17 school you worked for a company called
18 Equipment Technologies, Inc?
19   **A.    That's correct.**
20   Q.    What did you do there?
21   **A.    Designed mobile agricultural field**
22 **sprayers.  I was responsible for designs of**
23 **suspension systems, cab integration, user**
24 **interfaces regarding warning applications,**
25 **instruction manuals under the gamut of**

---

76

1  **engineering for a mobile off-road product.**
2    Q.    Again, nothing to do with hunting,
3  right?
4    **A.    Nothing to do with hunting.**
5    Q.    Have you ever been involved in
6  design of a hunting product?
7    **A.    No, I have not.**
8    Q.    Have you ever been involved in the
9  design of a treestand product of any type?
10   **A.    I have not.**
11   Q.    Have you ever worked for or a
12 treestand manufacturer?
13   **A.    I have not.**
14   Q.    Have you ever worked for a
15 treestand testing firm?
16   **A.    (No audible response.)**
17   Q.    By that I mean a firm that
18 specialized in testing treestands under ATSM
19 standards.
20   **A.    I have not.**
21   Q.    I saw the look on your face
22 because I'm sure Wolf Technologies -- I keep
23 saying Technologies, Technical Company has
24 tested treestands before, right?
25   **A.    That's correct.**

---

MSJ_JA000204

Transcript of Jarrett Waters
Conducted on February 7, 2024

77

1    Q.    And, in fact, in some of these
2    other cases -- and you said you assisted on
3    the testing, you actually did physical, you
4    know, load tests and other types of tests,
5    et cetera in those cases, right?
6    **A.    That's correct.**
7    Q.    And in those cases, those other
8    cases that you assisted on, they were
9    involving something in which a -- the
10   product actually broke in some way, right?
11   **A.    Yes.  There was a broken component**
12   **that led to a fall or an incident that**
13   **allowed the treestand to disengage from the**
14   **tree.**
15   Q.    And that differs in this point
16   where you're just saying that the design
17   should have changed because nothing failed
18   on this particular stand, right?
19   **A.    That's correct.  There is no**
20   **evidence of a broken component.  And the**
21   **opinions I offer are primarily design based**
22   **opinions, and design selection that should**
23   **be considered by designers of products,**
24   **regardless of whether it's a treestand or a**
25   **mobile piece of off-road equipment.**

78

1    Q.    You said you were a hunter, right?
2    **A.    That's correct.**
3    Q.    Bow hunter or rifle or both?
4    **A.    I try to stick to archery as much**
5    **as I can, but I hunt the available season.**
6    Q.    You usually hunt from elevation?
7    **A.    During archery season, yes.**
8    Q.    When was the last time you hunted
9    from elevation?
10   **A.    January 6th or 7th.  Near the**
11   **last -- end of our late archery season in**
12   **Indiana.**
13   Q.    What treestands do you own?
14   **A.    I do not have an inventoried list**
15   **of our fixed position -- or my fixed**
16   **position treestands.  I do know a lot of**
17   **them are Gorilla treestands.  And there is**
18   **one -- I apologize, I'm trying to remember**
19   **what labels look like.  There is a Hawk**
20   **fixed position treestand, and a Big Game**
21   **fixed position treestand.**
22   Q.    Were these all purchased in the
23   last ten years?
24   **A.    Some of them were.**
25   Q.    Your Gorilla stands are probably a

79

1    lot older than that.
2    **A.    That's correct.**
3    Q.    How long do you leave -- are these
4    all fixed position stands?
5    **A.    They are fixed position stands.**
6    Q.    And how long do you leave them in
7    the tree?
8    **A.    Typically the duration of the**
9    **season.**
10   Q.    Do you take them down at the end
11   of the season?
12   **A.    Yes.**
13   Q.    Are any stands still up in the
14   trees now?
15   **A.    There are several stands that are**
16   **still up in the tree that were installed**
17   **late in the season.**
18   Q.    The season is over in Indiana, is
19   it not?
20   **A.    That's correct.**
21   Q.    What is the longest time you've
22   kept a fixed position treestand in a tree?
23   **A.    I do not have a specific number.**
24   Q.    Did you purchase all of these
25   treestands new?

80

1    **A.    There is a combination of**
2    **acquired, whether it be gifts handed down or**
3    **whether they be purchased treestands, but**
4    **they were all new when we -- I'm saying my**
5    **family acquired them, yes.**
6    Q.    In all of the new ones that you
7    acquired, did they all come with harnesses?
8    **A.    To my knowledge, yes.**
9    Q.    Because they are fixed position
10   stands they also came with lineman's
11   climbing belt, true?
12   **A.    Lineman's climbing belt, is that**
13   **what you're referring to?**
14   Q.    Yes.
15   Q.    Yes.
16   Q.    And they also likely all came with
17   DVDs, true?
18   **A.    Likely did.**
19   Q.    And they also came with written
20   instructions and warnings, right?
21   **A.    Yes.**
22   Q.    And those detailed the safety use
23   of the stands and the safety use of
24   harnesses, right?
25   **A.    I would assume they did.**

MSJ_JA000205

Transcript of Jarrett Waters
Conducted on February 7, 2024

81

1    Q.    Now, Gorilla Treestands had some
2    warning labels that were sewn into some of
3    its equipment; are you aware of that?
4    **A.    I do not recall.**
5    Q.    For instance, all of its warning
6    labels that were on a tree strap, any type
7    of tree strap or attachment strap to the
8    tree would have been sewn into that; are you
9    aware of that?
10   **A.    That sounds consistent with what**
11   **I've seen.**
12   Q.    Okay.  Now, when was the last time
13   of you used a Summit treestand?
14   **A.    Probably well over ten years, the**
15   **last time when one of the climbing**
16   **treestands was utilized.**
17   Q.    When did you take hunter safety?
18   **A.    2000.**
19   Q.    Are you a certified hunter safety
20   instructor?
21   **A.    I am not a certified instructor.**
22   Q.    Have you ever worked at all inside
23   the treestand industry?
24   **A.    Not inside the treestand industry.**
25   Q.    What about the hunting or archery

82

1    industry?
2    **A.    No, I have not.**
3    Q.    Have you ever worked for a
4    distributor or retailer of hunting products?
5    **A.    I have not.**
6    Q.    Same is true of treestands; is it
7    not?
8    **A.    That's correct.**
9    Q.    Prior to this case, have you ever
10   designed any components for a treestand?
11   **A.    I have not.**
12   Q.    Part of this case did you ever
13   design any components for any hunting
14   product?
15   **A.    I have not.**
16   Q.    Do you hold yourself out as an
17   accident reconstructionist?
18   **A.    I do.**
19   Q.    Did you perform an accident
20   reconstruction in this case?
21   **A.    In this case I analyzed all of the**
22   **-- and reviewed all of the provided**
23   **materials, incident reports, inspected the**
24   **available evidence, performed testing and**
25   **performed an analysis on those components.**

83

1    **All those things are consistent with**
2    **accident reconstruction and the techniques**
3    **used within that field.**
4    Q.    Well, I mean, I don't want to get
5    too into the weeds of it, but you said you
6    were involved in some auto cases, correct?
7    **A.    That's correct.**
8    Q.    And in auto cases people do full
9    accident reconstructions.  They lay out the
10   scene.  They take measurements at the scene.
11   They explain exactly how the accident
12   happened, including the speeds of the
13   vehicle, the directions of the vehicles,
14   et cetera.  And that's not something that
15   you've done, that type of analysis in this
16   case, right?
17   MR. DARIA:  Objection to the
18   form.
19   THE WITNESS:  I have inspected
20   the scene.  I have taken measurements at
21   the scene.  I have analyzed the available
22   materials, and I have provided two
23   different scenarios that are most
24   consistent with the evidence on how the
25   climbing cable disconnected from the

84

1    treestand resulting in Mr. Vandine's fall.
2    BY MR. DARIA:
3    Q.    Let's talk a little bit about that
4    for a second.  First, back to my question
5    was:  You have not, other than what's in
6    your report, or generally what you just
7    testified to, you did not prepare a formal
8    accident reconstruction as would be prepared
9    in like an auto case, right?
10   **A.    In the sense of two vehicles**
11   **coming together, and initial and exit**
12   **velocities, no, there is not an accident**
13   **reconstruction in that sense.**
14   Q.    And is the evidence that you've
15   reviewed contained in the file materials
16   that were provided to me?
17   **A.    Yes.**
18   Q.    As well as your own physical view
19   and inspections of this product?
20   **A.    Yes.**
21   Q.    Some of which are represented in
22   your photographs that you took, right?
23   **A.    Yes.**
24   Q.    You also went to the scene, right?
25   **A.    That's correct.**

MSJ_JA000206

Transcript of Jarrett Waters
Conducted on February 7, 2024

---

85

1    Q.    Did you review the video portion
2    of Mr. Vandine's dep?
3    **A.    I did not.**
4    Q.    Did you see it referenced in the
5    deposition that it was being videoed?
6    **A.    I believe the initial front page**
7    **of the transcript said something about a**
8    **video deposition, but I was only provided**
9    **and only reviewed the written transcript.**
10    Q.    Did you ask for a copy of the
11    video transcript?
12    **A.    I did not.**
13    Q.    You could tell by reading through
14    that transcript that there were portions in
15    which he was showing the camera how he was
16    operating in the treestand, right?
17    **A.    That would be consistent with some**
18    **of the parenthal [ph] indicating comments**
19    **within the transcript, yes.**
20    Q.    You made some comments about
21    inadvertent touching or contact with the
22    QuickDraw trigger, right?
23    **A.    That's correct.**
24    Q.    Do you recall one way or the other
25    whether he said or showed where he would

---

86

1    hold the stand or was holding it right
2    before the accident?
3    **A.    I recall how he stated how he**
4    **would climb.  He would climb a little**
5    **different than a hunter that might sit on**
6    **the back bar while they're climbing.**
7    **He described climbing with his**
8    **elbows on some of the upright bar, which**
9    **would place his hands more towards the**
10    **general area of those QuickDraw springs, but**
11    **I do not know whether -- and I don't believe**
12    **he says anything regarding contact or no**
13    **contact with those springs.**
14    Q.    You don't recall him on the record
15    saying, "I was holding the stand right
16    here," and pointing to a section of the
17    stand?
18    **A.    That -- I could -- I'd have to**
19    **look back exactly at the transcript, but**
20    **that sounds consistent with what he said.**
21    Q.    And that would be something that
22    was important for somebody that's trying to
23    determine the cause of this event, true?
24    **A.    It would be a component of it,**
25    **yes.**

---

87

1    Q.    Because if he's showing the
2    location of the stand, where his hand is not
3    touching the trigger, that rules out one of
4    your theories, right?
5    **A.    At that time that he's**
6    **demonstrating where his hand was, yes, it**
7    **would be difficult -- if it is not**
8    **contacting the QuickDraw spring it would be**
9    **difficult for him to inadvertently disengage**
10    **that.**
11    **I think it is important to note**
12    **that while Mr. Vandine's specific case**
13    **conclude a disconnection of the cable there**
14    **are two theories that are presented.  One**
15    **is -- one is consistent with the material**
16    **deformation that we see on the endboard face**
17    **of the keyway and that's that the cable was**
18    **partially inserted or installed into the**
19    **cable bracket.**
20    **The second is that the -- in a**
21    **relative sense of the design of Summit**
22    **Treestands that the -- and including Summit**
23    **marketing materials and instructions,**
24    **include hunters inadvertently or**
25    **intentionally grasping the QuickDraw**

---

88

1    **springs, which may or may not disengage or**
2    **further engage those QuickDraw springs.**
3    Q.    Those are your two hypothesis of
4    what potentially could happen, right?
5    **A.    Regarding the cable disconnecting**
6    **from the stand, yes.**
7    Q.    But in this case as you say the
8    physical evidence is consistent with him
9    having it partially inserted at the time of
10    the incident, right?
11    **A.    That's correct.**
12    Q.    So the physical evidence support a
13    conclusion that he had partially reinserted
14    it when he moved it above a limb, true?
15    **A.    The physical evidence shows that**
16    **the -- is consistent with the cable being**
17    **partially inserted into the keyway.**
18    Q.    Now, in addition to the physical
19    evidence being consistent with that, do you
20    recall in his deposition, wherein he says,
21    "I moved it above the limb"?
22    **A.    "It" being?**
23    Q.    Moved the upper portion of the
24    treestand above the limb?
25    **A.    Okay.**

---

MSJ_JA000207

Transcript of Jarrett Waters
Conducted on February 7, 2024

89

1    Q.    "I reattached it"?
2    A.    **Correct.**
3    Q.    And there was a bunch of
4    discussion about reattaching it and how he
5    did it?
6    A.    **Correct.**
7    Q.    And he showed it on the video,
8    right?
9    A.    **Okay.**
10   Q.    When you say "okay," you're not
11   really answering, but you're not disagreeing
12   with me --
13   A.    **I have not reviewed the video of**
14   **his deposition.**
15   Q.    Fair enough.  So, in any event, he
16   says in his deposition, that "After I had
17   moved it, I did not move" -- "above it and
18   attached the cable into the cable bracket, I
19   did not move it again, when the accident
20   happened," right?
21   A.    **I believe his testimony is**
22   **inconsistent.  And there are some paragraphs**
23   **above that he does make a statement that he**
24   **says, "I move it," or "I will."  I don't**
25   **want to quote him verbatim without looking**

90

1    **at the transcript.**
2        **There is a section that could be**
3    **conceived that he moved the upper treestand**
4    **prior to applying his weight to it.**
5    Q.    Well, we went through that at
6    length in his deposition.  And in fact, his
7    testimony was on page 179 of his dep:
8        "QUESTION:  Between the time that
9    you placed the cable back into the bracket
10   and the time the accident occurred, you had
11   not made any significant movements to the
12   upper portion of the stand, right?"
13       "ANSWER:  No."
14       "QUESTION:  When you put it on the
15   stand, and when you put -- put the cable, it
16   was in position above the limb already for
17   you to make the next climb to the platform?"
18       "ANSWER:  Correct."
19       "QUESTION:  You didn't have to
20   move it at all, right?  You just leaned at
21   it."
22       "ANSWER:  To start that climb?
23       "QUESTION:  Yes."
24       "ANSWER:  I was stretched --
25   stretched out as far as I could.  So that I

91

1    could, instead of making little steps, I
2    stretched out as far as I could, underneath
3    my armpits and rest my weight on it to bring
4    my feet up."
5        "QUESTION:  But you hadn't moved
6    it?"
7        "ANSWER:  I hadn't moved it, no."
8    A.    **I agree with what you're reading**
9    **there.  That is one of the areas that he**
10   **discussed that.  Previously in there, and if**
11   **you'll allow me I'll find -- I can find the**
12   **words in my notes.  I would highlight where**
13   **some of his comments make that inconsistent.**
14   Q.    Okay.  Well, first of all, let's
15   talk about this.
16   A.    **Okay.**
17   Q.    These comments that he didn't move
18   it at all before the stand [sic] occurred,
19   right -- the incident occurred.
20   A.    **That you just read to me, yes.**
21   Q.    Okay.  And so if we take him at
22   his word in his deposition that he had moved
23   it above the limb --
24   A.    **Okay.**
25   Q.    -- and was in the process of

92

1    loading it so he could pick his feet up to
2    move the platform when the accident
3    occurred; then at that point in time the
4    cables are actually moving further into
5    engagement towards the tree, right?
6    A.    **Should the cables have been**
7    **properly inserted that movement would drive**
8    **the cable stop further into the bracket.**
9    Q.    And that means that your second
10   theory that there was inadvertent actuation
11   of the trigger along with movement of the
12   upper portion of the stand, would somehow
13   disengage the cable assembly would not be
14   applicable in this case, true?
15   A.    **If he does not move the stand from**
16   **the position where he buckled -- "buckled,"**
17   **he uses that word, installed the cable stop**
18   **into bracket, the inadvertent contact with**
19   **the QuickDraw spring likely does not apply**
20   **to this scenario.**
21       **I will say that Summit warned that**
22   **any mispositioning of the QuickDraw spring**
23   **is a hazard and warns that it may cause the**
24   **user to fall.  It includes pictures in**
25   **there, in the instruction manual which**

MSJ_JA000208

Transcript of Jarrett Waters

Conducted on February 7, 2024

93

1  Mr. Vandine testified that he was -- he did
2  not review, but it -- it provides
3  information that says that if the QuickDraw
4  should be out of position that the condition
5  is dangerous and at any time it could cause
6  the user to fall.
7      Q.   Okay.  But my question is you gave
8  two accident scenarios.  One, he takes the
9  treestand, climbs up to the tree -- climbs
10 up the tree, gets to the limb, removes the
11 cable from the upper portion, puts it around
12 the tree all while holding the stand,
13 attempts to put it back in the cable
14 bracket.  Doesn't put it fully back in the
15 cable bracket, attempts to load it and it
16 comes out.  That's one scenario, right?
17     A.   Correct.
18     Q.   And then there is a second
19 scenario that you gave in which he does all
20 of that, but then is in the process of
21 moving the upper portion of the stand in a
22 way that he inadvertently actuates the
23 trigger, the cable somehow becomes attached
24 to the back of the tree and he picks up that
25 upper portion of the stand so that the cable

94

1  moves out and then comes out, right?
2      A.   Yes, that is the second.
3      Q.   And there is nothing in the
4  testimony that suggested he was touching the
5  trigger assembly at the time of the
6  accident, right?
7      A.   Based on the transcript there is
8  nothing that discusses that.
9      Q.   And, in fact, he shows me on the
10 record, he says, "I was holding right here,"
11 and he points at a point that's not on the
12 trigger assembly; are you aware of that?
13     A.   I have not reviewed that video.
14     Q.   Do you recall him testifying that
15 his hand was right here?
16     A.   Without looking at the exact words
17 it sounds like something he would have said.
18     Q.   Okay.  Secondarily, after a person
19 has moved the treestand above a limb --
20     A.   Uh-huh.
21     Q.   -- and is as he describes I'm in
22 the process of now bringing the platform up,
23 there is no reason to now move the upper
24 portion of the stand, right?
25     A.   And that's what I'm referring to.

95

1  There is a section previously in his
2  transcript, that he says the words "I move
3  it," discussing the upper section of the
4  treestand.  That's where I'm getting the
5  inconsistencies in whether he did or did not
6  move it.
7      Q.   Okay.  But that's not my question.
8  So if you listen to my question --
9      A.   Please repeat your question then.
10     Q.   He's in the process of moving the
11 upper portion above the tree -- above the
12 limb, right?
13     A.   I believe he describes it, he just
14 moves the cable around the limb.
15     Q.   Oh.  In order to move the cable
16 around the limb you've got to kind of move
17 the upper portion above the limb, right?
18     A.   The upper portion could be
19 positioned at the limb, I guess.
20     Q.   So he's moved it up to that
21 location.  He says, "I don't move the
22 platform.  I don't take the platform out
23 above the limb," right?
24     A.   Correct.
25     Q.   And when the accident occurred he

96

1  says, "I'm in the process of trying to move
2  the platform up," right?
3      A.   When the disconnection occurs,
4  yes.
5      Q.   Okay.  And if he's in the process
6  of moving the platform up, he's not moving
7  the upper portion of the stand, right?
8      A.   At that time, correct.
9      Q.   So when his testimony is, "I'm in
10 the process of moving the platform," you
11 agree with me he's not moving the upper
12 portion of the stand because that's how you
13 use these, right?
14     A.   That's correct.
15     Q.   And that's how you have used these
16 in the 12 years you've used these, right?
17     A.   That's correct.
18     Q.   So based upon that testimony, we
19 can deduce that your second theory that
20 there is inadvertent actuation of the
21 trigger assembly is inconsistent with his
22 testimony, right?
23          MR. DARIA:  Objection to the
24 form.
25          THE WITNESS:  There is

MSJ_JA000209

Transcript of Jarrett Waters
Conducted on February 7, 2024

97

1  inconsistencies on whether he adjusted the
2  top of the stand after he believed he
3  buckled, or positioned the cable stop
4  within the cable bracket.
5  BY MR. SUTTON:
6    Q.    Well, setting aside these
7  inconsistencies which we'll get to in a
8  moment, his testimony was clear, that "I was
9  in the process of beginning to move the
10 platform when the accident occurred," right?
11   **A.    Correct.**
12   Q.    And that by itself, regardless of
13 what inconsistencies you think exist, that
14 by itself with your experience using a Viper
15 product you know that he was not moving the
16 upper portion of the stand, right?
17   **A.    He was not moving the upper**
18 **portion of the stand when the cable**
19 **disconnected. If he had moved the upper**
20 **portion of the stand prior to loading his**
21 **weight onto the upper portion, and had**
22 **inadvertently contacted the spring the cable**
23 **could become mispositioned within that**
24 **bracket should the cable have hung up on the**
25 **back of the tree.**

98

1    Q.    Is there any testing that you've
2  done while using this stand that's been able
3  to duplicate that, in any way?
4    **A.    The testing provided in that video**
5  **shows that if there is contact with the --**
6    Q.    Hold on a second. Before we get
7  to the video which we've gone over, and
8  we'll get to more again. The video was not
9  you standing on the stand using the stand on
10 a tree, right?
11   **A.    Correct.**
12   Q.    And the cable is nailed to the
13 back of the tree in that video, right?
14   **A.    It is adhered to the back of the**
15 **tree.**
16   Q.    I'm asking about any testing on an
17 actual tree in which you've been able to be
18 duplicate that.
19   **A.    I -- no.**
20   Q.    While the product is in use?
21   **A.    Correct.**
22   Q.    So, Mr. Vandine goes on to say on
23 page 180:
24     "QUESTION: ... let me finish and
25 you can sit down. You hadn't moved it

99

1  between the time you put the cable in the
2  cable bracket and the time the accident
3  occurred; right?"
4      "ANSWER: I did not move the --"
5      "QUESTION: The upper portion of
6  the stand?"
7      "ANSWER: No. I just -- it
8  depends on what you're calling move. I
9  mean, I put the cable around. I got it
10 right where I wanted to climb. It might
11 have been above, you know, this won't go
12 directly between the limb, this right here,
13 this angle."
14     "So I had it a little bit above
15 me. I had to put it above that to get it up
16 there. And then I can't honestly recall
17 moving it."
18     "QUESTION: Maybe I'm not asking a
19 very good question. I think we're on the
20 same page. I think that you have to move it
21 above the limb. Put it in that location.
22 Then put the cable" upon. "Put the cable
23 in, right?"
24     "And then you test starting it,
25 and then you put it in, you look at it and

100

1  start testing it."
2      "ANSWER: I tested it. Put all my
3  weight on it. That's when it came
4  connected."
5      "QUESTION: In the time that you
6  had put the cable in and tested it and the
7  time the accident occurred you did not move
8  the upper portion of the stand. It was
9  already at that location. You're just
10 moving the bottom?"
11     "ANSWER: Bottom, right."
12     That's clearly unequivocally
13 testifying that he did not move the upper
14 portion after putting it in.
15   **A.    May I reference the transcript to**
16 **discuss those areas?**
17   Q.    My question is on that first and
18 then we'll get to the other areas.
19   **A.    What you read me, yes.**
20   Q.    That's what it clearly says under
21 oath, right?
22   **A.    That portion that you read me,**
23 **yes.**
24   Q.    Okay. Now, you said you have some
25 other testimony. What is your other

MSJ_JA000210

Transcript of Jarrett Waters
Conducted on February 7, 2024

101

1  testimony?
2  **A.    From his transcript, I believe**
3  **page 175:**
4  **        The question is, "What happened**
5  **next?"**
6      "ANSWER:  I tested it, pushed on
7  it so it's locked in, I'm ready to go, move
8  it up, went to put my weight on it to bring
9  my feet up, that's when it became
10  unbuckled."
11  Q.    Yes.  As I read that testimony in
12  conjunction with his other testimony, he's
13  talking I'm ready go, move it up meaning I'm
14  going to move up the platform.
15  **A.   I don't -- it's not clear whether**
16  **he moves it up or he plans to move it up via**
17  **that statement.**
18  Q.    Okay.  But later I come back,
19  several pages later and you can get the
20  testimony I just read in which he clearly
21  and unequivocally says I had not moved it, I
22  was in the process of moving the platform,
23  right?
24  **A.   Right.  I agree with what you're**
25  **telling me from that portion of it.  This is**

102

1  **why I'm saying there's inconsistencies on**
2  **whether he moved it or not.  And I believe**
3  **he references he doesn't even recall in some**
4  **of these statements.**
5  Q.    Okay.  Well, the statement that
6  you read he says, "I moved it," could be
7  read to mean he was getting ready to move
8  the platform up, right?
9  **A.   I agree it could be read that way.**
10  **It also could be read that he moved up the**
11  **seat portion of the stand.**
12  Q.    Okay.  But several pages later in
13  the testimony that I read to you, on pages
14  179 through 181, I clarify that.  And
15  shortly after giving that, within a minute
16  or two after that, he clarified that he was
17  talking about moving up the bottom, that he
18  had not moved the top, right?
19  **A.   He does in that section, yes.**
20  Q.    So if you read all the testimony
21  together in testimony that occurs within
22  like six pages of one another on the
23  transcript, so a few minutes in the
24  deposition, he clarifies I was in the
25  process of moving the platform up, right?

103

1  **A.    He clarifies it based on the**
2  **statement that you read me, yes.**
3  Q.    Now, is there any other evidence,
4  whatsoever, that you have physical or
5  otherwise that suggests that he
6  inadvertently actuated the trigger assembly
7  at the time of the accident?
8  **A.    There is no evidence I have that**
9  **he inadvertently actuated the trigger**
10  **assembly.**
11  Q.    And do you have any evidence,
12  physical or otherwise, that suggests he
13  contacted the QuickDraw trigger assembly at
14  all just before the accident, other than to
15  put it around the tree.
16  **A.   I don't have any evidence,**
17  **physical evidence, that I have seen that he**
18  **did or did not touch it.**
19  Q.    Or other evidence?
20  **A.   Or other evidence.**
21  Q.    Do you have any physical or other
22  evidence that you can point to that suggests
23  that the cable somehow was caught on the
24  backside of the tree or anywhere on the
25  tree?

104

1  **A.    No physical evidence, with this**
2  **particular case; however, that is a scenario**
3  **within the design that could happen, and it**
4  **is foreseeable that it may happen.**
5  Q.    I'm asking about evidence in this
6  case.  So you went out to the tree and you
7  looked at the tree.  Were there any pieces
8  of bark that were displaced or anything like
9  that that you took photographs of that can
10  point to suggest that that possibly happened
11  anything in this case?
12  **A.    Nothing specific, no.**
13  Q.    Is there any other evidence other
14  than your theory that this is a hypothetical
15  possibility that suggests it happened in
16  this case?
17  **A.   No other physical evidence.**
18  Q.    Okay.  Did you do any testing
19  while you were out there to determine
20  whether or not the bark was of the type that
21  could put enough load to push the cable
22  backwards, regardless of whether the trigger
23  assembly was pulled?
24  **A.   I did not.**
25  Q.    And you're a hunter so you know

MSJ_JA000211

Transcript of Jarrett Waters
Conducted on February 7, 2024

105

1 that trees have different type of barks.
2 Some of them have loose bark that will just
3 peel off rather than -- at -- a small amount
4 of force, right?
5 **A.    Trees have different barks.  Some**
6 **bark is more resilient than others and some**
7 **bark provides more of a snagging hazard than**
8 **other types of bark.**
9 Q.    There wasn't a nail or anything
10 else in the back of the tree that suggested
11 the cable was nailed to the back of the
12 tree, right?
13 **A.    I did not witness a nail in the**
14 **back of the tree.**
15 Q.    And there is nothing about his
16 testimony that suggested that he had
17 physically attached that cable to the tree
18 itself, other than to put it around the tree
19 to move above the limb, right?
20 **A.    That's correct.**
21 Q.    Was there any physical or other
22 evidence that suggested, as for instance you
23 show in your -- that video that you sent
24 last night, that he changed his grip in the
25 middle of the fall event, or in the middle

106

1 of the accident scenario?  You know what I
2 mean by that?  Your video you show that you
3 have to in order to get it to come out, you
4 have to change your grip and then push the
5 spring so you push the cable out, right?
6 **A.    That's correct.**
7 Q.    Is there any evidence whatsoever
8 physical or otherwise that you have, that
9 suggests that that happened in this case?
10 **A.    There is no physical evidence that**
11 **describes that inadvertent contact with the**
12 **QuickDraw spring or the reengagement of the**
13 **QuickDraw spring.**
14 Q.    Okay.  So now we've gone over your
15 two hypotheticals of what could occur.  You
16 have one that you say is consistent with the
17 physical evidence and is also consistent
18 with his testimony, which is he goes up to
19 the tree -- goes up the tree to the branch,
20 moves it around, doesn't put it all the way
21 back in, and then falls as a result, right?
22 **A.    The evidence is consistent with**
23 **the cable not being fully installed into the**
24 **bracket, and that being the root cause of**
25 **the disconnection of the stand from the**

107

1 **tree.**
2 Q.    Both the physical evidence and the
3 testimony would support that possibility as
4 being the cause, right?
5 **A.    Yes, they would support that**
6 **possibility.**
7 Q.    On the other hand, you have this
8 hypothetical that this cable can just come
9 out, of which you have no evidence to
10 support in this instance that occurring?
11 MR. DARIA:  Objection to the
12 form.
13 THE WITNESS:  Given
14 Mr. Vandine's inconsistencies in his
15 deposition there was evidence to support
16 that he may have moved the stand which
17 would be a key component of that
18 actuation.  Without reviewing the video
19 that you're referencing and where his hand
20 is "right here," I do not know, whether or
21 not that hand is in the position of the
22 QuickDraw spring, or entangled in the
23 QuickDraw spring.
24 BY MR. SUTTON:
25 Q.    We went through the aspects of the

108

1 second scenario that were needed, the cable
2 has to be caught somehow in the tree, right?
3 **A.    Or the cable can be of such a**
4 **shape that it no longer has any outward**
5 **force or flex back to wanting to return to**
6 **its natural shape.  If the legs of the U are**
7 **parallel, the cable may have a tendency to**
8 **slide axially without having any additional**
9 **snagging or force on the back of the cable.**
10 Q.    Okay.  So first of all, you looked
11 at the cable in this case and that's not the
12 case in this cable, right?
13 **A.    This cable is more U-shaped than**
14 **the other cables I have reviewed.**
15 Q.    But it still has an outward
16 component outside the diameter would be on
17 this particular stand and this tree?
18 **A.    The photographs represented in**
19 **Figure 10 of my report show the cable in its**
20 **resting position on the table and the legs**
21 **while not perfectly parallel are very**
22 **parallel in a U-shape as compared to the**
23 **cables photographed for Figure 29, on page**
24 **31 of my report.**
25 Q.    First of all, that wasn't my

MSJ_JA000212

Transcript of Jarrett Waters
Conducted on February 7, 2024

28 (109 to 112)

109

1  question.  My question is, this is still --
2  the diameter of this is still outside the
3  diameter of the two cable brackets.  In
4  other words, it's still got to have some
5  type of outward component, right?
6      A.    There is no measure of the leg
7  width, I guess.
8      Q.    You didn't measure it at all?
9      A.    I could scale this photo and
10 determine that, from --
11     Q.    That's not my question.  My
12 question is did you measure it?
13     A.    I did not measure that specific
14 distance on -- as these cables sat on the
15 table.
16     Q.    One of the things that you just
17 said to me is that one of the possibilities
18 is that cable is exactly aligned in such a
19 way that it has no outward component on it,
20 right?  That's one of the things you just
21 said to me, right?
22     A.    As the cable takes a more parallel
23 shape that outward component is reduced.
24     Q.    Okay.  But there is the still
25 force in gravity, right?

110

1      A.    Sure.
2      Q.    There's still friction resulting
3  from -- this particular cable has a polymer
4  coating on it, right?
5      A.    There may be some friction
6  interaction within the keyhole slot if the
7  legs are parallel, yes.
8      Q.    And you still have nothing acting
9  on the back of the tree so if you tilted
10 that treestand, it would still, as you
11 talked about earlier, the cable would move
12 out into space, right?
13     A.    Depending how you tilt the stand.
14 If you tilt the stand upward gravity is
15 going to want to drive those cables rearward
16 into the tree.
17     Q.    But there is a tree in between it,
18 right?
19     A.    Yes, but you can still get some
20 upward component to the cable.
21     Q.    There's also a branch that he's
22 just put it over the top which prevents you
23 from tilting it down, right?
24     A.    He describes the cables above the
25 branch at the time of the incident.

111

1      Q.    Did you do any testing to support
2  that.  You just threw this out.  Did you do
3  any testing to support this hypothesis?
4      A.    That if a cable takes a more
5  parallel shape that it has reduced
6  resistance against the cable bracket?
7      Q.    That potentially -- that is a
8  possibility in this case?
9      A.    The shape of the cable was
10 analyzed and -- as observed during the
11 inspections, and has a more parallel shape
12 than new and other previously used cables --
13     Q.    It's a simple question.  Did you
14 do any testing to determine that hypothesis
15 you just threw out as you sit here today?
16     A.    The testing I did showed that a
17 climbing cable used on a narrow diameter
18 tree has a tendency to take that shape more
19 so than a cable that is never loaded or that
20 a cable that is used on larger diameter
21 tree.  That was the extent of that testing.
22     Q.    Okay.  So the subject cable you
23 didn't measure to determine whether this is
24 outward competent; you didn't measure the
25 distance between the two cable brackets to

112

1  determine if that was possible; and you
2  didn't test whether this was possible on a
3  tree during use, right?
4      A.    Sure.
5      Q.    Okay.  Now, go back to my
6  question.  In the one hypothesis you throw
7  out you say there's physical evidence that
8  supports it and the testimony supports it,
9  right?
10     A.    Correct.
11     Q.    We went through the other
12 components of what has to happen for it to
13 come back, including inadvertent actuation
14 in two different directions on the cable, on
15 the QuickDraw spring, and you have no
16 evidence to support that happened, right?
17     A.    In this particular case, no.
18     Q.    And as a engineer and in applying
19 good engineering principles, when we're
20 confronted with a hypothesis of what could
21 possibly happen, theoretically, and physical
22 evidence showing that another hypothesis is
23 more likely to occur, the scientific method
24 suggests that the one that the physical
25 evidence matches is the one that applied,

MSJ_JA000213

Transcript of Jarrett Waters
Conducted on February 7, 2024

---

113

1  right?
2  **A.    I present them as two different**
3  **scenarios on how the cable may disconnect**
4  **from the cable bracket.**
5  Q.    And I get that you are saying that
6  there is two different hypothetical
7  scenarios of what may happen, but you agree
8  with me that based upon your engineering
9  analysis in this case, that the one that
10 likely occurred is that he just didn't place
11 it back in the bracket correctly, right?
12 **A.    Based on my analysis, review of**
13 **all the evidence, that -- the scenario of**
14 **him -- the scenario of the climbing cable**
15 **not being fully positioned within the**
16 **climbing bracket is the most likely**
17 **scenario.**
18 Q.    Okay.  So if you were going to
19 testify to a reasonable degree of
20 engineering certainty as to what caused this
21 event, you would agree with me that in your
22 opinion the most likely scenario is that he
23 climbed to height, encountered a limb, tried
24 to move that upper portion of the treestand
25 above the limb, and in doing so failed to

---

114

1  put the cable properly in the cable bracket,
2  true?
3  **A.    The root cause of the incident is**
4  **the cable disconnecting from the cable**
5  **bracket.  That can happen whether he's at**
6  **the ground or that can happen at the top of**
7  **the tree with whatever actions that he does.**
8  **Should that cable not be -- that cable stop**
9  **not be fully positioned within the cable**
10 **bracket there is a likelihood that it will**
11 **disconnect.**
12 Q.    Okay.  That's not my question,
13 though.  My question is -- this is my
14 opportunity to take your deposition, and you
15 understand that when you're signing this and
16 you're giving a report in Federal court
17 you're supposed to be giving testimony to a
18 reasonable degree of engineering certainty,
19 right?
20 **A.    That's correct.**
21 Q.    And a reasonable degree of
22 engineering certainty looks at the physical
23 evidence and the other evidence to reach a
24 conclusion, right?
25 **A.    Correct.**

---

115

1  Q.    And you agree that based upon your
2  review of all of the evidence that you've
3  seen thus far, that the most likely
4  occurrence was that he did not, when he went
5  above the tree, put the cable properly back
6  in the cable bracket and that's what caused
7  this accident, right?
8  **A.    What caused the accident is the**
9  **cable not being fully positioned within the**
10 **cable bracket.**
11 Q.    That's not my question nor is it
12 close to my question.  And you know what the
13 question is and perhaps you don't want to
14 give the answer.
15 **A.    Could you repeat the request then.**
16 Q.    Sure.  My question is:  Based upon
17 a reasonable degree of engineering
18 certainty, after you reviewed the evidence
19 and the testimony and the physical evidence
20 itself, the evidence supports a conclusion
21 that the likely cause of the accident is
22 that Mr. Vandine, when he moved the upper
23 portion of the treestand above the limb
24 failed to put the cable assembly properly
25 back in the cable bracket, true?

---

116

1  **A.    Based on the evidence reviewed,**
2  **yes.**
3  **         He believed he reattached the**
4  **cable, inappropriately, and he believe he**
5  **tested it to verify that it was reconnected.**
6  **And then when he applied his full weight to**
7  **it, it became disconnected which is**
8  **consistent with it being partially inserted**
9  **into the cable bracket.**
10 Q.    Okay.  And just to nip it in the
11 bud, you agree with me to a reasonable
12 degree of engineering certainty, it is your
13 opinion that the most likely cause of this,
14 was that the plaintiff, Mr. Vandine, failed
15 to properly place that cable in the cable
16 bracket when he moved it above the tree?
17         MR. DARIA:  Objection to the
18 form.
19 BY MR. SUTTON:
20 Q.    True?
21 **A.    He failed to fully position the**
22 **cable stop within the cable bracket, which**
23 **in my opinion and outlined in this report is**
24 **a foreseeable misuse of this product and**
25 **should have been designed out through design**

---

MSJ_JA000214

Transcript of Jarrett Waters
Conducted on February 7, 2024

117

1 feature.
2 Q. And we'll talk about that, but the
3 answer to my question is that that is your
4 opinion of the likely cause of this
5 accident, right?
6 **A. Of the two scenarios that I**
7 **present how a cable could disconnect that is**
8 **most likely based on this physical evidence.**
9 Q. Okay. And just to tie a bow on
10 that, you cannot point me to any physical or
11 other evidence that affirmatively states
12 that your second theory, which is that he
13 manipulated the trigger assembly and the
14 cable got caught behind the tree and he
15 moved the upper portion of the treestand to
16 allow it come up, you cannot point to any
17 physical or other evidence to support that
18 that actually happened, true?
19 **A. While that is a viable way for the**
20 **cable to become dislodged from the cable**
21 **bracket, the cable being partially inserted**
22 **into the cable bracket is more consistent**
23 **with the physical evidence presented in this**
24 **case.**
25 Q. Okay.

118

1 Now, let me just ask you a few
2 questions about what you did or didn't do.
3 Did you do any type of a ASTM performance
4 testing on this product?
5 **A. I did not.**
6 Q. Do you have any reason, as you sit
7 here today, to disagree that the product met
8 all of the performance criteria of the ASTM
9 standards?
10 **A. I have no reason not to believe**
11 **that it met the performance criteria set**
12 **forth in the ASTM standards.**
13 Q. Do you have any reason to believe
14 that the harness that was provided with this
15 product didn't meet any of the performance
16 criteria of the ASTM standards?
17 **A. I was not able to evaluate the**
18 **harness that may or may not have been**
19 **provided with this product.**
20 Q. So you have no opinion that it did
21 not meet ASTM standards, right?
22 **A. That would be correct.**
23 Q. Now, did you perform any testing
24 of this model product while it was in the
25 tree? In other words, did you use it in a

119

1 tree?
2 **A. The testing I conducted was done**
3 **on a surrogate tree, essentially a utility**
4 **pole of approximately nine inches in**
5 **diameter.**
6 Q. And that was probably an inartful
7 question so let me ask it again. I'm asking
8 whether you actually went out and put it on
9 either a pole or a tree, got in it to
10 properly use it because when you use it
11 you're supposed to be in it, right?
12 **A. Correct.**
13 Q. And do any testing about
14 performance or did the cable come out or
15 anything like that?
16 **A. The testing I conducted reviewed**
17 **the ability of the cable to rest on the**
18 **keyway slot and its ability to come out in**
19 **subsequent movement.**
20 Q. That's that short video I received
21 last night?
22 **A. No. That's the photographs taken**
23 **in this report that show the cable in a**
24 **partially inserted position.**
25 Q. Did you ever actually -- let's

120

1 talk about that a second. Did you ever
2 actually put it in a partially inserted
3 position and try to climb with it?
4 **A. Yes.**
5 Q. And did you video that?
6 **A. I would have to review my file to**
7 **know if I videoed that or not.**
8 Q. I didn't see any videos in your
9 file. The only video I received was the one
10 I received last night.
11 What happened when you started
12 climbing with it in that perched position?
13 **A. Within one or two upward movements**
14 **and dis, not disconnection, but removal**
15 **of the -- or actuations of the climbing**
16 **treestand releasing the cable from the back**
17 **of the tree, the cable dislodged from the**
18 **perched position on the cable bracket.**
19 Q. In other words, your testing
20 showed that you would not be able to climb
21 in that because it's not stable position?
22 **A. Not for a prolonged period of**
23 **time. It would be very shortly after it was**
24 **positioned there that it would disconnect,**
25 **it would become disconnected from the stand.**

MSJ_JA000215

Transcript of Jarrett Waters
Conducted on February 7, 2024

121

1    Q.    And that's because the movement of
2    the stand itself will either knock it into
3    or out of the channel of the cable bracket?
4    **A.    Depending on its level of**
5    **engagement with that keyway slot, simply**
6    **applying weight to the stand may cause it to**
7    **dislodge.**
8    Q.    When it dislodged in that testing,
9    did it go into engagement, did it go into
10   the cable bracket?
11   **A.    No, it exited the top of the cable**
12   **bracket.**
13   Q.    Were you wearing a harness at the
14   time?
15   **A.    I was not wearing a harness at the**
16   **time.**
17   Q.    Were you standing on the ground?
18   **A.    I was standing six foot 12 inches**
19   **off the ground.**
20   Q.    Were you standing on the platform?
21   **A.    I was.**
22   Q.    And did you -- this testing, you
23   said you had some photographs of it.  I
24   don't recall seeing any of these
25   photographs.  Do you know where they are in

122

1    your file?
2    **A.    The photographs in my report were**
3    **a direct result of that testing and**
4    **positioning.**
5    Q.    I'm sorry, I was asking about in
6    the file, not in the report.  What pages are
7    you talking about on your report?
8    **A.    On page 34, page 35, showing a**
9    **partially seated cable within the keyway**
10   **slot where loading the stand or subsequent**
11   **movement of the stand may result in that**
12   **cable to dislodge.**
13   Q.    So you were not actually climbing
14   up a tree on it, you were just moving the
15   bracket up and down; is that right?
16   **A.    I was just moving the top section.**
17   Q.    Up and down?
18   **A.    Yes.**
19   Q.    So if anybody had actually placed
20   it in that location, that was something they
21   would not -- you would agree with me would
22   not be able to climb to height?  They would
23   know fairly quickly when they moved that
24   upper portion that it was not fully seated,
25   true?

123

1    **A.    You would know relatively quickly.**
2    **Whether it's the first application or the**
3    **fifth I don't know.  You would likely not be**
4    **able to climb to full height with it in the**
5    **partially seated position.**
6    Q.    Did you do any load or stress
7    calculations?
8    **A.    I did not.**
9    Q.    Now, you tested the load capacity
10   of the cables in other cases.  You did not
11   do that in this case, did you?
12   **A.    I did not.**
13   Q.    Do you recall the strength of them
14   from other cases that you tested?
15   **A.    I don't remember the specific**
16   **numbers.**
17   Q.    Did you review any other treestand
18   manufacturer's written warnings or
19   instructions for the purposes of this file?
20   **A.    I don't believe I did.**
21   Q.    The only other one I saw in here
22   was the Millennium Multi-Vision product.
23   What was the purpose of adding that?
24   **A.    Are you referencing -- is it a**
25   **photograph or is there a manual?**

124

1    Q.    It looks like in research.  It
2    doesn't look like it's a manual.  I think
3    it's -- it may be web page.
4    **A.    It is.  The incorporation of the**
5    **Multi-Vision was a -- was an alternative**
6    **design to a cable attachment to a climbing**
7    **treestand.  And it is a design that prevents**
8    **the scenario of a partially seated cable**
9    **providing a false positive or a feeling to**
10   **the user that the cable may be secure.**
11   **That design incorporates a series**
12   **of holes along the climbing cable that slide**
13   **into a tube, and that climbing cable is**
14   **secured via a pin such that there is no way**
15   **to partially secure that in a way that will**
16   **hold load.  The pin's either installed or**
17   **not installed.  If the pin is not installed**
18   **the climbing cable will retract or exit the**
19   **tube preventing the user for having a false**
20   **positive or a sense of securement.**
21   Q.    Okay.  Going to your testimony
22   list, you list two cases.  The first was a
23   man named Vore.
24   **A.    Correct.**
25   Q.    What's that case about?

MSJ_JA000216

Transcript of Jarrett Waters
Conducted on February 7, 2024

125

1    A.    It was a single-vehicle
2    collision -- a single vehicle accident where
3    the individual was claiming they were run
4    off the road.  And I was asked to inspect a
5    vehicle to determine if there was any
6    evidence or contact with a -- any evidence
7    consistent with the contact of another
8    vehicle.
9    Q.    And then the second case which was
10   both deposition and trial appears to be this
11   Gonzalez case?
12   A.    That's correct.
13   Q.    What is that case about?
14   A.    It was a two-vehicle collision in
15   an intersection.  I was asked to review GPS
16   data and light timing sequence to determine
17   essentially the motions or timing of a
18   vehicle entering the intersection.
19   Q.    Okay.  Do you keep a list of all
20   cases that you have been consulted on?
21   A.    I do not keep a list.
22       MR. SUTTON:  We've been going
23   for, I guess, about an hour.  If you want
24   to take a real quick break that would be
25   good.

126

1        - - -
2        (Recess.)
3        - - -
4    BY MR. SUTTON:
5    Q.    Mr. Waters, let's just talk
6    briefly about the purpose and use of a
7    climbing treestand. Would you agree with me
8    that a climbing treestand is a device that's
9    used to get higher or closer to the game?
10   A.    It is a device that allows one to
11   gain an elevated position.  And the purpose
12   of a climbing treestand that is often
13   typical for hunting.
14   Q.    Well, climbing treestands are
15   pretty much designed to be used for hunting,
16   are they not?
17   A.    I believe they are.
18   Q.    And mainly for hunting
19   White-tailed deer, right?
20   A.    That seems to be a very common
21   application for them.
22   Q.    And you know one of the things it
23   does is it puts the hunter's scent above the
24   game, right?
25   A.    Depending on thermals and wind

127

1    direction, yes.
2    Q.    And it potentially could also keep
3    them out of the view of the game that may
4    not look up into the trees to see if there
5    is something up there, right?
6    A.    Yes.
7    Q.    One of the things it does is to
8    give an archer like yourself the ability to
9    typically have a better shot at an animal as
10   well, right?
11   A.    Yes.
12   Q.    Now, you mentioned Gorilla and
13   Millennium and Treewalker and Summit as
14   treestand manufacturers -- and Big Game.  Do
15   you know of any others?
16   A.    There are a list of others.  And
17   some are private labels for certain
18   retailers.
19   Q.    Do you know that Treewalker is no
20   longer in business?
21   A.    I do.
22   Q.    Do you know that Gorilla is no
23   longer in business?
24   A.    I do.
25   Q.    When was the last time you

128

1    replaced the cables on your Gorilla
2    treestands?
3    A.    The cables moving -- or the cable
4    from the -- I'll call it the vertical
5    portion of the stand to the foot platform?
6    Q.    Yes.  It is the cable that goes
7    from the back post --
8    A.    Yes.
9    Q.    -- upon which the seat is, and it
10   goes down at about a 45-degree angle to the
11   front of the platform, right?
12   A.    Correct.
13   Q.    And those Gorilla treestands say
14   that they should be replaced every one year
15   or two years, right?
16   A.    That's correct.
17   Q.    When is the last time you replaced
18   yours?
19   A.    They have all been replaced by
20   chain and Grade 8 hardware.
21   Q.    So by that you mean you replaced
22   all of the cables by modifying your stands;
23   is that right?
24   A.    That's correct.
25   Q.    You modified them by now using a

MSJ_JA000217

Transcript of Jarrett Waters
Conducted on February 7, 2024

33 (129 to 132)

129

1  chain which is like a bicycle chain?
2  **A.   No, a five-sixteenth chain.**
3  Q.   And then you attached it by using
4  Grade 8 hardware, you mean Grade 8 bolts?
5  **A.   True.**
6  Q.   You remember in the manufacturer's
7  instructions state that you should never
8  modify a stand?
9  **A.   I do not recall that specifically**
10 **in those instructions, but I'm sure they**
11 **stated it.**
12 Q.   One of the reasons you're sure
13 they stated it is because you read the ASTM
14 standards in this case, right?
15 **A.   That's correct.**
16 Q.   And the ASTM standards include
17 multiple requirements for the content of
18 warnings and instructions, right?
19 **A.   That's correct.**
20 Q.   One of those is to never modify a
21 stand, right?
22 **A.   Yes.**
23 Q.   In addition, you said you've
24 watched multiple videos and the videos that
25 are co-packaged for these stands all say

130

1  that you should never modify your stand,
2  right?
3  **A.   That's correct.**
4  Q.   And that is something that you did
5  regardless of that, right?
6  **A.   I looked into purchasing**
7  **replacement cables from a company that no**
8  **longer existed and it was difficult to**
9  **acquire those cables.  I took it upon myself**
10 **to install chains, substantial hardware and**
11 **covers on those to replace the cable.**
12 Q.   Why didn't you just replace the
13 stand with new stands?
14 **A.   It gets expensive.**
15 Q.   I can understand.  That expensive
16 is less than a hundred dollars, you can find
17 them, aren't they?
18 **A.   Some stands may be less than a**
19 **hundred dollars, but you -- when you begin**
20 **considering replacing multiple stands that**
21 **is a high dollar amount that most hunters**
22 **don't have the appetite for.**
23 Q.   How many stands do you have?
24 **A.   More than six, probably less than**
25 **a dozen.**

131

1  Q.   Now, treestands are used at
2  height, right?
3  **A.   Typically, yes.**
4  Q.   This particular model is a 2015
5  Viper SD climbing treestand; is that right?
6  **A.   That's correct.**
7  Q.   Who was it designed by originally?
8  **A.   The original construction, as far**
9  **as I'm aware, was designed and patented by**
10 **Mr. Woller.**
11 Q.   What is Mr. Woller's background?
12 **A.   I would have to either reference**
13 **my report or his deposition notes to**
14 **remember his complete background.  I believe**
15 **it was -- no, I don't recall without**
16 **referencing that.**
17 Q.   Do you recall he was a mechanical
18 engineer?
19 **A.   That sounds familiar.**
20 Q.   Do you recall that he had been
21 involved in the industry for well over a
22 decade when he designed the Viper?
23 **A.   That sounds appropriate.**
24 Q.   Now, when this product was sold
25 new -- incidentally, Mr. Vandine testified

132

1  that he purchased this product new in a box,
2  right?
3  **A.   Correct.**
4  Q.   One of the defendants in this case
5  is Dick's Sporting Goods, are you aware of
6  that?
7  **A.   I am aware they are listed on the**
8  **complaint.**
9  Q.   Do you have any specific opinions
10 with regard to any actions by Dick's
11 Sporting Goods?
12 **A.   I do not.**
13 Q.   You're aware, are you not, that
14 Vipers are sold as complete climbing
15 systems?
16 **A.   I am aware that's what they are**
17 **referred to as in the instruction manual.**
18 Q.   And you're aware that as part of
19 the complete climbing system they come with
20 an upper portion or seat portion of the
21 stand, right?
22 **A.   Correct.**
23 Q.   And they also come with a
24 platform, right?
25 **A.   Correct.**

MSJ_JA000218

Transcript of Jarrett Waters
Conducted on February 7, 2024

34 (133 to 136)

133

1    Q.    Do you have any criticisms about
2 the shape of the platform, or the surface
3 area of the platform whatsoever?
4    **A.    I do not.**
5    Q.    Did you ever have any difficulties
6 in use of the platform whatsoever?
7    **A.    (No audible response.)**
8    Q.    When you used it.
9    **A.    None that I recall.**
10   Q.    The platform on your Viper is that
11 similar, if not identical, to the platform
12 on the subject product other than the hatch
13 cover, right?
14   **A.    That's correct.**
15   Q.    Now, it's also sold with full body
16 harness?
17   **A.    Okay.**
18   Q.    Are you aware of that?
19   **A.    Based on the instruction manual**
20 **that's how it appears to come.**
21   Q.    In fact, that's referenced in both
22 the instruction manual and the warning label
23 that's sewed into the seat, right?
24   **A.    I believe so, yes.**
25   Q.    The warning label that's sewed

134

1 into the seat is a black-and-orange label,
2 right?
3    **A.    Yes.**
4    Q.    And a person can certainly read it
5 as they face the tree, right?
6    **A.    If the seat is folded in manner**
7 **that presents the label to them, yes.**
8    Q.    Isn't the label on the top of the
9 seat?
10   **A.    It is.  However, the seat is**
11 **articulated, or has joints that can be**
12 **folded in a way to get it out of the way of**
13 **the hunter as they climb, and resulting that**
14 **label which is in the top portion of the**
15 **seat could be folded under and out of the**
16 **view of the hunter.**
17   Q.    Yeah, but when they go to get to
18 height they set up the seat.  That's one of
19 the first things that they do, right?
20   **A.    Once they get it height, yes they**
21 **would.**
22   Q.    And when they do that it's
23 presented to them, that label, right?
24   **A.    Once the seat is set up and if**
25 **they are still facing the tree they would be**

135

1 able to see the label.
2    Q.    Well, is there any other way to
3 set up the seat other than face the tree?
4    **A.    The ASTM standards discuss that**
5 **label needs to be present and visible while**
6 **the stand is in use.  And one of the uses of**
7 **the stand is for the purpose of the hunting,**
8 **which is facing away from the tree.**
9    Q.    Well, wait a minute --
10   **A.    During the hunting there is --**
11   Q.    First of all, that's not my
12 question.  My question is:  Isn't the way
13 you attach the seat to the stand require you
14 to face this tree?
15   **A.    The way you attach the seat to the**
16 **stand or the seat to the tree?**
17   Q.    Seat to the tree.
18   **A.    Yes, you would have to face the**
19 **tree to wrap the bungee cord around the**
20 **tree.**
21   Q.    In doing so you're up in the air
22 after you've gotten to height, right?
23   **A.    After you've gotten to height.**
24   Q.    And you're in the process of using
25 the stand at that point in time, right?

136

1    **A.    You are in the beginning phases of**
2 **your hunting portion of the climb, yes.**
3    Q.    Well, you use the stand from the
4 point you attach it to the tree to the point
5 you return it or take it off the tree,
6 right?
7    **A.    Yes.  And during that assembly**
8 **process the seat can be folded in a manner**
9 **that the label is not clearly visible to the**
10 **operator or the hunter.**
11   Q.    But there's no argument that
12 you're using the stand when you're climbing,
13 right?
14   **A.    You are using the stand when**
15 **climbing.**
16   Q.    You're using the stand when you're
17 up at height, right?
18   **A.    Correct.**
19   Q.    It's holding you up in the air so
20 you're using the stand, right?
21   **A.    Correct.**
22   Q.    You're using the stand when you're
23 descending, right?
24   **A.    Correct.**
25   Q.    When you get up to height the

MSJ_JA000219

Transcript of Jarrett Waters
Conducted on February 7, 2024

35 (137 to 140)

137

1  video which apparently you didn't watch, but
2  the instruction manual talks how you attach
3  the top portion of the seat using a bungee
4  cord around the tree, right?
5      **A.    Correct.**
6      Q.    Doing so that label is right in
7  your face, right?
8      **A.    It would be, yes.**
9      Q.    And you are using the stand to be
10 up at height at that point in time, right?
11     **A.    But the majority of the time that**
12 **you're in the stand you're facing the**
13 **opposite direction.**
14     Q.    That's not my question.  My
15 question is very simple.  My question is:
16 You're using the stand while you're up in
17 the tree at the point you're attaching the
18 seat to the tree?
19     **A.    Yes.  You would be using the stand**
20 **at that point.**
21     Q.    Okay.  Now, you're aware are you
22 not that Summit was one of the first
23 companies to include full-body harnesses in
24 their stands?
25     **A.    I don't know one way or the other,**

138

1  **but I would believe it if you told me.**
2      Q.    Are you aware that the industry
3  itself, the ASTM and TMS standards have
4  required that a full-body harness be
5  co-packaged with all climbing treestands
6  since 2004?
7      **A.    Yes, I believe so.**
8      Q.    And you're aware that that same
9  requirement is applied to ladder stands and
10 fixed position stands?
11     **A.    Yes.**
12     Q.    And you're aware that treestands
13 sold in the United States have all come with
14 full-body harnesses since that point in
15 time?
16     **A.    That's my understanding, yes.**
17     Q.    And universally, in the
18 instructions and warnings in every treestand
19 that's been sold since 2004, there is a
20 requirement to wear and properly use your
21 harness, right?
22     **A.    That is instructed by the warnings**
23 **on the stand, yes.**
24     Q.    And using the harness, when using
25 a climbing treestand, as instructed by every

139

1  manufacturer of climbing treestands, is to
2  attach it the tree as you begin to climb and
3  not to remove it until you return to the
4  ground, right?
5      **A.    That is what the instructions**
6  **recommend that you do.  They instruct you to**
7  **do that.  I believe there is plenty of**
8  **evidence and evidence within the treestand**
9  **industry that not all hunters still apply or**
10 **wear their safety harness.**
11     Q.    Listen to my question carefully.
12 The instructions all universally require you
13 to wear a harness, and have it attached to
14 the tree from the point you leave the ground
15 to the point you return to the ground when
16 using the climbing treestand in this
17 industry?
18     **A.    That's what the instructions**
19 **state, yes.**
20     Q.    You said they recommend, but none
21 of the instructions whatsoever recommend the
22 use, they mandate the use, right?
23     **A.    I don't have the words right in**
24 **front of me, but I'm sure the verbiage is**
25 **consistent with that.**

140

1      Q.    Well, you've read the ASTM
2  standards and the ASTM standards mandate
3  that that warning is in every treestand
4  manual, right?
5      **A.    Yes.**
6      Q.    And warning label, right?
7      **A.    Yes.**
8      Q.    That's the proper way to use these
9  climbing treestands based upon the ASTM
10 standards, right?
11     **A.    That's what the standards**
12 **recommend, yes.**
13     Q.    It's not what the standards
14 recommend.  It's what the standards require,
15 right?
16     **A.    The standards, again, are bare**
17 **minimum recommendation, that is up to the**
18 **manufacturer to adhere to and then adopt per**
19 **their standards or per their design effort.**
20     Q.    We're not here to play word games.
21 You can't require more than wear it at all
22 times, right?  So if that's the minimum, you
23 can't do any more than that, right?
24     **A.    Okay.**
25     Q.    All right?  And ASTM standards say

MSJ_JA000220

Transcript of Jarrett Waters
Conducted on February 7, 2024

36 (141 to 144)

141

1  that a user shall remain harnessed to the
2  tree from the point they leave the ground to
3  the point they return, right?
4  **A.    That's what they say.**
5  Q.    That same language has also been
6  mandated in all of the safety videos that
7  have been included with treestands since
8  2007, right?
9  **A.    That's what they say, yes.**
10  Q.    And every one that you've
11  received, all the instruction manuals and
12  warning labels and DVDs that you've received
13  in any of the stands that you purchased,
14  that's what the warnings, instructions and
15  DVD said, right?
16  **A.    That's correct.**
17  Q.    That's also taught in all of the
18  hunter safety courses in the United States,
19  right?
20  **A.    Correct.**
21  Q.    And that is the full and total
22  safe way to use this product, is to remain
23  harnessed to the tree from the time you
24  leave the ground to the time you return,
25  right?

142

1  **A.    That is a safe way to use the**
2  **treestand, yes.**
3  Q.    Well, you've worked with
4  Mr. Dickinson for a long period of time,
5  right?
6  **A.    Correct.**
7  Q.    And you understand that he has
8  testified and told me multiple times that
9  the total safe way to use this product, a
10  climbing treestand, is to be attached to the
11  tree with your harness, at all times after
12  leaving the ground, true?
13  **A.    That is a safer way to use the**
14  **stand, yes.**
15  Q.    And that's the way that you
16  believe is the safe way to use this product,
17  right?
18  **A.    I believe that is a safe way to**
19  **use this product, yes.  I believe there is**
20  **evidence that suggests that people in --**
21  **hunters within the industry do not always**
22  **wear a harness.**
23  Q.    If you were advising anybody about
24  using this product you would say:  You
25  should use your harness at all times, right?

143

1  **A.    Yes, I would.**
2  Q.    You would tell them that they
3  should be attached to the tree at all times
4  when using a climbing treestand, right?
5  **A.    Yes, I would.**
6  Q.    And you would do that because
7  there's an inherent danger involved in
8  climbing treestands, right?
9  **A.    There is danger any time you're in**
10  **an elevated position, yes.**
11  Q.    And that's true whether it's ANSI,
12  the tree industry, OSHA, or treestands,
13  right?
14  **A.    That's correct.**
15  Q.    And there is regulation in OSHA
16  and the tree industry, of which Mr. Vandine
17  was a part, that require the harness use any
18  time you're above ground, right?
19  **A.    I'm not familiar with the tree**
20  **industry standards, but the standards we're**
21  **discussing here today do require the use of**
22  **a harness in their verbiage.**
23  Q.    Mr. Vandine was in the tree
24  industry, was he not?
25  **A.    I believe he was.  I believe he**

144

1  **states that in his deposition.**
2  Q.    In New Jersey, right?
3  **A.    Yes.**
4  Q.    And you understand, do you not,
5  that OSHA requires mandates that any person
6  in the tree industry that's working above
7  ground has to be tied off to a tree with a
8  full body harness at all times?
9  **A.    Okay.**
10  Q.    Do you have any reason to disagree
11  with that?
12  **A.    I do not.**
13  Q.    Now, it's your testimony that
14  based upon the safe way to use this product,
15  you would agree with me, would you not, that
16  Mr. Vandine should have been wearing his
17  harness at the time of the accident?
18  **A.    I would agree that he should have**
19  **been wearing a harness when climbing the**
20  **tree.  I believe he also had a right to**
21  **understand and believe that the stand was**
22  **safe in its current design and that the**
23  **harness was there to prevent a misstep or a**
24  **slip on his behalf.  And I believe he -- he**
25  **viewed and he testified that he was not**

MSJ_JA000221

Transcript of Jarrett Waters
Conducted on February 7, 2024

145

1  aware that he was required to wear a
2  harness. And I believe in his deposition he
3  expressed concerns regarding harness use.
4      Q.    I'm asking you as an engineer
5  coming into a court of law, do you agree
6  with me that based upon all of the
7  instructions, the industry standards, the
8  hunter safety requirement and your own
9  personal use that Mr. Vandine should have
10 been wearing and using a harness at the time
11 accident. You agree with that, right?
12     A.    I agree he should have been
13 wearing a harness.
14     Q.    Okay. Now, you've given some
15 indication relating to the instructions and
16 the -- that we just discussed earlier,
17 right?
18     A.    I believe so.
19     Q.    Do you remember that Mr. Vandine
20 testified that his custom and practice was
21 sadly mostly never reading the warnings.
22     A.    I believe he stated he did not
23 read the warnings for this treestand.
24     Q.    When I asked him if it was custom
25 and practice to do so, he said, "Sadly,

146

1  sometimes," that he just would not read
2  them?
3      A.    Regarding other products?
4      Q.    Warnings, the warnings of
5  treestands.
6      A.    I believe he expressed that he
7  thought through his experience and prior use
8  that he felt comfortable enough with them
9  that he did not need to read the included
10 instructions.
11     Q.    Well, I asked him on page 82, "Is
12 it your course and practice to never read
13 instruction manuals?"
14         And he said, "Sadly, sometimes."
15 Do you recall that?
16     A.    I could look it up but I trust
17 you.
18     Q.    And he never read the instruction
19 manual on the Summit stand, right?
20     A.    That's my understanding.
21     Q.    And he never read the warning
22 label on the Summit treestand, right?
23     A.    I don't know if he ever read it.
24 I know the warning label was not on the
25 stand at the time of the inspection.

147

1      Q.    Well, I asked him in his
2  deposition whether he ever read it and he
3  said, "No." Do you recall that?
4      A.    I can look it up again, but if
5  it's in his transcript, then I'm sure he
6  testified to that.
7      Q.    Did you see when you inspected the
8  stand that he had physically removed that
9  warning label from the stand?
10     A.    The warning label was not attached
11 to the stand at the time of the inspection.
12     Q.    And did you look to see that it
13 had been cut off?
14     A.    The -- the remnant of the tag
15 appeared to be a very -- a clean cut, yes.
16     Q.    Okay. So in order to cut a tag
17 off you have to hold it in your hands,
18 right?
19     A.    Sure.
20     Q.    And so you have the opportunity to
21 read the warning label that you're cutting
22 off, right?
23     A.    You would have the opportunity to.
24 It doesn't imply that he did.
25     Q.    Okay. Maybe he made the choice.

148

1  I think he said intentionally to not read
2  the warning label. My question is he had
3  the opportunity to read it when he
4  intentionally cut it off, right?
5      A.    Based on what he represents is his
6  experience, he felt that he did not require
7  that warning label to be on the stand.
8      Q.    I asked you about reading the
9  warning label.
10     A.    He had the opportunity to read it,
11 yes.
12     Q.    And he chose not to, right?
13     A.    He testified that he did not, is
14 what you just read me.
15     Q.    Well, if he cut the label off, and
16 you agree with me that it appears to be cut
17 off, then he had the opportunity and yet he
18 didn't read it. And that's a choice,
19 because you're cutting something off of the
20 stand, right?
21     A.    I would agree that's a choice to
22 cut something off something, yes.
23     Q.    And if you're cutting off a
24 warning label that has written words on it,
25 you're making a choice I'm getting rid of

MSJ_JA000222

Transcript of Jarrett Waters
Conducted on February 7, 2024

38 (149 to 152)

**149**

1 this without reading it, right?
2 **A. He's making the choice to remove**
3 **the label, yes.**
4 Q. And it's obvious that it's a label
5 and it's got warnings on it, right?
6 **A. It appears to say the word**
7 **"warning," and includes instructions**
8 **regarding some of treestand's use, yes.**
9 Q. So you would agree with me that
10 he's making the intentional decision not to
11 read the warning label at that time, right?
12 **A. I struggle with the word**
13 **intentionality for his decision not to read**
14 **the warning at that time. He chose to cut**
15 **the label off. It doesn't imply whether he**
16 **read, did not read, chose not to read. He**
17 **just states that he removed the label.**
18 Q. Now, in your report, Exhibit 3,
19 you've given opinions relating to warning
20 labels, some of which we touched on. You
21 would agree with me since he never read the
22 warning labels where the label was placed
23 doesn't matter?
24 **A. I don't think that's true. If it**
25 **was a label adhered somewhere on the stand**

**150**

1 **he may have chose not to remove it.**
2 Q. Yeah, but when I asked him at his
3 deposition, "Did you read the warning labels
4 on, for instance your Field and Stream
5 products," he said, "No, I didn't read
6 them."
7 **A. Okay.**
8 Q. So if he chooses not to read them
9 regardless of where it's attached is not
10 relevant to this accident, right?
11 **A. Please restate that.**
12 Q. Yeah. If he's made the choice or
13 just doesn't read the warning labels for
14 whatever reason, then the placement of the
15 warning labels doesn't matter?
16 **A. In the past tense, yes. I mean**
17 **there is no reason he couldn't choose to**
18 **read the warning labels in the future should**
19 **he have questions regarding the stand.**
20 Q. You already told me his Field and
21 Stream products he never read the warning
22 labels, he intentionally removed the warning
23 label from the Summit stand, so it has
24 nothing to do with this accident, right?
25 MR. DARIA: Objection to form.

**151**

1 THE WITNESS: Warning labels
2 could have provided more instruction
3 regarding the insertion and installation
4 of a cable stop into the cable bracket.
5 Those were not present at the time of the
6 incident.
7 The instructions are often
8 provided at the point of use where they're
9 the most unique to the design and most
10 pertinent to the user. As you stated,
11 Mr. Vandine may or may not choose to read
12 those, but it was not available there to
13 be read.
14 BY MR. SUTTON:
15 Q. Well, it was available until he
16 removed it, right?
17 **A. The seat label was available to be**
18 **read before he removed it.**
19 Q. Have you reviewed the exemplar of
20 what was on that label?
21 **A. I believe I have.**
22 Q. Do you have problems with the
23 content of that specific label?
24 **A. The content of that specific label**
25 **doesn't address disconnecting the cable at**

**152**

1 **height. It doesn't address or provide**
2 **instructions regarding the proper insertion**
3 **of the cable into the cable bracket, would**
4 **be my two primary concerns with that.**
5 Q. Actually what it says, it says
6 that you have to read and follow all of the
7 instructions and review them. And in the
8 instruction manual it specifically says how
9 to properly install this onto the tree,
10 right?
11 **A. In the instruction manual, yes.**
12 Q. Let me ask you this: You would
13 agree with me regardless of design or the
14 method of attachment, it's up to the user to
15 correctly attach a treestand to a tree?
16 **A. The user is the individual that**
17 **attaches the treestand to the tree. It's up**
18 **to the designer of the product to make it as**
19 **easily useable as possible as well as**
20 **include and evaluate any type of foreseeable**
21 **misuse that the operator may have while or**
22 **during the installation.**
23 Q. But regardless of that, throwing
24 aside the design element, the user has to
25 properly attach it to the tree for it to

MSJ_JA000223

Transcript of Jarrett Waters
Conducted on February 7, 2024

153

1  function properly, right?
2  **A.    The user is required to attach the**
3  **stand to the tree, yes.**
4  Q.    And that's true regardless of the
5  design, right?
6  **A.    In order to go up the tree, the**
7  **user would have to wrap the climbing cable**
8  **around the tree and reinstall it to the**
9  **stand, yes.**
10  Q.    The user has to properly install
11  it in the first place, to get it on the
12  tree? That's a required thing for the user,
13  right?
14  **A.    This design allows the user to**
15  **install the cable in a way that may not be**
16  **considered proper according to the**
17  **instructions but still support weight. So**
18  **it could provide temporary use of the**
19  **product with a cable that's not positioned**
20  **properly.**
21  Q.    That's not my question. My
22  question is: The manufacturer is not out
23  there in the woods. The person that's
24  installing the treestand has to install it
25  properly, right?

154

1  **A.    Yes.**
2  Q.    And the place to look for how you
3  properly install something is in the
4  instruction manual, right?
5  **A.    Mr. Vandine testified that based**
6  **on his experience and use of the stand he**
7  **didn't feel that the -- he felt that he**
8  **fully understood how to use the stand**
9  **without the use of the instructions.**
10  Q.    Let's talk about that for a
11  moment. You have a product that's used at
12  height, right?
13  **A.    Correct.**
14  Q.    And it's well documented in all
15  kind of different literature if you fall
16  from height you can be seriously injured or
17  killed, right?
18  **A.    Okay. Yes.**
19  Q.    That's an open and obvious danger,
20  right?
21  **A.    Correct.**
22  Q.    And it's a danger that was well
23  known to Mr. Vandine? He agreed and
24  acknowledged it, right?
25  **A.    Correct, he did.**

155

1  Q.    In fact, he had been -- he had
2  been injured in a fall event from a tree
3  previously, right?
4  **A.    Yes, he testified to that.**
5  Q.    And products of any type, whether
6  the products are hunting products or other
7  type of products come with written
8  instructions, right?
9  **A.    Yes, they do.**
10  Q.    And the place to describe how to
11  properly use the product is contained in the
12  instruction manual, right?
13  **A.    In full detail they are typically**
14  **included in the instructions. However, if**
15  **the product has some unique feature or use**
16  **within the stand itself, or any product for**
17  **that matter the product often includes**
18  **specific instructions for the use of that**
19  **feature on the device.**
20  Q.    Now, do you know of any treestand
21  manufacturer that explained exactly how to
22  install a product on a tree in a warning
23  label?
24  **A.    The newer warning labels do**
25  **contain a QR code which is a direct link to**

156

1  **the instruction manual that allows the**
2  **operator to have access to those out in the**
3  **field. Prior to that, there was -- there**
4  **was no provision for the likes of the**
5  **instruction manual to be attached or adhered**
6  **to the stand.**
7  Q.    Well, you've been hunting for 20
8  years. You know that the instruction
9  manuals are where the manufacturer puts how
10  to install and assemble the product, right?
11  **A.    Correct.**
12  Q.    When you're using a product, such
13  a treestand that has an inherent risk of
14  falling, whenever you're at height, as an
15  engineer don't you think users should read
16  and follow those instructions prior to using
17  the product?
18  **A.    It would be recommended to read**
19  **the instructions. Mr. Vandine testified**
20  **that he thought he fully understood how the**
21  **stand operated.**
22  Q.    But it's your opinion that he
23  should have read the instructions and
24  followed them, right?
25  **A.    He should have read the**

MSJ_JA000224

Transcript of Jarrett Waters
Conducted on February 7, 2024

40 (157 to 160)

157

1  instructions, but it is foreseeable within
2  industry, and within industry of all
3  products that in the instruction manuals are
4  not always read and not read in full detail.
5     Q.    But you agree that he should have
6  read the instructions prior to using the
7  treestand, right?
8     A.    It would have been educational to
9  him to read the instructions, yes.
10    Q.    All right.  Now, going back to
11 your criticism of the warning label.  You're
12 specifically -- in reference, it's your
13 reference to ASTM 2121-13, right?
14    A.    I believe so.
15    Q.    I'm going show you what we marked
16 as Exhibit 4, which happens to be 2121-13,
17 so you can follow along with me.  All right?
18        (Standard Practice for Treestand
19    Labels, marked Defendant's
20    Exhibit No. 4, for identification.)
21 BY MR. DARIA:
22    Q.    This is specifically the standard
23 that's referenced into your report, right?
24        MR. DARIA:  Objection to form.
25

158

1  BY MR. SUTTON:
2     Q.    You had the page open.  You
3  already had it open.  If you read page 3 of
4  your report it says, "It is our opinion that
5  the 2015 Summit Viper ASTM F2122-13 Standard
6  Practice for Treestand Safety Devices at
7  Section 6.2.2 states that 'Labels and
8  warnings shall be placed on the unit in
9  accordance with practice F2121."
10    A.    Correct.
11    Q.    Which is then this standard.  Then
12 you go on to cite this standard why you
13 don't think it was attached correctly.
14    A.    Correct.
15    Q.    I have the 2122 standard here if
16 you want to read it, but I think the only
17 reference is that it says it has to be
18 attached in accordance with 2122-13.
19    A.    Regarding the labels, yes.
20    Q.    Yes.  Okay.
21        All right, now, according to your
22 report you say that it was not compliant
23 with this standard despite the fact that
24 multiple testing firms specifically tasked
25 with certifying this product have repeatedly

159

1  certified the product to meet the standard.
2  Your opinion is that it doesn't apply,
3  because at some point in time you may not be
4  able to read it while climbing?
5     A.    And the position of the label does
6  not comply with the placement locations that
7  are recommended by the standard.
8     Q.    Now, specifically you're talking
9  about 6.3.1, right?  Section 6.3 of ASTM
10 2121-13 references the selection of
11 placement; do you see that?
12    A.    Correct.
13    Q.    And then it goes down in 6.3.1, it
14 says, "Labels and warnings shall be placed
15 such that they are visible to user when
16 mounting the treestand or climbing stick and
17 when it is in use sitting or standing." Do
18 you see that?
19    A.    I do see that.
20    Q.    Did I read it correctly?
21    A.    I believe you did.
22    Q.    So first of all, you agree that
23 this label is visited when mounted, right?
24    A.    It would be visible from where
25 you're beginning to ascend the tree being a

160

1  fabric label and positioned the way it is on
2  the seat may be difficult to see from a
3  ground position standing next to the stand.
4     Q.    Any warning label no matter where
5  it's placed, in order to read it you have to
6  actually move to view it, right?
7     A.    Unless it's adhered in a way
8  that's directly in front of your face.
9     Q.    Well, in a climbing treestand, a
10 hunter when using a stand has to look at the
11 tree when climbing up and climbing down,
12 right?
13    A.    Correct.
14    Q.    There are no climbing treestands
15 which face away from the tree, right?
16    A.    Not that I'm aware of.
17    Q.    Then they can use the stand by
18 standing on the platform, right?
19    A.    Correct.
20    Q.    And they can fire in most every
21 direction except for that portion which is
22 blocked by the physical tree, right?
23    A.    Okay.
24    Q.    You understand that?
25    A.    Yes.

MSJ_JA000225

Transcript of Jarrett Waters
Conducted on February 7, 2024

161

1    Q.    And that includes them turning
2  around and facing near the tree and shooting
3  back behind them, right?
4    A.    Correct.
5    Q.    That happens with hunters all the
6  time, right?
7    A.    It does happen, yes.
8    Q.    They can also face frontwards and
9  shoot at a deer, right?
10   A.    That's correct.
11   Q.    They could also be sitting in the
12 seat, right?
13   A.    Correct.
14   Q.    Is it your opinion that a label
15 has to be placed in every single direction
16 to meet this standard?
17   A.    To meet the standard, no, it does
18 not have to be placed in every single
19 direction. It should be placed in a way
20 that's consistent with the recommended
21 placements that it gives.
22       The placements include the top
23 side of the platform as given in 3.2.7.,
24 which I believe is referencing -- which is
25 in a horizontal structural area of the

162

1  treestand on which the user stands and
2  places his feet. So that could be a
3  standing platform.
4        But along any top upper side of a
5  back bar, back bars can be flexible or
6  rigid. In this application a warning or
7  label near the installation of the back bar
8  would have been appropriate.
9        Along any flat, top side of flat
10 surface on a main structural support. That
11 allows the opportunity to place a warning
12 label along any of the V brace or the upper
13 right arms that may be visible to a person.
14 And should they be placed on the upright
15 arms it may be visible in the seated
16 position as well.
17       And then additionally on the top
18 upper portion of the component requiring a
19 special label or warning. The attachment of
20 the climbing cable to the climb bracket is a
21 unique feature to the Summit climbing
22 treestand and could warrant a special
23 warning or label at that position.
24       Additionally, the warning or label
25 could warn against the inadvertent contact

163

1  with the QuickDraw springs or assuring that
2  the QuickDraw springs are properly
3  positioned behind the climbing cable.
4    Q.    In all due respect, the attachment
5  of any climbing treestand is unique to that
6  climbing treestand; they're all different,
7  right?
8    A.    Some share similarities between
9  different brands, but yes, they're all
10 different.
11   Q.    So it's not a special
12 characteristic that makes it different that
13 needs a warning label. In fact, no climbing
14 treestand, not a single one in this industry
15 has a warning label that at the attachment
16 section tells you how to put it in the
17 product, right?
18   A.    I haven't reviewed every climbing
19 treestand on the market.
20   Q.    Because you don't have the
21 background in treestands.
22       Are you aware as you sit here
23 today of any treestands that have such a
24 warning label?
25   A.    I am not.

164

1    Q.    Okay. Now, let's go back to this
2  sentence. You read, from the second
3  sentence it says, "the following placement
4  locations are recommended." Do you see
5  that?
6    A.    I do see that.
7    Q.    There we go with that word
8  recommended again. We went over that
9  before. There is a difference between a
10 recommendation and a mandate, right?
11   A.    I would agree with that.
12   Q.    The standard does not require the
13 placement at those four positions, does it?
14   A.    It's provides a recommendation and
15 Summit had the ability to follow those
16 recommendations but chose to implement a
17 fabric warning label on the seat.
18   Q.    So summit who has had engineers
19 sitting on the ASTM standards committee for
20 well over a decade, you're suggesting is
21 violating the standard that they helped
22 write?
23   A.    I am suggesting that they could
24 have adhered to the standard more
25 accurately.

MSJ_JA000226

Transcript of Jarrett Waters
Conducted on February 7, 2024

42 (165 to 168)

165

1    Q.    You're basically suggesting that
2  engineers that have been sitting on the ASTM
3  standard committee that helped write this
4  standard that you're referring to are
5  violating the standard they helped write in
6  their own products?
7    **A.    They're not following the**
8  **recommended practices based on the standard.**
9    Q.    Despite the fact that every
10 single -- for 20 years, every single company
11 that specializes in certifying whether or
12 not the product meets that standard has
13 certified this product and agreed under that
14 standard it meets the standard, you're still
15 standing by that testimony, right?
16   **A.    These provide the most optimal**
17 **position based on the standard.**
18   Q.    That's not my question.  Despite
19 the fact that Summit has had folks sitting
20 on the ASTM committee, helped write the
21 standard, and passed the standard, and has
22 had this for 20 years submitted to at least
23 three different companies to certify it
24 under this standard, and they've all agreed
25 it passed the standard many, many times, you

166

1  believe that you -- an engineer that's never
2  worked in the treestand field -- can say
3  that yeah, this doesn't meet the standard
4  despite what all of those people believe.
5  Is that your testimony in front of a jury?
6    **A.    My testimony is this does not meet**
7  **the standard outlined here.**
8    Q.    Okay.  Let's talk about that for a
9  second.  At the beginning of this deposition
10 I asked you a question; do you remember
11 that?
12   **A.    The question of or.**
13   Q.    Yeah.  And this standard happens
14 to use the phrase or in it, or the word or,
15 doesn't it?
16   **A.    Yes, it does.**
17   Q.    It says that "The warning label
18 shall be placed such that they are visible
19 to the user when mounting the treestand or
20 climbing stick when it is in use."
21      And you've already agreed that
22 that warning label would be visible to the
23 user when they were using the treestand
24 attaching that seat to the tree, right?
25   **A.    It would be visible -- likely**

167

1  visible, during that certain phase of the
2  **use of the treestand which is the attachment**
3  **of the seat to the tree.**
4    Q.    And this says, "sitting or
5  standing," in parentheses.  Giving a choice,
6  right?
7    **A.    It does say that.**
8    Q.    So a person standing can certainly
9  read that warning label, right?
10   **A.    If they were to look down at the**
11 **seat, yes.**
12   Q.    And so under the text of this
13 standard, a person standing looking at the
14 tree, for instance, connecting the seat to
15 the back of the tree, the warning label is
16 visible to them, true?
17   **A.    During the phase of connecting the**
18 **seat to the tree.  The warning label is not**
19 **visible during all or the majority of the**
20 **remaining uses of the stand.**
21   Q.    It doesn't say in the standard
22 that it has to be always visible, and that's
23 not possible, considering you can turn 360
24 degrees in the product, right?
25   **A.    Right.  I agree with that.**

168

1    Q.    It just says that it has to be
2  visible when in use and you agree with me
3  that the standard is being used when you're
4  standing in it putting that seat on it,
5  right?
6    **A.    Yes.**
7    Q.    So it is visible in use at that
8  time, true?
9    **A.    At that time.**
10   Q.    Okay.  Now, let's step back a
11 little bit.  Let's talk a little bit about
12 the effect of other cases.  You made some
13 mention in your report that Summit has had
14 other cases, right?
15   **A.    Based on the information provided**
16 **in discovery, there have been other cases**
17 **brought against Summit, yes.**
18   Q.    Okay.  Would you agree that simply
19 because somebody makes an allegation in a
20 court of law doesn't necessarily make it
21 true?
22   **A.    I would agree with that.  Those**
23 **are claims brought against Summit.**
24   Q.    You would agree, would you not,
25 based upon your involvement in this industry

MSJ_JA000227

169

1  for the past five and a half years or so,
2  that allegations are frequently proven
3  wrong.
4  **A.   They can be proven wrong, yes.**
5  Q.   And a company has a right to
6  defend themselves, right?
7  **A.   I would agree with that.**
8  Q.   And then many times juries and
9  judges make determination on whether a
10  product is defective in product liability
11  suits, right?
12  **A.   If a jury is a part of that**
13  **decision, yes.**
14  Q.   And many times judges and juries
15  return verdicts in favor of the defendant?
16  **A.   I don't have statistics or numbers**
17  **to rely on.**
18  Q.   You're not of the opinion that
19  simply because someone has made a claim that
20  a product designer should change its product
21  design.
22  **A.   Please repeat that again.**
23  Q.   You're not of the opinion that
24  simply because somebody has made a claim
25  about something that a product designer

170

1  should change the product design?
2  **A.   I believe a claim should initiate**
3  **a process of the designer to evaluate**
4  **whether the features of the stand are viable**
5  **for that claim, and whether the features of**
6  **the stand successfully mitigate or reduce**
7  **the risk brought forth by that claim --**
8  Q.   Sure then you would have --
9  **A.   -- should initiate a design review**
10  **or additional risk analysis.**
11  Q.   Sure. A manufacturer can
12  investigate the allegations and determine
13  whether or not they want to make changes,
14  right?
15  **A.   Sure.**
16  Q.   And a manufacturer has the right
17  if it disagrees to defend itself, right?
18  **A.   I would believe so, yes.**
19  Q.   And if a judge or a jury returns a
20  verdict in their favor, it helps suggest to
21  them that maybe their design was a good one,
22  right?
23  **A.   I can see how it would. I still**
24  **believe that the risk analysis and further**
25  **design exercises should be conducted.**

171

1  Q.   In the event that a company
2  investigates the claims, believes they have
3  no merit, defend itself and a jury comes
4  back, or a judge throws the case out, you
5  would agree that those things help vindicate
6  the manufacturer's designs, right?
7  **A.   Again, I can see how that could be**
8  **interpreted that way.**
9  **I think it's up for the designer**
10  **to understand and foresee all the potential**
11  **uses or misuses of their product, and then**
12  **they should evaluate regardless of what a**
13  **judge or jury comes back with whether**
14  **they -- they should conduct a separate**
15  **analysis regarding the risk in the claims**
16  **and determine if they are viable or any**
17  **design changes are warranted.**
18  Q.   Are you aware that Mr. Woller and
19  Mr. Nelson have investigated the design
20  claims against the Viper product and they've
21  successfully defended all these cases?
22  **A.   I don't have access to all of**
23  **those materials.**
24  Q.   Are you aware that every single
25  jury that's decided the issue has come back

172

1  with a quick defense verdict?
2  **A.   I'm not aware of that.**
3  Q.   Are you aware that multiple cases
4  have been thrown out by judges for failing
5  to state a claim of design defect or prove a
6  design defect?
7  **A.   I'm not aware of that.**
8  Q.   Do you have any factual basis of
9  any other claims that were made against
10  Summit? In other words, are you claiming
11  that any of them are substantially similar
12  to the present case?
13  **A.   I have not reviewed the details of**
14  **all of those previous claims to know if**
15  **they're substantially similar or not.**
16  Q.   Fair enough.
17  Do you know of any other claims in
18  which a person admitted to intentionally
19  removing the cable from the cable bracket at
20  height to move it around a limb?
21  **A.   I do not know the details of those**
22  **claims to know if it involved that or not.**
23  **I think removing the cable bracket at height**
24  **is foreseeable.**
25  **Mr. Woller's original patent**

MSJ_JA000228

173

1  discusses that the design is acceptable and
2  created in a way that allowed the treestand
3  to be adjustable while climbing. And the
4  fact that Summit warns and instructs so
5  heavily against it indicates to me that that
6  is a foreseeable misuse or foreseeable use
7  of the treestand and therefore effort should
8  be taken to ensure or design out ways that
9  would allow the cable to disconnect under
10 the circumstances.
11    Q.    Now, I saw that in your report
12 that you suggested that the patent somehow
13 suggests that the cable can be removed at
14 height; do you recall that?
15    A.    I do.
16    Q.    Can you point to any portion in
17 the -- in the actual patent that suggests
18 the cable can be removed?
19        And if it helps you there was a
20 question asked of Mr. Woller on page 93 of
21 his deposition by Mr. Daria where he
22 references a specific portion of the patent.
23 The quote used by Mr. Daria -- and I believe
24 this is correct, when I double-checked the
25 patent stated "The use of the cleats and a

174

1  series of nuts on the ends of the cable also
2  makes the climbing tree very easy adjust
3  initially or as one ascends the tree.  The
4  diameter of the tree decreases as one
5  climbs." Is that the provision that you're
6  relying on?
7     A.    Yes.
8     Q.    It doesn't anywhere in that
9  sentence whatsoever in the patent suggest
10 that the cables can be taken out at height,
11 does it?
12    A.    It implies that they can be
13 adjusted at height which Summit warns that
14 adjustment is similar to the removal of the
15 cable in their instruction manual.
16    Q.    My specific question is, first,
17 does it say anywhere in there that the cable
18 can be removed from the treestand at height?
19    A.    No, it says adjusted.
20    Q.    Now, this cable design, because of
21 the way it's designed, you're aware, are you
22 not, can be -- the angle can be adjusted
23 without removing the cable because of its
24 inherent design; do you know that?
25    A.    Yes, the treestand can be adjusted

175

1  via its angle while up in the air.
2     Q.    In fact, if you go back to those
3  2002 videos from the ones that you had, show
4  one of the Wollers telling you -- it could
5  have been Mr. South as well, telling you how
6  to do that, without ever moving the cable,
7  right?
8     A.    It likely did.
9     Q.    So one of the things that it's
10 touting about the design is that you can
11 adjust the angle on this without ever
12 removing or moving the cable, right?
13    A.    I believe the patent claim was
14 addressing the shape of the covers and the
15 brackets relative to the ease of adjustment,
16 implying that the cable could be adjusted
17 within the bracket as opposed to the cable
18 being adjusted on the tree.
19        "The use of the cleats and a
20 series of nuts on the ends of the cable also
21 make the climbing treestand very easy to
22 adjust initially or as one ascends the
23 tree."
24    Q.    Right.
25    A.    And the previous sentence was,

176

1  "Also the keyhole shape opening in the
2  cleats and safety covers make engagement of
3  the cleats within that make the cable very
4  stable, reliable, and foolproof."
5     Q.    Yeah, and what it says in this
6  sentence is, "The use of the cleats and a
7  series of nuts on the end of the cable also
8  makes the climbing treestand very easy to
9  adjust." do you see that?
10    A.    I do see that.
11    Q.    One of the features of this
12 product is the cleats and the nuts on the
13 cables, keep that cable in place so that
14 when you move it, it moves out into space
15 behind the tree allowing you to make
16 adjustments, right?
17    A.    The -- okay, yes.
18    Q.    And there is nothing in this
19 sentence that says anything about movement
20 of the cables in that cable bracket
21 assembly, does it?
22    A.    The patent is referring to design
23 that has no QuickDraw spring or a locking
24 device behind the cable stop to prevent that
25 movement.

MSJ_JA000229

Transcript of Jarrett Waters
Conducted on February 7, 2024

---

177

1   Q.   Right. It's talking about the
2   cleats and the series of nuts. As we talk
3   about this cable is made so that it fits in
4   this cable bracket it wants to move out.
5   And it has a friction component on it so
6   that it -- it wants to hold that cable in
7   place. Right?
8   **A.   I'm following you. On a new cable**
9   **that still has the ability and wants to flex**
10  **outward, yes.**
11  Q.   Even the ones that you tested
12  later still go out?
13  **A.   To some degree, yes, at a lesser**
14  **degree of change.**
15  Q.   There's still a friction component
16  that's going to keep it and let it use it so
17  the cable moves out to space, right?
18  **A.   Okay.**
19  Q.   And then allows you to adjust it
20  on the tree, right?
21  **A.   Okay.**
22  Q.   Are you aware that for instance,
23  you read Mr. Saunders' report, you're aware
24  that Mr. Saunders actually tested it by
25  taking the springs out and climbing up and

178

1   down with it, videoing it, and showing the
2   cables don't move out of place because of
3   that friction?
4   **A.   Again, I haven't seen his videos**
5   **and his photos or the condition of the cable**
6   **that he had while he was climbing. I**
7   **believe he references tree diameter, but**
8   **again, and all those factors play into the**
9   **ability of that cable to move fore and aft**
10  **within the cable bracket.**
11  Q.   Okay. Any other part of the
12  patent that you think supports your opinion
13  that Summit admitted it was foreseeable that
14  somebody was going to remove a cable at
15  height?
16  **A.   No other part of the patent, no.**
17  Q.   By the way, are you aware of any
18  climbing treestand whatsoever, that states
19  you can remove a cable or whatever
20  attachment method it has at height to move
21  around a tree limb?
22  **A.   Please repeat.**
23  Q.   Are you aware of any climbing
24  treestand whatsoever in this industry that
25  suggests that you can remove the attachment

179

1   of the climbing treestand to move over and
2   above a limb?
3   **A.   I am not personally aware of all**
4   **the contents of instruction manuals and what**
5   **they warn against.**
6   **Because the design allows for the**
7   **disconnection of a cable to wrap around a**
8   **tree initially as the designer of the**
9   **product it's foreseeable that somebody may**
10  **choose to adjust that cable length at height**
11  **and may disconnect it, no different than**
12  **what Mr. Vandine did it.**
13  Q.   Well, aren't you aware that every
14  manufacturer of climbing treestands tells
15  the user not to do that?
16  **A.   I wouldn't be surprised if that's**
17  **what they warn against.**
18  Q.   Are aware that that's what's
19  taught in treestand videos, not to remove
20  your cables from the climbing treestand?
21  **A.   I would not be shocked if that's**
22  **what they instruct.**
23  Q.   Because that's the safe use of the
24  treestand, right?
25  **A.   That is the safer way to use the**

180

1   **stand, yes. Eliminating its connection to**
2   **the back of the tree, does create an**
3   **additional risk, which is foreseeable from**
4   **the design phase.**
5   **As Mr. Vandine did it he was fully**
6   **supported and his weight was fully supported**
7   **by the foot section which he testified he**
8   **had no intention of moving and he was only**
9   **adjusting the top section.**
10  Q.   Well, the point of the fact is, as
11  an engineer talking to a reasonable degree
12  of engineering certainty, you believe that a
13  user should not remove a cable at height
14  when using the Summit treestand, true?
15  **A.   I think it's foreseeable that**
16  **people are going to do it.**
17  Q.   It's not my question, sir. My
18  question is: Do you believe as an engineer,
19  to a reasonable degree of engineering
20  certainty, that a user should not remove a
21  cable at height because there are inherent
22  dangers, true?
23  **A.   Disconnecting that treestand at**
24  **height does introduce inherent dangers, yes.**
25  Q.   So you agree with me, true?

---

MSJ_JA000230

Transcript of Jarrett Waters
46 (181 to 184)
Conducted on February 7, 2024

181

1     A.    I believe so, yes.
2     Q.    Okay. Now, let's go back a little
3 bit on the instructions.
4          Instructions are the place that
5 the manufacturer has the ability to
6 communicate the safe use of product to the
7 user, right?
8     A.    Okay. Yes.
9     Q.    You agree with that, right?
10    A.    Yes.
11    Q.    Instructions are used throughout
12 multiple different products to communicate
13 to the user, right?
14    A.    I agree with that.
15    Q.    It can tell you how to properly
16 assemble the product, what you'd find in the
17 instructions, right?
18    A.    Yes, there are other tools and
19 availability to designers other than the
20 instructions to communicate to the users, as
21 far as what the intended use or safe
22 assembly of a product is. And one of those
23 would be the use of a safety cover, or some
24 sort of guard that locks out a keyhole
25 bracket. Those are tools that a

182

1 manufacturer and designer have to
2 communicate to a user.
3     Q.    Did I ask you about safety covers?
4     A.    You did not.
5     Q.    I was asking instructions, right?
6     A.    Instructions and that they are the
7 only way for somebody to communicate.
8     Q.    Did I say "only way," or did I say
9 it's a place where a manufacturer tells a
10 user how to properly use the product?
11    A.    Okay. It's a place, yes.
12    Q.    Okay. And it's a place where the
13 user commonly describes how to safely use
14 that product, right?
15    A.    It would describe its safe use,
16 yes.
17    Q.    How to safely maintain the
18 product, right?
19    A.    Likely, yes.
20    Q.    How to safely install, assemble,
21 et cetera, the product, right?
22    A.    Yes.
23    Q.    Now, summit included instructions
24 with the subject product. I'm showing what
25 we've marked as Exhibit 5, which is the

183

1 instruction manual for this product.
2          (Summit Climbing Treestands
3     Instruction Manual, marked Defendant's
4     Exhibit No. 5, for identification.)
5 BY MR. SUTTON:
6     Q.    Have you seen this document
7 before?
8     A.    I have, yes.
9     Q.    And in these instruction manuals
10 they describe a variety of different things
11 in them about the safe use of this product,
12 true?
13    A.    Yes.
14    Q.    Incidentally, this manual
15 specifically and repeatedly tells the user
16 to make sure that they read it and follow
17 all the warnings and instructions in it,
18 true?
19    A.    I believe it does.
20    Q.    Do the warnings also talk about
21 the requirement and necessity to wear a full
22 body harness?
23    A.    Yes, the warnings do include
24 verbiage about full body harness use.
25    Q.    And they are repeatedly stated

184

1 throughout this, are they not?
2     A.    They are.
3     Q.    As far as these specific -- I
4 didn't see it any in your report, I just
5 want make sure. As far as the content of
6 this specific instruction manual it didn't
7 appear you had criticisms of them. True?
8     A.    The instructions don't provide any
9 warning against inadvertent contact or
10 entanglement with the QuickDraw retention
11 spring.
12    Q.    Okay. Now, you've brought that up
13 several times, so let's talk about.
14 Anything else?
15    A.    Not that I'm aware of.
16    Q.    Now, you used two terms in that
17 answer. You said, "contact with and
18 entanglement with the QuickDraw spring,"
19 right?
20    A.    Yes.
21    Q.    Okay. Now, contact with the
22 trigger on the cable spring is different
23 than entanglement, right?
24    A.    Could be.
25    Q.    If you look on page 29 of your

MSJ_JA000231

Transcript of Jarrett Waters
Conducted on February 7, 2024

47 (185 to 188)

185

1  report, you have a photograph that you've
2  taken showing a person's hand near the
3  trigger assembly, right?
4  **A.   The photograph taken from Summit's**
5  **website shows a climber's hand near or**
6  **within the QuickDraw assembly while climbing**
7  **the tree.**
8  Q.   It actually doesn't show anybody's
9  hand within the QuickDraw assembly.  If
10  somebody is on the outside and holding that,
11  and gripping it, it actually pushes the
12  QuickDraw spring into further engagement,
13  right?
14  **A.   It can if they are fully gasping**
15  **it.**
16  **The lower photo represents the**
17  **index finger within the QuickDraw assembly**
18  **and the QuickDraw assembly is below the**
19  **location of the cable stop.**
20  Q.   The QuickDraw assembly is not --
21  the finger  is not in the QuickDraw assembly
22  in that photograph?
23  **A.   Okay.**
24  Q.   It's behind it.  Okay?
25  So if your finger is behind the

186

1  QuickDraw assembly and you bump the
2  QuickDraw assembly it's actually -- the only
3  thing it's going to do is push it further
4  into engagement, right?
5  **A.   It would further engage the**
6  **spring, yes.**
7  Q.   And in the photograph above if you
8  have your hand and you push it over the --
9  completely over the QuickDraw assembly and
10  you squeeze your hand, that's going to also
11  put it further into engagement, right?
12  **A.   If it is fully over the bottom**
13  **part of the QuickDraw assembly, yes, it**
14  **would be push further in engagement.**
15  **That photo makes it look like the**
16  **fingers are within the lower portion of the**
17  **QuickDraw assembly.  So his ring and pinky**
18  **finger could be applying forward pressure on**
19  **the spring as well.**
20  Q.   Well, let's talk about -- I
21  disagree with you but we don't need to argue
22  about it.
23  So let's say you do put your hands
24  inside the trigger assembly --
25  **A.   Sure.**

187

1  Q.   -- and you're using this product
2  to go up or go down the tree?
3  **A.   Correct.**
4  Q.   Okay.  What is the purpose you're
5  using your hands for?
6  **A.   Stabilizing the stand as you make**
7  **climbing movement.**
8  Q.   That's to hold the stand, right?
9  **A.   Correct.**
10  Q.   Which is a gripping motion, right?
11  **A.   Yes.**
12  Q.   And so if your fingers are inside
13  that trigger assembly, and you grip further
14  onto that platform arm, you're not pulling
15  the trigger at all, right?
16  **A.   It depends how your hand grips the**
17  **trigger assembly, yes.  You could apply a**
18  **rearward motion which would disengage the**
19  **QuickDraw assembly.**
20  Q.   In order to do that, like is show
21  in your video, you have to actually put your
22  finger in, and then pull in a downward angle
23  away from the tree, right?
24  **A.   It could be done in a motion where**
25  **one's thumb is still over the top of the**

188

1  **upright arm and his lower fingers are**
2  **engaging or -- engaging the QuickDraw**
3  **assembly in a rearward motion which would**
4  **disengage it.**
5  Q.   That's not consistent with moving
6  the treestand at the same time, right?
7  **A.   It's consistent with how someone**
8  **might grasp the treestand to move it.**
9  Q.   You believe that pulling the
10  trigger in a downward motion away from the
11  tree is consistent with somebody moving an
12  upper portion of the climbing treestand
13  while using this product?
14  **A.   I think it's foreseeable that**
15  **somebody may entangle their hand within that**
16  **QuickDraw assembly while they were climbing.**
17  Q.   That's not my question.  My
18  question is:  When you're actually using
19  this product -- you used the product.  Now
20  granted your product that you used didn't
21  have a QuickDraw spring.
22  **A.   Correct.**
23  Q.   But you used the product and in
24  order to use this product, you use it sort
25  of an inchworm like fashion, right?

MSJ_JA000232

Transcript of Jarrett Waters
Conducted on February 7, 2024

48 (189 to 192)

189

1    A.    Sure.
2    Q.    Platform's placed on the tree,
3 cable goes around it, right?
4    A.    **(No audible response.)**
5    Q.    Right?
6    A.    **Correct.**
7    Q.    The upper portion is placed on a
8 tree, cable goes around it, user gets on,
9 has his safety harness attached to the tree
10 and begins to climb, right?
11    A.    **Correct.**
12    Q.    And they do so by holding that
13 climbing portion and pulling it up higher,
14 right?
15    A.    **Correct.**
16    Q.    Okay.
17         Then they place their weight
18 either on the back bar by sitting, or on
19 their elbows, and they tilt up the platform
20 and they bring it up higher and attach that
21 to the tree, right?
22    A.    **That's correct.**
23    Q.    Okay. In none of those motions is
24 the user actually pulling their hand away
25 from the tree in the ordinary normal use of

190

1 this stand, right?
2    A.    **It's foreseeable that when they**
3 **are pitching the top section of the**
4 **treestand upward, or rotating it about the**
5 **bark biter to gain the next height or next**
6 **position that the angle of the treestand is**
7 **such that they could retract or engage that**
8 **QuickDraw spring.**
9    Q.    Wait a minute. You just said --
10 you're actually pulling it away the opposite
11 way. You pull the yolk out first in order
12 to disengage it when you climb. You know
13 that, right?
14    A.    **Yes.**
15    Q.    So you're actually pulling it up
16 away from it, and then lifting it. You're
17 not pulling the trigger at that point.
18 You're holding onto the hand so you can move
19 it and pull that yolk out, right?
20    A.    **Under normal use, yes. Consistent**
21 **with --**
22    Q.    And that's my question is --
23    A.    **-- the use of the hand could be**
24 **within that. And we don't know how every**
25 **person in the world would grip or grasp that**

191

1 area. It is foreseeable that it could be
2 actuated.
3    Q.    Well, in what way? They have
4 to -- first of all, you measured the force
5 that you have to pull this spring in a
6 downward -- an exactly downward angle
7 between, what, eight to ten pounds, right?
8    A.    **Some as low as, I believe, six;**
9 **but, yes, in that range.**
10    Q.    I thought the lowest was eight,
11 but...
12    A.    **I --**
13    Q.    I thought you got higher, like 16,
14 but -- but regardless, it takes -- that's
15 not a little bit of weight. I mean some
16 people workout with five pound weights or
17 ten pound weights.
18    A.    **It's not insignificant. There is**
19 **variability, as shown in that testing, in**
20 **the spring's retraction force, that -- but**
21 **when somebody is putting their weight or**
22 **supporting their entire weight through their**
23 **grip and their elbows I believe it is**
24 **foreseeable that somebody could retract that**
25 **QuickDraw spring.**

192

1    Q.    Well, hold on a second. We're
2 talking about your testing right now. You
3 keep going back to this phrase you're saying
4 foreseeability. We're getting to that,
5 we're getting to why is it foreseeable
6 because forces all work in the other
7 direction, but we'll get to that.
8         The first thing is that you tested
9 how many pounds it would take to pull down,
10 right?
11    A.    **Correct.**
12    Q.    In this scenario, in the scenario
13 you're suggesting of this hypothetical thing
14 that you agree is likely not involved in
15 this accident, your video shows you actually
16 pulling it back like you're pulling a
17 trigger, right?
18    A.    **Correct.**
19    Q.    Now, that takes -- because it's
20 operated at a different part of the curve on
21 the spring that takes more force than
22 pulling it directly down, right?
23    A.    **It would take more force, yes.**
24    Q.    Have you measured that force?
25    A.    **I have not measured a force in**

MSJ_JA000233

Transcript of Jarrett Waters
Conducted on February 7, 2024

193

1 that direction.
2 Q.    Do you know whether a person just
3 normally climbing it, what type of force --
4 have you ever measured or looked at what
5 type forces they might be providing in their
6 hand when they do that?
7 **A.    I have not looked at grip forces**
8 **of somebody's hands while they were**
9 **climbing.**
10 Q.    You know you -- now, I'm sure in
11 your involvement in this case have put these
12 on and off trees or on and off poles
13 multiple times, right?
14 **A.    Correct.**
15 Q.    It's not an unintentional thing.
16 You have to pull that trigger in order to
17 pull it out, right?
18 **A.    Yes.  In the stands I've tested**
19 **the QuickDraw spring is behind the cable**
20 **stop and it has to be retracted in order to**
21 **slide the cable stop rearward in the cable**
22 **bracket.**
23 Q.    Have you done any type of
24 surrogate tests or any tests while people
25 videoing them, normally using it about

194

1 whether they're pulling it in the direction
2 of -- of actually pulling this trigger or
3 the QuickDraw spring open?
4 **A.    I have not done that testing.**
5 Q.    The photographs that you show on
6 paragraph 29, the way the hand is gripping
7 is actually not in the same direction that
8 would have to be gripped to pull that
9 trigger, you would agree with that, right?
10 **A.    The lower photo appears to show**
11 **the index finger within the QuickDraw**
12 **assembly in a way that could retract the**
13 **QuickDraw spring from the cable stop.**
14 Q.    Well, it appears from that lower
15 figure which I've looked it this photograph
16 and I've looked at this, and I don't -- I
17 think you're wrong.  I don't think it's
18 inside it, but I'm just going to go with
19 that you say it's inside.
20 **A.    Okay.**
21 Q.    He's got his thumb on the
22 top of the cable bracket, right?
23 **A.    Okay.**
24 Q.    The meat of his thumb is placed on
25 the top of that, right?

195

1 **A.    Okay.**
2 Q.    So the gripping -- when you do
3 that, the gripping strength of your hand is
4 going to be pointing up toward that thumb,
5 right?
6 **A.    The -- yeah, the part of the hand**
7 **that's wrapped around the upright arm would**
8 **be gripping up towards the thumb.**
9 Q.    So your hand can't be in that
10 position to actually pull this -- this
11 trigger, right?
12 **A.    If the index finger is within the**
13 **trigger it could be rocking the trigger**
14 **backwards.**
15 Q.    Rocking the trigger backwards is
16 not going to be with enough force when it's
17 in that hand to pull the trigger
18 sufficiently to open that trigger and allow
19 the cable to pass through, is it?
20 **A.    That photo represents that the**
21 **cable stop is positioned above the position**
22 **of the retention spring.  The photo**
23 **represents that he is applying force to that**
24 **retention spring in an effort, or in a**
25 **manner that places it below the cable stop.**

196

1 Q.    I guess I can't see that.  And
2 I've looked at this video, I've looked at
3 your -- I don't see that in any way it
4 suggests that.  Have you done measurements
5 or testing to show that this can happen
6 during ordinary use?
7 **A.    I have produced that during**
8 **testing that one could grip and retract that**
9 **spring.  I don't know if it's represented in**
10 **the photos or video.**
11 Q.    Well, do you have any photographs
12 or video of you showing that you're climbing
13 a tree and you are able to -- while climbing
14 a tree and repositioning the upper portion,
15 you're able to inadvertently come in contact
16 and pull this trigger in a way that will
17 open that QuickDraw spring?
18 **A.    I do not have photos or video that**
19 **show the inside of the stand positioning the**
20 **upper section and my hand grasping and**
21 **disengaging the QuickDraw spring.**
22 Q.    So this hypothetical scenario,
23 this theoretical scenario that you now agree
24 is not likely the cause of this accident you
25 haven't been able to replicate on any tree,

MSJ_JA000234

Transcript of Jarrett Waters
Conducted on February 7, 2024

197

1 true?
2 **A.   I have been able to replicate it.**
3 **I don't know if I have photographic evidence**
4 **of that replication.**
5 Q.   You've been able replicate while
6 climbing in a tree?
7 **A.   Not while climbing in the tree,**
8 **excuse me.**
9 Q.   That's my question.  While using
10 this stand in the intended manner, have you
11 been able to replicate that hypothetical
12 situation that you now agree is not likely
13 the cause of this accident?
14 **A.   Not while climbing a tree.**
15 Q.   Okay.  Do you have any criticisms
16 of the selection of the cable itself?
17 **A.   I do not believe I do.**
18       MR. SUTTON:  I think I broke my
19 promise.  I think I've gone over an hour.
20 So we can go off the record.
21            - - -
22       (Recess.)
23            - - -
24 BY MR. SUTTON:
25 Q.   All right.  So we're back on the

198

1 record.  It appeared to me from your review
2 of the report that you didn't really have
3 any particular criticisms of the cable
4 bracket design itself.  You thought that
5 there should be an additional guard, but as
6 far as the bracket itself you didn't have
7 criticisms; is that fair to say?
8 **A.   That's fair to say.**
9 Q.   In the QuickDraw spring I know
10 that you thought there should be additional
11 items on it, but I didn't see any criticisms
12 of the design of the QuickDraw spring; is
13 that true?
14 **A.   Of the design of the spring itself**
15 **no criticisms.  Of a safety interlock or a**
16 **safety device I have criticisms that I**
17 **express in the conclusions in my report.**
18 Q.   And I guess maybe that was an
19 inartful question but my question really is:
20 The material selection, the curvature, those
21 type of things, you don't have any design
22 opinions relating to it, right?
23 **A.   I do not, no.**
24 Q.   You talked a little bit about the
25 hatch cover design.  You previously had,

199

1 what, two Mini Vipers in 2002?
2 **A.   I believe it was a Mini Viper and**
3 **a Viper XLS, but yeah.**
4 Q.   Were they arm climbers or hand
5 climbers or did they have -- were they
6 sit-and-stand climbers?
7 **A.   They were sit-and-stand climbers,**
8 **and both did have the hatch cover for the**
9 **safety cover.**
10 Q.   The hatch covers were as designed,
11 if I recall, an aluminum or steel design
12 that would open up, you put bracket or the
13 cable in the bracket and then you close the
14 hatch cover; is that right?
15 **A.   That's correct.**
16 Q.   That required a user to properly
17 close the hatch cover in order to have that
18 guard to be effective, right?
19 **A.   The user would have to manually**
20 **open and manually close that to block the**
21 **open keyway, correct.**
22 Q.   So that's an additional step in
23 trying to put this onto the tree, right?
24 **A.   It would be an additional step,**
25 **yes.**

200

1 Q.   Now, in addition to that, when it
2 was open in an open position it had the
3 ability to become entangled or catch on
4 other things, whether that was in transport
5 or otherwise, right?
6 **A.   It could.  And the way it pivoted**
7 **out it was exposed in a manner that, you**
8 **know, could be caught on other things.  It**
9 **also in an open manner would serve**
10 **potentially the visual indicator to the**
11 **operator that that hatch cover was open and**
12 **not positioned over the keyway.**
13 Q.   It could be damaged if it was --
14 if the treestand was dropped, caught on
15 something, et cetera, bent out of shape,
16 true?
17 **A.   Yeah.  Similar to any other metal**
18 **component on the stand.**
19 Q.   If a hatch cover is bent out of
20 shape, that can prevent it from closing and
21 being able to work and provide its function,
22 true?
23 **A.   It could make it more difficult to**
24 **close.  They have a slight springiness to**
25 **them which allows you to kind of reform them**

MSJ_JA000235

201

1  back to the shape of cable bracket, but if
2  permanently damaged, then, yes, it would be
3  difficult to close.
4      Q.    From time to time did you have
5  to -- have to apply pressure or load to get
6  them to go back into the original shape?
7      A.    I don't recall specifically having
8  to reshape them.  Oftentimes, you would
9  sometimes have to require additional force
10 to close them back over the cable bracket.
11     Q.    Because they would become
12 squishy --
13     A.    If they became pinched.
14     Q.    Okay.  Got it.  If they became
15 slightly loose then they could open further
16 while you were climbing, right?
17     A.    Potentially, yes.
18     Q.    And that could lead to a danger,
19 right?
20     A.    It could lead to an open or
21 exposed keyway.
22     Q.    Now, if you turn to Exhibit 5,
23 which is the treestand instructions, and
24 specifically to page 6.  Let me know when
25 you're there.

202

1      A.    I'm there.
2      Q.    This is the page that talks and
3  tells the user how to use this product,
4  right?
5      A.    The title at the top of the page
6  describes and provides the instructions for
7  attachment to the tree.
8      Q.    Fair enough.  And then it goes on,
9  and in a series of numbered paragraphs and a
10 series of figures which are photographs
11 shows the user how to put the cable in the
12 cable bracket, right?
13     A.    It does, yes.
14     Q.    And what it shows is that the user
15 pulls down on the QuickDraw spring, true?
16     A.    Yes, it shows that in figure 3.
17     Q.    Inserts the cable, right?
18     A.    Inserts the cable in No. 4, yes.
19     Q.    And as shown in No. 4 you have to
20 bend the cable to get it into the cable
21 bracket, right?
22     A.    It shows some arc in the cable in
23 order to insert it into the tube of the
24 upper right arm and navigate around the
25 opening in the keyway.

203

1      Q.    Incidentally, how far apart are
2  cable bolts or the cable nuts, cable stops?
3      A.    The drawing indicates that they're
4  spaced four inches on center on each end.
5  Four and a half inches from the end.
6      Q.    And did you make any determination
7  as to how close the QuickDraw spring can
8  come toward any part of the tree itself in
9  this design?  Do you know what I mean?
10     A.    How close the QuickDraw spring can
11 come to the tree?  I'm not following.
12     Q.    In other words, a cable that goes
13 around goes over the QuickDraw spring and
14 then it goes around the tree and connects
15 back into the cable bracket, right?
16     A.    Correct.
17     Q.    And there is a distance when it's
18 installed into a tree between that QuickDraw
19 spring or the cable nut if you push it
20 against the QuickDraw spring and the side of
21 the tree when it first touches the tree that
22 goes around.
23     A.    Okay.
24     Q.    The cable has to touch the tree,
25 right?

204

1      A.    Sure.
2      Q.    And did you make determination as
3  to what those variable lengths were?
4      A.    Under what circumstance?
5      Q.    When you place in a tree, load it
6  into a tree?
7      A.    I did not measure that specific
8  distance, no.
9      Q.    So, in any event, this talks about
10 proper insertion and it says on the warning
11 label, "If the QuickDraw cable spring does
12 not lock into place behind the cable stop as
13 shown in figure 7, do not use the treestand
14 since the cable is not secured and may
15 result in the user to fall.  Contact Summit
16 to obtain the proper corrective action." Do
17 you see that?
18     A.    I do.
19     Q.    You see figure 7 shows the cable
20 so that the cable stop is in front of the
21 spring, right?
22     A.    Yes.
23     Q.    Okay.  And then what that's
24 showing is -- is showing the user is to make
25 sure that you confirm that that's the

MSJ_JA000236

Transcript of Jarrett Waters
Conducted on February 7, 2024

205

1  location of the cable in front of the spring
2  like that, fully inserted in the cable
3  bracket when you install this into the tree?
4      A.    **From the side view of the stand,**
5  **yes.**
6      Q.    Well, the video also shows Summit
7  folks installing it from the side as well,
8  are you aware of that?
9      A.    **I'd believe it if you told me. I**
10 **don't know one way or the other.**
11     Q.    And from looking at the side view
12 you would agree with me that it is very easy
13 to discern whether or not that cable is
14 properly in the cable bracket, true?
15     A.    **From this side view and the**
16 **closeup photograph and the lighting**
17 **conditions, yes.**
18     Q.    So what -- you threw out a last
19 part, and I'll get to that in a second. But
20 you agree with me that a person looking at
21 this at the side can easily determine
22 whether the cable has been appropriately and
23 properly installed in the cable assembly?
24     A.    **From a closeup view represented in**
25 **figure 7, yes. From a position represented**

206

1  **in figure 8, it becomes a lot more difficult**
2  **to determine if QuickDraw spring is**
3  **positioned behind the cable stop.**
4      Q.    Well, first of all, you can't see
5  in figure 8 that it's -- that it's installed
6  in front of the cable -- the cable stop is
7  installed in front of the QuickDraw spring?
8      A.    **It appears to be, however tree**
9  **obscures much of the -- or the back obscures**
10 **the background and it is difficult to see**
11 **the cable stop from that angle.**
12     Q.    Sure, because the person that took
13 the photograph is standing several feet
14 away. But a user that puts this on a tree
15 is standing right up next to it because they
16 have to be able to hold it, right?
17     A.    **They would be standing potentially**
18 **closer than what is shown in figure 8.**
19     Q.    And as shown in these figures 3
20 through 7 it's really easy to just look to
21 see if it's connected correctly, right?
22     A.    **From the side it becomes easier to**
23 **determine that, yes.**
24     Q.    Now, what are those things that
25 put on your head that shoot light out of?

207

1      A.    **(No audible response.)**
2      Q.    What are they called again? I'm
3  really am having a brain freeze.
4      A.    **Head lamp.**
5      Q.    Head lamp, I'm sorry. Head lamp.
6  You ever use head lamps?
7      A.    **I do.**
8      Q.    How about flashlights, you ever
9  use flashlights?
10     A.    **Typically not during any climbing,**
11 **or -- yeah, any climbing activity I prefer**
12 **hands free or a head lamp.**
13     Q.    In any event, they shed light on
14 it. So if you're in an early morning, late
15 night application -- well, you shouldn't be
16 using this at night, so you should be taking
17 it off the tree at night. But if you're in
18 the early morning you can use a light, and
19 most hunters do, to see whether if this is
20 appropriately put on the tree?
21     A.    **Many hunters do use headlamps. I**
22 **believe Mr. Vandine testified that did not.**
23     Q.    Well, he said he didn't use a
24 flashlight. But most people also carry a
25 phone and phones have flashlights on them.

208

1  All they have to do is take an extra couple
2  of seconds and flash that flashlight to see
3  whether or not it's appropriately attached,
4  right?
5      A.    **If they use the light from their**
6  **phone, they could more easily discern**
7  **whether it's properly attached.**
8      Q.    But you agree with me that if
9  you're standing on the side of the stand and
10 you're looking at it from the point of view
11 that's shown in these photographs, it's
12 really easy to determine whether or not the
13 cable has been appropriately and properly
14 inserted into the cable bracket?
15     A.    **If you were as close as figure No.**
16 **7, yes.**
17     Q.    Well, I mean even as close as
18 figure No. 6, right?
19     A.    **I would agree it with that, given**
20 **the white background that we see here.**
21     Q.    And even as close as figure No. 8
22 you could see the top -- the right side
23 cable bracket. You can easily see that
24 attachment, right?
25     A.    **Against the white background of**

MSJ_JA000237

Transcript of Jarrett Waters
Conducted on February 7, 2024

53 (209 to 212)

209

1  the photo, yes.
2  Q.    And you said you have a problem
3  because the photograph shows the left
4  bracket in front of the tree, but you can
5  just kind of move around the side of the
6  tree a little bit and get a better view and
7  make sure you can see that that cable
8  bracket is appropriately installed, right?
9  A.    The operator could change their
10 position to change their viewing angle. I
11 don't think they're ever going to see a
12 white background like in figure 8 unless
13 it's a snowstorm, but they do have the
14 ability to move alongside of the tree to
15 better inspect that cable assembly.
16 Q.    And you agree that a user, prior
17 to using a climbing treestand, should take
18 the time to check to make sure they have
19 properly installed the climbing treestand to
20 the tree, true?
21 A.    Yeah.  During the installation to
22 the tree and prior to climbing it would be
23 good practice to inspect that the cable is
24 fully seated within the cable bracket.
25 Q.    So you agree that the user should

210

1  do that, right?
2  A.    Yes, the user should do that.
3  Q.    And that's true of the designs
4  you've drawn up in the CAD drawings that
5  Summit designed and any other climbing
6  treestand, right?
7  A.    The user should inspect that the
8  cable bracket or cable is fully secured in
9  one way or another.
10 Q.    And you would agree that
11 especially concerning inherent risks that
12 are used -- strike that.
13       Especially considering the
14 inherent risks in using a climbing
15 treestand, you would agree that the user
16 should take the appropriate amount of time
17 to ensure that their stand is properly
18 attached to the tree?
19 A.    They should inspect it, in a way
20 that confirms to them that the stand is
21 appropriately attached to the tree.
22 Q.    And these instruction manuals,
23 this instruction that's set forth on page 6
24 clearly show the user how to do that, with
25 this product, right?

211

1  A.    This instruction manual does
2  outline how to do that, yes.
3  Q.    And provide samples that a user
4  can compare against and make that their
5  product is installed on the tree, right?
6  A.    Provided they have the instruction
7  manual with them at the tree.
8  Q.    Or if they wanted to prepare it or
9  they could just look it at, memorize it and
10 realize what it's supposed to look like
11 because it's easy to see on the side of the
12 stand when you look at it sideways, right?
13 A.    If they were to memorize all these
14 figures, yes, they could deduce that.
15 Q.    Now, I don't have of way of
16 marking your video that you did, and I don't
17 know if it's easier for you to pull up, and
18 I can give you -- I feel that it is not,
19 because mine is installed in a Cloud, and
20 so -- right now I'm not at 000, but it's
21 saying I'm at 000.  So I don't think I'm
22 going to be to do it.  So I'm going to show
23 you my video here.
24 A.    Okay.
25 Q.    The video just shows, it appears

212

1  to be your hand, right?
2  A.    That is correct.
3  Q.    And you're standing on the left
4  side of the treestand, right?
5  A.    Correct.
6  Q.    Using your right hand, right?
7  A.    Correct.
8  Q.    So the right hand, when you're
9  using this stand, doesn't interact with that
10 left arm, right?
11 A.    During the climbing of the
12 treestand?
13 Q.    Yes.
14 A.    Yes.  Your right hand would likely
15 be on the right upright.
16 Q.    So in any event, you can see --
17 now I can't see, but your hand is holding
18 onto the arm of the climbing bracket, right?
19 A.    Correct.
20 Q.    It's also got a finger that's
21 several -- one or two inches away from the
22 other fingers through the trigger assembly,
23 right?
24 A.    Yes.
25 Q.    And by having it one or two inches

MSJ_JA000238

Transcript of Jarrett Waters
Conducted on February 7, 2024

54 (213 to 216)

213

1  away, that gives you the ability to put the
2  force on it that opens this up, right?
3     **A.    I likely could apply that force**
4  **should my hands have been closer to the**
5  **trigger, but in this video that is what it**
6  **represents, yes.**
7     Q.    Did you try to do that?  In other
8  words, did you do a video where you didn't
9  apply it with your hand turning it a
10 different direction than it normally just
11 using this product as shown in your video?
12    **A.    I did not record any of those**
13 **trials.**
14    Q.    That wasn't my question, though.
15 Did you actually do it?
16    **A.    I believe I actuated the stand**
17 **with my hand in a closer grip through some**
18 **of my testing, however it is not documented**
19 **likely through photograph or video.**
20    Q.    Okay.  Now, I'd appreciate it if
21 you excuse the fact that this is in a Cloud,
22 sometimes they get fuzzy but here -- there
23 are two photographs.  There is one
24 photograph that I will represent to you that
25 you produced of this test, which has the

214

1  nails in the back, I think you said screws?
2     **A.    They are, yes.**
3     Q.    There's screws in the back, and
4  then there's one photograph that doesn't,
5  right?
6     **A.    Of the recently produced, the two**
7  **photographs in the video?**
8     Q.    Yes.
9     **A.    I think both include the screws.**
10    Q.    That's the second photograph.  I
11 don't see the screws in it.
12    **A.    May I zoom in on that?**
13    Q.    Yeah.  Let me do it for you
14 because it's easier.
15        MR. DARIA:  Can you probably see
16 here.
17 BY MR. SUTTON:
18    Q.    You and Counsel can look at it
19 yourself if you want to.
20    **A.    I believe I can see the head of**
21 **one of those screws in that photograph along**
22 **the top.  But the screws are -- the screws**
23 **are attaching that cable to that pole in**
24 **that photo.  Whether you can see them or not**
25 **due to the angle of the photo, they are.**

215

1     Q.    Okay.  That was just kind of a
2  prefatory question to the next one.  So it
3  appears to me that in this -- this set up
4  that you've set this up against a tree,
5  you've actually taken the cable assembly and
6  set it up higher than it would normally go.
7        In other words, there is a bend in
8  that cable assembly so that it goes up to
9  where it's nailed to the tree.  Do see that?
10    **A.    I do see that.**
11    Q.    Is there a reason you did that?
12    **A.    This photograph was taken after**
13 **that video was recorded, I believe, and the**
14 **treestand may have moved or slid down the**
15 **utility pole post testing.**
16    Q.    Well, let's talk about that for a
17 second.  Because you see the same
18 photograph.
19    **A.    I made an attempt to level the**
20 **stand prior to the initiation of that test.**
21    Q.    The other one, which is the other
22 photograph, that also shows it at a higher
23 level like that, correct?
24    **A.    Correct.**
25    Q.    So the video shows that the cable

216

1  seems to be at a higher level than it
2  normally would be as well.  Was that done
3  intentionally to make it easier to come out
4  of the stand?
5     **A.    No.  The stand was positioned**
6  **level first on the tree and then I adhered**
7  **or affixed the cable to the tree.**
8     Q.    If I --
9     **A.    The cable was in its natural state**
10 **as it was connected into the cable bracket**
11 **when I secured it to the tree.**
12    Q.    And if I understood this test that
13 you did, the upper portion of the treestand
14 was attached at the bottom part to the tree
15 to the yolk, right?
16    **A.    That's correct.**
17    Q.    These products work on a process
18 of cantilever force, right?
19    **A.    Sure.**
20    Q.    So there's an equal and opposite
21 reaction, and as pulls against the back of
22 the tree it pushes on the front of the tree
23 at the yolk, right?
24    **A.    Yes.**
25    Q.    And I can get more in-depth than

MSJ_JA000239

Transcript of Jarrett Waters
Conducted on February 7, 2024

55 (217 to 220)

---

217

1 that, I'm just trying to get to the next
2 question.
3        In any event, it appears that in
4 your testing what you did was simply rotate
5 the furthermost point of the treestand up
6 towards the tree, you didn't actually move
7 the yolk; is that true?
8    **A.    I'd have had to watch the video.**
9 **The yolk may not disconnect from the tree**
10 **given how I was -- from the side of it.**
11   Q.    I'm not sure we can watch it
12 together, but I'm going to try, because when
13 you get in a bigger firm they put in these
14 things to make it hard to see the from side
15 so nobody can read over your shoulder.
16   **A.    Play it one time for me, please.**
17   Q.    Of course.
18   **A.    Yeah, the yolk was not**
19 **disconnected from the tree at the time that**
20 **testing was done.**
21   Q.    And so that testing was not a
22 normal movement of the treestand if you were
23 just moving it up or down the tree, because
24 you would -- the first thing you'd do, is
25 you remove the yolk and then you move it up,

---

218

1 right?
2    **A.    I think it's a foreseeable**
3 **movement.  Some individuals may rotate about**
4 **the yolk, to push the cable away from the**
5 **tree before sliding the platform up the**
6 **tree.**
7    Q.    Well -- and you use these stands,
8 the yolk actually digs into the tree a bit,
9 right?
10   **A.    To some degree, depending on the**
11 **tree.**
12   Q.    So you have to pull the yolk back
13 to get it to move, right?
14   **A.    You can still rotate about the**
15 **yolk as a fulcrum point or a pivot point.**
16   Q.    In any event, you would agree that
17 because the product yolk does not come off
18 the tree this is not a normal movement to
19 reposition the stand, if you were just
20 moving the stand up, which requires you to
21 move the yolk, remove the yolk and
22 disconnect it from the tree?
23   **A.    I think it's a foreseeable**
24 **movement and we don't know how everybody**
25 **utilizes the treestand and moves it as they**

---

219

1 inchworm up the tree.
2    Q.    Well, nobody is dragging the yolk
3 and then the yolk has to come off the tree
4 to move it, right?
5    **A.    It has to come off eventually.**
6    Q.    That's my point is that your
7 testing isn't the actual movement part
8 because you haven't taken the yolk off,
9 you're just pivoting the climbing stand,
10 right?
11   **A.    I am pivoting the climbing stand**
12 **which is a foreseeable action that somebody**
13 **may do in the field.**
14   Q.    Since we're going to use the word
15 "foreseeable," which you like to use, how
16 foreseeable is it that the cable is nailed
17 to the back of the tree?
18   **A.    It is unlikely that the cable**
19 **would be nailed to the back of the tree;**
20 **however, it is foreseeable that the cable**
21 **may encounter obstructions, whether it be**
22 **limbs or potential bark that may create a**
23 **snag or prevent its free motion behind the**
24 **tree.**
25   Q.    Well, one of the things that the

---

220

1 instruction manuals talk about, in fact, all
2 the instructions for climbing treestands
3 talk about is to not use climbing stands on
4 trees that have obstructions like limbs to
5 go up them, right?
6    **A.    (No audible response.)**
7    Q.    Did you get that question?
8    **A.    I did.  I apologize for the delay.**
9 **I'm looking through the warnings for a**
10 **specific line.**
11        **The warning states, "On trees that**
12 **have an obstruction that may limit**
13 **treestands use."  So it would be up to the**
14 **user interpret whether that is obstruction**
15 **is something that limited their use.**
16   Q.    Well, if it interferes in the
17 movement of the upper portion of the
18 standard cable that would limit the use,
19 wouldn't it?
20   **A.    If it's a one-off obstruction it**
21 **may be something that they could work**
22 **around.**
23   Q.    In other words, they could saw it
24 off?  They could cut off or saw off --
25   **A.    Right.  A small limb that could be**

---

Transcript of Jarrett Waters
Conducted on February 7, 2024

221

1 flexed out of the way as they go up above
2 it.
3    Q.    On the backside of the tree where
4 the cable goes?
5    A.    Anywhere along the trunk of the
6 tree you can encounter a small flexible limb
7 or a vine or some obstacle that could
8 potentially be deflected out of the way.
9    Q.    You're suggesting that while
10 climbing in a climbing treestand -- the
11 cable only touches the tree at the back of
12 the tree, right?
13    A.    It can interface with the sides of
14 the tree as well, yeah.
15    Q.    You're suggesting that while
16 holding it a person should use that, work up
17 and then try to twist that off like if it's
18 on the back of the tree or something?
19    A.    I'm not suggesting that they
20 remove the obstacle.  I was suggesting that
21 if there's a one-off obstacle they may move
22 around it.
23    Q.    But you've done no testing on any
24 type of objects on a tree to determine
25 whether or not they have any sufficient

222

1 force to even do what you did in this video
2 in real life?
3    A.    I think there's many different
4 obstructions that present themselves in
5 trees.  Yes, there are no screws found in
6 trees that would be attached to the cable
7 post installation.
8    Q.    My question is:  Did you test it?
9 Did you do any testing whatsoever to
10 determine the type of force that you could
11 deduce on the cable or cable bracket on any
12 actual feature of a tree?
13    A.    No, I did not.
14    Q.    Now, it appears to me that when
15 you did this test, you pulled the trigger
16 down and tilted the cable bracket toward the
17 tree, right?
18    A.    Correct.
19    Q.    Then as you did that, the cable
20 moved axially because you've now
21 intentionally bypassed the QuickDraw spring,
22 right?
23    A.    In that test I bypassed the
24 QuickDraw spring by retracting it, yes.
25    Q.    And that's the intentional use of

223

1 this product; that's how it is designed to
2 be used.  In other words, it's designed so
3 that if you pull the spring you can move the
4 cable out of the bracket because that's how
5 you remove it, right?
6    A.    That's how it's designed, yes.
7    Q.    Okay.  But when you did that and
8 you pushed the cable bracket up high enough
9 so that the cable went past the spring, it
10 didn't come out of the stand, true?
11    A.    It did require the second
12 actuation of the QuickDraw spring to lift
13 it.  If it would have driven forward there
14 was a chance it could have partially caught
15 on the exposed keyway at that point.
16    Q.    My point is that the actual design
17 of the cable bracket itself in your test and
18 the cable system in your test, showed that
19 even when you pulled that spring,
20 intentionally bypassing it, and moved the
21 platform forward to -- so the cable would
22 back out from the area it was in front of
23 the spring, it still wouldn't come out of
24 the cable bracket, true?
25    A.    At that moment in time, no.  The

224

1 stand has to be lowered back.
2    Q.    Well -- and your test required you
3 to make now, a second movement at which you
4 change the position of your hand --
5    A.    Reengaging the QuickDraw spring to
6 drive it upwards, yes.
7    Q.    -- to now, move your hand so that
8 now, two fingers were over on the outside of
9 trigger.  So you have to take your finger
10 out of the trigger assembly, then move it to
11 the other side with two fingers now, pushed
12 it up, so that you can now physically use
13 that spring to push the cable out of the
14 cable bracket, right?
15    A.    That test shows that, yes.
16    Q.    Were you ever able to do a test
17 where you didn't have to do that step?
18    A.    If I didn't do that step there
19 were tests where the cable stop would engage
20 or partial engage the keyway at the top of
21 the cable bracket.
22    Q.    Where are the videos of those
23 tests?
24    A.    I don't have videos of those
25 specific tests.

MSJ_JA000241

Transcript of Jarrett Waters
Conducted on February 7, 2024

225

1    Q.    So if you didn't do this
2  intentionally change your grip, take your
3  finger out of the trigger assembly, put it
4  on the outside and then push it up, you
5  could not get the cable to just come out of
6  the cable bracket, fair?
7    **A.    It would not fully exit the cable**
8  **bracket but it did partially engage the**
9  **keyway in that perched position that we**
10 **referenced earlier.**
11   Q.    On inside, or the lower side of
12 it?
13   **A.    I would say mid side, midline.**
14   Q.    Did you move it from there, to
15 determine what would happen if you moved the
16 stand?
17   **A.    If I applied load on the stand**
18 **from there it would temporarily hold from**
19 **that position.**
20   Q.    Until it -- until you moved the
21 stand one way or the other to move it out of
22 that position; is that right?
23   **A.    Correct.**
24   Q.    So one of the things you came up
25 with this hypothesis that we talked about,

226

1  that doesn't likely apply to this case,
2  would require separate and distinct
3  movements.  It would require one movement to
4  push this to get the cable to come out and
5  then remove the upper portion a second time,
6  in order to get the cable to come off that
7  perched position; is that fair?
8    **A.    Please repeat.**
9    Q.    Okay.  So if I understood this,
10 what you are saying is you would pull the --
11 intentionally pull the QuickDraw trigger
12 just like the product was designed to do,
13 right?
14   **A.    Yes.**
15   Q.    Then tilt the upper portion toward
16 the cable assembly which has been screwed to
17 the back of the tree, right?
18   **A.    Yes.**
19   Q.    And because it's been screwed to
20 the back of the tree, the cable stays the
21 same point while you move the upper portion,
22 right?
23   **A.    That's correct.**
24   Q.    So the cable stays at the same
25 point, you've moved the upper portion back

227

1  and the cable assembly is still by its
2  design of both the cable bracket and the
3  cable itself staying in that channel of the
4  cable bracket, right?
5    **A.    The cable stop has the ability to**
6  **sit on the face of the keyway --**
7    Q.    We haven't gotten there yet.
8    **A.    Okay.**
9    Q.    At this point in time it's still
10 in that channel, right?  You haven't pulled
11 it back, you just moved it forward?
12   **A.    Okay.  Yes.**
13   Q.    Then when you pull it back, it
14 doesn't just come out is what you found,
15 right?
16   **A.    It could engage the keyway, yes.**
17   Q.    It could go right back to where it
18 was normally, that's one of the things that
19 could happen, right?
20   **A.    That's correct.**
21   Q.    Or it could potentially engage the
22 opening of what I think Mr. Woller called
23 the neck of that keyway?
24   **A.    Yes.  The narrowed portion of the**
25 **top of the cable bracket.**

228

1    Q.    And what we talked about earlier
2  as the perched position, right?
3    **A.    That's correct.**
4    Q.    And then in order for it to come
5  out any further you had to then move the
6  climbing stand further to get it to move
7  from that position, right?
8    **A.    That would be correct.**
9    Q.    And there is nothing in the
10 testimony of Mr. Vandine that suggests he
11 did that, right?
12   **A.    There is nothing in his testimony**
13 **that talks about the actuation of those**
14 **QuickDraw springs when he went to reload or**
15 **test the cable stop and the bracket.**
16   Q.    And there is also nothing in it
17 that suggested that -- strike that.  That's
18 an important point I want to get back to.
19       When he is attaching the cable
20 bracket on it, he's doing it while he's at
21 height, right?
22   **A.    Yes.**
23   Q.    That requires him to stand on the
24 platform without a harness, right?
25   **A.    He can do it with or without a**

MSJ_JA000242

Transcript of Jarrett Waters
Conducted on February 7, 2024

58 (229 to 232)

229

1  harness.  He's standing on the platform.
2  Q.    But he had no harness on?
3  A.    Yes.
4  Q.    And he has to keep the upper
5  portion of the tree stand controlled, right?
6  A.    Yes.
7  Q.    So he describes this process where
8  he's partially holding the treestand against
9  the tree with his body, right?
10  A.    Yes.
11  Q.    And he's reaching around the tree
12  with one hand to try to put it in, and then
13  trying to put it in the other side with his
14  other hand, right?
15  A.    Correct.
16  Q.    And in order to hold it up against
17  the tree, he's got to be close to the tree,
18  right?  Because he's got to be touching the
19  physical outer rim and he's got to be within
20  a few inches away from the tree, right?
21  A.    Yes.
22  Q.    And as he does it difficult, if
23  would be difficult or not impossible for him
24  to really see that connection point, right?
25  A.    It would be difficult to see that

230

1  connection point, yes.
2  Q.    Now, nothing in what he testified
3  to suggested that he touched or moved the
4  QuickDraw spring during that action, right?
5  A.    Okay.  I agree he does not
6  reference the QuickDraw spring during that
7  portion of his testimony.
8  Q.    And following up on that, as he
9  says, "I put it in," and he does not
10  describe any significant movement -- or two
11  movements of the stand.  So if your theory
12  was correct he would have put it
13  incorrectly -- if your second theory was
14  correct he would put it correctly, right?
15  A.    Okay.
16  Q.    And then he has to move part of
17  the upper portion while pulling the trigger,
18  right?
19  A.    Yes.
20  Q.    And if he did that, and the cable
21  was somehow stuck to the back of the tree
22  through some magical means we don't know of
23  right now because there wasn't anything on
24  the tree, but if it hypothetically did
25  that --

231

1  A.    Okay.
2  Q.    -- your testing shows it would
3  have at worst only got to a point where it
4  stuck on the -- on that neck or the perch
5  position?
6  A.    Yeah, it could have become in a
7  partially installed state.
8  Q.    And then in order for it to come
9  out you said you -- they had to move it
10  again, right?
11  A.    It had to be reloaded.  Whether it
12  moved or load was applied, disengaged and
13  reapplied it would have had to have been
14  reloaded.
15  Q.    Now, we talked earlier about the
16  fact that removing the cable from a climbing
17  treestand, while at height, it's danger,
18  right?
19  A.    It induces a -- additional risk,
20  yes.
21  Q.    Let's not beat around the bush, by
22  that you mean it's dangerous, right?
23  A.    It -- it increases the risk.
24  Q.    Of a product that already has the
25  inherent danger of falling to your death or

232

1  being seriously injured in a fall event,
2  right?
3  A.    Yes.
4  Q.    So isn't it fair to say that's
5  dangerous?
6  A.    It would be one's interpretation.
7  Q.    So the manual specifically tells
8  you not to do that, right?
9  A.    The manual says, "Under no
10  circumstances should you ever release the
11  cable from the platform or seat climber to
12  make adjustments once you are off the
13  ground."
14  Q.    Okay.  So that's the first place.
15  That's on page 1, and you just read it.
16  That's a bullet point on the first page.
17  And by that it's saying under no
18  circumstances, which means never, right?
19  A.    Under no circumstances so, yes,
20  that would imply never.
21  Q.    And then if you look at page 6,
22  again, there is a warning on this page --
23  that's the lowest one in the left-hand
24  column that says, "Never release the cable
25  from the platform or seat climber to make

MSJ_JA000243

Transcript of Jarrett Waters
Conducted on February 7, 2024

59 (233 to 236)

233

1  adjustments once you are off the ground."
2  Do you see that?
3      A.   I do see that.
4      Q.   And so we can agree that Summit
5  specifically warned the user never to do
6  that, right?
7      A.   Summit warned the user to do that
8  in these instructions, yes.
9      Q.   To never do that, right?
10     A.   To never release the cable.
11     Q.   And we can agree that Mr. Vandine
12 failed to follow those instructions and
13 warnings, true?
14     A.   Mr. Vandine testified that he did
15 not read these instructions.
16     Q.   But that's not my question.  These
17 are the instructions, right?
18     A.   These are the instructions, yes.
19     Q.   And they tell you not to do it,
20 right?
21     A.   They say not to do it.
22     Q.   Mr. Vandine didn't follow them,
23 right?
24     A.   Mr. Vandine disconnected the cable
25 at height, which he wasn't -- he was not

234

1  unaware he wasn't supposed to do.
2      Q.   Right.  My question is they
3  specifically tell you not to do that in two
4  places and he did it, so he did not follow
5  the instructions, right?
6      A.   He did not follow the instructions
7  regarding the disconnection of the cable.
8      Q.   Okay.  In your history of
9  climbing, have you ever done that?
10     A.   Yes, I have.
11     Q.   You removed a cable at height?
12     A.   Yeah.
13     Q.   For what reason?
14     A.   To get around a limb.
15     Q.   Were you fully tied off to the
16 tree at the time with a harness?
17     A.   I believe I was.
18     Q.   And did you do that knowing that
19 it was a potential dangerous?
20     A.   I knew that climbing the tree was
21 potentially dangerous.  I wasn't aware of
22 instructions with those particular
23 treestands regarding the disconnection of a
24 cable from the stand.
25     Q.   What treestand did you do it on?

235

1      A.   Those old Summit Vipers.
2      Q.   You don't remember the 2002
3  warnings suggesting you should never do
4  that?
5      A.   I did not.  I have read the
6  warnings now.  I did not recall the warnings
7  at the time that I did that.
8      Q.   How old were you when you did
9  that?
10     A.   I couldn't tell you an exact age.
11     Q.   Okay.  Let's talk a minute about
12 the importance of harnesses.  I understand
13 you own an X-1 Hunter Safety System Harness,
14 right?
15     A.   Right.
16     Q.   And you used it at all times when
17 you were in a climbing treestand?
18     A.   Yes.
19     Q.   From the point you leave the
20 ground to the point of return?
21     A.   This is all said, I haven't used a
22 climbing treestand in ten years or so.
23     Q.   When you last used it did you wear
24 your harness?
25     A.   Yes, I did.

236

1      Q.   And did you do so because you knew
2  it would prevent you from hitting the ground
3  in a fall?
4      A.   I knew it would restrain me to the
5  tree should something happen.
6      Q.   That's what the harnesses are
7  tested for, right?
8      A.   That's correct.
9      Q.   And they're designed to prevent
10 you from hitting the ground, right?
11     A.   That's correct.
12     Q.   And there are instructions and
13 warnings that tell you how use to a harness
14 that has been around since about 2004; are
15 you aware of that?
16     A.   That would make sense.
17     Q.   Because that when they were
18 mandated, right?
19     A.   (Witness nods head.)
20     Q.   Is that a "yes"?
21     A.   That's correct.  Sorry.
22     Q.   2007 the treestand standards
23 required inclusion of a video in all
24 treestands, are you aware of that?
25     A.   I am aware that they're included.

MSJ_JA000244

Transcript of Jarrett Waters
Conducted on February 7, 2024

60 (237 to 240)

237

1  The specific date I'm not sure of.
2  Q.    And the universal mention on those
3  is to minimize the slack in your tether at
4  all times when using a harness, right?
5  **A.    Correct.**
6  Q.    And the reason to do that is to
7  prohibit you falling below your treestand,
8  so you can get back up into it, right?
9  **A.    Yes, it reduces the distance that**
10 **you fall.**
11 Q.    Now, these harnesses are
12 specifically tested so that they know they
13 will relate -- strike that.  These harness
14 are specifically tested so we know that they
15 will arrest the fall of a person within the
16 weight limits, right?
17 **A.    Correct.**
18 Q.    They're also specifically tested
19 so that the person will not suffer injuries
20 when they fall, are you aware of that?
21 **A.    I'm not aware of that testing.**
22 Q.    You're not aware of the fact that
23 they test the suspension release -- not the
24 suspension release.  They test the arrest
25 force of the harnesses when they drop down

238

1  to make sure that they meet the threshold to
2  cause injuries?
3  **A.    If that's part of the testing I**
4  **may have read that, but I wasn't aware of**
5  **any testing done on things that weren't an**
6  **instrument in mannequining.**
7  Q.    One of the things they test in an
8  instrument mannequining, you'd be happy to
9  know it include -- the manufacturers of your
10 harness, the Hunter Safety System folks, the
11 guys from Danville, Alabama, they test them
12 as well as everybody else for maximum fall
13 resistance force.  In other words, maximum
14 force that will be seen during a fall event.
15 **A.    Okay.**
16 Q.    And you're aware that on the
17 tethers you have these foldaway tears or
18 break-away tears?
19 **A.    Correct.**
20 Q.    You see those in seatbelts?
21 **A.    Correct.**
22 Q.    And they are a matter of sort of
23 --
24 **A.    Energy absorption.**
25 Q.    In other words, it gives you a

239

1  little bit of ride down event.
2  **A.    Right.**
3  Q.    So it's not just a snap stop.  It
4  lets you kind of jerk down.  Almost like
5  you're pumping on your brakes within driving
6  on ice, right?
7  **A.    Sure.  Yeah.**
8  Q.    Now, you're aware that throughout
9  Summit's written warnings and instructions
10 and their video written instructions they
11 repeatedly advise the user that they must
12 wear a fall arrest system at all times when
13 using this product?
14 **A.    Through their instructions and**
15 **warnings, yes.**
16 Q.    Are you aware that they define it
17 as a misuse if you're not using them?
18 **A.    I'm not sure I recall that exact**
19 **language, but...**
20 Q.    Are you aware that they include
21 specific harness instructions that discuss
22 the required use of harnesses?
23 **A.    Are you referring to the specific**
24 **instructions included with a harness, or --**
25 **I misunderstood.  I'm sorry.**

240

1  Q.    Summit includes a second set of
2  instructions that are harness specific.
3  Have you read those?
4  **A.    I have seen them.  I don't know if**
5  **I read them in entirety.**
6  Q.    Would you be surprised that they
7  specifically advise a user to always remain
8  harnessed to a tree?
9  **A.    I would not be surprised.**
10 Q.    Now, you made some reference
11 regarding harness use in the treestand
12 field.  And you've made some references in
13 your reports to some studies.
14 **A.    That's correct.**
15 Q.    The studies referenced in your
16 report include a couple of articles, a Henry
17 Ford study and the NEISS data, correct?
18 **A.    That's correct.**
19 Q.    Prior to this case had you done
20 any type of work, in your field, to ever
21 study or look at harness use with
22 treestands?
23 **A.    No.**
24 Q.    Now, have you -- strike that.
25     Each of those things that you've

MSJ_JA000245

Transcript of Jarrett Waters
Conducted on February 7, 2024

61 (241 to 244)

241

1   cited -- sources that you've cited in your
2   opinions, talk generally about harness use.
3   Are you aware of that?
4   **A.    Yes.**
5   Q.    Now, this particular treestand is
6   a climbing treestand, right?
7   **A.    That's correct.**
8   Q.    Do any of those studies
9   specifically address the use of harnesses
10  with climbing treestands?
11  **A.    I would have to review each one of**
12  **those studies again.**
13  **        One of the studies made mention**
14  **that one of the issues they had in gathering**
15  **data was the lack of reporting that occurred**
16  **during each mishap.**
17  Q.    That was the Henry Ford study?
18  **A.    That's right.**
19  Q.    We're going to talk a little bit
20  about that in a few minutes, but I just --
21  as I've looked at that information, and you
22  include it in your file materials, none of
23  them specifically relate to climbing
24  treestands, right?
25  **A.    They mention treestands in**

242

1   **general.  They don't specify fixed or**
2   **climbing.**
3   Q.    Well, there's also ladder stands,
4   right?
5   **A.    That's correct.**
6   Q.    And there's also tripods, right?
7   **A.    That's correct.**
8   Q.    And tripod harnesses aren't used
9   because there's no place to attach them,
10  right?
11  **A.    That's correct.**
12  Q.    So a person that says:  I'm
13  hunting from a tripod treestand, and they
14  ask him if you're using a harness, he may be
15  using the product completely appropriately
16  and says:  No, I'm not wearing a harness,
17  right?
18  **A.    That could be.**
19  Q.    Somebody asks the question of a
20  ladder stand person:  Do you wear your
21  treestand harness attached to a tree from
22  all points from when you leave the ground
23  until you return to the ground, they're
24  going to say, no, because in the appropriate
25  use of a ladder stand you climb up to height

243

1   using the three-point climbing technique and
2   then attach the harness at height, right?
3   **A.    Typically.  I know there has been**
4   **a push for lifelines to be adhered to or**
5   **safety ropes to be affixed to the climbing**
6   **ladder, so you're connected at all points.**
7   Q.    Sure.  You can buy an aftermarket
8   pen and lifeline.  Hunter Safety Systems
9   would be very happy -- you're referencing
10  their specific product, or its equivalent
11  can be used in ladder stands, but not all
12  ladder stands come with lifelines, right?
13  **A.    I would agree with that.**
14  Q.    And the manufacturers may say:
15  Look, this is the safety issue, if you use a
16  three-point climbing technique -- which is
17  the technique used in ladders -- until you
18  get to the platform and then you're going to
19  tie in and be your harnessed, right?
20  **A.    Okay.**
21  Q.    You agree with that?
22  **A.    Yes.**
23  Q.    And my point is that if they're
24  asked a question:  Were you wearing your
25  harness when you were climbing into the

244

1   treestand?  They might say, no, and they're
2   using that treestand completely
3   appropriately, but they're indicating that
4   they weren't wearing a harness at the
5   specific time, which is giving larger
6   numbers to harness use, right?
7   **A.    The treestand industry pushes and**
8   **advocates that you should be connected any**
9   **time you leave the ground, right?**
10  **        I think it's arguable that the**
11  **treestand use and how falls are reported**
12  **come from a variety of treestands and not**
13  **just these stands that are not requiring**
14  **harnesses at height.**
15  **        I think there is a lack of**
16  **reporting, and I think that the different --**
17  **the numbers from industry indicate that**
18  **there are a variety of stands and a variety**
19  **of individuals falling from a variety of**
20  **stands that are not harnessed at the time of**
21  **the fall.**
22  Q.    Okay.  So let's talk a little bit
23  about these.
24        These sources that you've cited
25  all relied on certain data?

MSJ_JA000246

Transcript of Jarrett Waters
Conducted on February 7, 2024

245

1   A.   Sure.
2   Q.   You've not seen any of that data,
3   right?
4   A.   **In the NEISS data?**
5   Q.   Well, first of all, have you seen
6   any of the detail from what was relied upon
7   by TSSA?  Did you look through specifically
8   the NEISS data?
9   A.   **I did access some of that database**
10  **and was looking for examples of falls, yes.**
11  Q.   Well, great.  So you know --
12  because I've looked through the NEISS data
13  multiple times, so you know that things like
14  somebody walking through the woods with a
15  treestand, trips and breaks their leg,
16  because it uses a term "treestand," it's
17  reported as a treestand injury, right?
18  A.   **They can be, yes.**
19  Q.   Somebody that says that I'm up in
20  the treestand and I cut my finger on the
21  broadhead gets reported as a treestand
22  injury, right?
23  A.   **Potentially.**
24  Q.   And so not all of the injuries
25  reported in treestand -- as treestand

246

1   injuries in NEISS even involve a treestand
2   related incident, right?
3   A.   **And I think that could be flipped**
4   **and say there are a lot of incidents that**
5   **don't ever get reported to NEISS that**
6   **involve treestand falls without the use of**
7   **harnesses.**
8   Q.   We're just talking about the NEISS
9   data --
10  A.   **Okay.**
11  Q.   -- and why it's not a reliable
12  area to look at.  Because you know that
13  there are errors like we just talked about,
14  that are overreporting the number of
15  treestand injuries, right?
16  A.   **Then why does the treestand**
17  **industry rely on the data from those**
18  **publications as part of their marketing and**
19  **advertising and teaching?**
20  Q.   I'm asking you about the data that
21  they used.  You know that there are flaws in
22  that data, right?
23  A.   **There are issues in how the data**
24  **is reported to the database.**
25  Q.   Which as an engineer you would

247

1   talk about being a flaw in the data, right?
2   A.   **Potentially, yes.**
3   Q.   The other things that happens --
4   another thing that happens in NEISS data, is
5   that it doesn't differentiate between a
6   homemade stand and a commercially purchased
7   stand, right?
8   A.   **I would agree with that.**
9   Q.   So if a person, you know, goes up
10  and staples a 2-by-4 into a tree and says:
11  I was hunting on my treestand, it reports it
12  as a treestand incident and may have nothing
13  to do with the treestand industry, right?
14  A.   **In that specific case, yes.  This**
15  **is -- I mean this is data, though, that's**
16  **publically available to the treestand**
17  **industry, and therefore is an indication**
18  **that not everyone wears a harness when**
19  **climbing at height.**
20  Q.   Well, let's -- hold on a second.
21  Let's talk about that for a second.  The
22  NEISS data is taken from hospitals, right?
23  A.   **Correct.**
24  Q.   And those good folks at the
25  hospital, what they're really after is:

248

1   What injury did you suffer and how do we
2   treat it?
3   A.   **I would hope so.**
4   Q.   They're not trying to investigate
5   exactly how an accident occurred, or what
6   specific product was being used, right?
7   A.   **I would agree that.  Their primary**
8   **care is the care of the patient.**
9   Q.   So looking at hospital reports and
10  how it's coded in and ultimately gets report
11  to the NEISS is not, you would agree with
12  me, a reliable indicator of harness use
13  because of the flaws in the data, right?
14       MR. DARIA:  Objection to form.
15       THE WITNESS:  It is reliable in
16  the fact that there are individuals that
17  fall from heights that aren't harnessed.
18  The specific number that the data reports
19  or underreport may be questionable, based
20  on the inputs.
21  BY MR. SUTTON:
22  Q.   Let's talk for a second about
23  seatbelts.
24  A.   **Okay.**
25  Q.   So seatbelts, since the '60s and

MSJ_JA000247

Transcript of Jarrett Waters
Conducted on February 7, 2024

63 (249 to 252)

249

1  '70s, the prevalent use of seatbelts has
2  changed greatly, right?
3  **A.  Yes.**
4  Q.  Twenty years ago, people might
5  say:  Well, it's kind of your choice whether
6  you wear a seatbelt.  Universally now
7  everybody knows you have to wear your
8  seatbelt.  Failing to do so is going to be
9  dangerous, right?
10 **A.  I believe most people have that**
11 **perception, however the automakers still**
12 **provide warnings, both visual and auditory**
13 **regarding their use.**
14 Q.  You can't put an auditory warning
15 unless you're talking about the video on a
16 treestand, because being quiet is one of the
17 most important things, right?
18 **A.  Unless it sounds like a deer call.**
19 Q.  So in a warning label it says --
20 both stamped in the treestand and on the
21 warning label to wear your harness at all
22 times, right?
23 **A.  The warning that's stamped into**
24 **the treestand is very -- at least**
25 **Mr. Vandine's treestand was very difficult**

250

1  **to read, and would have been difficult from**
2  **his position.  It was difficult to read**
3  **under photograph, let alone at a hunting**
4  **scenario.**
5  Q.  Okay.  Well, it's also in the
6  instructions and also in that warning tag
7  that he intentionally cut off, right?
8  **A.  It was in the instructions and it**
9  **was in the tag that was not present on his**
10 **stand.**
11 Q.  And let's talk a little bit, you
12 reference the treestand accidents reported
13 from the TSSA, right?
14 **A.  Yes.**
15 Q.  They're just referencing the NEISS
16 data, right?  That we know is unreliable,
17 right?
18     MR. DARIA:  Objection to the
19 form.  Go ahead.
20     THE WITNESS:  It's my
21 understanding that they did rely on that
22 data.  I'm not sure regarding all of the
23 other data that was relied upon or any
24 other data that was relied upon.
25

251

1  BY MR. SUTTON:
2  Q.  In fact, what's cited in your
3  report, or in your articles that you gather
4  is an article written by Mr. Mayhew, who
5  incidentally, works alongside the folks at
6  Hunter Safety Systems, Mr. Wydner.  And
7  their concern was just saying:  Hey, it's
8  important to wear your harness, right?
9  **A.  I would agree they're saying that**
10 **it's important to wear your harness.  But**
11 **they are using numbers that represent**
12 **individuals that don't wear their harness as**
13 **a training technique or instruction**
14 **technique, therefore it's foreseeable to the**
15 **industry that not everyone wears a harness.**
16 Q.  You keep saying that it's
17 foreseeable, but it doesn't make it right.
18 It doesn't make it the smart decision.  It's
19 doesn't make it the decision that should be
20 made by a prudent user of a treestand, does
21 it?
22 **A.  No.  But it should be foreseeable**
23 **to the designers that the treestand should**
24 **be made in a manner that does not allow for**
25 **a mispositioned cable or a user action to**

252

1  **unintentionally disconnect a cable.**
2  Q.  Well, you haven't shown me any
3  type of testing that shows it
4  unintentionally can be disconnected.  You
5  showed me a video showing you intentionally
6  disconnect it, right?
7  **A.  Mr. Vandine believed he reinserted**
8  **the cable.  When he reinstalled it he**
9  **believed he inspected it and he believed it**
10 **was fully inserted and safe and that it**
11 **disconnected upon loading the stand.**
12 Q.  Well, let's just nip this in the
13 bud.  Summit says:  We produced a product,
14 which by its cable bracket and cable
15 assembly itself -- shapes of those, is
16 designed so that the cable wants to stay in
17 those cable brackets, doesn't come out.
18 **A.  Should it be fully inserted, yes.**
19 Q.  And, in fact, in your testing
20 which you disengaged the spring, that's what
21 you found, that it wants to stay in the
22 cable bracket, right?
23 **A.  If there is no motion to the**
24 **stand, it's going to stay where it currently**
25 **was.**

MSJ_JA000248

Transcript of Jarrett Waters
Conducted on February 7, 2024

253

1    Q.    Summit then added a redundant
2    safety device or safety feature which is the
3    QuickDraw spring to keep it from backing
4    out, moving actively in the cable bracket?
5    **A.    That is correct. The QuickDraw**
6    **spring however does not prevent somebody**
7    **from partially inserting the cable into the**
8    **keyway on the top of the cable bracket.**
9    Q.    But you don't disagree that Summit
10   included a redundant safety feature in a
11   keylock QuickDraw spring to keep that cable
12   from moving axially.
13   **A.    I believe they thought it was a**
14   **redundant safety. As my opinions state in**
15   **the report, a redundant safety shouldn't be**
16   **able to be engaged or disengaged through**
17   **some inadvertent action foreseen within the**
18   **normal use of the stand and should require a**
19   **separate and deliberate action by the user.**
20   Q.    So you disagree with it, but you
21   admit that that's what they did. They
22   included something that they believe was a
23   secondary or redundant safety part of this
24   product, right?
25   **A.    Yes.**

254

1    Q.    Have you done any type of testing
2    on a tree where you removed a spring,
3    climbed up and down a tree just to see how
4    the cable moves?
5    **A.    I have not done than testing.**
6    **My prior use of the treestand did**
7    **not include a QuickDraw spring, and just**
8    **included the hatch covers. My attention was**
9    **never towards the movement of the cable stop**
10   **within the bracket but was for the**
11   **inspection of the hatch cover or safety**
12   **cover to make sure it closed.**
13   Q.    And Summit includes, by the way, a
14   third redundant safety feature which is a
15   full-body harness to prevent a user from
16   falling to the ground?
17   **A.    Which is not mechanically**
18   **integrated into the stand.**
19   Q.    No full-body harness is
20   mechanically integrated into any the stand.
21   In fact, it's in the standard not to have it
22   integrated. It can't be integrated by
23   standard, right?
24   **A.    I would agree. There are design**
25   **options or available features that could**

255

1    **have been incorporated into the stand that**
2    **would have been a more suitable remedy for**
3    **the root cause of this whole thing which is**
4    **the cable becoming disconnected from the**
5    **treestand.**
6    Q.    Well, if we assume that the
7    accident happened because he intentionally
8    removed it at height and didn't put it fully
9    back into the cable bracket -- you with me?
10   **A.    I'm with you. I don't agree that**
11   **he intentionally mispositioned the cable. I**
12   **believe he thought he had it fully**
13   **positioned within the cable bracket when he**
14   **went to load it.**
15   Q.    I meant he intentionally moved it
16   at height, right?
17   **A.    He chose to remove the cable from**
18   **the bracket and reinstall it above the limb,**
19   **yes.**
20   Q.    And he had no difficulty climbing
21   up to the location of the limb before that,
22   right?
23   **A.    None that he discusses in his**
24   **deposition.**
25   Q.    So you would agree with me that if

256

1    he hadn't intentionally removed the cable,
2    this accident would not have occurred?
3    **A.    This same root cause could have**
4    **occurred at ground level when he was**
5    **initially setting up the stand and still**
6    **resulted in a fall.**
7    Q.    Sir, we just said he didn't have
8    any problems climbing up, right?
9    **A.    He did not have any problems**
10   **climbing up on the day of the incident.**
11   Q.    The stand worked appropriately all
12   the way up to that limb, right?
13   **A.    Based on his testimony. The**
14   **mispositioning of the cable within the cable**
15   **stop could still occur at ground level**
16   **though. I'm not saying that he traveled up**
17   **the entire tree with cable mispositioned.**
18   **I'm saying that this mispositioning of the**
19   **cable could come any time that it was**
20   **installed.**
21   Q.    You mean if a user doesn't follow
22   the express instructions on how to properly
23   and appropriately connect it into the cable
24   bracket?
25   **A.    If the user don't visually inspect**

MSJ_JA000249

Transcript of Jarrett Waters
Conducted on February 7, 2024

257

1 based on those images, it could be possible
2 that the stand could be positioned in a
3 manner that holds weight and the cable not
4 fully installed in the bracket.
5    Q.    You would agree he with me that if
6 Mr. Vandine had taken the time and inspected
7 the cable assembly, in the cable bracket, as
8 shown on page 6 of the instruction manual,
9 he could have seen whether or not it was
10 appropriately installed and avoided this
11 accident?
12    A.    If he referenced that manual while
13 looking at the side of the bracket, yes, he
14 could have been able to determine that the
15 cable was not fully seated.
16    Q.    If he didn't reference a manual --
17 but that's what he did -- in other words,
18 look at it from the side.  You would agree
19 with me that he could tell whether or not
20 the cable was appropriately and properly
21 installed --
22    A.    He doesn't say he looks it from
23 the side up in the tree.
24    Q.    We're going to get to that in a
25 second.  I'm just saying if he'd done that,

258

1 he would have been able to tell whether it
2 was appropriately and properly installed,
3 right?
4    A.    Yes, he would have been able to
5 observe that from the side.
6    Q.    Now, when a person is using a
7 climbing treestand, they're standing in the
8 middle of the outer rim of the upper portion
9 of the treestand, right?
10    A.    Correct.
11    Q.    And so all they have to do to look
12 is to bend over and look to the left or to
13 the right to see if that cable is properly
14 inserted in the cable bracket, right?
15    A.    They could bend over and look,
16 yes.
17    Q.    It's visible both to the right and
18 to the left of them if they just take the
19 time to look at it, right?
20    A.    It -- yes, it would be visible
21 from the side.
22    Q.    And its easy to see just as shown
23 in page 6 of the instruction manual, it's
24 easy to see if Mr. Vandine had just taken
25 the time to check to see if that cable was

259

1 properly placed in the bracket?
2         MR. DARIA:  Objection to the
3 form.
4         THE WITNESS:  Mr. Vandine relied
5 on loading the stand or temporarily
6 placing weight on the stand as his method
7 of inspecting the cable based on his
8 experience.
9 BY MR. DARIA:
10    Q.    Did I ask you about loading?
11    A.    You did not.
12    Q.    I asked you about whether it was
13 easy to see, right?
14    A.    From the side it could be
15 observed, yes.
16    Q.    You agree with me that it is easy
17 to see from the side as you're standing in
18 the middle of the stand, right?
19    A.    Within a certain proximity, yes,
20 given all sorts of lighting circumstances.
21    Q.    Well, this was the middle of the
22 day, right?
23    A.    His incident was the middle of the
24 day, I agree.
25    Q.    So under his lighting

260

1 circumstances you agree if he had taken the
2 time he could have seen it, right?
3    A.    If he would have bent over and
4 looked into the side of the bracket he would
5 have been able to determine whether the
6 cable was partially or fully seated.
7    Q.    Please turn to page 35 of your
8 report.
9        Okay, page 35 of your report, your
10 have photographs taken from a top-down view
11 of the cable in the cable bracket; do you
12 see that?
13    A.    I do.
14    Q.    The one on the left says, "fully
15 seated," the two on the right says,
16 "partially seated."  Do you see that?
17    A.    I do.
18    Q.    Now, do you agree with me that
19 looking down and visually inspecting it even
20 from this location, shows that it's easy to
21 see whether or not the cable is properly in
22 the cable bracket?
23    A.    The photos are taken with the
24 camera directly on top of the cable bracket.
25 And also we have the ability to sit here and

MSJ_JA000250

Transcript of Jarrett Waters
Conducted on February 7, 2024

66 (261 to 264)

261

1  look at these for a longer period of time.
2  I believe at a glance it is possible to --
3  and it is difficult that one may have
4  trouble -- strike that.
5        One may have issues perceiving and
6  understanding that that cable is fully
7  seated should they quickly look at it from
8  their climbing position.
9        These photos aren't taken from a
10  climbing position. They're taken from
11  directly over the bracket. Figure 32 on
12  page 34 represents photographs from a
13  climbing position.
14  Q.    Okay. My question is first on 35.
15  We haven't gotten to 34 yet. Figure 33, on
16  page 35. You would agree with me that a
17  person standing in the stand can bend over
18  and look directly at this cable bracket on
19  the top like where these photographs are
20  taken to determine whether or not this cable
21  bracket, it has the cable fully inserted?
22  A.    It is possible. But at a quick
23  glance or look it may be difficult to
24  perceive.
25  Q.    You're talking about a person who

262

1  is not wearing a harness, has fallen
2  previously from a tree, and been injured,
3  works in the tree field where the
4  requirement of the state of New Jersey is to
5  always wear your harness above the ground,
6  has a harness, and has gone contrary to
7  instructions up in the air, and has removed
8  the cable assembly; is it your testimony
9  under oath, to this jury that that person
10  should not take the time to make sure that
11  they properly inserted into the cable
12  bracket?
13  A.    Mr. Vandine said he inspected it
14  by pushing down on it. He was given the
15  perception that it was fully seated based on
16  his experience and how he chose to inspect
17  it.
18  Q.    That's not my question. My
19  question, is it your testimony to the jury
20  that a person that's done that under those
21  circumstances I just read to you, should not
22  take the time to visually inspect and make
23  sure that that cable is properly placed in
24  the cable bracket?
25  A.    I do believe he should take the

263

1  time to visually inspect that. Mr. Vandine
2  chose, based on his experience, to test it
3  by loading it up.
4  Q.    Second, if he had done, and taken
5  the time to view it, whether it was from the
6  side as shown in page 6 of the instruction
7  manual or directly on top as shown on page
8  35 of your report, figure 33, a person could
9  easily visually inspect whether or not the
10  cable was properly installed in the cable
11  bracket, true?
12  A.    If they looked at it long enough,
13  yes, could.
14  Q.    And a person whose life is on the
15  line, should take the time to look at it
16  long enough, right?
17  A.    They should look at it long enough
18  to be able to determine whether they feel
19  that it's safe to continue.
20  Q.    Okay. Now, we talked a little bit
21  about the TSSA, and you don't know any of
22  the background from the data they're
23  reporting, true?
24  A.    (No audible response.)
25  Q.    Just trying to finish this

264

1  subject, and then we'll break for lunch.
2  A.    You're referring to the "ABCs,"
3  the TSSA's article?
4  Q.    The TSSA's "ABCs." They reference
5  a certain number of people that have fallen,
6  but you don't know where they got the data
7  or what the data said?
8  A.    That's correct.
9  Q.    And actually I think they may have
10  referred to the NEISS system which means
11  that's a system taken from medical
12  providers, which is -- has flaws in it,
13  right?
14        MR. DARIA: Objection to the
15  form.
16        THE WITNESS: I think some of
17  the inputs are flawed, but still
18  represents that there are individuals that
19  do not wear a harness while hunting from a
20  treestand.
21  BY MR. SUTTON:
22  Q.    Okay. Then there's a CPSC and
23  that's referenced in here. I didn't see any
24  CPSC data in your --
25  A.    Consumer Product Safety

MSJ_JA000251

Transcript of Jarrett Waters
Conducted on February 7, 2024

265

1  Commission?
2     Q.    Yeah.  I saw there was some stuff
3  about a consumer that had contacted the CPSC
4  about a Viper stand, but I didn't see
5  anything related to harness in your file.
6  What are you referring to here?
7     A.    Can you point me to the page in
8  the report?
9     Q.    I know what it says, so I don't
10 know exactly where it is.  It says, "The
11 Consumer Product Safety Commission, CPSC,
12 tracks incidents relating to the use of
13 specific products.  Many of the reported
14 incidents and injures include users that
15 fell to the ground as a result of not being
16 connected to the tree through to use of
17 safety harness."  That's the first part of
18 it.  It goes on in another sentence which
19 I'll read to you in a second.
20        The question I have is, I don't
21 know what data you're referring to, because
22 I didn't like see any data in your file
23 materials.
24    A.    The data I was referring to was --
25 bear with me for a moment.  The CPSC data

266

1  I'm referring to is from an online query of
2  the NEISS system.
3     Q.    Is that in your file somewhere?
4     A.    It should be.  Under "Treestand
5  safety, NEISS."
6     Q.    So it's based on the same NEISS
7  data that we agreed was flawed?
8         MR. DARIA:  Objection to the
9  form.
10        THE WITNESS:  We -- I agreed
11 that the input of the NEISS data may not
12 represent all these scenarios but is a
13 general indication of lack of harness use
14 within the industry.
15 BY MR. SUTTON:
16    Q.    Well -- and we talked about the
17 fact that as a scientist that means that the
18 data was flawed, right?
19        MR. DARIA:  Objection.
20        THE WITNESS:  The specific
21 numbers to the data may have -- may not
22 represent whether high or low the exact
23 count of related injuries, but as a trend
24 it represents that there are individuals
25 that choose not to wear a harness.

267

1  BY MR. SUTTON:
2     Q.    I'm just asking about the data
3  now.  So basically, what I'm looking at is
4  the data that you reference in the CPSC is
5  really the same NEISS data?
6     A.    That's correct.
7     Q.    You also talk about Dr. Alan
8  Lazzara Henry Ford Health, in Michigan?
9     A.    That's correct.
10    Q.    And his point is, you know, I
11 looked at this medical data, but the problem
12 is that that's not what really people are
13 treated for, so there are falls that may or
14 may not involve treestands or harnesses, we
15 don't know, right?
16    A.    Repeat that, please.
17    Q.    Dr. Lazzara, I apologize to him if
18 I'm not pronouncing correctly, says, for
19 instance, "Out of the 33-patient study, four
20 cases were documented where a harness was
21 being used and five were documented where a
22 harness not being used.  The report states
23 that there is no documentation about harness
24 use or nonuse in the majority of the patient
25 charts." In other words, it's just not

268

1  tracking that.
2     A.    That's correct.
3     Q.    So other than those -- and then
4  you've got this chart, which I believe is
5  the NEISS data.  So other than those other
6  things which all derive from the medical
7  field, do you have -- in which we agree I
8  think that the medical professionals are
9  looking at the care of the patient not how
10 the accident was caused.  Do you have any
11 other support for your conclusion that a lot
12 of folks don't wear harnesses?
13    A.    I don't think I reference it as "a
14 lot of folks."  I believe it's some.
15    Q.    Do you have any idea how many or
16 what the percentage is?
17    A.    I do not know what the percentage
18 is.
19        You know, from information
20 disseminated through the hunting industry,
21 and treestand safety, and you know, just in
22 general posts that you see of conservation
23 officers and emergency response indicate
24 that, you know, there are individuals that
25 do not wear a harness.  What that specific

MSJ_JA000252

Transcript of Jarrett Waters
Conducted on February 7, 2024

269

1  number is and what that percentage is, I do
2  not know.
3      Q.    Let me just tie all this stuff up
4  and then we can break.  Were you personally
5  involved in any studies?
6      A.    I was not.
7      Q.    Did you see any of the questions
8  or any of the data from which these reports
9  were made?
10     A.    I did not see the input forms that
11 they fill out or use to submit the data to
12 the NEISS.
13     Q.    Did you see any of the specific
14 data?
15     A.    I did see the specific data.
16     Q.    From the NEISS report?
17     A.    That's correct.
18     Q.    And that's basically a spreadsheet
19 of certain parameters, how that data was
20 originally entered, or what, you don't know.
21     A.    That's correct.
22     Q.    Do you not know who provided the
23 responses to any of these things?  In other
24 words, the NEISS data, you don't know
25 whether it was a technician, a nurse, a

270

1  doctor, or who provided any of that
2  information?
3      A.    That's correct.
4      Q.    None of the data is broken down by
5  treestand type, right?
6      A.    Correct.
7      Q.    And you would agree with me that
8  of the four types of treestands, the easiest
9  to use a harness on is a climbing treestand,
10 right?
11     A.    A standalone harness, yes, it
12 would be a climbing treestand.  A safety
13 line and harness on a fixed position
14 treestand is also easy.
15     Q.    You don't know how the data was
16 captured, true?
17     A.    I know it was reported to the
18 NEISS.  I don't know what form was filled
19 out in order to report it.
20     Q.    You don't know what type of
21 treestands were involved, true?
22     A.    That's correct, unless it's
23 included in their description.
24     Q.    Don't know if there were any
25 homemade stands, true?

271

1      A.    That would be correct.
2           MR. SUTTON:  Okay.  This is a
3  good time for a break.
4           - - -
5           (Lunch recess.)
6           - - -
7           MR. SUTTON:  Back on the record.
8           - - -
9           EXAMINATION (Cont'd)
10          - - -
11 BY MR. SUTTON:
12     Q.    Mr. Waters, we talked at length
13 about harness use and your opinion that
14 Mr. Vandine should have been wearing his
15 harness.  Do you recall that?
16     A.    I believe the instructions state
17 that he should have been wearing a harness.
18 I believe my opinion, represented in the
19 report, discusses that the industry's aware
20 that some individuals do not wear their
21 harness.
22     Q.    Yes, but we also talked about --
23 we went around and around about it, and I
24 don't need to rehash it about the fact that
25 it is your opinion that he should have been

272

1  wearing a harness at the time of the
2  accident, right?
3      A.    It would have -- yes, he should
4  have been wearing a harness at the time.
5      Q.    Okay.  Now, Mr. Vandine was
6  injured when he hit the ground.  Would you
7  agree with that?
8      A.    That seems to be my understanding
9  of it.  I wasn't -- I didn't witness his
10 fall, so I don't know what he struck on his
11 way down to the ground.
12     Q.    According to the witnesses,
13 shortly after his fall event, he was calling
14 for help and one of his friends came and
15 helped him and led him out of the woods,
16 right?
17     A.    That's correct.
18     Q.    So he was hunting in the c lose
19 proximity of another of his friends, right?
20          MR. DARIA:  Objection of form.
21          THE WITNESS:  It's my
22 understanding that the other gentleman was
23 within earshot of him.
24 BY MR. SUTTON:
25     Q.    And that's all I meant by close

MSJ_JA000253

Transcript of Jarrett Waters
Conducted on February 7, 2024

69 (273 to 276)

273

1  proximity. I know Counsel had an objection,
2  but I just meant somebody was hunting in
3  earshot of him, right?
4  **A.   (Witness nods head.)**
5  Q.   Would you agree with me that had
6  Mr. Vandine been wearing his harness and had
7  it attached to the tree at the time of the
8  accident he would not have fallen to the
9  ground where he was injured in this
10  accident?
11  **A.   He would not have fallen to the**
12  **ground, that's correct.**
13  Q.   Would you agree with me, that if
14  he had called for help, he had somebody in
15  earshot to come get him if in the unlikely
16  event he could not get back in the stand?
17  **A.   We know somebody was hunting**
18  **within earshot. If he had been suspended by**
19  **a harness he likely could have yelled out to**
20  **them, yes.**
21  Q.   We also know that if using the
22  harness, in the manner and method described
23  in the written and video instructions and
24  warnings that come with the stand, that the
25  slack of the tether should be minimized so

274

1  that the person doesn't fall below the
2  platform, true?
3  **A.   True.**
4  Q.   And therefore, if he fell and was
5  arrested by the fall, he should have been in
6  a position to be able to get back on that
7  platform, true?
8  **A.   He would have been provided an**
9  **opportunity to do that. I don't know**
10  **relative height relative to the platform**
11  **where that would have been relative to his**
12  **body and whether that would have been**
13  **feasible or not, or something he was capable**
14  **of.**
15  Q.   Well, you've used the systems
16  before so you know if, for instance, the
17  platform, he'd fallen so that the platform
18  was shoulder height or above, he could have
19  grabbed it with his hands, tilted it
20  forward, moved it down the tree and then got
21  it to a location he could easily get on,
22  right?
23  **A.   If he could have reached it with**
24  **his hands and both his hands were operable,**
25  **yes, that would have been a possibility.**

275

1  Q.   He did not hurt his hands in this
2  accident, right?
3  **A.   I don't know if I've seen his**
4  **medical records, but I don't recall hearing**
5  **anything of his hands being injured.**
6  Q.   So given that, you would expect
7  that he would have been able to get back in
8  the treestand, if he was wearing his harness
9  and had been properly attached to the tree?
10  **A.   He could have lowered the foot**
11  **platform to an area where he could have**
12  **transferred to it.**
13  Q.   There is some mention in your
14  report about suspension trauma; do you
15  recall that?
16  **A.   I do, yes.**
17  Q.   You understand, do you not, that
18  the harness that was supplied with this
19  treestand came with a suspension relief
20  strap; are you aware of that?
21  **A.   That would be my understanding of**
22  **it, yes.**
23  Q.   Do you know what a suspension
24  relief strap is?
25  **A.   I do.**

276

1  Q.   And incidentally, have you talked
2  to Dr. Bishop at all in this case?
3  **A.   I have not talked to him regarding**
4  **the details of the case from the time of the**
5  **inspection.**
6  Q.   You talked to him -- he was at the
7  inspection?
8  **A.   Yes.**
9  Q.   You haven't talked to him since;
10  is that right?
11  **A.   Correct.**
12  Q.   What you had indicated in some
13  reports in CPSC about potential suspension
14  trauma, did I see that correctly in your
15  report?
16  **A.   There were documents provided that**
17  **reference the CPSC data, and one of the**
18  **events includes the discussion, I believe,**
19  **of asphyxiation.**
20  Q.   Asphyxiation is different than
21  suspension trauma, true?
22  **A.   I don't claim to be a doctor. My**
23  **basic understanding of it is I do believe**
24  **they are different.**
25  Q.   That's fair enough. You're not a

MSJ_JA000254

Transcript of Jarrett Waters
Conducted on February 7, 2024

277

1 biomechanical expert, right?
2    **A.    I'm not a biomechanical engineer.**
3    Q.    And you're not a medical doctor,
4 correct?
5    **A.    I'm not a medical doctor.**
6    Q.    You said that the documents were
7 provided to you.  What documents are you
8 talking about?
9    **A.    Materials received 10/19/2023.**
10    Q.    Hold on one second.  What folder
11 is that in?
12    **A.    On mine that's the name of the**
13 **folder, 230058, materials received**
14 **10/19/2023.**
15    Q.    I don't think I have that folder.
16         I have 23-58 CPSC, Materials
17 Received 1/11/24.  I have the CAD Drawings;
18 I have Defense Expert Reports; Dep Exhibits;
19 Dep Notes; Invoices; JDW Mini Viper; JDW
20 Report; Research; Site Inspection
21 Photographs; Stand Inspection Photographs;
22 Summit Research; Treestand Safety; Wolf
23 Treestand Photographs; Deposition Exhibits;
24 Deposition Transcripts; Defendant's Document
25 Production; Defendant's Rule 26 Disclosure;

278

1 Gloucester County Emergency Response;
2 Plaintiff's Document Production; Plaintiff's
3 Expert Reports; Prior Litigation;
4 Defendant's Expert Reports and Affidavits;
5 Summit Treestand Brochures, West Deptford.
6 Am I missing something?
7    **A.    I'm curious if it's information**
8 **that I was provided that was part of initial**
9 **discovery and you would have received it**
10 **that way.**
11         **I am looking at it in the case**
12 **folder now.  I'd be happy to pull it up so**
13 **we can both look at it.**
14    Q.    Yeah.  And I'm not asking for
15 drafts or anything, which I think is
16 protected under the rules.  You just
17 referenced what appeared to be a folder and
18 I'm not sure that you have the same folder
19 structure that I have.
20         Do you have a different folder
21 structure?  Do you mind if I take look at
22 it?  I apologize.  I'll come over and look
23 over your shoulder.
24         MR. DARIA:  Off the record.
25         - - -

279

1         (Discussion held off the
2 record.)
3         - - -
4 BY MR. SUTTON:
5    Q.    So that would not -- so that if
6 you go back to your main folders.  I have
7 folders that say things like Defendant's
8 Document Production, which I don't see in
9 your folders.
10         MR. DARIA:  I think that was my
11 office describing what it was in his file.
12         MR. SUTTON:  Okay.  Because that
13 one you were just looking at, the CPSC
14 reports, I don't think I've got.
15         THE WITNESS:  Okay.
16 BY MR. SUTTON:
17    Q.    Basically, just for the record,
18 there are a number of folders in your
19 physical -- or not physical file, digital
20 file, that are entitled like "Materials
21 Received" and given certain dates.
22    **A.    That's correct.**
23    Q.    In my file things have been broken
24 down in different folders to talk about
25 deposition exhibit, deposition transcript,

280

1 defendant's document production,
2 disclosures, plaintiff's production,
3 et cetera.  But I have no way of doing that,
4 unless spending time to go through and see
5 whether I have those things.  I do not
6 recall seeing any of those CPSC reports you
7 were just referencing.
8    **A.    THE WITNESS:  Okay.**
9    Q.    MR. SUTTON:  So I don't think I
10 have them.
11         MR. DARIA:  Do me a favor --
12 sorry to interrupt.  Under "Treestand
13 Safety," there is a note of CPSC.  I don't
14 know if that's the same or if it's
15 different, but maybe just check that
16 before saying that you don't have them.
17         MR. SUTTON:  Sure.
18 BY MR. SUTTON:
19    Q.    And so the reports under
20 "Treestand Safety," this NEISS stuff, and on
21 the right -- and under the "NEISS" folder
22 there is one thing that says, "CPSC, NEISS
23 Online Query," and there are other things
24 that talk about the ASTM standards,
25 hierarchy controls and et cetera.  But what

Transcript of Jarrett Waters
Conducted on February 7, 2024

---

281

1  he was specifically referencing was -- if
2  you pull up the materials received, there
3  appear to be three separate CPSC
4  publications.
5  **A.    That's correct, yes.**
6  Q.    And I don't see them.
7      I can do a search.  Let me check
8  the search here, maybe I do have them.
9      I think that what possibly
10 happened is that they translated your file
11 into something else.
12 **A.    Yeah.  I don't know what happened**
13 **after I sent a share file link of my file.**
14 Q.    All right.  Go ahead.  Can you
15 give me the name.
16 **A.    Yeah.  "CPSC Incident Report**
17 **Detail."**
18 Q.    Is there a space?
19 **A.    There is, yes.  "CPSC Incident**
20 **Report Details."**
21 Q.    The only thing that's showing with
22 CPSC in it is that NEISS data.  Those things
23 appear to be missing.
24     I just did a search for just
25 "CPSC" instead of "CPSC Incident."

282

1  Obviously there is some stuff that you
2  received, the materials received on 1/11/24.
3  And then there's a "CPSC Treestand Query,"
4  which if you open there's the "NEISS."
5  **A.    That's correct.**
6  Q.    And then there is a bunch of
7  documents of Summit recalls that don't apply
8  to the stand, including some complaints with
9  CPSC that could be it.
10     What are the dates on those
11 incident reports?
12 **A.    One incident report is 2019,**
13 **12/17.**
14 Q.    Okay.
15 **A.    And then there is one that's**
16 **different, doesn't have the word "Incident**
17 **Report."  It as "Treestand Incidents" in the**
18 **title 2011 through 2022.**
19 Q.    Okay.  It appears that those were
20 renamed and I may have them.
21     It says, received "Month, Year
22 11/2022."  And it looks like it's a printout
23 of some type of treestand incidents and some
24 of them are highlighted.
25 **A.    The one I am looking at has**

283

1  **highlights in it, yes.  How many pages total**
2  **is the document?**
3  Q.    Forty-two.
4  **A.    Correct.**
5  Q.    All right.  Now, back to where we
6  were.  I can't even remember where we were.
7  We were talking about suspension trauma, I
8  think.
9  **A.    I believe we were.**
10 Q.    Okay.
11     Back to suspension trauma.  Some
12 of those CPSC related incidents that you
13 refer to talk about asphyxiation; is that
14 right?
15 **A.    Yes.**
16 Q.    Have you personally investigated
17 any claim involving suspension trauma in any
18 treestand case?
19 **A.    I have not.**
20 Q.    Have you personally investigated
21 any suspension trauma in any non-treestand
22 case?
23 **A.    I have not.**
24 Q.    Are you aware of whether or not
25 suspension trauma has actually ever been

284

1  confirmed with regard to a specific
2  treestand?
3  **A.    Do you mean a specific treestand**
4  **or a specific harness?**
5  Q.    To a harness or treestand?
6  **A.    Yeah, I don't have any case**
7  **offhand or know of any exact literature**
8  **discussing that.**
9  Q.    Now, I know that earlier on, 20
10 years ago, there were references made to
11 some folks that may have suffered suspension
12 trauma.  But if you look at the data, they
13 actually asphyxiated, or maybe they cut
14 their legs out, or they -- so that they
15 asphyxiated around the chest, when they were
16 wearing just a single strap safety belt or
17 something like that.  It wasn't actually
18 suspension trauma.
19     So my question to this is:  Have
20 you yourself done any type of research or
21 anything in regard to suspension trauma?
22 Are you a suspension trauma expert?
23 **A.    I am not.**
24 Q.    Okay.  So we go to the accident
25 scene.  If we go to the accident scene, you

---

MSJ_JA000256

Transcript of Jarrett Waters
Conducted on February 7, 2024

285

1  were there, right?
2  **A.    That is correct.**
3  Q.    And you recall it was on Sunoco
4  property, right?
5  **A.    I recall it was on a refinery**
6  **property, I believe.  It may have been**
7  **Sunoco.**
8  Q.    And it was property that was not
9  owned by Mr. Vandine, right?
10  **A.    That is my understanding.**
11  Q.    Mr. Vandine did not have authority
12  to hunt there, right?
13  **A.    I believe he thought he had the**
14  **ability to hunt there.  I don't know how the**
15  **permission or lack of permissions worked.**
16  Q.    Well, did you see any "No
17  Trespassing" signs when you were there?
18  **A.    I do not recall seeing "No**
19  **Trespassing," or "No Hunting" signs, but I**
20  **also don't have any documented evidence of**
21  **that.**
22  Q.    Would you agree with me based upon
23  what you've come to learn is that
24  Mr. Vandine was hunting in a location he did
25  not have authority to hunt at, at the time

286

1  of the accident?
2  **A.    I believe he was hunting on a**
3  **property that he did not have authorization**
4  **to hunt on.**
5  Q.    And that's considered a trespass;
6  are you aware of that?
7  **A.    I don't what the legal terms are.**
8  **I can understand, I think there is an**
9  **incident report that has a citation note**
10  **that cites trespass.**
11  Q.    Now, you went to the tree, right?
12  **A.    That's correct.**
13  Q.    Do you know what type of tree it
14  was?
15  **A.    I believe it was a cherry tree.  A**
16  **wild cherry, folks like to refer to it as.**
17  Q.    And you did some measurements that
18  are set forth in your report about the
19  circumference of the tree up to that limb,
20  correct?
21  **A.    That's correct.**
22  Q.    And the limb is slightly under
23  nine inches; is that right?
24  **A.    The diameter of the limb or the**
25  **position of the limb on the tree?**

287

1  Q.    That was a bad question.
2  The tree at approximately the
3  location of the limb, the diameter was a
4  little under nine inches, right?
5  **A.    That's correct.**
6  Q.    And the bottom of the tree at its
7  widest portion was a little over nine inches
8  in diameter, right?
9  **A.    I have approximately 9.6 inches,**
10  **but yeah, nine inches.**
11  Q.    It was a tree that had a large
12  curve in it, true?
13  **A.    The tree had curvature to it.  And**
14  **I will incur some of the questions, the tree**
15  **had some lean to it.  The -- though the**
16  **instruction manuals discuss lean or**
17  **curvature, those metrics aren't defined as**
18  **far as what is excessive or too much lean.**
19  **Mr. Vandine, he testified that he**
20  **evaluated the lean on the tree and thought**
21  **it was sufficient for him to climb.  I will**
22  **say the manual -- the tree diameter, does**
23  **comply with the manual's recommended tree**
24  **diameter.**
25  Q.    How high was the limb?

288

1  **A.    The limb was approximately**
2  **nine feet above the ground.**
3  Q.    And the limb would have been off
4  to his right as he was climbing the tree,
5  right?
6  **A.    I believe it would have been to**
7  **his left.**
8  Q.    Do you have a photograph of it in
9  your report?
10  **A.    (No audible response.)**
11  Q.    So you looked on page 17, and I
12  wasn't at the scene, so the question is, was
13  he climbing on this side or was he climbing
14  on the other side.  I thought he was
15  climbing on other side.
16  He testified that he was climbing
17  towards -- the side over the pond.
18  **A.    Clear as mud.  The branch was on**
19  **his left or on his right?  I'm going to**
20  **reference another site inspection**
21  **photograph.**
22  Q.    Sure.
23  **A.    Many of the photographs were taken**
24  **standing on the ground facing the tree,**
25  **facing approximately south.  The limb was on**

MSJ_JA000257

Transcript of Jarrett Waters
Conducted on February 7, 2024

73 (289 to 292)

289

1  the right-hand side.  As I believe he
2  states, he's climbing with the treestand
3  out, facing towards the water, which would
4  put the limb on the left-hand side.
5      Q.    What was the bark like on the
6  tree?
7      A.    Relatively rough, consistent with
8  a cherry tree, as far as -- yeah, I have no
9  other comment.
10     Q.    Cherry trees aren't what you term
11 a loose or a chipped bark tree, true?
12     A.    Cherry trees tend to have kind of
13 scaled shaped bark.  It's not like a
14 Shagbark Hickory, as far as having longer
15 sections of protruding bark.  I'm also not
16 an arborist, so describing tree bark is not
17 something I regularly do.
18     Q.    Fair enough.
19         Now, the product was purchased by
20 Mr. Vandine in about 2015 in New Jersey from
21 Dick's, right?
22     A.    That's my understanding.
23     Q.    And it's always used in New
24 Jersey, true?
25     A.    That's my understanding.

290

1      Q.    And the accident occurred in New
2  Jersey, true?
3      A.    That is also my understanding.
4      Q.    I want to get back to the video
5  test that we did.  I just have a few
6  follow-up questions that I didn't ask.  But
7  before we get to it, during the deposition I
8  asked Mr. Vandine could he explain to me the
9  mechanics of his body through the fall and
10 he couldn't do that.  Do you have any way to
11 do that, as you sit here today?
12     A.    Do I have any way to explain the
13 mechanics --
14     Q.    Yes.
15     A.    -- or explain his recollection of
16 the mechanics?
17     Q.    Explain the mechanics.
18     A.    I mean as far as loading of the
19 stand goes, he said he applies his elbows
20 and his arms to be upright as he begins to
21 lift his feet and then he says he falls to
22 the right.
23     Q.    Other than that, that was
24 generally all he was able to tell us, right?
25     A.    Right.

291

1      Q.    Okay.  Going back to this video
2  that I was sent yesterday, what was this
3  video supposed to show?
4      A.    After reviewing Saunders' report
5  and reviewing his testing of a cable affixed
6  to the back of the tree with a bent over
7  nail and its inability to overcome the
8  retention spring in its normal position, I
9  wanted to take a look at that same test and
10 evaluate its ability to drive the cable
11 rearward axially should the retention
12 springs be out of position.
13     Q.    You don't disagree with -- I think
14 I asked this before.  I apologize if I did.
15 You don't disagree with his conclusion that
16 pushing it back from a static point in the
17 back of the tree or a nail point in the back
18 of the tree, you couldn't put sufficient
19 load on the cable to push it -- overcome
20 that spring, right?
21     A.    I think I answered I would tend to
22 agree with that statement.  I would like to
23 review his photos and videos prior to.
24     Q.    Which Viper was being used?
25     A.    This was the exemplar, 2010 Summit

292

1  Viper with the QuickDraw.
2      Q.    Was there any structural
3  difference between this and the subject
4  stand?
5      A.    Not that I'm aware of.
6      Q.    I notice that you had several
7  exemplars.  You had two 2002 Vipers that you
8  owned, right?
9      A.    That's correct.
10     Q.    And you had this Viper.  Did you
11 have another one as well?
12     A.    I did purchase, as an exemplar, a
13 new Summit Viper PRO.
14     Q.    Did you make any type of
15 comparison between the 2010 Summit Viper and
16 the 2015 Viper?
17     A.    The only comparison of relevant
18 data I had was regarding the retention
19 spring retraction forces.  And again, that
20 was highlighted as a point to show that
21 there is some variability within the
22 springs.  And the 2015 had one spring in
23 particular that was -- had a static position
24 higher than the rest which resulted in a
25 higher retraction force than the other three

MSJ_JA000258

Transcript of Jarrett Waters
Conducted on February 7, 2024

74 (293 to 296)

293

1  springs.
2    Q.    If we look at photograph 0004, do
3  you see there are other Summit Vipers in the
4  background?
5    **A.    Are you referring to the image**
6  **with the caliper in it?  I'm sorry, there's**
7  **a couple of photos I haven't seen.**
8    Q.    I do not see a caliper.
9    **A.    0004.  The image of the --**
10   Q.    Yes.
11   **A.    Okay.  Yes, there are others in**
12  **the background and those are the Summit**
13  **Vipers from 2002.**
14   Q.    And if you look at other
15  photograph which is 005, is that taken in
16  the same room?
17   **A.    Yes.**
18   Q.    Because I don't see the Vipers
19  back there any longer.  And I don't see the
20  plug in the wall.
21   **A.    Would you mind looking at my**
22  **screen to make sure we're looking at the**
23  **same photo?**
24   Q.    Yeah.  It could just be the
25  orientation of the photographer.

294

1    **A.    This one (indicating)?**
2    Q.    That one, right there.
3    **A.    Yeah, same room, same pole, same**
4  **condition of everything around it.**
5    Q.    Those two photographs were taken
6  contemporaneously.
7    **A.    Yes, 2/5/24, 11:07 a.m.**
8    Q.    By the time it came to me, and
9  this happens a lot of times, when it comes
10  from the attorney's office, it gets scrubbed
11  of all that information, so -- I know my
12  office has us do that.  I'm sure your office
13  does as well, so I couldn't tell whether it
14  was taken -- but they're approximately
15  within minutes of each other?
16   **A.    Yes.**
17   Q.    And the -- how close to the time
18  period of the video was it?
19   **A.    Less than 10 minutes.**
20   Q.    Now, the video is -- I assume,
21  these were all taken on the same camera?
22   **A.    Correct.**
23   Q.    So the video is 0003, one
24  photograph 0004, the other photograph 0005.
25  Is there a photograph 1 and 2?

295

1    **A.    There may have been from previous**
2  **inspections on different days.  A lot of**
3  **times the camera can roll over for different**
4  **cases, I guess is what I'm getting at.**
5    Q.    Did you delete any photographs?
6    **A.    I do not recall deleting any**
7  **photographs.**
8    Q.    Did you do any type of testing
9  where you placed a load cell on the cable
10  assembly to see what type of load you could
11  induce on the cable attachment through
12  interaction with the tree?
13   **A.    I did not.**
14   Q.    Did you do any type of testing to
15  test the amount of deflection that the cable
16  would see during ordinary use?
17   **A.    Not any measurable testing.**
18   Q.    Did you do any type of testing to
19  see what type of force it would take to push
20  back forcibly over and overcome the spring?
21   **A.    I did not.**
22   Q.    Other than this test where we have
23  video, did you do any type of test where you
24  placed it on a tree while you were inside
25  the product standing on the platform with

296

1  the upper portion around you and you tried
2  to get the cable to come out?
3    **A.    Please restate the beginning of**
4  **that question.  I want to make sure I**
5  **understood it correctly.**
6    Q.    Did you do any type of testing
7  where you actually were standing inside the
8  upper assembly and tried to get the cable to
9  come out for any reason?
10   **A.    I mean, I attempted and actuated**
11  **the springs while standing in the stand, and**
12  **I moved the stand up and down the tree.  And**
13  **during those times the cable did not come**
14  **out of the bracket.**
15   Q.    One of the things that is done
16  here in this is as we talked about, the yolk
17  is placed against the tree and then the back
18  is tilted upwards; is that right?
19   **A.    That's correct.**
20   Q.    And that movement of that back bar
21  in an upward direction is limited by the
22  body being inside of it, right?
23   **A.    To some degree, yes.  Depending**
24  **how far the user is standing forward in the**
25  **stand.**

MSJ_JA000259

Transcript of Jarrett Waters
Conducted on February 7, 2024

75 (297 to 300)

297

1    Q.    The 2002 Vipers you obtained
2 yourself -- and they've been in your
3 possession for 20 years or so --
4    **A.    That's correct.**
5    Q.    -- did you get -- you got them
6 used; is that right?
7    **A.    No, they were a gift from my**
8 **father.  So we -- my brother and I received**
9 **them for Christmas one year.  I don't have**
10 **the receipts, and they were presented to us**
11 **not in their original box.**
12    Q.    And I may have written this wrong,
13 my note said it was a 2012 examplar Viper
14 and you said 2010?  Maybe I wrote it down
15 wrong.
16    **A.    I will check on inspection photos**
17 **of it, but I believe it was a '10.**
18    Q.    Okay.
19    **A.    Page 31 references a 2010 Summit**
20 **Viper and I'm looking at a photo right now**
21 **that has a K and a 10.**
22    Q.    I just typed it wrong.  Thank you.
23       Now, we talked a little bit about
24 warnings, and the warnings and instructions
25 you were critical of.  Have you told me all

298

1 of the criticisms of the warnings and
2 instructions that you have?
3    **A.    Of the warnings, yes.**
4    Q.    And the instructions?
5    **A.    Instructions, yes.**
6    Q.    Have you done any type of
7 exemplars of any type of warnings of what
8 you think the content should have been with
9 regard to not placing your hand near the
10 trigger assembly?
11    **A.    Whether I had generated what a**
12 **warning decal would look like, or an**
13 **instruction in a manual is that what you're**
14 **referring to?**
15    Q.    Either, or.
16    **A.    No, I have not generated that.**
17    Q.    Are there any other warnings,
18 opinions that we haven't -- or instruction
19 opinions that we haven't discussed?
20    **A.    I do not believe so.**
21    Q.    And I think we talked about it,
22 and I don't want to go over it again, but
23 we've gone over all of your knowledge and
24 understanding of the facts of any other
25 incident that's been claimed against Summit

299

1 relating to the use of that Viper treestand,
2 true?
3    **A.    I believe so.**
4    Q.    Now, your report is a bit
5 interesting because you have a summary and a
6 conclusion statement.  They appear to say
7 namely the same thing.  And then you have a
8 discussion section in between.  I believe
9 the conclusions are up front and then the
10 summaries at the end.  Is there really any
11 difference between the two, or they -- they
12 basically appear to be the same thing over
13 and over again.
14    **A.    They are essentially the same**
15 **thing.**
16    Q.    The first conclusion on page 2 of
17 your report talks about that you feel that
18 "the 2015 Summit Viper climbing treestand is
19 defective and dangerous, that the current
20 design allows the climbing cable to be
21 positioned in a manner that will temporally
22 support the weight of the climber, but
23 provides a false sense of security as the
24 cable and cable stops may not be fully
25 positioned and secured within the stand's

300

1 cable."  Did I read that correctly?
2    **A.    You did.**
3    Q.    And it goes on to say, "The
4 temporary securement of the cable provides
5 the climber with a false positive.  As the
6 climber loads and unloads the weight from
7 the section of the treestand, the cable and
8 cable stops can dislodge from the cable
9 bracket resulting in the cable disconnecting
10 from the treestand and ultimately
11 disconnecting from the tree."
12       That's your conclusion with regard
13 to that.  I think we've already talked about
14 that the ability to place this in a perch
15 position; is that right?
16    **A.    Yes, the ability for the climbing**
17 **cable to be partially inserted or partially**
18 **rested on the cable bracket.  And defective**
19 **and dangerous because that provides the**
20 **owner or the operator of the stand a false**
21 **sense of security, such that they can place**
22 **their weight and their weight be held, but**
23 **upon subsequent unloading and reloading of**
24 **the stand can result in the disconnection.**
25    Q.    Did you yourself in using the 2002

MSJ_JA000260

Transcript of Jarrett Waters
Conducted on February 7, 2024

76 (301 to 304)

301

1  Viper in all the times that you used it ever
2  initially place the cable in a perched
3  position?
4      **A.    I don't specifically recall if I**
5  **did. If I did, I had the sliding -- or the**
6  **pivoting cover as a second mechanical means**
7  **of checking to know whether I had the cable**
8  **positioned fully within the bracket.**
9      Q.    And again, you agree with me that
10 a vigilant user would be able to see whether
11 the cable is appropriately placed in the
12 cable bracket, true?
13 **A.    Under a certain level of**
14 **inspection, yes, it can be visually seen**
15 **that it is within the cable bracket.**
16     Q.    Now, we'll get to your alternative
17 designs in a bit, but you talk a little bit
18 about the use of a couple of your designs
19 that you made CAD drawings of. They have,
20 for lack of a better term, a cotter pin. Do
21 you know what a cotter pin is?
22 **A.    I know what a cotter pin is?**
23     Q.    And that's what is used in those
24 designs, right?
25 **A.    (No audible response.)**

302

1      Q.    And if you'd rather, you're using
2  a pin that has a U-shaped retainer bracket
3  on it?
4      **A.    I believe, yeah, one of the**
5  **renderings represents a U-shape bale, if you**
6  **will. Serves a similar purpose to a cotter**
7  **pin, it's just connected to the pin. It**
8  **isn't separately removable.**
9      Q.    All right. The pin is necessary
10 for the use of all of those alternative
11 designs, right?
12 **A.    In these proposed designs the pin**
13 **would be necessary, for the first proposed**
14 **design, to keep the cover in a closed**
15 **position as a secondary connection for**
16 **securement for the cover in a closed**
17 **position.**
18     **In the second proposed design the**
19 **pin is the mechanical means that blocks the**
20 **top of the open bracket as well as the**
21 **mechanical means that someone could use the**
22 **pin to mechanically and physically confirm**
23 **that the cable is fully seated.**
24     Q.    In the first design, your design
25 requires the person to properly seat the

303

1  cable in the cable bracket, true?
2      **A.    For the cover to be closed the**
3  **cable would have to be properly seated, yes.**
4      Q.    And then that cover has to be
5  closed, right?
6      **A.    That's correct.**
7      Q.    And then you have to physically
8  put a pin into that bracket, right?
9      **A.    Yes. You would have to insert the**
10 **pin.**
11     Q.    If the pin is lost, then that
12 bracket, if it becomes loose, can open as
13 the person climbs, right?
14 **A.    Yes, that's feasible. The pin is**
15 **a representation. The pin could implement a**
16 **lanyard very similar to what the QuickDraw**
17 **Pro design utilizes as far as the lanyard to**
18 **retain the pin to the stand.**
19     Q.    Okay. Pin retention, if it's
20 loose is difficult on a forest floor; is it
21 not?
22 **A.    You mean to find should it fall to**
23 **the floor?**
24     Q.    Yes, drop a cotter pin or a black
25 pin?

304

1      **A.    I have dropped hardware and I have**
2  **dropped black pins on -- in leafy, woody**
3  **conditions. And, yes, it's difficult to**
4  **find. That's why I brought up the lanyard**
5  **suggestion similar to what the QuickDraw Pro**
6  **uses.**
7      Q.    And the QuickDraw Pro has a
8  specific different change in the physical
9  dimension of the cable bracket that you
10 haven't resolved -- you haven't shown any of
11 your designs, right?
12 **A.    I believe the QuickDraw Pro has an**
13 **elongated, narrowed portion of the keyway**
14 **bracket, if I recall correctly. Without**
15 **looking at dimensions I cannot recall if I**
16 **represent the elongated keyway or the**
17 **initial keyway shape in the initial**
18 **drawings.**
19     Q.    Okay.
20     Let me ask you this: If the cable
21 is properly placed within the bracket and a
22 person doesn't intentionally pull the
23 trigger and/or the cable doesn't become
24 stuck behind the tree, that cable bracket as
25 designed firmly and solidly secures it in

MSJ_JA000261

Transcript of Jarrett Waters
Conducted on February 7, 2024

305

1  place, right?
2     **A.    If the cable stop is fully**
3  **inserted into the cable bracket without the**
4  **QuickDraw spring, without the additional**
5  **devices that would help the user determine**
6  **if it's fully seated or not, the cable has a**
7  **tendency to want to stay in its position**
8  **when installed.**
9     Q.    And the only potential way that
10 you were able to have it come out is to
11 intentionally actuate the trigger and to fix
12 the cable to the tree, right?
13    **A.    And in the circumstances where the**
14 **cable wasn't fully positioned or seated**
15 **within the cable bracket.**
16    Q.    Well, that was part of my -- this
17 is a followup to my earlier question, if
18 it's properly inserted to begin with.  So
19 let's start with that again.
20       If properly inserted into the
21 bracket the only way you were able to get it
22 to come out is three things:  One is to
23 first of all actuate the trigger so it
24 defeats the QuickDraw spring?
25    **A.    That's correct.**

306

1     Q.    Second, secure the cable to the
2  back of the tree, so that it can't move,
3  right?
4     **A.    That is what I did for the test,**
5  **yes.**
6     Q.    And then third, move the trigger
7  switch and grip on the trigger and move the
8  trigger to push it out of the cable bracket,
9  right?
10    **A.    That third motion wasn't in that**
11 **test.  As a result of that, we also did see**
12 **the cable without the upward motion result**
13 **in that perched scenario where it was**
14 **partially -- partially inserted into the**
15 **cable bracket.**
16    Q.    Okay.  Removing that last step,
17 the first two steps have to occur for that
18 cable to come out in its ordinary use,
19 right?
20    **A.    That would be true, yes.**
21    Q.    And if either of those two things
22 don't occur, the design of this treestand
23 keeps that cable within the bracket during
24 use, right?
25    **A.    The shape of the cable bracket**

307

1  **does retain the cable stop should it be**
2  **fully inserted into the cable stop.**
3     Q.    So in other words, as long as the
4  cable doesn't somehow get stuck to the tree
5  as you have screwed it here, or a person
6  doesn't actuate the trigger in the movement
7  that defeats that QuickDraw spring, this
8  product works safely?
9        MR. DARIA:  Objection to form.
10       THE WITNESS:  The position of
11 the cable is not likely to move based on
12 its current design.
13 BY MR. SUTTON:
14    Q.    So if those two things don't
15 occur, this product works safely, right?
16       MR. DARIA:  Objection to form.
17       THE WITNESS:  The cable remains
18 fully seated within the cable bracket.
19 BY MR. SUTTON:
20    Q.    Which is what it is designed to
21 do, which allows you to safely use the
22 product?
23    **A.    It allows you to use the product.**
24    Q.    If either of those things don't
25 occur, the cable also remains safely in the

308

1  bracket, true?
2     **A.    Repeat that, please.**
3     Q.    If either of those two things
4  doesn't occur, the cable also remains safely
5  in the bracket, true?
6     **A.    If it is only seated in the**
7  **bracket upon installation.**
8     Q.    The second paragraph in your
9  conclusions talk about engaging or
10 disengaging as the climber ascends and
11 descends.  We've already talked about that,
12 right?
13    **A.    That's correct.**
14    Q.    Is there anything in addition you
15 need to add that I didn't ask you about?
16    **A.    No, I think we've discussed that.**
17    Q.    Your third conclusion said that,
18 "It is our technical opinion that a locking
19 device or safety interlock should require a
20 separate and intentional user action to
21 disengage the lock, and should not be able
22 to be inadvertently disengaged during the
23 normal foreseen use of this equipment.  The
24 Summit QuickDraw locking spring can be
25 inadvertently disengaged as it is in the

MSJ_JA000262

Transcript of Jarrett Waters
Conducted on February 7, 2024

309

1  position of orientation that's often grasped
2  by the climber's hand during normal use."
3  Did I read that correctly?
4      **A.    You did.**
5      Q.    And this talks, and goes into your
6  alternative designs that you set forth at
7  the bottom of your report or back of your
8  report, right?
9      **A.    I'm not sure that tied directly**
10  **into the alternative designs.  The**
11  **alternative designs were created in a way**
12  **that could still retain or keep the**
13  **QuickDraw retention spring should it be**
14  **wanted.  Those designs were made to be able**
15  **to still allow the function of the QuickDraw**
16  **spring.**
17        **This particular conclusion is**
18  **discussing that a device referred to as a**
19  **locking device or safety interlock should**
20  **require a separate and different user action**
21  **in order to be disengaged.  Whereas, the**
22  **QuickDraw spring is in the area that can be**
23  **grasped and has the potential to be moved**
24  **inadvertently and the safety interlock**
25  **should require a separate and intentional**

310

1  **action.**
2      Q.    And that's what we've already
3  discussed at length, correct?
4      **A.    That's correct.**
5      Q.    The next opinion appears to relate
6  to the warning label.  We've already
7  discussed that at length.  Is there anything
8  else you want to add on?
9        I'm sorry.  The next opinion, I
10  skipped one.  The next opinion goes to ASTM
11  F2122-13 and that is that in your opinion
12  the Summit failed to provide additional
13  safety precautions.  But in all due respect,
14  they did provide both a redundant safety
15  device in the QuickDraw spring and a
16  harness.  You just -- it's your opinion they
17  could have been safer, right?
18      **A.    It's my opinion there were things**
19  **that were feasibly, whether through the**
20  **design and economically, that could have**
21  **been incorporated, and that were ones**
22  **incorporated that could have changed the**
23  **outcome of this incident, but also could**
24  **have been easily incorporated into the**
25  **design.**

311

1      Q.    Let me ask you this:  The
2  alternative designs that you propose in your
3  report, I take it you have not made them.
4  You've drawn them up, but you've not made
5  them, right?
6      **A.    Correct.  They are scaled models**
7  **and I've made renderings of those models.**
8      Q.    So you've never actually tried to
9  install them on a tree, right?
10      **A.    Those designs have never been**
11  **fabricated.**
12      Q.    So the question is, is that if a
13  person is up at height like Mr. Vandine does
14  and decides for whatever reason I want to
15  remove my cable assembly, can those designs
16  even be used to do it?  Because you're
17  taking what is really requiring your body
18  and two hands and make it even a more
19  difficult action to try to reinstall the
20  cable assembly height?
21        MR. DARIA:  Note my objection to
22  the form.
23        THE WITNESS:  I don't think
24  those designs would inhibit somebody's use
25  to properly install a climbing cable or

312

1  fully install a climbing cable into the
2  climbing bracket.
3  BY MR. SUTTON:
4      Q.    What happens if they lose control
5  of the pin and it falls to the ground?
6      **A.    Again, those are no -- those**
7  **renderings are examples of features that**
8  **could easily incorporate a lanyard or**
9  **something that retains the pin to the stand.**
10      Q.    Would you agree with me then, if
11  the pin does fall to the ground it would
12  render them useless?
13      **A.    If the pin fell to ground, despite**
14  **any lack of lanyard, it would render the pin**
15  **part useless on the second design.  And the**
16  **first design you would still have the cover**
17  **that could be pivoted over and block the**
18  **open keyway.**
19      Q.    Okay.
20        The next conclusion, is
21  multi-paragraphed, but it relates to the
22  location of the warning label.  Do you see
23  that?
24      **A.    That's correct.**
25      Q.    We've already discussed that.  Is

MSJ_JA000263

Transcript of Jarrett Waters
Conducted on February 7, 2024

---

313

1  there anything else you want to add?
2  **A.    No.**
3  Q.    The next opinion talks about
4  wearing a full-body harness. We've already
5  discussed that. Is there anything else you
6  want to add?
7  **A.    No, there is not.**
8  Q.    Then the last one is sort of a
9  catchall -- the last two are sort of
10 catchall, I guess it goes on the fourth page
11 too. Is there anything else you want to
12 add? Though it appears to be stuff that
13 you've been saying throughout the
14 deposition. Is there anything else you need
15 to add that you haven't told me about in
16 those opinions?
17 **A.    The opinions are founded in the --**
18 **kind of in the philosophy of design, and as**
19 **the designer of a product one should**
20 **consider all the foreseeable uses and**
21 **misuses that could exist on a product, and**
22 **that involves doing risk analysis, and**
23 **different failure modes analysis, or**
24 **different tasks that require a designer to**
25 **evaluate and document the process that they**

314

1  **went through in order to realize those risks**
2  **and how they mitigate those risks.**
3  **We don't have any evidence of a**
4  **risk analysis, or a DSMEA, or documents that**
5  **show that a design review was conducted**
6  **regarding the lack of a cover or the open**
7  **keyway, should the product or should the**
8  **climbing cable not be fully inserted into**
9  **the climbing bracket. And had the stand**
10 **been equipped with a safety cover, which**
11 **Mr. Vandine would have had the opportunity**
12 **to close that safety cover and realize that**
13 **the climbing cable was not fully positioned**
14 **within the cable bracket.**
15 Q.    Well, you don't have any
16 documents, but you have the testimony of a
17 design that's over 20 years old, but you
18 have the testimony of Mr. Woller that he did
19 all those steps, right?
20     MR. DARIA: Objection to form.
21     THE WITNESS: I read that in his
22 transcript. I have not seen copies of the
23 risk analysis or the documentation of
24 that.
25

315

1  BY MR. SUTTON:
2  Q.    And in that analysis of a design
3  that was designed when the company was a
4  different actual legal entity?
5  **A.    That may be the case.**
6  Q.    Okay.
7       Go to page 8. You looked at some
8  of the reports under NIOSH, that's the
9  history of controls that you reference
10 later; do you see that?
11 **A.    The Hierarchy of Controls, yes.**
12 Q.    Yes.
13 **A.    Yes.**
14 Q.    And then as you go down there's a
15 bunch of stuff in here, many of which we've
16 talked about. But then you get to some
17 photographs and marketing images from
18 Summit's website. I know some of them we
19 already talked about. Where are they in
20 your file?
21     MR. DARIA: Sorry; what were you
22 asking for?
23     MR. SUTTON: It says,
24 "Photographs and Marketing Images from
25 Summit's Website." I know you have one

316

1  that's a folder entitled "Summit Treestand
2  Brochures and Instructions."
3       THE WITNESS: I have a folder
4  entitled "Summit Research."
5  BY MR. SUTTON:
6  Q.    Okay.
7  **A.    There's a folder in there with, a**
8  **subfolder with patents at the bottom -- at**
9  **least the list I'm looking at includes one,**
10 **two, three, four, photographs that appear to**
11 **be from the Summit website.**
12 Q.    Okay. The first one I have, is
13 this SU8137; is that right?
14 **A.    Yes, product_viper steel; is that**
15 **it?**
16 Q.    Yep.
17 **A.    Yep.**
18 Q.    That includes the two photographs
19 we were talking about already.
20 **A.    That's correct.**
21 Q.    Then it goes on to talk about the
22 OL'MAN website. That's the other one we
23 were talking about, right?
24 **A.    Correct.**
25 Q.    That's the Multi-Vision product?

MSJ_JA000264

Transcript of Jarrett Waters
Conducted on February 7, 2024

---

317

1    A.    Yes.
2    Q.    And then it talks about Hawk.  I
3 didn't see Hawk in there.
4    A.    I may have copied those
5 photographs straight into the report.
6    Q.    I didn't see the photographs in
7 the report.
8    A.    That was the extent of photographs
9 of Hawk's that I put in the report.
10        MR. DARIA:  What page are you
11 referring to?
12        THE WITNESS:  Thirty-nine.
13 BY MR. SUTTON:
14   Q.    Have you actually seen that Hawk
15 product?
16   A.    I have not physically seen that
17 product.
18   Q.    So basically you just were copying
19 photographs from a website and that's the
20 extent of it?
21   A.    Yes.  These photographs are from
22 their website.
23   Q.    On page 13, the very last three
24 words say, "The climbing cable," and then
25 goes onto the next page.

318

1    A.    Yes.
2    Q.    "The climbing cable did exhibit a
3 bend not consistent with a natural shape of
4 the cable at the interior of the innermost
5 cable stop that was positioned within the
6 left cable bracket."  Did I read that
7 correctly?
8    A.    You did.
9    Q.    What do you mean by that?
10   A.    The -- first of all, clarify the
11 reference of left and right.  I identified
12 left and right from the user's hunting
13 perspective facing away from the tree as
14 opposed to facing the tree.
15        That cable did exhibit a kink, or
16 a sharper bend where the cable appeared to
17 exit the cable bracket on that left side.
18   Q.    Do you have any of photographs of
19 that?
20   A.    Figure 9 and 10 it is represented,
21 however it is not close up.
22   Q.    I guess I can't see the kink.
23   A.    It is not severe, and I'm looking
24 at it from up.
25   Q.    Okay.

319

1        If you turn to page 15.  You
2 talked about physical evidence being present
3 that tells us that the accident happened
4 when the cable assembly was not probably
5 placed in the bracket.  The lower right
6 photograph in figure 12 is what you're
7 talking about, right?
8    A.    That is correct.  The material
9 that's deformed on the inside of that keyway
10 would be consistent with the cable bracket
11 or cable stop partially being inserted and
12 resting against that keyway under load.
13   Q.    And on that lower right photograph
14 of figure 12 we have a portion of the cable
15 bracket seen with a silver X on the left
16 side of it and then a mark on the right side
17 opposite the silver X that you're talking
18 about, right?
19   A.    That's correct.
20   Q.    And that demonstrates to you, or
21 that damage occurs only when the cable is
22 not fully placed into the cable bracket and
23 load is placed on the cable sufficiently to
24 alter the aluminum, right?
25   A.    That's correct.

320

1    Q.    You tested the strength of the
2 platform springs on Mr. Vandine's treestand
3 as well as the seat portion; is that right?
4    A.    That's correct.
5    Q.    And Mr. Vandine testified that he
6 never would remove it from the right side.
7    A.    Right.
8    Q.    You're referring to the
9 opposite -- your reference is from the
10 person facing away from the tree hunting,
11 right?
12   A.    That's correct.
13   Q.    So what you found is that on the
14 right side in the orientation just
15 described, the pounds disengaged of the
16 spring were 6 pounds, and on the other side
17 it was 9.2 pounds; is that right?
18   A.    That's correct.
19   Q.    And one of the things that you
20 reference as an alternative design is the
21 QuickDraw Pro -- I'm sorry -- the Viper Pro
22 design.  In the Viper Pro design there is an
23 actual handle that can be gripped and opened
24 to pull the spring down, right?
25   A.    That's correct.

MSJ_JA000265

Transcript of Jarrett Waters
Conducted on February 7, 2024

321

1        MR. DARIA:  Just note my
2    objection to the form.
3    BY MR. SUTTON:
4        Q.    It's a lever system, other than a
5    spring system?
6        **A.    Yeah.  It's a polymer lever, but I**
7    **believe that lever has a torsional spring**
8    **installed around the shaft make it spring**
9    **back to its position.**
10       Q.    So it differs from the Viper
11   design in that if force is applied to that
12   lever in the direction of, for instance,
13   grabbing, or gripping the treestand arm, the
14   spring goes down to allow that cable to
15   move, right?
16       **A.    That would be correct.**
17       Q.    And Mr. Nelson testified in his
18   deposition that because of that, to preclude
19   it from bumping on anyone because it's now
20   external, they included a pin in that
21   design, right?
22       **A.    That's my understanding, yes.**
23       Q.    And what happens if you bump the
24   spring?  In the bottom of the spring what
25   happens if you bump it?  Does it go further

322

1    into engagement in the Viper design?
2        **A.    If it's bumped upward, yes.  It**
3    **would go further into engagement.**
4        Q.    And there is some written things
5    in here that you said that the subject stand
6    was not properly certified.  Do you recall
7    that?
8        **A.    Based on the documentation**
9    **provided, the model number stand was not the**
10   **same model number that was certified on the**
11   **MCR report.**
12       Q.    So your only -- you don't think
13   that the stand didn't meet any of the
14   performance standards, right?
15       **A.    As far as I know, that's correct.**
16       Q.    You've used Viper treestands.
17   That's been the same base design for 20
18   years.  You have no reason to believe that
19   they didn't meet the performance standards,
20   right?
21       **A.    The model I have, I have not had**
22   **issues with any of the performance.  The**
23   **only thing I have to go off of, of whether**
24   **they meet performance standards or not, are**
25   **the Treestand Manufacturers Association's**

323

1    **Member Certification Report.**
2        Q.    And you're not here to testify
3    that this stand didn't meet any of the
4    performance standards, the ASTM tests, are
5    you?
6        **A.    Performance specifically relating**
7    **to the static loading and the two times**
8    **loading that we were referring to as**
9    **performance?**
10       Q.    Right.
11       **A.    That's correct.**
12       Q.    And the only real criticism about
13   the ASTM appears to be placement of the
14   label which you acknowledge has existed
15   since 2002 and has been repeatedly certified
16   in all kinds of different Viper products,
17   right?
18       **A.    That's correct.**
19       Q.    So although you point out that the
20   model number that was in the Member
21   Certification Report that was produced may
22   not be the same as the model number, you
23   can't even tell me, as you sit here today,
24   whether the model that's referenced in the
25   scientific testing lab's signed Member

324

1    Certification Report is different in any way
2    whatsoever than the subject stand, right?
3        **A.    From photographs from that Member**
4    **Certification Report I believe as we**
5    **discussed earlier there is a camouflage**
6    **pattern that was different and there might**
7    **have been a different set of backpack straps**
8    **and interlink.**
9        Q.    And tether, umbilical cord as they
10   call it?
11       **A.    Correct.**
12       Q.    Those have nothing to do with
13   testing, right?  The backpack straps aren't
14   tested in the TMS or ASTM?
15       **A.    That's correct, they're not**
16   **tested.**
17       Q.    And the camouflage doesn't matter
18   in testing, right?
19       **A.    Unless they start to include deer**
20   **in their testing, I don't think so.**
21       Q.    And the umbilical cord isn't
22   tested either, right?
23       **A.    To my knowledge, it's not tested.**
24       Q.    And that's the only difference
25   that you saw, right?

MSJ_JA000266

Transcript of Jarrett Waters
Conducted on February 7, 2024

82 (325 to 328)

---

325

1    A.    From the photographs and the
2  report, that's correct.
3    Q.    There was some discussion about
4  the stirrups, whether or not they were
5  included, but you're not of the opinion that
6  has anything to do with this accident, other
7  than just noting them, correct?
8    A.    I don't think the stirrups are
9  related in this incident.
10   Q.    On page 32 of your report there is
11  some discussion of a rivet?
12   A.    That is correct.
13   Q.    Are these photographs that you
14  have here in the report, these are of an
15  exemplar 2010 Summit Viper, right?
16   A.    That's correct.
17   Q.    Did you find any issues whatsoever
18  with the rivets on the subject stand?
19   A.    I -- no, I did not.
20   Q.    At the back of your report, at the
21  end, you have a section called Summary?
22   A.    That's correct.
23   Q.    Now, I'm going to give you a fair
24  opportunity, but I've read through these and
25  I've looked through them in comparison to

---

326

1  the conclusions at the beginning of the
2  report and it appears they're the same
3  thing. Is there anything different about
4  them that I missed?
5    A.    There may be a few more words in
6  some of the sentences, but the gist of the
7  summary is the same thing that's represented
8  in the conclusions.
9    Q.    So now, let's talk about the
10  alternative design and see if we can get
11  closer to conclusion. You would agree with
12  me alternative design is only good if it
13  makes the product safer?
14   A.    Please state that again.
15   Q.    An alternative design is only good
16  if it makes the product safer, right?
17   A.    The purpose of revising or
18  providing alternative design should be to
19  make the product safer, yes.
20   Q.    And if the product becomes more
21  difficult to use that may make it less
22  likely to be used, an alternative design,
23  right?
24   A.    It depends in what way it becomes
25  more difficult to use. The proposed designs

---

327

1  with what are here I do not believe make the
2  stand any more difficult to use and actually
3  it provides the user a way to physically
4  determine that the cable has been fully
5  seated within the cable bracket.
6    Q.    Well, in using the subject product
7  attaching it to a tree, you put the cable
8  around the tree, you slide it into the cable
9  bracket, you pull it forward, you can hear
10  an audible click and you can see that it is
11  attached, right?
12   A.    You can, yes, you can do that.
13   Q.    And then you're ready to go,
14  right?
15   A.    Should the cable be fully
16  positioned, yes.
17   Q.    And one of the reasons that people
18  like Summit treestands is because of that
19  ability to put them on the tree and be ready
20  to start your hunt, right?
21   A.    I would assume so.
22   Q.    Especially in low-light
23  conditions, right?
24   A.    So the QuickDraw spring does not
25  provide any feature to ensure that the --

---

328

1  any mechanical feature to ensure that a
2  cable stop is fully seated within the cable
3  bracket.
4    Q.    That's not my question. My
5  question is that that's a user optimized
6  feature, that users like to be able to put
7  this on a tree without an additional step.
8  You're aware of that, right?
9    A.    I would agree that users want to
10  go as quickly as they can, yes.
11   Q.    And all of the proposed additional
12  features that you have, or additional --
13  require additional steps. For instance, the
14  first one would be moving hatch cover and a
15  secondary pin requires you to open the
16  hatch, it requires you to put the cable in,
17  close the hatch, put the pin in, right?
18   A.    Those are the actions, however
19  those actions would take a matter of seconds
20  for the amount of duration that you're to
21  spend in the stand.
22   Q.    I'm just saying it takes
23  additional steps. It's not as easy to put
24  on as the design is --
25   A.    It would require --

---

MSJ_JA000267

Transcript of Jarrett Waters
Conducted on February 7, 2024

329

1    MR. DARIA:  Let him finish his
2  question.
3    Objection to the form.
4    THE WITNESS:  Please repeat the
5  question.
6    MR. DARIA:  Did you finish?
7  Sorry.  I think you started to answer,
8  that's all.
9  BY MR. SUTTON:
10    Q.  My question is simple:  It takes
11  more steps and therefore it is not as easy
12  to put on, you would agree with that, right?
13    MR. DARIA:  Objection to the
14  form.
15    THE WITNESS:  It takes more
16  steps, yes, but those steps are steps that
17  the user can use to verify that the cable
18  is fully installed.
19  BY MR. SUTTON:
20    Q.  Which in the present design the
21  user can just physically look, right?
22    **A.  If they looked long enough and**
23  **hard enough, yes, they can look at it and**
24  **determine that the cable was positioned.**
25    Q.  With all due respect, how long do

330

1  you have to look at the side of it to make
2  sure it's seated in front of the QuickDraw
3  spring?
4    **A.  In that photo right there, not**
5  **very long.**
6    Q.  You said, "in that photo right
7  there," you're referring to page 6 of the
8  manual?
9    **A.  Okay.  Figure 32, on page 34 of**
10  **the report, is an example of a cable stop**
11  **that is partially seated versus a cable stop**
12  **that is fully seated.  And in that condition**
13  **it is quite difficult to discern easily that**
14  **the cable is fully seated.  If you sit and**
15  **stare at it, you can determine that it's**
16  **fully positioned.**
17    Q.  Sit and stare at it.  If you lean
18  over and look at it from the side you could
19  easily determine.  It takes you less than
20  two seconds, right?
21    **A.  About the same time to close the**
22  **cover and insert a pin.**
23    Q.  What I'm saying is that you can
24  visually see it very easily, right?
25    **A.  Not very easily.  If you sit there**

331

1    **and look at it, you can visually determine**
2    **whether it's seated or not.  That photo**
3    **represents something that's visually**
4    **difficult to determine.**
5    Q.  The photograph that you took of
6  the person that's standing in the middle of
7  the stand which is not how Summit shows you
8  to attach it to a tree, right?
9    **A.  From the operator position within**
10  **the stand, yes.**
11    Q.  But Summit shows you in the video
12  and shows you on the instruction manual to
13  do it from the side, right?
14    **A.  That's what the instruction manual**
15  **says, yes.**
16    Q.  And Figure 33, on page 35, very
17  easily shows the top view, which can be
18  easily determined whether or not the cable
19  is attached?
20    **A.  I think we'll argue whether people**
21  **can easily determine things in a quick look.**
22  **If you look at that long enough and get**
23  **close enough, yes, you can determine.**
24    Q.  In the design that you have, which
25  is the design of the -- which is your

332

1  proposed alternative design on page 40 --
2    **A.  Yes.**
3    Q.  -- in this design that you have on
4  this -- on this product, if the gate is not
5  closed, is there anything that prevents,
6  other than the design of the cable and the
7  cable bracket itself that prevents that
8  cable from moving backwards?
9    **A.  Repeat that, please.**
10    Q.  If that cover is not closed, is
11  there anything in that design as you've
12  drawn here that prevents that cable from
13  moving backwards?
14    **A.  As drawn in that photo, the cable**
15  **can move rearwards without risking the**
16  **ability for it to exit the pathway or exit**
17  **the bracket.  And I do note in the report**
18  **that those drawings could be used with the**
19  **QuickDraw retention spring should it want to**
20  **be retained.**
21    Q.  Well, first of all, you didn't
22  actually physically draw it in these with
23  the QuickDraw spring in it, right?
24    **A.  That's correct.**
25    Q.  And you didn't actually physically

MSJ_JA000268

Transcript of Jarrett Waters
Conducted on February 7, 2024

84 (333 to 336)

333

1  make it to determine whether or not that
2  made it much more difficult because of the
3  operation of the QuickDraw spring to
4  actually enclose this cover, right?
5  **A.    The cover is on the external or**
6  **above the side of the cable bracket.  That**
7  **QuickDraw spring doesn't interfere with**
8  **anything above the cable bracket.**
9  Q.    The way it's drawn it's on the top
10  and the bottom of the cable, isn't it?  Or
11  is it just an L shape?
12  **A.    The removable cover itself is just**
13  **an L shape.**
14  Q.    Okay.  First of all, if it's not
15  closed, it doesn't add any safety at all,
16  right?
17          MR. DARIA:  Objection to the
18  form.
19          THE WITNESS:  If the cover is
20  not closed, the cable could still be
21  partially inserted or have the ability to
22  move axially within the bracket.
23  BY MR. SUTTON:
24  Q.    Secondly, if the cable is open and
25  you're carrying it through the woods, and it

334

1  hits something and bends it, you've defeated
2  the whole purpose of that, right?
3  **A.    If somebody is carrying the**
4  **treestand through the woods and snags the**
5  **QuickDraw retention spring on something,**
6  **they could bend it out of shape and defeat**
7  **its purpose.**
8  Q.    We've been going so long because
9  you won't actually answer the question.  Did
10  I ask you a question about the QuickDraw
11  spring?
12  **A.    You did not.  I'm just offering**
13  **suggestions.  All things are susceptible to**
14  **damage.**
15  Q.    My question is on your design and
16  you have a moveable hatch cover and the
17  moveable hatch cover is capable of being
18  bent because it's basically an outside wing
19  on the end of a stand that you're carrying
20  through the woods, right?
21  **A.    If it's not in positioned and**
22  **closed, yes.**
23  Q.    The QuickDraw spring, however, is
24  behind the arm itself.  It doesn't extend on
25  the outside, so it's less likely to be

335

1  caught in anything, right?
2  **A.    Potentially.**
3  Q.    Okay.
4          Now, you did not draw up in any of
5  these any type of pin that is actually
6  physically attached to the stand, right?
7  **A.    I did not represent a lanyard that**
8  **tied the pin to the stand in these drawings.**
9  Q.    Have you ever used a stand that
10  had a pin like this?
11  **A.    A pin and a lanyard?**
12  Q.    Yes.
13  **A.    Yes, the Treewalker.**
14  Q.    And did you have to replace it
15  after a while?
16  **A.    No, it had a lanyard that attached**
17  **it to the stand.**
18  Q.    Now, if it has a lanyard that it
19  attached and it becomes damaged, does that
20  affect its ability to use it?
21  **A.    If the lanyard -- sorry, repeat.**
22  **If the lanyard becomes damaged?**
23  Q.    No, if the pin becomes damaged.
24  **A.    If the pin became damaged, it**
25  **could become difficult to insert.**

336

1  Q.    I want you to turn back at exhibit
2  is it 3, page 38.  Your report, page 38.
3          Now, here you are suggesting that
4  this OL'MAN treestand design is one
5  potential alternative design to the subject
6  treestand, right?
7  **A.    That is correct.**
8  Q.    This is the Multi-Vision product,
9  right?
10  **A.    Correct.**
11  Q.    You realize, do you not, that you
12  signed a report in Lee versus Millennium
13  Outdoors in which you stated that the
14  Multi-Vision treestand was defective and
15  dangerous?
16  **A.    I don't recall authoring that**
17  **report.  I may have been a technical**
18  **reviewer on that report, but I did not**
19  **author that report.**
20  Q.    But when you sign it, aren't you
21  signing that you've reviewed it, and read
22  it, and agreed to it?  Isn't that the whole
23  purpose of having somebody sign it?
24  **A.    The individual that signs it is a**
25  **technical reviewer.  Those are not their**

MSJ_JA000269

Transcript of Jarrett Waters
Conducted on February 7, 2024

337

1  opinions.
2  Q.    So you're saying that on behalf of
3  Wolf Forensic and Design Engineering or
4  whatever it's currently called --
5  A.    True.
6  Q.    -- that if you sign a report, as a
7  reviewer, you are not saying that you agree
8  to the opinions?  That's not the purpose of
9  signing the report?
10  A.    Those are not your authored
11  opinions.  The author of the report, it's
12  their opinion.
13  Q.    So if I have a case called Lee
14  versus Millennium Outdoors that you had
15  signed the document of a report saying that
16  this design that you're now proposing as
17  alternative in this case is defective and
18  dangerous, you now say you don't agree to
19  that?
20  A.    The opinions authored in that
21  report were not my opinions.
22  Q.    Well, they --
23  A.    They're the opinions of
24  Mr. Dickinson.
25  Q.    They were issued by Wolf Forensics

338

1  and Design Engineering, that's your firm,
2  right?
3  A.    That's correct.  That's who I work
4  for.
5  Q.    And Mr. Dickinson was your boss,
6  right?
7  A.    He's a colleague.
8  Q.    And isn't he an owner of Wolf?
9  A.    Not that I'm aware of.
10  Q.    Isn't he a person that provides
11  reports and supportive service on behalf of
12  Wolf?
13  A.    Yes, he does.
14  Q.    And part of your protocol to make
15  sure that a report has been peer reviewed
16  and is appropriate under "Daubert" is to
17  have somebody review it and sign it as well,
18  right?
19  A.    Our protocol is for somebody to
20  review the report, yes.
21  Q.    You are saying here, under oath,
22  that there are reports out there that you've
23  signed that you don't agree with the
24  opinions on?
25  A.    I am not saying I disagree with

339

1  the opinions.
2      MR. DARIA:  Objection to form.
3      THE WITNESS:  I'm saying they're
4  not my opinion.
5  BY MR. SUTTON:
6  Q.    Are there any reports that have
7  been issued with regard to any cases out
8  there, that you have signed, that you
9  disagree with any opinions?
10  A.    I'm not aware of those.  The
11  opinions are the opinions of the author.
12  And if I recall from this particular -- and
13  without seeing that report in front of me
14  and knowing what Mr. Dickinson said, I
15  believe he was referring to the lack of
16  inspection of the cable as far as the
17  effects of corrosion because it was within a
18  polymer tube, not necessarily the attachment
19  point of the climbing cable into the tube.
20  Q.    You do remember the case.  You do
21  remember that Mr. Dickinson was saying that
22  this attachment was dangerous because a
23  person couldn't see whether or not it
24  corroded?
25  A.    I believe, and again, I don't have

340

1  the report in front of me, I believe his
2  report was discussing that the cover over
3  the cable prevented its inspection.
4  Q.    You are aware, are you not, that
5  in the case Walker versus Alliance Outdoor
6  Products, Edward versus Alliance Outdoor
7  Products, and Clayton versus Alliance
8  Outdoor Products you signed a report in
9  which the proposed alternative design to the
10  product that was used in that case, a
11  climbing treestand by X-Stand was Summit
12  Viper?
13  A.    I don't recall if it was a
14  proposed alternative design.  There was an
15  analysis of the tension or tensile strength
16  of the climbing cable.
17  Q.    It was the only attachment method
18  that you referenced in your report.  And you
19  did testing, and I know you did testing
20  because you were the one that did it.
21  A.    I'm not arguing that I did
22  testing.  I know I did testing on my 2002
23  Summit Viper stand.
24  Q.    And your opinions in that case was
25  that the Summit Viper treestand was a safe

MSJ_JA000270

Transcript of Jarrett Waters
Conducted on February 7, 2024

86 (341 to 344)

341

1  alternative design to that X-Stand, right?
2        MR. DARIA:  Objection to the
3  form.
4        THE WITNESS:  I believe the
5  reports are referencing the tensile
6  strength of the climbing cable as an
7  alternative to what X-Stand provided.
8  BY MR. SUTTON:
9     Q.    Well, wait a minute.  You're not
10 saying I can propose a new alternative
11 design and it may be safer in one aspect but
12 be much more dangerous in some other aspect,
13 but I still think it's a good alternative
14 design?  You have to look at how the product
15 works throughout for its entire application
16 to determine whether it's a safer
17 alternative design, right?
18       MR. DARIA:  Objection to form.
19       THE WITNESS:  The Multi-Vision
20 stand was included because of its
21 attachment method through the tube, which
22 would prevent the user from being able to
23 partially secure the climbing cable.  The
24 other aspects of that design were not
25 evaluated and not considered as part of

342

1  their proposal in this report.  It was
2  simply an alternative method how a cable
3  attaches to a treestand.
4  BY MR. SUTTON:
5     Q.    In fact, the same issue that you
6  had that you and Mr. Dickinson signed a
7  report saying the Multi-Vision was
8  detective, also exists in the Treewalker
9  climbing stand because it's also connected
10 and contained within a polymer tube, right?
11       MR. DARIA:  Objection to form.
12       THE WITNESS:  That would be
13 correct.  That cable is difficult to
14 inspect or not possible to inspect.
15 BY MR. SUTTON:
16    Q.    And you yourself use a 2002 Viper
17 stand, two of them.  Have you had any issues
18 with corrosion at all with the Summit
19 treestand?
20    **A.    They both are equipped with**
21 **replacement cables at this point, so I don't**
22 **have the original existing cables from 2002.**
23    Q.    Okay.  The Hawk climbing treestand
24 you have included in here has an attachment
25 method that you haven't specifically

343

1  actually manipulated, right?
2     **A.    That's correct.**
3     Q.    Because I know that in the
4  photograph that you show on page 39 there
5  is, for instance, a knob for the retention
6  of it that you can see in that photograph
7  that appears to come off the top.  Do you
8  see that?
9     **A.    Page again, please?**
10    Q.    Thirty-nine.
11    **A.    Yes, that's correct.**
12    Q.    That is in a location where if
13 somebody is going to be using their hand and
14 elbows may make it difficult for them to use
15 it in the stand in the same manner in which
16 Mr. Vandine said he used the subject stand,
17 right?
18    **A.    I don't believe it would because**
19 **hands and elbows would be interacting with**
20 **the remainder of the upright arm and his**
21 **hands would likely be maybe at or near that,**
22 **but below that bracket.**
23    Q.    It also appears to only be
24 adjustable on one side; do you see that?
25    **A.    The photo on the left appears to**

344

1  **have adjustments on both sides.**
2     Q.    Your eyes are better than mine.
3  It doesn't look like it to me, but okay.
4        The Multi-Vision and the
5  TreeStalker appear to only have -- if you
6  permanently attached on one side; is that
7  correct?
8     **A.    That's correct.  They're**
9  **permanently affixed on one side.**
10    Q.    Do you have any criticisms or
11 disagreements with Mr. Saunders and his
12 report?
13    **A.    I -- the primary disagreement I**
14 **have with his report is he refers to --**
15 **comments on misuse of a treestand which was**
16 **not foreseeable by Summit because of the**
17 **warnings and the instruction manual.  The**
18 **fundamental misuse or the primary misuse of**
19 **a treestand should be considered by the**
20 **designer and if there are feasible economic**
21 **design alternatives, they should be**
22 **considered.**
23    Q.    Anything else?
24    **A.    Off the top of my head, no.**
25    Q.    What about Mr. Smith?

MSJ_JA000271

Transcript of Jarrett Waters
Conducted on February 7, 2024

87 (345 to 348)

345

1    A.    If I recall, Mr. Smith's report
2  was primarily concerned with data existing
3  in the -- data existing regarding the use of
4  harnesses.  And I believe that data does
5  show that harness use is not a hundred
6  percent and therefore the industry is aware
7  that not every hunter uses a harness while
8  they climb a tree.
9    Q.    Anything else?
10   A.    Not that I recall.
11   Q.    Would you agree with me that had
12 Mr. Vandine followed all of the instructions
13 and warnings contained in the written and
14 video instructions and warnings provided by
15 some of the text that wouldn't have
16 occurred?
17   A.    I believe there was still a
18 potential for the cable to disconnect should
19 it be partially inserted into the cable
20 bracket.
21   Q.    But we're talking about the way
22 this accident occurred.  Would you agree
23 with me that if he had followed the
24 instructions and warnings that were written
25 and contained in the video provided by

346

1  Summit, that this incident, the way it
2  occurred would not have occurred?
3        MR. DARIA:  Objection to form.
4        THE WITNESS:  If the -- if the
5  instructions would have been adhered to
6  the letter, it is likely that the climbing
7  cable -- strike that.
8        If the instructions had been
9  adhered to the letter, Mr. Vandine likely
10 wouldn't have been injured when he fell
11 and hit the ground.
12 BY MR. SUTTON:
13   Q.    And would you agree that if he'd
14 followed the written and video instructions
15 provided by Summit that Mr. Vandine also
16 likely would not have fallen at all?
17   A.    If the -- if he had inspected and
18 insured that the cable was fully seated as
19 those instructions outlined per those
20 photographs, which Mr. Vandine stated he did
21 not review, the climbing cable would likely
22 not have become partially seated and then
23 therefore become detached upon his next
24 loading of the treestand.
25   Q.    If you'll just give me few minutes

347

1  to review my notes, I'm just about done.
2        - - -
3        (Recess.)
4        - - -
5  BY MR. SUTTON:
6    Q.    Page 39.  This is a Treewalker
7  treestand; is that right?
8    A.    That's correct.
9    Q.    Is that one of your stands?
10   A.    It is.
11   Q.    This Hawk Ultra-Lite -- the
12 treestand we're here talking about today is
13 a 2015 model year product, right?
14   A.    That's correct.
15   Q.    This Hawk Ultra-Lite climbing
16 treestand, do you know when it first came
17 out?
18   A.    I do not know.
19   Q.    Do you know if it was even
20 available in 2015?
21   A.    I do not know that either.
22   Q.    Would you agree with me that
23 Mr. Vandine failed to follow numerous and
24 multiple instructions and warnings contained
25 and provided by Summit with its products in

348

1  using the products?
2        MR. DARIA:  Objection to form.
3        THE WITNESS:  I would agree that
4  Mr. Vandine failed to follow the
5  instructions in the written instructions
6  regarding the use of the tree -- or the
7  fall arrest harness and the instruction
8  regarding the disconnection of the cable
9  at height.
10       It's Mr. Vandine's testimony
11 that he did not review those instructions,
12 and he also testified from his experience
13 and his understanding that he wasn't aware
14 that those things were restricted or
15 warned against in the instructions.
16 BY MR. SUTTON:
17   Q.    Well, if you don't read them you
18 can't be aware of whether or not they
19 contain warnings, right?
20   A.    It's difficult to know things that
21 you don't or haven't looked at or read.
22   Q.    Which is why as an engineer,
23 knowing that there's an inherent danger in
24 the use of treestands, want all treestand
25 users to use and follow the instructions and

MSJ_JA000272

Transcript of Jarrett Waters
Conducted on February 7, 2024

349

1  warnings, true?
2  **A.    It is recommended that a user or**
3  **operator of a piece of equipment understand**
4  **the written instructions for that piece of**
5  **equipment. Mr. Vandine, as he testified,**
6  **felt that his experience and use of the**
7  **treestand had given him a good foundation on**
8  **understanding the use of the treestand and**
9  **what its capabilities were.**
10  Q.    But nevertheless, it's your
11  opinion as an engineer, familiar with the
12  use of treestands because you've used them,
13  that a user should read and follow the
14  instructions that come with them since they
15  have such inherent dangers?
16      MR. DARIA:  Objection; asked and
17  answered.
18      THE WITNESS:  The user should
19  follow the directions that are provided
20  with the treestand.
21  BY MR. SUTTON:
22  Q.    Now, one last little thing.  There
23  was something in your file materials I noted
24  that talked about the addition of a 2019
25  footrest?

350

1  **A.    Addition of a 2019?**
2  Q.    There is something in your folder
3  that says 2019 Summit footrest.  I don't
4  remember where it was.
5  **A.    Under Summit Research 2019**
6  **accessory footrest?**
7  Q.    Yes.  Did Mr. Vandine attach a
8  footrest to the subject stand?
9  **A.    I know there was a footrest**
10  **attached to the stand.**
11  Q.    Did he drill holes in the stand in
12  order to do that?
13  **A.    It would have to be holes placed**
14  **in the footrest to attach the bumpers.  Go**
15  **back to inspection photos.**
16  Q.    Did he drill holes in the outside
17  tube of the treestand to attach it; do you
18  recall?
19  **A.    I don't recall, offhand.  I'm**
20  **running through inspection photos real fast**
21  **to look.**
22      **There is a footrest installed on**
23  **his stand and it appears to be attached to**
24  **the stand via two screws.**
25  Q.    Do you know whether he followed

351

1  the Summit instructions to attach it?
2  **A.    I do not know, as I sit here, if**
3  **he followed the Summit instructions to**
4  **attach that.**
5      MR. SUTTON:  I have no further
6  questions at this time.  Thank you very
7  much.
8      MR. DARIA:  Just a couple,
9  Mr. Waters.
10      - - -
11      EXAMINATION
12      - - -
13  BY MR. DARIA:
14  Q.    Starting with that point, this
15  footrest.  Does that in any way affect or
16  alter the opinions you've rendered in this
17  case, or have anything to do with the
18  attachment point that we've been talking
19  about?
20  **A.    No, it does not.**
21  Q.    Mr. Waters, we went through your
22  report dated November 22nd of 2023.  All of
23  the opinions contained in that report, were
24  they stated to a reasonable degree of
25  engineering certainty?

352

1  **A.    Yes, they were.**
2  Q.    Despite the questions that you
3  were asked today with regard to the facts,
4  the opinions, and conclusions you reached in
5  that report, do you maintain those facts,
6  opinions, and conclusions?
7  **A.    Yes, I do.**
8  Q.    You were asked whether you have
9  any criticisms of Mr. Saunders' and
10  Mr. Smith's reports, but were not given a
11  copy of those reports.  And I just want to
12  be clear, to the extent that your opinions
13  differ from their opinions, is it fair to
14  say that you disagree in those respects?
15  **A.    Yes, it would be.**
16  Q.    All of the opinions and testimony
17  you have provided today, has that been given
18  to a reasonable degree of engineering and
19  professional certainty?
20  **A.    Yes, they have.**
21  Q.    In reaching your opinions and
22  conclusions in this case, did you follow
23  your usual and regular methodology?
24  **A.    Yes, I did.**
25  Q.    Based upon your experience, your

MSJ_JA000273

Transcript of Jarrett Waters
Conducted on February 7, 2024

353

1  training, and your education, is that a
2  methodology that is generally used and
3  followed and accepted by other engineers in
4  your field?
5  **A.  Yes, it is.**
6  Q.    And that methodology, reviewing
7  evidence, testimony, principles of
8  engineering and other things set forth in
9  that report of yours, is that the
10 methodology that you used?
11 **A.  Yes.**
12 Q.    And in addition, did you utilize
13 your experience, your education, and your
14 knowledge in the field of hunting in forming
15 your opinion?
16 **A.  Yes, in forming my opinions.**
17 Q.    And you were asked today about
18 testing a number of times.  Is there any
19 additional testing that you needed to do to
20 reach the opinions and conclusions set forth
21 in your report?
22 **A.  No, there is no additional**
23 **testing.**
24 Q.    And to the extent you've provided
25 opinions today, is there any additional

354

1  testing that you need to do to render those
2  opinions and conclusions?
3  **A.  No.**
4      MR. DARIA:  That's all I wanted
5  to ask.  Thank you.
6      (At 3:58 p.m., proceedings were
7  concluded.)
8          - - -
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

355

1      C E R T I F I C A T E
2
3      I hereby certify that the
4  proceedings and evidence are contained
5  fully and accurately in the notes taken by
6  me in the above cause and that this is a
7  correct transcription of the same.
8  Review was requested.
9
10
11      *Lisa Neal*
11      Lisa Claud Neal, RPR
12
13
14      - - -
15
16
17
18
19
20
21
22
23
24
25

MSJ_JA000274

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOHN VANDINE and RENEE VANDINE,  )
                                 )      CIVIL ACTION NO.  2:23-cv-00027
              Plaintiffs,         )
vs.                               )
                                 )
SUMMIT TREESTANDS, LLC, and       )
DICK'S SPORTING GOODS, INC.       )
                                 )
              Defendants.         )
                                 )

## AFFIDAVIT OF DOUGLAS J. STIPANOVICH

STATE OF PENNSYLVANIA    )
                         ) ss.
COUNTY OF ALLEGHENY      )

      DOUGLAS J. STIPANOVICH, being first duly sworn upon his oath at law, deposes and says:

      1.    I am over eighteen years of age.

      2.    I have personal knowledge concerning the statements and information contained in this Affidavit.

      3.    I am competent to testify to the matters contained in this Affidavit.

      4.    I am an authorized representative of Dick's Sporting Goods, Inc. (hereinafter "DSG") and I am authorized to sign this Affidavit on behalf of DSG. I currently hold the position of Senior Corporate Counsel for DSG.

      5.    I state that the factual information and statements made herein are true and correct to the best of my knowledge, information, and belief, and if called as a witness to testify, I could and would testify to all of the following under oath.

MSJ_JA000275

6.      Based on the pleadings and discovery conducted in this matter, the subject treestand has been identified as a 2015 model year Viper Climbing Treestand manufactured and/or distributed by Summit Treestands, LLC.

7.      The subject model treestand was purchased by DSG from Co-Defendant Summit Treestands, LLC, the distributor and/or manufacturer of the subject treestand.

8.      Summit Treestands, LLC is a named party in this matter and is actively defending this case.

9.      At no time did DSG have any involvement in or with the design, manufacture, assembly, packing, or packaging of any treestands manufactured by Summit Treestands, LLC.

10.     At no time did DSG have any involvement in or with the design, manufacture, assembly, packing, or packaging of the subject treestand that has been identified as a 2015 model year Viper Climbing Treestand, which was manufactured and/or distributed by Summit Treestands, LLC.

11.     At no time did DSG have any involvement with the production of any treestands distributed by Summit Treestands, LLC, including the subject 2015 model year Viper Climbing Treestand at issue in this case.

12.     The name Dick's Sporting Goods, Inc. has never been placed on any treestand, packaging, packing, warnings and instructions, or display pieces on any of the treestands manufactured and/or distributed by Summit Treestands, LLC at any time.

13.     The subject climbing treestand, as with all other treestands distributed by Summit Treestands, LLC and sold at DSG, was to be sealed in a cardboard box before it was shipped to DSG for sale at its store and DSG does not alter products received from Vendors.

2

MSJ_JA000276

14.   DSG had no knowledge that there was any alleged defect with the subject 2015

Viper Climbing Treestand at issue in this case.

15.   Assuming arguendo that there was an alleged defect with the subject 2015 Viper

Climbing Treestand at issue in this case, DSG had no involvement with the creation of any such

alleged defect.

**FURTHER AFFIANT SAYETH NOT**

Dick's Sporting Goods, Inc.

By:  Douglas J. Stipanovich
Its:  Senior Corporate Counsel

Subscribed and sworn to before me this
_____20_____ day of March, 2024

_____
NOTARY PUBLIC
Allegheny County, Pennsylvania

My Commission Expires: ___7|7|25

Commonwealth of Pennsylvania - Notary Seal
Sheree A. Parente, Notary Public
Beaver County
My commission expires July 7, 2025
Commission number 1125429
Member, Pennsylvania Association of Notaries

3

MSJ_JA000277



DEFENDANT'S DEPOSITION
EXHIBIT
3
LCN        2|7|24



**WOLF**

# REPORT

Prepared for:

Feldman Shepherd Wohlgelernter Tanner Weinstock Dodig LLP
**Attn: Mr. Jason Daria**
1845 Walnut Street, 21st Floor
Philadelphia, Pennsylvania 19013

**By: Jarrett Waters**
**On: November 22, 2023**

**Your Reference: Vandine v. Summit Treestands, LLC and Dick's Sporting Goods, INC**
**Wolf Project No.: 23-0058-3775**

Wolf Technical Services, Inc.◦ 13097 Parkside Drive ◦ Fishers, IN 46038
(800) 783-9653 ◦ (317) 842-6075 ◦ Fax (317) 842-6974

MSJ_JA000278



13097 Parkside Drive
Fishers, Indiana 46038
800.783.9653 · 317.842.6075

wolftechnical.com

**November 22, 2023**

Feldman Shepherd Wohlgelernter Tanner Weinstock Dodig LLP
1845 Walnut Street, 21st Floor
Philadelphia, Pennsylvania 19013

Attn:   Mr. Jason Daria

**RE:    Vandine v. Summit Treestands, LLC and Dick's Sporting Goods, INC**
**No.: 2:23-cv-00027**
**Wolf Project No.:  23-0058-3775**

**BACKGROUND:**

Wolf Technical Services, Inc. (Wolf) was asked to consult on an incident involving a hunter that became injured while utilizing a climbing treestand.  On November 6, 2020, Mr. John Vandine was injured when the Climbing Cable of his 2015 Summit Viper climbing treestand disconnected from the Seat Climber section of the treestand.  The disconnected Climbing Cable allowed the Seat Climber to dislodge from the tree resulting in Mr. Vandine's fall.

At the time of the incident, Mr. Vandine had owned the Summit Viper climbing treestand for approximately five years and had utilized the treestand many times throughout the hunting seasons.  The 2015 Summit Viper utilizes two independent sections, referred to as the Platform and the Seat Climber, that allow a hunter to climb a tree to gain a better vantage point and increase one's chances of harvesting an animal. The two aluminum framed sections each rely on an adjustable Climbing Cable that wraps around the tree and provides support to the framework. The Climbing Cable (cable) is a critical component that secures the climbing treestand's structure to the tree during the climbing and stationary phases of the hunt. On November 6, 2020, Mr. Vandine was climbing a tree in preparation for his afternoon hunt. While climbing the selected tree, the cable disconnected from the Seat Climber and Mr. Vandine fell from the height that he had climbed and was injured.

**Celebrating Over 40 Years of Engineering Excellence**

MSJ_JA000279





<div align="center"><strong>Figure 1: Mr. Vandine's 2015 Summit Viper climbing treestand</strong></div>

Wolf was asked to attend inspections of the Summit treestand and the incident site on May 4, 2023, review the provided materials, and consult regarding the design of the treestand.

## CONCLUSIONS:

It is our technical opinion, based upon the available evidence, that the design of the 2015 Summit Viper climbing treestand is defective and dangerous. The current design allows the Climbing Cable to be positioned in a manner that will temporarily support the weight of the climber but provides a false sense of security as the cable and cable stops may not be fully positioned and secured within the stand's cable brackets. The temporary securement of the cable provides the climber a false positive. As the climber loads and unloads the weight from the section of the treestand the cable and cable stops can dislodge from the cable bracket resulting in the cable disconnecting from the treestand and ultimately disconnecting from the tree.

It is our opinion that the Summit QuickDraw locking spring can be engaged and disengaged as the climber ascends and descends the tree throughout the climbing treestand's normal and foreseen use. The trigger shaped spring is located in a position that is often grasped by the climber's hands during the climbing phase of the hunt and it is foreseeable that one's hand may interact with the locking spring in a manner that further engages or disengages the spring causing it not to be fully seated behind the cable stops. The Summit QuickDraw feature was intended to automatically lock behind the stops on the Climbing Cable should the cable be fully inserted into the cable bracket.

It is our technical opinion that a locking device, or safety interlock, should require a separate and intentional user action to disengage the lock and should not be able to be inadvertently disengaged during the normal and foreseen use of the equipment. The Summit QuickDraw locking spring can be inadvertently disengaged as it is in a position and orientation that is often grasped by the climber's hands during normal use. It is our opinion that a locking device, or safety interlock, that can be inadvertently disengaged through normal, expected, and foreseen use is defective and dangerous.

MSJ_JA000280



It is our opinion that the 2015 Summit Viper does not comply with ASTM F2122-13 (effective July 2013) Standard Practice for Treestand Safety Devices as Section 6.3 states that *Auxiliary safety devices shall be provided where additional safety precautions can be made to further protect the user. Examples include: anti-slip platforms, backbar locking devices, or tie-offs.* The 2015 Summit Viper failed to provide additional safety precautions that were feasible and incorporated into previous designs. The 2015 Summit Viper utilized a backbar locking device that could be inadvertently disengaged during normal and foreseeable use and did not prevent the false, or temporary engagement, of the cable stops in a manner that was not fully positioned within the cable bracket. Previous Viper designs incorporated a safety cover, or guard, that could not be closed unless the Climbing Cable and cable stops were safely positioned within the cable bracket. Summit U.S. Patent 5,975,242 *Climbing Tree Stand with Cable Attachment* states the moveable covers prevented the cable from becoming accidently dislodged from the cable brackets. Mr. Vandine's 2015 Summit Viper did not include moveable safety covers.

It is our opinion that the 2015 Summit Viper does not comply with ASTM F2122-13 Standard Practice for Treestand Safety Devices as Section 6.2.2 states that *Labels and warnings shall be placed on the unit accordance with Practice F2121*. It is our opinion that the 2015 Summit Viper does not comply with ASTM F2121-13 (effective July 2013) Standard Practice for Treestand Labels as Section 6.3 states that *Labels and warnings shall be placed such that they are visible to the user when mounting the treestand or climbing stick and when it is in use (sitting or standing). The following placement locations are recommended for individual units and situations:*

> *6.3.1.1 The Top (upper) side of the platform as given in 3.2.7.*
> *6.3.1.2 Along the top (upper)side of the backbar as given in 3.2.1.*
> *6.3.1.3 Along the top (upper) side of a flat surface on a main structural support member.*
> *6.3.1.4 On the top (upper) portion of a component requiring a special label or warning.*

The 2015 Summit Viper was equipped with a fabric label that was stitched into the seat back of the Seat Climber, and it is our opinion that the warning and identification label would not be visible when the user is in a seated position and would be difficult to see while the user is climbing as the seat is typically folded during the climbing phase. The location of the sewn-in fabric label does not comply with the locations outlined in the ASTM F2121 Standard Practice for Treestand Labels.

It is our opinion that some hunters do not wear a full body safety harness while ascending and descending trees while hunting. Additionally, some hunters do not wear a full body safety harness while hunting at height.

It is our opinion that designers and manufacturers of products should consider and anticipate user error and misuse during the design phases of the product and incorporate safety features that design out, or guard against, the anticipated user error or misuse.

MSJ_JA000281



It is our opinion that had Mr. Vandine's Summit Viper SD been equipped with safety covers or a retention pin that blocked the exposed keyway at the top of the cable bracket his Climbing Cable would not have disconnected from the stand and the accident would not have occurred.

**EVIDENCE:**

The evidence available to Wolf includes:

- Complaint – Civil Action John Vandine and Renee Vandine, Plaintiffs v. Summit Treestands, LLC and Dick's Sporting Goods, Inc, Defendants
- Photographs of incident Summit Viper climbing treestand
- Plaintiff Document Production
  - Answers of Plaintiff, John Vandine, to Defendant's Interrogatories
  - Answers of Plaintiff, Renee Vandine, to Defendant's Interrogatories
  - Plaintiff's Response to Defendants' Request for Production of Documents
  - Documents Produced by CPSC – FOIA Request
  - U.S Patent 5,975,242 – Climbing Tree Stand with Cable Attachment
  - U.S Patent 6,182,792 – Climbing Tree Stand with Cable Attachment
  - 2001 Summit Specialties Treestand Instruction Booklet
  - 2002 Summit Specialties Treestand Instruction Booklet
  - 2002 Summit Specialties Instruction Booklet for Cobra and Bushmaster
  - 2003 Summit Specialties Treestand Instruction Booklet for Revolution and Python
  - 2004 Summit Specialties Bushmaster and Clearshot Instruction Booklet
  - 2006 Summit Treestands Instruction Booklet for Cobra XLS
  - 2008 Summit Treestands Instruction Booklet Trophy Chair
  - U.S. Patent D, 575,411 – Foothold for Climbing Treestands
  - U.S. Patent 7,588,123 – Foothold for Climbing Treestands
  - 2015 Summit Climbing Treestands Manual
  - 2015 Summit Harness Manual
  - 2021 Summit Viper Pro SD Instructions
  - Summit Viper Level Pro SD climbing treestand recall
  - TMA table of current standards
  - ASTM F2275-21 Standard Practice for Treestand Manufacturer Quality Assurance Program
  - ASTM F3249-20 Standard Specification for Treestands, Climbing Sticks, and Tripods or Tower Stands
  - Photographs of Summit Mini Viper
  - Recall 17-041 Summit Explorer SD Climbing Stand
  - Answer to Complaint by Defendant Summit Treestands, LLC
  - Answer to Complaint by Defendant Dick's Sporting Goods, Inc.
  - Defendants Initial Disclosures
  - Summit Treestands Answer to Plaintiff's Interrogatories

November 22, 2023                    4                    Wolf Project No.: 23-0058-3775

MSJ_JA000282



- o Summit Treestands Response to Plaintiffs Request for Production
- o Dick's Sporting Goods Answers to Plaintiffs Interrogatories
- o Dick's Sporting Goods Response to Plaintiffs Request for Production
- o U.S. Patent 6,125,966 – Harness Assembly for Safely Restraining Person
- o U.S. Patent 5,937,969- Hanging Tree Seat
- o Color Photographs of incident tree
- o Photograph of Summit QuickDraw Pro
- Defense Document Production
  - o Cooper University Medical Records
  - o Cooper Advance Care Medical Records
  - o Additional Cooper University Medical Center Records
  - o Woller Patent Application – Climbing Tree Stand with Cable Attachment
  - o Various Insurance Policy Documents
  - o 2015 Summit Climbing Treestands Instruction Manual
  - o 2015 Summit Harness Instruction Manual
  - o 2013 Scientific Testing Laboratories Summit Viper Climbing Stand TMA Report
  - o George Saunders Photograph Index of Incident Treestand 5/4/2023
  - o Produced materials pertaining to Carden v. Summit
  - o Produced materials pertaining to Hathaway v. Summit
  - o Produced materials pertaining to Kimball v. Summit
  - o Produced materials pertaining to Merrell v. Summit
  - o Produced materials pertaining to Saunders v. Summit
  - o TMA Correspondence re: Testing
  - o 2010 Warnings and Instructions for Climber Treestands
  - o 2010 Warnings and Instructions for Summit Harness
  - o 2011 Warnings and Instructions for Climber Treestands
  - o 2011 Instructions for Ultimate Viper
  - o 2012 Instructions Manual for Summit Viper
  - o 2012 Warnings and Instructions for Climber Treestands
  - o 2013 Warnings and Instructions for Climber Treestands
  - o 2014 Warnings and Instructions for Climber Treestands
  - o Complaint Wilson v. Summit
  - o Photo of CD Treestand Safety
  - o 2011 Warnings and Instructions for Summit Harness
  - o 2010 Seat Label
  - o 2011 Seat Label
  - o 2012 Seat Label
  - o 2013 Seat Label
  - o 2014 Seat Label
  - o 2015 Seat Label
  - o 2012 Warnings and Instructions for Summit Harness
  - o 2013 Warnings and Instructions for Summit Harness
  - o 2014 Warnings and Instructions for Summit Harness

MSJ_JA000283



- 2010 Summit Harness Label
- 2011 Summit Harness Label
- 2012 Summit Harness Label
- 2013 Summit Harness Label
- 2014 Summit Harness Label
- 2015 Summit Harness Label
- 2011 Lineman's Belt Label
- 2012 Lineman's Belt Label
- 2013 Lineman's Treestrap label
- 2014 Lineman's Treestrap label
- 2015 Lineman's Treestrap label
- 2012 Scientific Testing Laboratories Summit Viper Climbing Stand TMA Report
- 2012 Scientific Testing Laboratories Summit Harness #83054-DOT TMA Report
- 2013 Scientific Testing Laboratories Summit Harness #83054 Source One TMA Report
- 2012 TMA Member Certification Report
- 2012 TMA Member Certification Report for climbers
- 2010 Summit Catalog
- 2011 Summit Catalog
- 2012 Summit Catalog
- 2013 Summit Catalog
- 2014 Summit Catalog
- 2015 Summit Catalog
- 2015 Summit Viper Specs
- 2015 BP Signs Summit-Final
- 2015 Mills Signs Summit – Final
- 2014 Papes Full Page
- 2015 Papes Full Page
- Summit Treestands Quality Assurance Plan REV 0 3/11/2014
- Channel Platform Beam Design 2015
- Channel Platform Cablearm Design 2015
- Cable ASM Design Drawing FBBG-120297-01 Rev 5
- Elastic Seat Strap Design Drawing 2014
- Rapid Climb Stirrup Design Drawing 2003
- Seat Drawings 2002
- Seat Stiffener Design Drawing 2015
- Summit harness Manufacturing & Assembly Procedure 2012
- Cable Retention Spring Design Drawing
- Universal Cable Bracket Design Drawings
- Universal Top V-Brace Design Drawing
- Universal Yoke Design Drawing
- Viper Platform Perimeter Design Drawing 2015

MSJ_JA000284



- o Viper Top Complete Design Drawing
- o Viper Top Perimeter Design Drawing 2015
- Deposition and exhibits of John Vandine June 13, 2023
- Deposition and exhibits of Sean Thomas September 19, 2023
- Deposition and exhibits of Officer James Alexander October 3, 2023
- Deposition and exhibits of Jake Nelson October 10, 2023
- Deposition and exhibits of Ronald Woller October 10, 2023
- Deposition and exhibits of Jake Nelson October 25, 2023
- Deposition and exhibits of Sgt. Richard Penney October 24, 2023
- Gloucester County Emergency Medical Service CAD Report
- 911 Audio Call 1 and 2
- West Deptford Police CAD report
- West Deptford Police Incident report
- West Deptford BodyCam video Vandine November 5, 2020
- Consumer Product Safety Commission Incident Report 20191217 FD606 2147375976
- CPSC Treestand Incidents 2011-2022

This investigation and analysis was conducted by Jarrett Waters of the Wolf Technical Services staff. Wolf inspected the 2015 Summit Viper treestand on May 4, 2023 at the offices of Feldman, Shepherd, Wohlgelernter, Tanner, Weinstock & Dodig in Philadelphia, Pennsylvania. The incident treestand location was inspected in the afternoon of May 4, 2023 behind the residence of 119 Eighth St. in West Deptford, New Jersey. In addition to the inspection of the 2015 Summit Viper climbing treestand, Wolf has also inspected, researched, analyzed, and tested a 2002 Summit Mini Viper, a 2002 Summit Viper XLS, an exemplar 2010 Summit Viper, and a 2022 Summit Viper Pro climbing treestand. Our analysis and conclusions are based on the available evidence, principles of engineering, published data, regulatory safety procedures and standards, and on Mr. Waters' education, background and experience in mechanical engineering and his experience and background in the application of treestands for hunting purposes.

Published data reviewed by Wolf include the following:

- TMS/ASTM Standards:
  - o TMS 01 Standard Practice for Testing Treestand Load Capacity REV C 6/25/2010
  - o ASTM F2120-06 Standard Practice for Testing Treestand Load Capacity
  - o TMS 02 Standard Practice for Treestand Labels REV D 6/26/2009
  - o ASTM F2121-13 Standard Practice for Treestand Labels
  - o TMS 03 Standard Practice for Treestand Safety Devices REV B 4/19, 2000
  - o ASTM F2122-13 Standard Practice for Treestand Safety Devices
  - o TMS 04 Standard Practice for Treestand Instructions REV H 6/25/2010
  - o ASTM F2123-13 Standard Practice for Treestand Instructions
  - o TMS 05 Standard Practice for Testing Ladder Treestand, Tripod Stand and Climbing Stick Load Capacity REV E 6/15/2012

MSJ_JA000285



- ASTM F3249-20 Standard Specification for Treestands, Climbing Sticks, and Tripod or Tower Stands
- TMS 06 Standard Test Method for Treestand Fall Arrest System REV B 3/15/2005
- TMS 09 Standard Practice for Treestand Manufacturer Quality Assurance Program REV C 6/26/2009
- ASTM F2275-03 Standard Practice for Treestand Manufacturer Quality Assurance Program
- ASTM F2275-21 Standard Practice for Treestand Manufacturer Quality Assurance Program
- TMS 11 Standard Test Method for Treestand Static Load Capacity REV D 6/24/2004
- ASTM F2126-06 Standard Test Method for Treestand Static Load Capacity
- TMS 12 Standard Test Method for Treestand Adherence and Static Stability 6/24/2004
- ASTM F2125-09 Standard Test Method for Treestand Static Stability and Adherence
- TMS 15 Standard Test Method for Repetitive Loading Capability REV D 6/15/2012
- ASTM F2128-13 Standard Test Method for Treestand Repetitive Loading Capability
- TMS 17 Standard Test Method for the Load Capacity of Treestand Seats 6/24/2004
- ASTM F2531-13 Standard Test Method for the Load Capacity of Treestand Seats
- ASTM F3412-20 Standard Terminology Relating to Treestands

- National Institute of Occupational Safety and Health (NIOSH) Hierarchy of Controls
- 2022 Building Blocks of Tree Stand Safety
- Deer and Deer Hunting Tree Stand Accidents on the Decline, Aug. 2020
- Treestand Falls: Do they Require Formal Investigations, Pat Durkin, October 2022
- Tree Stand-Related Injuries in Nonadmitted and Admitted Patients at a Level 2 Trauma Center in Michigan: 2015-2019, Henry Ford Health Scholarly Commons, A. Lazzara, B. Ditmer, K. Doughty, K. Reynolds, September 24, 2021
- National Electronic Injury Surveillance System (NEISS) Estimated Falls Requiring Emergency Dept. Care
- NEISS Data for 2010, 2015, 2020, and 2022
- Photographs and marketing images from Summit's website
- Photographs and marketing images from OL'MAN's website
- Photographs and marketing images from Hawk's website
- 2019 Footrest Accessory Installation Instructions
- U.S. Patent 5971104 Climbing Tree Stand
- U.S. Patent 5975242 Climbing Tee Stand with Cable Attachment
- U.S. Patent 6182792B1 Climbing Tree Stand with Cable Attachment
- U.S. Patent 7588123 Foothold for Climbing Tree Stands
- U.S. Patent Application 2017/0266504 A1 Folding Climbing Stirrup

MSJ_JA000286



- U.S. Design Patent D575411 Foothold Pair for Climbing Treestands
- Google Earth aerial imagery

**DISCUSSION:**

The American Society for Testing and Materials (ASTM) defines a treestand as a *device designed to be affixed to a tree so as to permit an individual to sit or stand thereon for the purpose of attaining an elevated position from which to observe, photograph, or hunt.* Mr. Vandine was utilizing his 2015 Summit Viper climbing treestand for the purposes of hunting when he was injured on November 6, 2020. ASTM defines a climbing treestand as a *treestand that provides both the means to ascend the tree, and allow the user to remain at a desired elevation.* The Summit Viper portable climbing treestand comprises two sections that each have an adjustable Climbing Cable that is secured with cable brackets. The lower section, or Platform, is designed for standing while the upper section, or Seat Climber, is designed to allow the user to sit facing away from the tree for the purposes of hunting or face the tree for the purposes of climbing. The geometry of the aluminum framed sections is such that the user's weight is primarily supported by the cable that wraps around the tree, while the frame's yoke engages the tree providing frictional and lateral support to the assembly. Should the adjustable Climbing Cable become disconnected from either of the two cable brackets, the weight of the user would no longer be supported and the treestand section would dislodge and fall away from the tree. The Climbing Cable is a critical component to supporting the weight of the user and equipment.



**Figure 2: 2010 Summit Viper with QuickDraw**

MSJ_JA000287



Summit climbing treestands utilize a cable bracket that includes an open top and a keyway designed for a series of crimped, or swaged, cable stops to interface with the bracket. Summit has used the keyed cable brackets from as early as 1998 as reflected by early patents filed by Ronald Woller and assigned to Summit Specialties (Summit Treestands, LLC).



**Figure 3: Diagrams from U.S. Patent 5,975,242 showing Climbing Cable, Cable Stops, and Cable Bracket**



**Figure 4: Summit Climbing Cable FBB-120297-01 REV 5**

MSJ_JA000288



Summit's Climbing Cable consists of a semi-flexible 0.25" diameter steel cable and crimped, or swaged, cable stops toward the ends of the cable assembly. The cable stops allow the treestand and Climbing Cable to be adjusted for varying tree diameters. To insert the cable into the bracket, one must place the crimped cable stop through the wider portion of the keyed bracket and then push down into the cavity created by the bracket. Until approximately 2003, Summit utilized a moveable cover that would pivot and close, blocking the open keyway exposed on the top of the bracket. Around 2004, Summit eliminated the cover and elected to include a QuickDraw cable spring that is intended to lock the cable into position within the bracket. The QuickDraw spring is shaped like a trigger, mounted on the lower side of the cable bracket, and allows the user to disengage the spring with their forefinger. As the QuickDraw spring is located on the underside of the cable and bracket, is relatively obscured from the position of the user during the climbing phases of the hunt. Mr. Vandine's 2015 Summit Viper was equipped with the QuickDraw cable springs.



**Figure 5: Summit Climbing Cable installation instructions**

MSJ_JA000289





Figure 6: 2010 Summit Viper - Climbing Cable and QuickDraw springs from the perspective of the climber



Figure 7: U.S Patent 5,975,242 diagrams showing hatch cover in the open and closed positions

Summit Viper

Mr. Vandine's 2015 Summit Viper portable climbing treestand was inspected, photographed, and measured on May 4, 2023. The aluminum tubed framed Platform section consisted of five

MSJ_JA000290



channels, or slats, and measured approximately 28-inches (36-inches overall) by 20-inches and is consistent with a Summit Viper SD model climbing treestand. The Platform included an installed Summit footrest and backpack straps. The Climbing Cable was installed into the left cable bracket (facing out from tree) and the innermost cable stop was positioned in the bracket while the remainder of the cable was free. The noise cancelling plastic coating on the climbing cable showed wear and was peeled back exposing the cable and the crimped cable stops. The Platform did not include Summit's RapidClimb Stirrups or any affixed labels or warnings. Stamped onto the bottom of the cable brackets was "I 15" which is consistent with a stand produced in the 9th month of 2015.



Figure 8: PLATFORM of Mr. Vandine's 2015 Summit Viper SD

The aluminum tubed framed Seat Climber measured approximately 29-inches (37-inches overall) by 22.5-inches wide and is consistent with a Summit Viper SD model climbing treestand. The Seat Climber included a camouflage seat, arm and front pads, an umbilical rope, and a bow holder. The Climbing Cable was installed into both cable brackets and the left side of the cable was positioned at the innermost cable stop, while the right side of the cable was positioned at the second innermost cable stop. Black tape was placed around the top of the camouflage arm pads. The noise cancelling plastic coating on the climbing cable showed wear and was peeled back exposing the cable and the crimped cable stops. The Seat Climber did not include any affixed labels or warnings. The assembled V Brace did include an engraving that contained verbiage regarding harness use. However, it was very difficult to read and would not be noticeable to the user as the depth of the engraving appears to be mostly filled by the powder coating process. After reviewing the produced assembly drawings, the V Brace does not include any notations regarding the addition of the warning to the bracket. The Climbing Cable

MSJ_JA000291



did exhibit a bend not consistent with the natural shape of the cable at the interior of the innermost cable stop that was positioned within the left cable bracket. During the insertion and removal of the cable from the stand, the bent, or kinked, section of the cable made it more difficult to insert and remove the cable from the narrow keyway of the bracket. Stamped onto the bottom of the cable brackets was "I 15" which is consistent with a stand produced in the 9th month of 2015.



**Figure 9: Seat Climber of Mr. Vandine's 2015 Summit Viper SD**



**Figure 10: Climbing Cables from Mr. Vandine's 2015 Summit Viper SD**

MSJ_JA000292



The inner faces of the cable brackets showed signs of wear that were consistent with the treestand being used on smaller diameter trees. The inner face of the upper keyway on the right (facing out from tree) cable bracket exhibited removal of the green powder coat and areas of material deformation. The areas of deformation are consistent with the cable stop interacting, interfering, and sliding over this portion of the keyway.



**Figure 11: Left and Right Cable Brackets on Platform**



**Figure 12: Left and Right Cable Brackets on Seat Climber**

MSJ_JA000293



During the inspection the spring retraction force was measured for each of the QuickDraw springs. One measurement was taken at the retraction force required for the cable stop to clear the spring, and the second taken at the force required to fully retract the QuickDraw spring to the bottom of the cable bracket. The right (facing away from tree) QuickDraw spring on the Seat Climber required less force to disengage compared to the others tested. Its force to fully retract remained similar to the other springs.

**Table 1: QuickDraw Disengage and Retract forces for Mr. Vandine's 2015 Summit Viper**

| VANDINE SUMMIT VIPER SD | | |
|---|---|---|
| Location | Force to Disengage [lbs.] | Force to Retract [lbs.] |
| PLATFORM RIGHT | NA | 19.6 |
| PLATFORM LEFT | 8.2 | 18.9 |
| SEAT RIGHT | 6 | 19.5 |
| SEAT LEFT | 9.2 | 18.5 |

<u>Site</u>

The incident tree was inspected, photographed, and measured on May 4, 2023. The tree was accessed through a property located at 119 Eighth St., in West Deptford, New Jersey. The tree was located at a latitude and longitude of 39.870295, -75.166540 (31 ft. accuracy), and the bark was consistent with a wild cherry tree. The tree was positioned on the south side of an embankment adjacent to a marsh. At 36 inches off the ground the tree had a circumference of approximately 30.25 inches (9.63" Dia.) and at 48 inches had a circumference of approximately 29.75 inches (9.47" Dia.). At 72 inches above the ground, the tree had an approximate circumference of 28 inches (8.9" Dia.). A limb projected southwest from the trunk of the tree approximately 9 feet above the ground.



Figure 13: Approximate Incident Location marked by yellow pin

MSJ_JA000294





**Figure 14: Incident tree as indicated by Mr. Vandine located at approximately 39.870295, -75.166540**

Deposition of Mr. Vandine

Mr. Vandine gave a deposition on June 13, 2023 and provided testimony regarding the incident that occurred on November 6, 2020. Mr. Vandine testified that he was an experienced hunter and has been hunting from elevation for approximately 20 years. He stated that he purchased the Summit climbing treestand from a Dick's Sporting Goods in Deptford, New Jersey and recalled using the treestand anywhere from 100 to 200 times prior to the incident. Mr. Vandine reported that he did not recall seeing any written instructions in the box after he purchased the stand and he stated that the foot stirrups were not attached to the stand.

**November 22, 2023**                    17                    **Wolf Project No.: 23-0058-3775**



He testified that when setting up the treestand he always detaches the left side (facing the tree) of the cable. He stated that it is difficult to inspect underneath the cable stops and it is difficult to see cable stops and the QuickDraw spring in the dark when he is typically setting up the stand for a morning hunt.

Mr. Vandine testified that he will on occasion disconnect the climbing cable from one side of the stand to maneuver the Seat Climber above a tree limb. He stated that he would only do this for the Seat Climber and would not disconnect the cable from the Platform section of the stand. Mr. Vandine testified that he intended to hunt above the limb that projected from the subject tree on the day of the incident. Mr. Vandine stated that he was unaware that Summit warned its users about taking the cable out of for any reason at height.

Mr. Vandine testified that he would not sit on the front bar of the Seat Climber when climbing a tree, but rather support himself with his elbows.

Mr. Vandine stated that he was unaware that the product was designed to be used with a full body harness.

Mr. Vandine testified that the incident with the subject treestand occurred later in the afternoon on November 6, 2020 and that he typically hunted the subject tree approximately 12 to 15 times a year. He stated that he typically positioned the stand in the subject tree with it looking out toward the water. On the day of the incident, he testified that he climbed the tree until he encountered the limb and then removed the cable from one of the cable brackets and reattached the cable above the limb. He stated that he reconnected the cable and pressed down on the stand to inspect it. He testified that when he went to put his whole weight onto the stand in order to bring his feet up, the stand became "unbuckled", and he fell to his right.

Deposition of Mr. Thomas

Mr. Thomas gave a deposition on September 19, 2023 regarding Mr. Vandine's incident on November 6, 2020. Mr. Thomas testified that he was hunting with Mr. Vandine on the day of the incident but could not see Mr. Vandine from his location. After hearing Mr. Vandine's screams, Mr. Thomas first discovered Mr. Vandine while Mr. Vandine was walking out of the woods toward the residence on 119 Eighth St. Mr. Thomas stated that after Mr. Vandine was taken to the hospital, he and a responding officer located the incident tree and treestand. Mr. Thomas testified that the Seat Climber section of the treestand was on the ground while the Platform section of the treestand was still positioned up in the tree. Mr. Thomas estimated that the Platform section was approximately 10 feet above the ground. He stated that he had to disconnect the cable from the Platform in order to remove it from the tree, however he did not have to disconnect the cable on the Seat Climber.

MSJ_JA000296



<u>Deposition of Mr. Woller</u>

Mr. Woller gave a deposition on October 10, 2023 regarding his participation in the design and implementation of Summit Treestand products. He stated that he served in roles such as operations manager and as director of engineering, before becoming a consultant for the ownership company of Summit (Pradco) in 2013. Mr. Woller stated that the cable attachment device has stayed consistent since it was introduced in 2004. He described it as a keyhole bracket design on the treestand and that the cable contains multiple stop sleeves that interact with a cable retention spring.

Mr. Woller testified that he and Summit were aware of common engineering hazard analysis techniques and the design hierarchy used to remove, reduce, and mitigate those hazards.

Mr. Woller testified that previous Summit climbing treestands utilized pivoting covers to close the opening of the keyway on the cable bracket. He stated that the covers prevented disengagement during the entire sequence of using the treestand and later described the covers as a safety feature. He also testified that the safety covers were easy to visually determine if the covers were open or closed. He stated that he thought the cost of the covers was in the five to ten cent per piece range. He reported that after 2003, Summit no longer used the pivoting safety covers on their cable attachment mechanisms.

Mr. Woller testified that at the time of the climbing attachment patent that a foreseeable use of the design was for the user or hunter to adjust the cable as he or she ascended the tree. He also testified that during his time at Summit he recalled a couple accidents involving a user that had disengaged the cable at height.

Mr. Woller testified that the QuickDraw retention spring system replaced the safety covers that were on previous models. Mr. Woller described the QuickDraw cable spring as the following: *"It is a retention spring somewhat of a, I'll call it a bar, but it's a device to prevent the axial movement of the cable inside the bracket in order to perform the first operation, which is required to disengage the cable from the bracket. If the cable cannot move, I'll say rearward down into the tube, it's impossible for it come out of the cable bracket. So the cable retention spring, the sole purpose is to prevent the cable from moving backwards. But it also provided an automatic engagement and a manual disengagement. The user had to do nothing to engage the cable and the cable retention spring, but he had to manually pull down on it in order to release the cable from the bracket."* He continued by saying *"They would have to just simply insert the cable fully down into the cable bracket and then seat it against the back of the stop— the cable bracket."* He testified that he was the initial designer of the QuickDraw cable spring and it was implemented in model year 2004.

Mr. Woller testified that if the cable spring does not perform as intended and does not secure the cable, the cable can move axially when the stand is not under load. Mr. Woller testified that the QuickDraw system was originally designed to require 25-30 pounds to fully retract the

MSJ_JA000297



retention spring to the bottom of the cable bracket. He stated that the trigger to the spring is not located where a hunter would place their arms or hands during the use of the stand.

Mr. Woller stated that when the load from the platform is removed the cable expands outwards and the friction of the coating and the cable bracket prevent the cable from moving axially even without engagement of the cable retention spring.

Mr. Woller testified that in 2012 every treestand that left Summit should have had a warning label sewn into the seat, but he was not sure if there were other labels installed on the stand.

Deposition of Mr. Nelson

Mr. Nelson gave depositions on October 10, 2023 and October 25, 2023 regarding the design of the Summit climbing treestand. Mr. Nelson began working for Summit Treestands in 2018. He began as a product engineer and after two years became product manager. Mr. Nelson testified that a hazard analysis includes the analysis of the foreseeable use of the product and what hazards are associated with that use. He stated that a climbing treestand that includes a cable attachment system, a potential hazard would be the disengagement of the cable from the stand.

Mr. Nelson, based upon his inspection of the treestand, believes that Mr. Vandine's incident treestand was a Viper SD model. He testified that the foot stirrups do not come assembled to the Platform of the stand, but they are standard components that come with every stand.

Mr. Nelson testified that during regular use, the design does not require the QuickDraw spring to hold the cable in place, but rather the design of the cable bracket and cable hold it in place. He stated that the design of the cable bracket and the shape of the cable itself and the friction of the outer surface prevents the cable from moving axially without the QuickDraw spring. He testified that the QuickDraw spring is considered a redundant safety and is considered a safety mechanism or device. Mr. Nelson stated that in normal use, as one removes the load while climbing, the stranded aircraft cable tries to spring back out into its natural straight shape. By doing that, it springs off the tree and also against the outer surfaces of each cable bracket creating a frictional force that causes the cable not to move. He testified that even without the QuickDraw spring engaged, under normal use the cable does not move and there is no risk of the cable coming out of the bracket.

Mr. Nelson testified that the warning label was sewn into the backrest of the seat and that there were no other warnings or labels that would have been on a 2015 model treestand.

Mr. Nelson provided testimony regarding the new design of the QuickDraw Pro system and its incorporation of locking pin. He stated that " *the main function change being that the way that the QuickDraw handle grips is actually now in the motion of the gripping the stand itself in the upright arm. So where the QuickDraw spring you pull down to then disengage the cable, the QuickDraw Pro handle allows to grip the stand and the –disengaging the retention mechanism*

MSJ_JA000298



*all in the same motion. But – so there's – there's that main difference between the two. And because of the difference in the way that it opens up, if you will, disengages, it now necessitated a secondary retention pin that keeps the QuickDraw Pro handle from disengaging if you were to reach up into that area. If you were to reach up that area with the standard QuickDraw system spring, any engagement there would actually push the retention mechanism into the retaining position, where potentially with the QuickDraw Pro system, it would be the opposite of a disengagement of the retention system. So it retained the automatic locking procedure, but then because of that difference in the way that it opens, necessitated a secondary locking pin."*

Mr. Nelson stated that the *"retention pin is not redundant in the fact as the spring cannot prevent it, but the retention pin does....Like it's not a redundancy because it is the ---it is the thing, the first line of defense against an inadvertent use of that handle."*

Mr. Nelson reported that the function of the pin holder was to ensure that the retention pin stays in place once it is installed.

Mr. Nelson stated that he conducted an evaluation of the application of the original safety covers with the QuickDraw spring retention system during the time between his two depositions. He reported that the cover would interfere with the cable stop when it was properly seated in the bracket and in front of the spring and that the cover would not be able to be closed without moving the lug (cable stop) downward.

Mr. Nelson testified that there are hunters that will make the intentional choice to misuse the product and not use the entire climbing system, but that is not a foreseeable use of the climbing system.

<u>TMS and ASTM Standards</u>

The Treestand Manufacturer's Association (TMA) and the American Society for Testing and Material (ASTM) publish recommended practices and standards regarding the design and design process of treestands. Summit Treestands, LLC is a member of the TMA.

A Member Certification Report (MCR) dated August 2, 2012, lists six climbing treestand products that were submitted to the TMA on July 6, 2012. The report lists the product model number as 81080 for the Viper SD climbing treestand. While the 81080 Viper SD was available in the 2012 and 2013 product offerings, Summit released a Viper SD model number 81120 in 2014. Based upon the available and provided TMA certification reports, there is no evidence that the Model 81120 Viper SD was submitted to the TMA for certification. According to the 2015 Summit Climbing Treestands Instructions, the 2015 Summit Viper SD was designated with model number 81120.

MSJ_JA000299





Figure 2: A photograph of the Summit Viper climbing stand in the as received condition.

**Figure 15: TMA Member Certification Report Viper SD Model No.: 81080**



**Figure 16: Summit 2015 Viper Model No.: 81120 Spec sheet and Instruction Manual**

TMS and ASTM standards are considered to be a minimum requirement and do not constitute certification or an adequate and safe product design. The TMS and ASTM tests conducted by Scientific Testing Labs, for example, test static loading and repeatedly load the stand for a number of cycles, but the tests do not encompass all aspects of the stand or test all functions of the product. The QuickDraw retention spring would not be tested as the treestand remains in a static position on the surrogate tree during the completed testing and the Climbing Cable would only be inserted and installed a minimal number of times during the tests.

TMS 03 and ASTM F2122-13 (effective July 2013) Standard Practice for Treestand Safety Devices provides guidance for providing user safety devices on treestands. Section 4.1 *states that this practice provides guidelines for the selection, availability, and placement of user safety devices on treestands and climbing sticks particularly for quality assurance and adequacy of auxiliary safety including:*

    *4.1.1 Use of instructions in anticipation of user error or misuse.*

    *4.1.2. Availability of instructions in case of their loss*

    *4.1.3  User fall protection*

    *4.1.4 Interconnects*

MSJ_JA000300



*4.1.5 Auxiliary security*
*4.1.6 Securing and pivot stabilizing for ladder treestands.*

ASTM F2122-13 Section 6.2.2 states that *Labels and warnings shall be placed on the unit in accordance with Practice F2121.* ASTM F2121-13 (effective July 2013) Standard Practice for Treestand Labels as Section 6.3 states that *Labels and warnings shall be placed such that they are visible to the user when mounting the treestand or climbing stick and when it is in use (sitting or standing). The following placement locations are recommended for individual units and situations:*

    *6.3.1.1 The Top (upper) side of the platform as given in 3.2.7.*
    *6.3.1.2 Along the top (upper)side of the backbar as given in 3.2.1.*
    *6.3.1.3 Along the top (upper) side of a flat surface on a main structural support member.*
    *6.3.1.4 On the top (upper) portion of a component requiring a special label or warning.*

The 2015 Summit Viper was equipped with a fabric label that was stitched into the seat back of the Seat Climber, the location of the warning and identification label would not be visible when the user is in a seated position and would be difficult to see while the user is climbing as the seat is typically folded during the climbing phase. The location of the sewn-in fabric label does not comply with the locations outlined in the ASTM F2121 Standard Practice for Treestand Labels. The 2015 Summit Viper SD was not equipped with any other warning decals or labels according to Mr. Nelson or that were available to be inspected on May 4, 2023. The V Brace of the Climbing Seat did include an engraved warning regarding harness use; however, it was very difficult to see and the depth of the engraving appeared to be filled with the powder coating material. Warnings and instructions are often included on products at the point of use and are used to advise the user of potential hazards and provide proper instructions on how to use the product and mitigate the risk of the identified hazards. ASTM F2122-3 states that the use of instructions should anticipate user error or misuse of the product.

ASTM F2122-13 Standard Practice for Treestand Safety Devices Section 6.3 states that *Auxiliary safety devices shall be provided where additional safety precautions can be made to further protect the user. Examples include: anti-slip platforms, backbar locking devices, or tie-offs.* The 2015 Summit Viper failed to provide additional safety precautions that were feasible and incorporated into previous designs. The 2015 Summit Viper utilized a backbar locking device that could be inadvertently disengaged during normal and foreseeable use and did not prevent the false, or temporary engagement, of the cable stops in a manner that was not fully positioned within the cable bracket. Previous Viper designs incorporated a safety cover, or guard, that could not be closed unless the Climbing Cable and cable stops were safely positioned within the cable bracket. Summit U.S. Patent 5,975,242 *Climbing Tree Stand with Cable Attachment* states the moveable covers prevented the cable from becoming accidently dislodged from the cable brackets. Mr. Vandine's 2015 Summit Viper did not include moveable safety covers.

MSJ_JA000301



U.S. Patents

Summit Treestands has several U.S. patents filed to protect their intellectual property regarding the design of their treestands. The 2015 Summit Climbing Treestands instruction manual states that Summit Treestands are manufactured under one or more of the following U.S. Patents:

- U.S. Patent 5975242 Climbing Tree Stand with Cable Attachment
- U.S. Patent 6182792 Climbing Tree Stand with Cable Attachment
- U.S. Patent 7588123 Foothold for Climbing Tree Stands
- U.S. Design Patent D575411 Foothold Pair for Climbing Treestands

U.S. Patent 5,975,242 Climbing Tree Stand with Cable Attachment discusses claims regarding the connection of the treestand's Climbing Cable to the cleats or cable brackets integrated into the stand. In the summary of the invention, it states that the cleats include safety covers for preventing the cable ends from being accidentally dislodged. It describes that the safety covers are moveable and can cover the keyhole-shaped opening and can be moved to uncover the openings, and with an opening covered, the cable is prevented from becoming accidentally disengaged or dislodged from the cleats. The patent describes that the use of cleats and the series of nuts on the ends of the cable also makes the climbing treestand very easy to adjust, initially or as one ascends the tree.



**Figure 17: U.S Patent 5,975,242 diagrams showing hatch cover in the open and closed positions**

Mr. Vandine's Summit treestand did not include moveable covers as described by the patent. Summit abandoned the moveable safety cover around the 2004 model year of treestands and developed a retention spring that failed to cover the keyhole-shaped opening on the top of the cable bracket. Additionally, the patent describes that Summit was aware, and it was a

MSJ_JA000302



foreseeable use, that a climber could and may adjust the Climbing Cable while ascending the tree. Mr. Vandine's adjustment of the Climbing Cable while at height was foreseeable.



**Figure 18: 2002 Summit Viper with safety cover compared to a 2010 Summit Viper with QuickDraw**

2015 Summit Climbing Treestand Instruction Manual

The 2015 Summit Climbing Treestand Instructions manual includes warnings and instructions for the use of their climbing treestand products. In Section 2 *Tree Size/Weight Limit* the manual instructs that the stand minimum and maximum tree sizes for the models described in the manual is 8 to 20 inches in diameter. The tree Mr. Vandine was climbing was approximately 9 inches in diameter on the day of the incident. Based upon the diameter limits established by Summit, the treestand was appropriate for the selected tree. Section 3 Parts List describes the contents of the box when the new stand is purchased. It describes that the Platform is to come assembled with the RapidClimb Stirrups, Backpack Straps, and Umbilical Rope already installed on the stand. The Seat Climber is to come assembled with arm pads and a utility strap while the foam seat, and climbing cables are separate. It states that the Safety Harness, warranty card, Summit Decal, written instructions, and DVD are to be included in an Accessory Packet. A photograph included in the Scientific Testing Laboratories, Inc. Summit Viper Climbing Stand Test Report STL 21929 shows the product as it was removed from the packaging. The photograph depicts the stand with the RapidClimb Stirrups, Backpack Straps, and Umbilical Rope installed on the Platform.

MSJ_JA000303





WOLF
Forensics and Design Engineering

**3 PARTS LIST**

Please call 800-353-0634 or visit http://www.summitstands.com/contactus/ if you have any questions, if you need replacement parts, if you have any missing parts or if the included DVD does not play.

***BOX CONTENTS (ALL MODELS)***

*DESCRIPTION*
PLATFORM (ASSEMBLED)
INCLUDES RAPIDCLIMB STIRRUPS, BACKPACK STRAPS, UMBILICAL ROPE
SEAT CLIMBER (ASSEMBLED)
INCLUDES ARM PADS, UTILITY STRAP
FOAM SEAT - STYLE AND CAMO MAY VARY
CLIMBING CABLES (PAIR)
ACCESSORY PACKET

***ACCESSORY PACKET (ALL MODELS)***

| *PN* | *DESCRIPTION* | *QTY* |
|---|---|---|
| 83054 | SUMMIT 4 POINT SAFETY HARNESS W/ ATTACHED SRS STRAP | 1 |
| | HARNESS SAFETY STRAP | 1 |
| 18007 | WARRANTY CARD | 1 |
| 10915 | SUMMIT DECAL | 1 |
| 18072 | WRITTEN HARNESS INSTRUCTIONS | 1 |
| 18108 | SAFETY AND INSTRUCTIONAL DVD | 1 |

*PG 2* www.summitstands.com

**Figure 19: Parts List from 2015 Summit Climbing Treestands Instruction Manual**

**Figure 20: Summit Viper parts diagram from 2015 Summit Climbing Treestands Instruction Manual**

The Summit instruction manual includes a table designating the treestand configurations and their corresponding model numbers. The table indicates that the Viper SD treestand is identified as Model Number 81120. The photographs from the STL 21929 report indicate they received and tested a Model 81080 Viper SD treestand. The photographs depict the backstraps and umbilical rope differ from the parts diagram in the 2015 Summit instruction manual. At



this time, there is no available evidence that the assembly, or system, of the Model 81120 Viper SD treestand has been evaluated by Scientific Testing Laboratories.

### TREESTAND CONFIGURATION

| | MODEL | DESCRIPTION | PLATFORM | SEAT CLIMBER |
|---|---|---|---|---|
| GROUP A | 81120 | VIPER SD | 5 CHANNEL | STANDARD |
| | 81533 | VIPER SD INFINITY[B] | 5 CHANNEL | STANDARD |
| | 81537 | VIPER LIMITED[B] | 5 CHANNEL | STANDARD |
| | 81119 | GOLIATH SD | 5 CHANNEL | WIDE |
| | 81118 | TITAN SD | 6 CHANNEL | WIDE - LONG |
| | 81116 | 180 MAX SD | 6 CHANNEL | WIDE CURVED FRONT[A] |
| | 81122 | VIPER ELITE SD | 5 CHANNEL ROUND TUBE | STANDARD ROUND TUBE |
| | 81124 | MINI VIPER SD | 4 CHANNEL | SHORT |
| B | 81117 | RAZOR SD | 5 CHANNEL | HAND CLIMBER - FOLDING BAR |
| | 81115 | OPENSHOT SD | 4 CHANNEL | HAND CLIMBER |
| C | 81121 | SPECIALIST SD | 5 CHANNEL ROUND TUBE | HAND CLIMBER ROUND TUBE |
| | 81123 | COBRA SD | 5 CHANNEL | HAND CLIMBER |
| | 81536 | SPECIALIST MLB | 5 CHANNEL ROUND TUBE | HAND CLIMBER ROUND TUBE |

**Figure 21: Treestand Configuration table with Model Numbers from 2015 Summit Climbing Treestands Instruction Manual**



Figure 2: A photograph of the Summit Viper climbing stand in the as received condition.

**Figure 22: Figure 2 from STL report showing the Viper as received for testing - Model Number received was 81080**

MSJ_JA000305





Figure 3: A photograph of the Summit Treestands climber stand as removed from the package.

*Figure 23: Figure 3 from STL report showing the Viper as unpackaged - Stirrups installed*

The Summit QuickDraw retention spring is integrated into both the sit and stand climbers and the open front, or hand climbers. The manual provides instructions on how to install and remove the climbing cable from the QuickDraw retention spring, and images showing how the QuickDraw spring must lock into place behind the cable. It warns the user that if the cable stop does not lock into place that the cable is not secured and may result in a user to fall. Instructions found in the 2015 and 2022 manual vary on the depiction of a properly seated cable, however both include the cable stop between the retention spring and the face of the cable bracket. The manuals do not warn or instruct the user to avoid grasping or placing one's hands in or around the QuickDraw retention spring. Inadvertently grasping the QuickDraw retention spring while climbing may cause the retention spring to not be fully seated by the cable stop and Summit warns that this condition results in an unsecured cable and may result in a fall. Images in both the 2015 and 2022 manual depict a user grasping the area of the stand where the QuickDraw retention spring is mounted, while images on Summit's website depict climbers with their fingers engaged in the QuickDraw trigger and disengaging the spring while climbing. It is foreseeable that a climber may grasp, or inadvertently engage or disengage the QuickDraw spring while climbing and the manual instructs that any disengagement of the QuickDraw retention spring results in an unsecured cable.

MSJ_JA000306





WOLF Forensics and Design Engineering

**Figure 24: Spring Fully Seated Behind Cable Stop Instruction from 2015 and 2022 Manuals**

**Figure 25: Climber grasping QuickDraw spring and with fingers placed inside the "trigger" - Summit Website**

**Figure 26: Climber grasping and disengaging QuickDraw - Viper Steel Summit Website**



The 2015 Summit manual provides warning to the user that the Climbing Cable should not be used if it has broken or damaged metal strands. In Section 9 Maintenance and Care it states that the *sole purpose of the plastic coating on the cable is to eliminate noise. After some use you may notice some abrasions peeling or possible cuts in the coating. This coating does not affect the performance or safety of the treestand.* The plastic coating on Mr. Vandine's climbing treestand was worn, abraded and peeling while the stranded wire cable showed no visual evidence of broken or damaged strands.

The peeled plastic coating when folded back can reduce the engagement area of the cable stop with respect to the face of the QuickDraw retention spring. Additionally, the peeling plastic coating can create resistance when the cable stop and cable are inserted through the keyed opening on the top of the bracket and may obstruct the user's view of the retention spring. The instruction manual does not warn against the issues created by the worn or peeling noise reduction coating.



**Figure 27: Top View of cable bracket with peeling noise reduction coating**



**Figure 28: Peeling noise reduction coating between the Cable Stop and QuickDraw spring**

MSJ_JA000308



Analysis

Wolf has also inspected, researched, analyzed, and tested a 2002 Summit Mini Viper, a 2002 Summit Viper XLS, an exemplar 2010 Summit Viper, and a 2022 Summit Viper Pro climbing treestand. The two 2002 Summit climbing treestands include the moveable safety covers described in the Summit U.S. Patent 5,975,242. The 2010 Summit Viper is equipped with the QuickDraw retention spring like Mr. Vandine's 2015 Summit Viper SD, and the 2022 Summit Viper Pro was equipped with the QuickDraw Pro retention spring that includes the sprung handle and the retention pin with the locking pin holder. Additionally, Wolf inspected Mr. Vandine's 2015 Summit Viper SD on May 4, 2023.

The climbing cable that was installed in Mr. Vandine's 2015 Summit Viper SD was inspected, measured, and photographed. As compared to new, the climbing cable had taken a more permanent set, likely from periods of loaded use around smaller diameter trees. The permanent set allows the ends of the Climbing Cable to remain closer to parallel, forming a "U" shape, as a new cable wants to spring open as described by Mr. Nelson. As the Climbing Cable ends become naturally parallel the friction between the cable and the outer edge of the cable bracket will be reduced and allow for more free axial movement within the cable bracket when the stand is unloaded. When loaded, the cable will remain fully seated, if installed fully, but when unloaded the cable stops may axially slide rearward and have an increased tendency to rely on the QuickDraw retention spring to remain in the keyway. A visual comparison of cables available to Wolf shows that use on smaller diameter trees may have an increased effect on the radius as compared to prolonged use on larger diameter trees.



Figure 29: Summit Climbing Cable comparison

MSJ_JA000309



The QuickDraw retention spring is formed to an initial trigger shape during the manufacturing of the stand. The formed spring is retained to the cable bracket with a blind rivet from the underside of the bracket. Through time and actuations, it is foreseeable that the head of the rivet may become deformed and allow for additional free play within the retention spring system. The free play on an exemplar used stand was measured to be approximately 3/32" (0.0938"). The additional free play may decrease the engagement of the retention spring relative to the back of the cable stop and increase the possibility of the cable stop sliding axially rearward past the retention spring.



Figure 30: Exemplar 2010 Summit Viper QuickDraw free play measurement and rivet

The QuickDraw retraction and disengagement forces were measured on the 2010 Summit Viper exemplar and table showing their results are below. The forces are relatively consistent with the tested springs on Mr. Vandine's stand. The right Platform spring has an exceptionally high disengage force, but is likely due to the high starting position of the spring. While the springs are formed the same from the manufacturer, they are subject to wear and damage that may alter their shape. As their shape becomes altered, their spring characteristics will also be altered.

Table 2: Disengage and Retraction forces for 2010 QuickDraw retentions springs

| 2010 SUMMIT VIPER | | |
|---|---|---|
| Location | Force to Disengage [lbs.] | Force to Retract [lbs.] |
| PLATFORM RIGHT | 16 | 20.1 |
| PLATFORM LEFT | 9.8 | 18.9 |
| SEAT RIGHT | 8.8 | 14.9 |
| SEAT LEFT | 7.8 | 15.5 |

It is foreseeable that a climber's hands may engage or inadvertently become entangled with the QuickDraw retention spring. While fully grasping the QuickDraw spring forces the spring upward, an entanglement with the QuickDraw trigger may move the spring away from the cable stop defeating its retention ability. If the retention spring is out of position when the Climbing

MSJ_JA000310



Cable is unloaded, the Climbing Cable has the ability to slide axially rearward. This rearward motion could place the cable stop directly on top of, or behind the retention spring, and as the load is reapplied to the stand creating a ramp for the cable to exit the keyway on the open top of the cable bracket should the cable be pulled in an upward manner. This action may be exaggerated by the full grasping of the spring driving the spring upward, lifting the cable from the bracket.

The Summit QuickDraw locking spring can be engaged and disengaged as the climber ascends and descends the tree throughout the climbing treestand's normal and foreseen use. The trigger shaped spring is located in a position that is often grasped by the climber's hands during the climbing phase of the hunt and it is foreseeable that one's hand may interact with the locking spring in a manner that further engages or disengages the spring causing it not to be fully seated behind the cable stops. The Summit QuickDraw feature was intended to automatically lock behind the stops on the climbing cable should the cable be fully inserted into the cable bracket. A locking device, or safety interlock, should require a separate and intentional user action to disengage the lock and should not be able to be inadvertently disengaged during the normal and foreseen use of the equipment. The Summit QuickDraw locking spring can be inadvertently disengaged as it is in a position and orientation that is often grasped by the climber's hands during normal use. A locking device, or safety interlock, that can be inadvertently disengaged through normal, expected, and foreseen use is defective and dangerous.



**Figure 31: Example of climber grasping QuickDraw retention spring in the 2015 Summit Climbing Treestands Instruction Manual**

During Wolf's inspection of Mr. Vandine's treestand it was observed that the inner face of the upper keyway on the right (facing out from tree) cable bracket exhibited removal of the green powder coat and areas of material deformation. The areas of deformation are consistent with

MSJ_JA000311



the cable stop interacting, interfering, and sliding over this portion of the keyway. Through testing Wolf was able to create similar marks on the exemplar 2010 Summit Viper.

While the manual attempts to warn and instruct the potential user regarding the use of the treestand, it is foreseeable that a user may not fully insert the cable stop into the keyway on the top of the bracket allowing the cable stop to be partially inserted. In this position, the Climbing Cable can and will support the weight of the user but will likely dislodge during the subsequent loading cycles. For the purposes of hunting, climbing treestands are typically attached and detached to the tree during periods of low light or darkness, impairing the user's ability to visually inspect components.





Figure 32: QuickDraw TOP: Cable fully seated into bracket. BOTTOM: Cable partially seated into bracket

The current design of the QuickDraw retention spring, and the design incorporated into Mr. Vandine's 2015 Summit Viper SD allows the Climbing Cable to be positioned in a manner that will temporarily support the weight of the climber but provides a false sense of security as the cable and cable stops may not be fully positioned and secured within the stand's cable brackets. The temporary securement of the cable provides the climber a false positive. As the climber loads and unloads the weight from the section of the treestand the cable and cable stops can

November 22, 2023                34                Wolf Project No.: 23-0058-3775

MSJ_JA000312



dislodge from the cable bracket resulting in the cable disconnecting from the treestand and ultimately disconnecting from the tree.



**Figure 33: QuickDraw and Climbing Cable in multiple positions while holding load**

Mr. Vandine's Seat Climber and Climbing Cable became disconnected and allowed the Seat Climber to dislodge from the tree and resulted in Mr. Vandine's fall. Review and inspection of his treestand did not reveal any broken or failed components. Based upon the review of the materials and review the exemplar treestands, the evidence is most consistent with two scenarios: the Climbing Cable on Mr. Vandine's stand becoming disconnected due to inadvertently grasping and actuating of the QuickDraw trigger or the cable stop was not fully inserted into the cable bracket. Either scenario is foreseeable and could have been prevented with a guard or locking device that closed the open keyway on the top of the cable bracket.

MSJ_JA000313



Hazard Avoidance

As a product designer part of the design process is evaluating the hazards associated with the application and integrating features that mitigate or reduce the exposure to the hazard. The National Institute for Occupational Safety and Health (NIOSH) instructs that the Hierarchy of Controls is a way of determining which actions will be best to control the exposure to the hazard. The preferred order of action based on effectiveness is: **Elimination** (remove the hazard), **Substitution** (replace the hazard), **Engineering Controls** (isolate people from the hazard), **Administrative Controls** (change the way people work), and **Personal Protective Equipment** (protect the worker with personal protective equipment).



**Figure 34: NIOSH Hierarchy of Controls**

Safety Through Design published through the National Safety Council presents to achieve the greatest effectiveness in hazard avoidance, elimination, or control the Order of Design Precedence should be applied to all design and redesign processes. The Order of Design states the concepts are to **Design for Minimum Risk**, **Incorporate Safety Devices**, **Provide Warning Devices**, **Develop and Institute Operating Procedures and Training**. It states that from the beginning the top priority is that the hazards be **eliminated** in the **design** process. If the hazard cannot be eliminated, the associated risk is to be reduced to acceptable level through design selection. The next course of action, if the hazards cannot be eliminated or adequately reduced through design, is to reduce the risks through the use of fixed, automatic, or other protective safety design features (**guards**). When the identified hazards cannot be designed out or reduced through safety devices, it instructs to provide safety systems that detect hazardous conditions and include **warning signals** to alert personnel of the hazard. When the hazard cannot be reduced through design, safety devices, or warning signals, relevant operating procedures, **training**, and written **warning** advisories, signs and labels shall be used. It warns not to use operating procedures and training, or other warning or caution signs and labels as the only risk reduction method for critical hazards.

MSJ_JA000314



While NIOSH and the National Safety Council use different words, the design hierarchy or hierarchy of controls is a commonly implemented tool in the design process of products. The process can be simplified to **Design, Remove, Guard, Warn, and Train**.

The primary hazard when hunting from height is the risk of becoming unsupported and disconnected from the tree. As a product designer, the Hierarchy of Controls should be followed to mitigate or reduce the hazard and reduce or eliminate the exposure of the hazard to the user.

From a design perspective the strength of the materials appears to be adequate. The hazard of the cable disconnecting from the stand is difficult to remove because a connection point is required in order to wrap the climbing cable around the tree. The next step in the process would be to provide safety design features that guard against the hazard. Summit could have implemented covers, or retention pins, that blocked the open keyway on the top of the cable bracket. While the QuickDraw and the QuickDraw Pro were intended to automatically engage, they still leave the opening on the top of the bracket exposed. A moveable safety cover, as once implemented in the Summit climbing treestand design, would cover the exposed opening. Additionally, the cover, or pin, would provide tactile feedback if the cable stop was not fully inserted into the bracket as the cover would not close. Based upon the provided materials, there is no evidence that Summit conducted a documented analysis of the hazards and risks associated with the use or misuse of the Viper climbing treestand in or before 2015. Summit had the opportunity to incorporate feasible, cost-effective, previously implemented safety devices to reduce the hazard of the climbing cable being disconnected, but relied upon the QuickDraw retention spring that could become inadvertently disengaged and failed to cover the exposed keyway on the top of the cable bracket.

Warnings and user training are the last resort of the designer. If required, warnings and instructions are most effective when used at the point of use. Summit typically included a fabric warning label that was sewn into the seat cushion which would often be difficult for the user to see, tucked out of the way while climbing, and not in view of the user while sitting to hunt. Mechanical safety devices are significantly more effective than written warnings and training.

<u>Design Alternatives</u>

Throughout the industry, climbing treestand manufacturers address the issue of adjusting and securing the climbing cable with various mechanisms. Several manufacturers have climbing cables that have multiple mounting locations that attach to a single location on the frame of the climber, while the most common attachment method typically involves the frame of the treestand including a series of holes where the climbing cable's single attachment point is adjusted and pinned with a bolt or pin with a secondary keeper. One example of this method would include the Ol'Man Outdoors Multivision Grand 3 climbing treestand. A cable with highly visible end fittings slides down the tubes of the frame and is pinned in place along a series of adjustment holes. The pinning fastener includes a knob that has to be removed prior to removing the pin. This method of securement and attachment to the tree greatly reduces the

MSJ_JA000315



likelihood of a climbing cable becoming partially secured as the cable will not bear any load, additionally the pin or locking mechanism cannot be inadvertently engaged or disengaged through the normal and foreseen use of the climbing treestand. The locking pin requires an intentional and separate action to unlock as compared to the Summit QuickDraw system that can be engaged and disengaged unknowingly by the climber should one's hands interface with the mechanism.



Figure 35: OL'MAN Multivision climbing treestand with replacement cable – OL'MAN current product offering from OL'MAN website

A second example of this climbing cable adjustment and securement is the Treewalker climbing treestand.

MSJ_JA000316





Figure 36: Treewalker climbing treestand (circa 2008) - example of climbing cable adjustability and securement

A method found in industry that is more similar to Summit's Climbing Cable configuration is a portable climbing treestand manufactured by Hawk. The Hawk Ultra-Lite Climber has a climbing cable that includes multiple stops, or positions, along the ends of the cable, very similar to Summit's Climbing Cable. The stand includes cable brackets that have a pivoting latch mechanism that is automatically engaged upon insertion of the cable into the bracket. The AutoLatch mechanism, in combination with the bracket, fully surrounds the cable preventing its disengagement. The AutoLatch includes a secondary pin for locking the mechanism in place.



Figure 37: Hawk Ultra-Lite climbing treestand with the Auto-Latch Cable System – Hawk current product offering from Hawk website

Prior to 2004, Summit climbing treestands included a pivoting safety cover that was able to swing open and then snap shut blocking the exposed keyway on the top of the bracket and

November 22, 2023                    39                    **Wolf Project No.: 23-0058-3775**

MSJ_JA000317



preventing the Climbing Cable from inadvertently disconnecting from the bracket. Additionally, the fit and the location of the cover provided feedback to the user regarding the position of the cable relative to the bracket. Should the cable have not been fully inserted into the cable bracket, the cover would not be able to be closed informing the user that something was wrong with the cable installation. While simple, but likely adequate, the covers could be improved with an additional locking pin preventing the cover from inadvertently being opened. A second step could be the addition of a red or orange indicator that would be exposed while the cover is open and would be concealed when the cover is closed. This would provide additional information to the user regarding the position of the safety cover and aid in the visual inspection of the device. The proposed cover and locking pin would not interfere with the existing QuickDraw retention spring should its functionality want to be retained.



Figure 38: Alternative design that includes safety cover with locking pin



Figure 39: Alternative design that includes safety cover and locking pin shown with the cover open exposing the red indicator

November 22, 2023                    40                    Wolf Project No.: 23-0058-3775

MSJ_JA000318



Similar in concept to the cover, a retention pin could be added that blocks the exposed keyway on the top of the cable bracket. This method could utilize two plates added to the side of the bracket, or could be accomplished with two bent flanges integral to the bracket. The plates, or flanges, would include concentric holes that would allow a locking pin to be inserted and latched. The pin would be positioned such that the cable could not be released from the bracket without its removal, and as with the covers, the pin would be positioned in a manner that it could not be inserted should the cable or cable stops be out of position. The pin would include a bail, or secondary locking pin to prevent it from backing out while in use. The proposed plates and locking pin would not interfere with the QuickDraw retention spring should its functionality want to be retained.



Figure 40: Alternative design with a locking pin that blocks exposed keyway



Figure 41: Alternative design shown with the locking pin installed and removed

MSJ_JA000319



The use of safety covers, or a retention pin, would fully secure the cable into the bracket and prevent its ability to be mispositioned or for it to escape out to the open keyway on the top of the bracket. These safety devices could be feasibly implemented with minor economic impact on the climbing treestand and are in line with the solutions found in industry. The safety benefit of the proposed designs provides significant value compared to the minor cost to implement the revisions. The implementation of the proposed safety devices was feasible, and the components were available prior to, or in, 2015 when Mr. Vandine's treestand was manufactured. There is no evidence that Summit considered the risks of removing the covers implemented prior to 2004, and there is no evidence that Summit considered the risks of failing to add safety features such as the proposed designs prior to, or in, 2015. Had Mr. Vandine's Summit Viper SD been equipped with either of these solutions his Climbing Cable would not have disconnected from the treestand. Summit recently developed a newer version of the QuickDraw system called the QuickDraw PRO that includes a sprung handle and the addition of side plates and a locking pin to the cable bracket.



Figure 42: Summit QuickDraw PRO with locking pin installed

Hunter Safety and Harness Use

An article published in Deer and Deer Hunting entitled Tree Stand Accidents on the Decline discusses the TreeStand Safety Awareness Foundation's (TSSA) tracking of tree stand falls requiring emergency department care and how the number of reported incidents have decreased over time. The article states that recently released data from 2019 from the National Electronic Injury Surveillance System (NEISS) was analyzed to calculate an estimated 1,937 people sought emergency department care as a result of an injury from a treestand fall.

TSSA published the Building Blocks of Tree Stand Safety that includes the ABC's of treestand safety. **A:** Always remove and inspect all your equipment before use – 35% of falls involved

MSJ_JA000320



inspection elements.  **B:** Buckle your harness securely – 86% of fall victims didn't wear a harness.  **C:** Connect before you leave the ground – 99% of fall victims were not attached. **D:** Destination – Share your stand and location for each hunt.

The Consumer Product Safety Commission (CPSC) tracks incidents relating to the use of specific products. Many of the reported incidents and injuries include users that fell to the ground as a result of not being connected to the tree through the use of a safety harness. However, the CPSC also reports that several individuals suffered suspension trauma and/or were asphyxiated as a result of becoming entangled in their safety harness.

A study conducted by Dr. Alan Lazarra of Henry Ford Health reviewed treestand related injuries for non-admitted and admitted patients at a level II trauma center in Michigan. Out of the 33-patient study, four cases (12%) were documented where a harness was being used and five were documented where a harness was not being used. The report states that there was no documentation about harness use or nonuse in the majority of the patient charts. The report also sampled the NEISS database to review the trend of treestand related injuries overtime and provided the following chart for the estimated yearly treestand-related injury cases:



Figure 43: Tree Stand-Related Injuries, Dr. Alan Lazzara - NEISS estimates of yearly tree stand-related injuries in the United States from 2004 through 2019.

While encouraging that the reported incident numbers are decreasing, these facts are evidence that the industry is aware that users are falling short of fully inspecting their equipment and wearing their PPE, or safety harness.  Training and education are important and useful, but as highlighted by the hierarchy of design and the design principles, the proper design and use of mechanical safety devices such as locks and guards are the most effective means of mitigating the risk of the equipment and user from disconnecting from the tree.

MSJ_JA000321



**SUMMARY:**

Mr. Vandine's Seat Climber and Climbing Cable became disconnected and allowed the Seat Climber to dislodge from the tree and resulted in Mr. Vandine's fall. Review and inspection of his treestand did not reveal any broken or failed components. Based upon the review of the materials and review the exemplar treestands, the evidence is most consistent with two scenarios: the Climbing Cable on Mr. Vandine's stand becoming disconnected due to inadvertently grasping and actuating of the QuickDraw trigger or the cable stop was not fully inserted into the cable bracket. The 2015 Summit Viper did not include any safety devices that would have prevented either of these scenarios.

Based upon the available evidence, the design of the 2015 Summit Viper climbing treestand is defective and dangerous. The current design allows the Climbing Cable to be positioned in a manner that will temporarily support the weight of the climber but provides a false sense of security as the cable and cable stops may not be fully positioned and secured within the stand's cable brackets. The temporary securement of the cable provides the climber a false positive. As the climber loads and unloads the weight from the section of the treestand the cable and cable stops can dislodge from the cable bracket resulting in the cable disconnecting from the treestand and ultimately disconnecting from the tree. Review of the produced materials indicates that Summit had knowledge of previous claims of the Climbing Cable becoming disconnected from the treestand.

The Summit QuickDraw locking spring can be engaged and disengaged as the climber ascends and descends the tree throughout the climbing treestand's normal and foreseen use. The trigger-shaped spring is located in a position that is often grasped by the climber's hands during the climbing phase of the hunt and it is foreseeable that one's hand may interact with the locking spring in a manner that further engages or disengages the spring causing it not to be fully seated behind the cable stops. The Summit QuickDraw feature was intended to automatically lock behind the stops on the climbing cable should the cable be fully inserted into the cable bracket.

A locking device, or safety interlock, should require a separate and intentional user action to disengage the lock and should not be able to be inadvertently disengaged during the normal and foreseen use of the equipment. The Summit QuickDraw locking spring can be inadvertently disengaged as it is in a position and orientation that is often grasped by the climber's hands during normal use. It is our opinion that a locking device, or safety interlock, that can be inadvertently disengaged through normal, expected, and foreseen use is defective and dangerous and not reasonably safe for foreseeable uses and misuses.

The 2015 Summit Viper does not comply with ASTM F2122-13 Standard Practice for Treestand Safety Devices as Section 6.3 states that Auxiliary safety devices shall be provided where additional safety precautions can be made to further protect the user. Examples include: anti-slip platforms, backbar locking devices, or tie-offs. The 2015 Summit Viper failed to provide additional safety precautions that were feasible and incorporated into previous designs. The 2015 Summit Viper utilized a backbar locking device that could be inadvertently

November 22, 2023                    44                    Wolf Project No.: 23-0058-3775



disengaged during normal and foreseeable use and did not prevent the false, or temporary engagement, of the cable stops in a manner that was not fully positioned within the cable bracket. Previous Viper designs incorporated a safety cover, or guard, that could not be closed unless the Climbing Cable and cable stops were safely positioned within the cable bracket. Summit U.S. Patent 5,975,242 Climbing Tree Stand with Cable Attachment states the moveable covers prevented the cable from becoming accidently dislodged from the cable brackets. Mr. Vandine's 2015 Summit Viper did not include moveable safety covers.

The 2015 Summit Viper does not comply with ASTM F2122-13 Standard Practice for Treestand Safety Devices as Section 6.2.2 states that Labels and warnings shall be placed on the unit accordance with Practice F2121. The 2015 Summit Viper does not comply with ASTM F2121-13 Standard Practice for Treestand Labels as Section 6.3 states that *Labels and warnings shall be placed such that they are visible to the user when mounting the treestand or climbing stick and when it is in use (sitting or standing). The following placement locations are recommended for individual units and situations:*
> *6.3.1.1 The Top (upper) side of the platform as given in 3.2.7.*
> *6.3.1.2 Along the top (upper)side of the backbar as given in 3.2.1.*
> *6.3.1.3 Along the top (upper) side of a flat surface on a main structural support member.*
> *6.3.1.4 On the top (upper) portion of a component requiring a special label or warning.*

The 2015 Summit Viper was equipped with a fabric label that was stitched into the seat back of the Seat Climber, and the warning and identification label would not be visible when the user is in a seated position and would be difficult to see while the user is climbing as the seat is typically folded during the climbing phase. The location of the sewn-in fabric label does not comply with the locations outlined in the ASTM F2121 Standard Practice for Treestand Labels.

Injury related studies and industry safety/training materials indicate some hunters do not wear a full body safety harness while ascending and descending trees, or while hunting. Designers and manufacturers of products should consider and anticipate user error and misuse during the design phases of the product and incorporate safety features that design out, or guard against the anticipated user error or misuse.

Had Mr. Vandine's Summit Viper SD been equipped with safety covers or a retention pin that blocked the exposed keyway at the top of the cable bracket his climbing cable would not have disconnected from the stand and the accident would not have occurred.


**ADDITIONAL WORK:**

The information contained in this report and the conclusions reached are based on information available at the time this report was prepared. We reserve the right to amend and/or modify this report if any new and/or significant data that could impact this investigation becomes available. We recommend that if any additional statements, depositions, photographs, evidence or other information documenting this incident become available, that they be supplied to Wolf

MSJ_JA000323



for our review so that we may render any further opinions in any future report, deposition, or testimony.

Respectfully submitted,

Jarrett Waters

Technically reviewed by,

William E. Dickinson, P.E.

November 22, 2023                    46          Wolf Project No.: 23-0058-3775

MSJ_JA000324