**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **JOHN VANDINE AND RENEE VANDINE,** | **CIVIL ACTION** |
| **Plaintiffs,** | |
| **v.** | |
| | **NO. 23-0027** |
| **SUMMIT TREESTANDS, LLC AND DICK'S SPORTING GOODS, INC.,** | |
| **Defendants.** | |

## OPINION

Plaintiff John VanDine was hunting from a treestand manufactured by Defendant Summit Treestands, LLC ("Summit"). The treestand detached from the tree, and VanDine fell and was injured. He and his wife, plaintiff Renee VanDine, sued Summit in strict products liability pursuant to N.J.S.A. § 2A:58C-2; Renee also brought a claim for loss of consortium.

Summit has moved to exclude testimony by Plaintiffs' proffered experts, pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), as well as for summary judgment as to Plaintiffs' claims, pursuant to Federal Rule of Civil Procedure 56. For the reasons that follow, Summit's Motions to Exclude Testimony of Jarrett Waters and Phillip Bishop will be granted in part and denied in part, and its Motion for Summary Judgment will be denied.

### I.   FACTUAL BACKGROUND

Except where noted, the facts set forth herein are not in dispute.

#### A.  The Treestand

A treestand attaches to a sturdy tree so that a hunter can hunt from an elevated position.

1

The treestand in this case is a Viper Climbing Treestand made by Summit.  It includes a lower platform and an upper climber/seat, which adhere to the tree using cantilevered forces: Each part includes a cable that loops around the back of the tree, and when downward force (like from a hunter's bodyweight) is applied, teeth on the front of the treestand components bite into the front of the tree.  A full-body safety harness, which the hunter attaches to the tree, is included with the Viper as well.[1]  The top and bottom parts of the Viper are depicted below:



To use the Viper, a hunter attaches the lower (platform) part, the upper (climber/seat) part, and the harness to a tree.[2]  Each of the platform and climber/seat includes a cable that the hunter loops around the tree.  Each cable includes a series of nuts about four inches apart; each nut can be used to secure the cable, so that the hunter can secure each part of the Viper around

---

[1] Defendants contend that the Viper is a "complete climbing system comprised of a platform, a climbing seat attachment, a full body safety harness, written warnings and instructions, and an operational and safety video."

[2] The full-body harness "attaches around the hunter's arms, torso, and[] legs, and anchors through a tether to the tree [to arrest a hunter] in the event of a fall.  Plaintiffs maintain that the harness is a "separate item[]" from the climbing seat and platform sections of the treestand.  As will be discussed in depth below, they also contend there is "evidence and testimony in this case that many hunters do not utilize harnesses" when they use climbing treestands.

trees of varying diameters.  After the hunter loops the cable around, he inserts it into an

aluminum tube inside a cable bracket, where it is locked into place by a special device called the

QuickDraw spring.  The warnings and instructions packaged with the Viper illustrate the cable-

locking mechanism and QuickDraw spring:



When the cable is seated behind the QuickDraw spring, the treestand is ready for use.  The

Viper's instructions warn users that the QuickDraw cable spring must be locked into place:



The hunter steps onto the lower platform section and secures his feet to stirrups.  Then, to

climb the tree, he alternates raising the lower and upper portions of the stand to inch his way up

the tree.  First, he places his weight fully on the lower part and then moves the upper part higher

on the tree; then he shifts his weight to be supported by the upper portion and pulls up his feet

(bound to the lower part by stirrups) to raise the lower part.  He continues inching up the tree in

this fashion until he reaches his desired height.  The pictures below show the hunter putting his

weight on the top part and lifting the bottom part with his feet:



**B. Vandine's Fall**

On the day of the incident in question, VanDine attached the Viper to a tree from which he had previously hunted 12 to 15 times over the preceding three years. He secured the Viper's cables into the cable brackets while he was on the ground and then began climbing. About eight feet off the ground a large branch extended from the tree.[3] VanDine detached the cable from the upper part of the Viper, moved the upper part above the branch, and attempted to re-insert the cable.[4] He did not visually inspect the cable to confirm that the cable he removed to maneuver around the branch was properly locked into the bracket. Instead, he applied weight to it.[5] And when he placed his weight on the upper part, "the cable gave way and [he] fell to the ground." VanDine was not connected to the tree with a harness when he fell.

---

[3] The parties agree that the precise height of the branch was not measured. VanDine testified that that eight feet "[a]ppear[ed] to be right," though he "never measured" it.

[4] Vandine maintains that he "did re-insert the cable into the left bracket." Defendants argue VanDine "did not properly re-insert the cable into the cable bracket assembly at height." This dispute is central to the case and will be discussed at length below.

[5] VanDine says that he "press[ed] down on it" to "inspect the cable" and "make sure it was secure."

## II.    DISCUSSION

Because the parties cite expert evidence in the Motion for Summary Judgment and its responses, the Court will first resolve Summit's Motions to Exclude Plaintiffs' Experts before proceeding to Summit's Motion for Summary Judgment.

### A.  Summit's Motions to Exclude Plaintiffs' Experts

#### i.    *Legal Standard*

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) established a gatekeeping role for trial courts in admitting expert testimony.  The *Daubert* standard is codified in Federal Rule of Evidence 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  The proponent of expert testimony has the burden of establishing its admissibility by a preponderance of the evidence.  *In re TMI Litig.*, 193 F.3d 613, 705 (3d Cir. 1999) (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994) ("*Paoli II*")). Rule 702 "embodies three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit."  *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000).

*Qualification* under Rule 702 requires that "a witness proffered to testify to specialized knowledge [] be an expert."  *Paoli II*, 35 F.3d at 741.  But the specialized-knowledge requirement is "interpreted . . . liberally," and "a broad range of knowledge, skills, and training qualify an expert as such."  *Id.*  The basis of specialized knowledge "can be practical experience as well as academic training and credentials," and "at a minimum, a proffered expert witness . . .

must possess skill or knowledge greater than the average layman." *Elcock*, 233 F.3d at 741

(citing *Waldorf v. Shuta*, 142 F.3d 601 (3d Cir. 1998)) (quotations removed).

*Reliability* under Rule 702 requires that an expert's opinions "reliably flow from the facts

known to the expert and the methodology used." *Oddi v. Ford Motor Co.*, 234 F.3d 136, 146 (3d

Cir. 2000). And an expert's conclusions must be based on the "methods and procedures of

science," not on "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590.

Therefore, the focus of reliability is "solely on principles and methodology, not on the

conclusions that they generate." *Id.* at 580. The expert must have "good grounds" for his belief.

*In re Paoli R.R. Yard Litig.*, 35 F.3d at 743. The inquiry is "a flexible one." *Id.* at 742. And the

bar for reliability "is not that high" because it is "lower than the merits standard of correctness."

*In re TMI Litig.*, 193 F.3d 613, 665 (3d Cir. 1999), *amended*, 199 F.3d 158 (3d Cir. 2000).

*Fit* under Rule 702 requires that the expert's testimony "assist the trier of fact." *Paoli II*,

35 F.3d at 742-43. Admissibility depends in part on "the proffered connection between the

scientific research or test result to be presented and particular disputed factual issues in the case."

*Id.* (citing *United States v. Downing*, 753 F.2d 1224, 1237 (3d Cir. 1985).[6] Fit "is not always

obvious, and scientific validity for one purpose is not necessarily scientific validity for other,

unrelated purposes." *Id.* (citing *Daubert*, 509 U.S. at 591). Therefore, "even if an expert's

proposed testimony constitutes scientific knowledge, his or her testimony will be excluded if it is

not scientific knowledge *for purposes of the case.*" *Id.*

---

[6] For instance, "animal studies may be methodologically acceptable to show that chemical X increases the risk of cancer in animals, but they may not be methodologically acceptable to show that chemical X increases the risk of cancer in humans" without, for example, "good grounds to extrapolate from animals to humans." *Id.*

####       *ii.*       ***Summit's Motion to Exclude Testimony of Jarrett Waters***

Summit first moves to exclude the testimony of Jarrett Waters.  Waters proposes to testify as to the design of the Viper and the warnings that accompanied it, as well as hunters' behavior in using safety harnesses.  He opines that the 2015 Viper is "defective and dangerous" in two ways.

First, it "allows the Climbing Cable to be positioned in a manner that will temporarily support the weight of the climber but provides a false sense of security as the cable and cable stops may not be fully positioned and secured within the stand's cable brackets."  The cable may be "temporar[ily] secure[d]" and give the user a "false positive"—but then, "as the [user] loads and unloads the weight from the section of the treestand the cable and cable stops can dislodge from the cable bracket[,] resulting in the cable disconnecting from the treestand and ultimately disconnecting from the tree."

Second, Waters opines, the QuickDraw spring "can be engaged and disengaged as the climber ascends and descends the tree throughout the climbing treestand's normal and foreseeable use."  The QuickDraw spring, Waters says, "is located in a position that is often grasped by the climber's hands" during ordinary use, and a "locking device, or safety interlock, should require a separate and intentional user action to disengage the lock" to prevent "inadvertent[] disengage[ment] during the normal and foreseen use of the equipment."

Waters also opines that "though Mr. VanDine was not [w]earing a harness at the time of the incident, it is widely known and thus foreseeable that some hunters do not wear a full[-]body safety harness while ascending and descending trees, or while hunting at height."  Waters cites several studies showing that many hunters do not wear harnesses, which Plaintiffs argue "Summit knew or should have known about."  He opines that, therefore, "designers and

manufacturers of products should consider and anticipate user error and misuse during the design phases of the product and incorporate safety features that design out, or guard against, the anticipated user error or misuse."

Summit argues that Waters' testimony should be excluded because, it contends, Waters is not qualified to testify about hunting products, his methods are unreliable, and his conclusions do not fit the facts of the case.

### a.   Qualifications

Summit first argues Waters is not qualified in that "Waters is a mechanical engineer" and that he "has no experience, background or training in hunting products, including treestands." Summit notes that Waters casts himself as a "mechanical engineer who investigates vehicle and tractor trailer accidents" and it argues further that he lacks the necessary experience and training because he has "never been involved in the design of a hunting product" and because this is the "first treestand case in which he has testified as an expert."

Waters' curriculum vitae reveals that he has a degree in Mechanical Engineering and has worked in engineering roles for nearly 15 years.  Among other things, he has developed and implemented testing procedures for structural components, designed and produced functional product prototypes, and performed mechanical-failure analyses.  He holds several patents that evince mechanical-engineering expertise greater than that of the "average layman."[7]

Nevertheless, Summit argues that Waters lacks professional experience with hunting and hunting treestands, which lack disqualifies him.  For support it cites *Surace v. Caterpillar, Inc.*,

---

[7] For instance, he is a co-inventor of U.S. Patent No. 9,868,481.  The '481 Patent describes a device that elevates a fifth-wheel trailer-hitch assembly.  It purports to improve on prior-art devices that elevate hitch assemblies along arced paths; the '481 device elevates them vertically.

111 F.3d 1039 (3d Cir. 1997).  In that case, plaintiff Surace argued that the defendants were at
fault for his injury by a large machine because their backup-alarm design failed to prevent
habituation (a process by which a stimulus like an alarm becomes less effective as a warning to
people who are frequently exposed to it).  The Third Circuit upheld the district court's decision
to preclude testimony by one of Surace's experts because while he was an electromechanical-
engineering expert,  "there [wa]s no evidence in the record to suggest that [he] possesse[d]
sufficient knowledge [as to] habituation." *Surace*, 111 F.3d at 1056.  Here, Defendants argue
that Waters is like Surace's expert—generally a mechanical-engineering expert, perhaps, but
possessed of insufficiently specialized knowledge regarding "this field of treestands and hunting
safety."

     The analogy fails.  The district court precluded Surace's expert because he admitted that
he "had not read any literature on"—and that he relied on a *different* expert as "the sole
authoritative basis for his conclusions regarding"—habituation, the "central issue of design
defect in the case." *Id.*  Here, Summit does not suggest that this case involves a narrowly
specialized field analogous to habituation (cable-bracket-seating, perhaps?).  Rather this case
involves alleged defects in simple mechanical components, and Waters is plenty qualified by his
mechanical-engineering education and his background in "investigat[ion of] accidents, systems,
component failures, and, more generally, product defects and failures," as well as his experience
"designing components, weldment, and assemblies for multiple products" and "performing
performance validation, troubleshooting component failures, and implementing prototype
solutions."

     In any case, as Plaintiffs note, Waters does in fact have experience with treestands.  He
has "been involved in the investigation of treestands, has conducted tests on treestands, and has

co-signed reports authored by his colleagues." And he himself routinely hunts from treestands, including earlier versions of the Viper. *Cf. Betterbox Commc'ns Ltd. v. BB Techs., Inc.*, 300 F.3d 325, 328 (3d Cir. 2002) (holding that personal, not just professional, experience may qualify an expert). Waters' familiarity with treestands and mechanical-engineering background suffice.

b. Reliability

Summit argues next that Waters' opinions do not reliably result from the facts of the case. It disputes Waters' reliability as to two categories: the testing he performed on the treestand cable mechanism, and his testimony that it is well known that many hunters do not wear full-body harnesses when hunting at elevation.

*1. Waters' Testing*

Summit first argues that Waters' testimony as to treestand testing he conducted must be excluded.

Waters opines in his report that the cable on VanDine's treestand disconnected due either to Vandine's "inadvertently grasping and actuating of the QuickDraw trigger" or his failure to "fully insert[]" the "cable stop . . . into the cable bracket" after he removed the cable to move around the tree branch at elevation.

Summit argues the testing should be excluded because it "in no way relates to the ordinary use of the [tree]stand." Specifically, Summit notes that some of Waters' testing included "screwing the cable to the back of [a] tree, and manipulating the [QuickDraw] spring device in a manner that neither represents normal use nor the facts of the case." It argues Waters' testing "was created for this case alone, was not subjected to peer review, and does not even represent the ordinary use of the stand." Plaintiffs respond that the test replicates normal

treestand use and demonstrates that "if the user of the treestand inadvertently engaged the QuickDraw trigger . . . and the cable became stuck or [e]nsnared on the back of the tree, the cable could become disengaged."  They say Waters' testing supports their argument that a safer alternative design would have been equipped with "safety covers or a retention pin" on the cable-bracket assembly to prevent inadvertent disconnection.

A test need not perfectly and identically recreate real-world conditions to be reliable enough to clear *Daubert*'s low admissibility bar:  *Daubert* "does not require a paradigm of scientific inquiry as a condition precedent to admitting expert testimony."  *Oddi v. Ford Motor Co.*, 234 F.3d 136, 156 (3d Cir. 2000).  Admissibility just requires "good grounds"—reliability does not turn on whether a test used the "best" methodology or "unassailable" research.  True, a "haphazard, intuitive inquiry" will not suffice.  *Oddi*, 234 F.3d at 156.  But Waters' testing was not haphazard or intuitive.  (Even if it is reasonable to question, as Summit does, the extent to which screwing the cable to a tree mimics the cable's getting stuck in a tree, that is a question of weight, not admissibility.)  Ultimately, "the standard for determining reliability is 'not that high.'"  *In re TMI Litig.*, 193 F.3d 613, 665 (3d Cir. 1999), *amended*, 199 F.3d 158 (3d Cir. 2000) (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994) ("*Paoli II*").  Waters' testing clears the low bar.

### 2.  Waters' testimony regarding harness use

Summit next argues that Waters' testimony regarding harness use among hunters is unreliable because Waters "admitted that not only were the studies he referenced flawed, but he could not recall the specific methodology used to obtain the data" in the studies.

In particular, Waters refers to studies by the Tree Stand Safety Awareness Foundation (TSSA) that stated 86% of treestand-fall victims were not wearing harnesses.  Summit cites

Waters' testimony that "[t]here are issues in how the data is reported to the database," that he "would agree" the study did not differentiate between homemade and commercially manufactured treestands, and that he "d[id no]t know what form was filled out in order to report" the data."

Each of these alleged flaws is paradigmatic cross-examination fodder.  Flaws alone do not prevent studies' admissibility.  *See Karlo*, 849 F.3d at 81.  Waters' citation of the TSSA studies meets reliability's low standard.

c.   <u>Fit</u>

 Summit argues that three aspects of Waters' testimony do not fit the facts of the case: (1) Waters' testimony that "inadvertent grasping" of the QuickDraw spring could lead to unexpected detachment of the Climbing Cable; (2) Waters' testimony that the Viper was defective because the Climbing Cable could "simply come out"; and, (3) Waters' opinion that the Viper's warnings and instructions were inadequate.

*1.   Waters' testimony regarding "inadvertent grasping"*

Summit argues that Waters' testimony regarding his theory that VanDine may have inadvertently actuated the QuickDraw spring and unintentionally released the Climbing Cable must be precluded.  It cites Waters' testimony that "[i]f VanDine [did] not move the stand from the position where he . . . installed the cable stop into [the] bracket, the inadvertent contact with the QuickDraw spring likely does not apply to this scenario," that "[b]ased on [VanDine's deposition] transcript there is nothing that discusses that" VanDine was touching the QuickDraw trigger assembly at the time of the accident, and that Waters did not "have any . . . physical evidence" or "other evidence" that VanDine "did or did not touch" the trigger at the time of his fall.  Summit urges that Waters' professed lack of certainty as to whether VanDine did or did not

12

accidentally actuate the QuickDraw trigger marks any testimony regarding Waters' inadvertent-grasping theory for exclusion.  Plaintiffs argue in response that VanDine "did not specifically remember how he utilized the stand that day."

Here Summit is correct.  Waters points to no evidence (in fact, he says he is not aware of any evidence) indicating that VanDine inadvertently grasped the QuickDraw spring and thereby released the Climbing Cable.  "The 'ipse dixit of the expert' alone is not sufficient to permit the admission of an opinion."  *McMunn v. Babcock & Wilcox Power Generation Grp., Inc.*, 869 F.3d 246, 272 (3d Cir. 2017).  Here, with no evidence that inadvertent grasping happened in this case, Waters' theorizing that it did happen in this case (or that it could happen in a hypothetical case) will be precluded.

### 2.  *Waters' testimony that the Climbing Cable could "simply come out"*

Summit next argues that Waters' testimony contradicts his theory that the Climbing Cable could "come out" during "ordinary use."  In fact, Summit argues, Waters testified that "if the user follows the instructions and fully inserts the cable, it will ***not simply*** come out of the cable bracket."  Summit further argues that "Waters' testimony clearly establishes that if a user uses the stand as intended, the cable will not simply come out of the bracket."

Specifically which testimony Summit seeks to preclude is not clear.  The heart of Plaintiffs' design-defect claim is that "the cable can be partially inserted in a manner that will temporarily support the weight of the climber and thus provide a false sense of security despite the cable['s] not being fully positioned and secured with the stand's cable brackets."  Summit argues that "if a user uses the stand as intended, the cable will not simply come out of the bracket," and that "Waters admitted in his deposition that the incident resulted from the

Plaintiff['s] removing the cable at height to move the upper portion of the stand above a tree limb (contrary to express instructions) and then failing to properly replace it back in the bracket." Summit is making a substantive argument dressed up as an evidentiary one.  Summit would like to ensure that Waters' testimony reflects its *substantive* argument that VanDine misused the Viper (about which much more below).  But the extent to which testimony elicited during trial supports or contradicts Summit's substantive theory of the case is a matter of trial strategy, not admissibility.  Accordingly, Waters will not be precluded from testifying that the Climbing Cable came out of the bracket assembly, "simply" or otherwise.

### 3. Waters' testimony regarding the adequacy of the Viper's warnings

Summit argues that Waters' testimony regarding the adequacy of the Viper's warnings should be precluded because VanDine conceded "he did not read the instructions and cut the warning labels off" the Viper.  Plaintiffs do not contest Summit's Motion as to Waters' adequate-warning testimony, so the Motion will be granted with respect to that testimony.

### 4. Conclusion

For the reasons above, Summit's Motion to Exclude Plaintiff's Expert Jarrett Waters will be granted in two respects: first, Waters will be precluded from testifying regarding his theory that VanDine inadvertently grasped the QuickDraw spring and released the cable; second, Waters will be precluded from testifying that the Viper's warnings were inadequate.  The Motion will be denied in all other respects.

### iii. Summit's Motion to Exclude Testimony of Phillip Bishop

Summit next moves to exclude the testimony of Plaintiffs' expert Phillip Bishop.  Bishop is presented to testify that the Viper was defective in its design in several ways, including that it

made visual inspection of the QuickDraw spring very challenging, that the cable bracket assembly was prone to positioning such that it might "work for a few cycles and then detach," and that design changes could make the Viper safer at low cost.  He also seeks to testify as to hunters' behavior with respect to harness usage in general.  Summit attacks Bishop's qualifications and the reliability and fit of his proposed testimony.

a.  Qualifications

Summit argues that Bishop is not qualified to testify in this case because, it contends, he does not have the right education or professional experience:  "Bishop holds a Master's and Doctor of Education in physical education.  As a profession, Bishop worked for the physical education department of the University of Alabama.  The focus of his teaching was on physical education and exercise physiology."  Summit further argues that Bishop "is not an engineer and has never designed a consumer product," that he "does not possess any experience or background in the manufacture or design of treestands or safety harnesses," and that he "has never designed or manufactured a treestand or safety harness for commercial purposes or for sale to anyone."  And it argues that Bishop is unqualified to testify regarding the theory of suspension trauma (an alleged phenomenon in which injury is caused by being suspended from some type of harness).

Plaintiffs argue in response that Bishop's educational and professional background qualifies him sufficiently, even if it is not a perfect match to the "field" of hunting and treestand use; they argue further that his personal experience with the subject matter at issue qualifies him as an expert.

Plaintiffs are correct on both counts.  As explained above, professional experience is not necessary for qualification under Rule 702—personal experience may suffice.  *See Betterbox*

*Commc'ns Ltd.*, 300 F.3d 325, 328 (3d Cir. 2002).  Here, even if Bishop has never designed or

built a treestand "for commercial purposes or sale," he "has been hunting at height from

treestands for over 50 years and has completed hunter[-]safety programs multiple times."  Even

if he does not possess an educational degree related directly to hunter safety, he "has published

articles on deer[-]stand education, falls, safety harnesses, and suspension trauma."  His

knowledge about hunting, treestands, suspension trauma, and hunters' reticence to wear

harnesses is "greater than the average layman['s]".  *See Elcock*, 233 F.3d at 741.  He is qualified

to testify.

b.  Reliability

Summit next argues that Bishop's testimony must be precluded because it is unreliable in

five ways: (1) His opinion that the Viper cable's coating contributes to the stand's failure is

speculative; (2) His opinions related to the safety of harnesses have no basis; (3) His opinion that

Summit harnesses had "several potential problems" is speculative; (4) He conceded that the

cable stops cannot be detached unless the product is misused; and, (5) His opinion that the Viper

had a history of failures due to cable engagement is speculative.

*1.  Bishop's opinions regarding the cable coating*

Plaintiffs do not contest Summit's Motion with regard to the coating on the Viper's

cables, so Summit's Motion as to Bishop's cable-coating testimony will be granted.

*2.  Bishop's opinions regarding the use of safety harnesses, including suspension trauma*

Summit argues that Bishop's opinions regarding hunters' use of safety harnesses is

unreliable.  In particular they attack a survey Bishop conducted in 2012 regarding harness use.

Bishop, Summit argues, "could not explain who was surveyed, the scope of the survey, the types

of treestands used, or any of the questions asked" and thus "could not actually explain any of his methodology."  Summit also contends that Bishop's opinion that many hunters forego harnesses because they fear suspension trauma must be excluded because Bishop "could not identify any of the factual foundation" from the Consumer Product Safety Commission (CPSC) report he references.[8]  Plaintiffs respond that Bishop's inability to recall the specifics of the survey he conducted or the data underlying the CPSC report does not doom his reliance on them.

Plaintiffs have the better of it.  True, in deposition Bishop could not recall the raw data of, or the questions asked in, the survey he conducted, but his expert report cites the survey and provides data of its demographics and conclusions.  Likewise, regarding the CPSC report—Bishop's expert report cites the CPSC Incident ID and summarizes his interpretation of (and the limits of his interpretation of) it.  These are "good grounds" for Bishop's views.  See *In re TMI Litig.*, 193 F.3d at 663.  The extent to which the studies successfully support Bishop's conclusions is a question for cross-examination.  (In fact, an expert need not even conduct his own research to reliably rely on the conclusions of that research.  *Jaasma v. Shell Oil Co.*, 412 F.3d 501, 514 (3d Cir. 2005).  So, *a fortiori*, Bishop's own survey is sufficient to pass muster even if in deposition he could not recall its particulars).[9]

---

[8] Summit's argument that "Bishop is not a hunter[-]safety instructor or hunting[-]safety investigator" is an argument as to Bishop's qualification to testify (which is resolved above), not the reliability of his testimony.

[9] Summit argues further that Bishop should not be allowed to testify as to the symptoms and causes of suspension trauma from a medical perspective because he has not demonstrated any methodology, and in any case is not qualified to testify regarding, the medical aspects of suspension trauma.  Plaintiffs say they "do not intend to elicit medical opinions from Mr. Bishop."

In a diversity case, state rules as to the degree of medical certainty required for expert testimony prevail.  *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 153 n.4 (3d Cir. 1999).  In New Jersey, non-physician experts may testify as to some aspects of medical phenomena.  Even where a subject is "ultimately medical in nature," not all "aspects of the subject" are "within the exclusive knowledge of licensed practitioners," and an expert's "training and experience" may "indicate sufficient expertise to support a reliable opinion."  *Landrigan v. Celotex Corp.*, 605 A.2d 1079, 1089 (N.J. 1992).  The New Jersey Supreme Court cites as an example a nonpsychologist clinical director of a "women's resource center" who was "eminently well qualified" to testify as to the psychological symptoms resulting from

> ### 3. *Bishop's testimony regarding the Summit harnesses' "several potential problems"*

Plaintiffs do not contest Summit's Motion concerning Bishop's testimony that the Summit's harnesses had "several potential problems" (specifically, that self-rescue while suspended would be difficult for the average hunter) so Bishop will be precluded from testifying that the harnesses had "several potential problems."

> ### 4. *Bishop's alleged admission that the cable stops cannot be detached unless the Viper is misused*

Summit argues that Bishop should be precluded from testifying that the Viper's cables "could somehow move 'by catching on bark irregularities facilitating disengagement and stand failure during climbing or descending.'"  Summit contends that the test Bishop performed, which involved inserting a wedge into the cable bracket to replicate the engagement of the QuickDraw spring by a user, does not faithfully replicate real-world treestand use because in ordinary use a hunter would not insert a wedge into the cable bracket and in ordinary use a hunter would use the Viper to climb a tree, whereas Bishop performed his test at ground level.

As explained above about Waters' testing, a test need not perfectly recreate the conditions of the incident in order to be reliable enough for admission.  *See Oddi*, 234 F.3d at 156.  Here, Plaintiffs argue, the wedge Bishop inserted produces the same result as the engagement of the QuickDraw spring by a user.  They also argue it makes no difference that Bishop performed his test without "ascending the tree," which he chose not to do because it "would be dangerous and he did not want to be injured."  The dispute about the extent to which Bishop's testing is credible as a re-creation is fundamentally about its persuasive weight, so

---

spousal abuse.  *Id.* at 1089.  Therefore, Bishop will not be precluded from testifying—within the extent of his expertise—as to the phenomenon of suspension trauma.

Bishop's testimony regarding the test he performed will not be excluded.

          *5.  Bishop's testimony regarding the Viper's "history of failures"*

Last, Summit seeks to preclude any testimony by Bishop regarding other legal claims against it with respect to alleged treestand failures.  It argues any such testimony is "entirely speculative, unreliable and without basis" because "Bishop admitted he has no knowledge of the underlying facts of any other cases or prior claims."  Plaintiffs respond that Bishop read about prior cases and "reviewed numerous documents detailing specific complaints" about Summit treestands "in preparation for this case."  They cite Bishop's reference to the testimony of Summit engineer Ron Woller in a previous case, as well as a list of previous lawsuits against Summit.

When a plaintiff "attempts to introduce evidence of other accidents as direct proof of a design defect," the evidence is admissible "only if the proponent demonstrates that the accidents occurred under circumstances substantially similar to those at issue in the case at bar."  *Barker v. Deere & Co.*, 60 F.3d 158, 162 (3d Cir. 1995).  Plaintiffs say the similarity or dissimilarity of previous cases cannot be verified now because Woller testified that while he previously "maintained documentation related to product claims," he now "has no knowledge if it exists today or where the documentation went."  They also say Woller testified that "there is no documentation reflecting any of the internal testing that would have been done" on the Viper.  Plaintiffs indicate they intend to seek a spoliation charge and an adverse inference that any such documentation would have been harmful to the defense.

The dispute over the admissibility of previous allegations against Summit, and over whether any spoliation charge or adverse inference is warranted, is a matter for trial.  At present,

Summit's Motion as to evidence of previous claims will be denied without prejudice.

### c.  Fit

Last, Summit argues that Bishop's opinions do not fit the facts of the case.  Specifically, Summit contends that: (1) Bishop contradicts himself as to his testimony regarding the difficulty of visually inspecting the cable bracket assembly; (2) Bishop based his opinion regarding the Viper's coloration on the wrong treestand; (3) Bishop's opinion regarding the inadequacy of the Viper's warnings is irrelevant because VanDine did not read the instructions; (4) Bishop's opinion that the Summit harness had "several potential problems" is irrelevant; and, (5) Bishop's opinions regarding deaths and injuries from harnesses is irrelevant.

### 1.  *Bishop's opinions regarding the difficulty of visually inspecting the cable-bracket assembly*

Summit argues that Bishop's opinions regarding the difficulty of inspecting the cable-bracket assembly must be precluded.  Specifically, Bishop opines in his report that "[t]he lack of color contrast made the position of the [QuickDraw Spring] in relation to the cable difficult to detect."  Summit contends Bishop's testimony in deposition contradicts his report.  In deposition, Summit says, Bishop conceded that "[i]n the daylight, in good lighting," it is "easy to see from the side" whether or not the cable is properly inserted.  Moreover, Bishop testified that it "would be easy to see with a visual inspection" (which "would not take much time") whether the cable was fully inserted when looking "from either side, either the outside of the stand or the inside of the stand."

Plaintiffs respond that in deposition Bishop also testified that while it might be easy to visually inspect the cable-bracket assembly from the side, it is difficult to inspect it "[f]rom the top" because of the lack of color contrast visible from the top.  This disagreement about the most

representative view from inside the Viper is not a matter for resolution in a *Daubert* motion; it is a matter for the jury. *See Daubert*, 509 U.S. at 596, ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

        *2. Bishop's opinions regarding the Viper's coloration generally*

Along related lines, Summit contends that Bishop should be precluded generally from opining that the Viper's coloration provided insufficient contrast to facilitate visual inspection of the cable-bracket assembly because his opinion "arises out of his use of [a] different model treestand with [a] different color scheme" and because Bishop testified in deposition that coloration matters more in "[l]ow-light conditions," and VanDine's fall did not occur in low-light conditions.

Indeed, Plaintiffs concede that the treestand Bishop inspected had "a brown color scheme," while VanDine's Viper "had a grayer color scheme." But they contend that VanDine's Viper actually had *less* contrast than the one Bishop inspected (and that therefore it would have been even more difficult to visually inspect), so Bishop's inspection of a different-colored treestand is immaterial.

Regardless of who is correct, the accuracy of the inspected color scheme, and Bishop's credibility as to his views regarding ambient lighting conditions, are matters for the jury. *See Daubert*, 509 U.S. at 596, ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

        *3. Bishop's opinions regarding the adequacy of the Viper's instructions*

Summit argues that Bishop's opinions as to the adequacy of the Viper's instructions must be precluded because it has been established VanDine did not read them.  Plaintiffs respond that they do not contest Summit's Motion as to Bishop's opinions regarding the Viper's instructions, so Summit's Motion will be granted to that extent.[10]

> 4.  *Bishop's opinion that the Summit harnesses had "several potential problems"*

Summit again attacks Bishop's testimony that the Summit harnesses had "several potential problems," here on relevance grounds.  That issue, discussed above, has been resolved; Bishop will be precluded from testifying that the Summit harnesses had "several potential problems."

> 5.  *Bishop's opinions regarding deaths and injuries from harnesses*

Last, Summit argues that Bishop's opinions regarding deaths and injuries from harnesses must be precluded as irrelevant because he has also opined that "a hunter should ***always*** wear their safety harness."  But, as Plaintiffs argue in response, "Bishop's opinions regarding harness use relate to foreseeability."  Bishop may himself believe that hunters should wear harnesses while also testifying that fear of injuries sometimes induces them not to.  To the extent any contradiction lies, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking" it. *Daubert*, 509 U.S. at 596.

---

[10] Plaintiffs indicate they do intend to elicit testimony regarding hunters' proclivity to read instructions generally. The Court's granting of Summit's Motion regarding the adequacy of the Viper's instructions does not preclude Bishop's testimony regarding hunters' proclivity to read instructions generally.

d.  Conclusion

For these reasons, Summit's Motion to Exclude Plaintiff's Expert Phillip Bishop will be granted as to Bishop's testimony regarding: (1) the Viper's cable coating; (2) the Summit harnesses' having "several potential problems"; and, (3) the adequacy of the Viper's instructions. It will be denied in all other respects.

**B.  Summit's Motion for Summary Judgment**

Plaintiffs bring two claims: one, together, in strict products liability under a design-defect theory pursuant to N.J.S.A. § 2A:58C-2; and one, by Plaintiff Renee VanDine (John VanDine's wife) only, for loss of consortium.  Summit moves for summary judgment as to both claims.[11]

In its Motion Summit raises four arguments: first, that product misuse bars products-liability recovery and VanDine misused the subject treestand; second, assumption of risk bars products-liability recovery and VanDine assumed a known risk by detaching the Viper at height and by declining to wear a safety harness; third, products-liability plaintiffs must show causation and VanDine cannot; and fourth, that plaintiff Renee VanDine's loss-of-consortium claim must fail because it is derived from Plaintiffs' products-liability claim, which Summit argues must fail.[12]

---

[11] Plaintiffs' original Complaint, filed in the Pennsylvania Court of Common Pleas for Philadelphia County, brought against Summit and erstwhile defendant Dick's Sporting Goods, Inc., five claims under Pennsylvania law: one count of common-law negligence and one of common-law strict products liability against each defendant, and one count of loss of consortium by plaintiff Renee VanDine against both Defendants.  Plaintiffs' claims have undergone some transformation since then.  First, the parties have agreed that New Jersey, not Pennsylvania, substantive law applies. As a result, Plaintiffs' complaint was dismissed as to defendant Dicks', with Plaintiffs' consent, pursuant to New Jersey's 'innocent-seller' exemption.  Second, as will be explained below, New Jersey's products-liability regime is governed largely by statute.  Therefore, Plaintiffs' common-law claims will be dismissed; as Plaintiffs concede, their negligence claim is subsumed by their NJPLA strict-liability claim.  Third, Plaintiffs have withdrawn any claim for strict products liability under either a manufacturing-defect theory or a failure-to-warn theory.  As will be addressed (and assessed) below, they proceed only on a design-defect theory.

[12] Summit also argues that any claims under failure-to-warn or manufacturing-defect theories must fail as matters of law.  As noted above, Plaintiffs voluntarily withdrew any claims under failure-to-warn or manufacturing-defect theories.  They further acknowledged in their Response to Summit's Motion that they "have narrowed their strict

For the reasons set forth below, Summit's Motion will be denied.

### *i.   Legal Standard*

A party seeking summary judgment must show "that there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "Material facts are those that could affect the outcome of the proceeding." *Roth v. Norfalco LLC*, 651 F.3d 367, 373 (3d Cir. 2011) (internal quotation marks and citation omitted). Unless those facts are derived from evidence that would be admissible at trial, they cannot defeat a motion for summary judgment. *Callahan v. A.E.V., Inc.,* 182 F.3d 237, 252 n.11 (3d Cir. 1999); *accord* Fed. R. Civ. P. 56(c)(1)(B), 56(c)(2). "A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-26 (1986); *Anderson*, 477 U.S. at 248-52). "The non-moving party may not merely deny the allegations in the moving party's pleadings; instead he must show where in the record there exists a genuine dispute over a material fact." *Id.* (citation omitted). A moving party is entitled to judgment as a matter of law where the "nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex*, 477 U.S. at 323.

---

product liability claim to a design[-]defect [theory]." Therefore, only the design-defect theory will be addressed.

"Inferences to be drawn from the underlying facts contained in the evidential sources must be viewed in the light most favorable to the party opposing the motion."  *Peters Twp. Sch. Dist. v. Hartford Acc. & Indem. Co.*, 833 F.2d 32, 34 (3d Cir. 1987); *see also Scott v. Harris*, 550 U.S. 372, 378 (2007) (cautioning that "courts are required to view the facts and draw *reasonable* inferences" in favor of the nonmoving party (emphasis added)).  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott*, 550 U.S. at 380.

### ii.    Analysis

#### a.    Plaintiffs' Claim Under New Jersey Products-Liability Law

The New Jersey Product Liability Act (NJPLA) codifies many aspects of New Jersey's products-liability law, including claims premised on strict products liability.  *See* N.J.S.A. § 2A:58C-1 *et seq.*, *Willner v. Vertical Reality, Inc.*, 192 A.3d 1011, 1019 (N.J. 2018); *see also Repola v. Morbark Indus., Inc.*, 934 F.2d 483, 492 (3d Cir. 1991) ("We . . . predict that the New Jersey Supreme Court would hold that the NJPLA generally subsumes common law product liability claims, thus establishing itself as the sole basis of relief under New Jersey law available to consumers injured by a defective product.").

Here, Plaintiffs bring a NJPLA claim for strict products liability under a design-defect theory.  NJPLA provides, in relevant part:

> A manufacturer or seller of a product shall be liable in a product liability action only if the claimant proves by a preponderance of the evidence that the product causing the harm was not reasonably fit, suitable, or safe for its intended purpose because it . . . was designed in a defective manner.

N.J.S.A. § 2A:58C-2.  A design-defect plaintiff must also "prove that a practical and

feasible alternative design existed that would have reduced or prevented his harm."
*Lewis v. Am. Cyanamid Co.*, 715 A.2d 967, 975 (N.J. 1998).

The heart of Plaintiffs' products-liability claim is that the Viper treestand's design was defective because it could appear to the user to be securely fastened, when in fact it was not secure and could detach from the tree at elevation.

### b.  Misuse

Summit first argues that Plaintiffs' products-liability claim is barred because, it contends, VanDine misused the Viper, and "if the plaintiff misused the product and such a misuse was not reasonably foreseeable, the plaintiff cannot recover under New Jersey law."  And what is more, Summit urges, "the absence of misuse is part of the plaintiff's case," so Plaintiffs "ha[ve] the burden of proving there was no misuse of the product or that the misuse was objectively foreseeable."

The specifics of Summit's arguments are that VanDine misused the Viper by detaching and attempting to reattach the cable at height and failing to visually inspect the cable after reconnecting it; and, by not wearing a safety harness.  The facts as to VanDine's alleged misuse are not much in dispute.  All agree that VanDine "removed the Climbing Cable to maneuver around a tree branch" and that he was not wearing a harness.  But Plaintiffs argue that summary judgment is inappropriate because "[i]t is the responsibility of the factfinder to determine whether this 'misuse' was foreseeable," and that here any misuse by VanDine was foreseeable.

Indeed, a manufacturer "has a duty to prevent an injury caused by the foreseeable misuse of its product," so "a defendant may still be liable when a plaintiff misused the product, if the misuse was objectively foreseeable."  *Jurado v. Western Gear Works,* 619 A.2d 1312, 1317-18

(N.J. 1993).[13]  *Jurado* prescribes a three-step process to be used "when misuse is an issue in a design-defect case":

1.  The factfinder should determine "whether the plaintiff used the product for an objectively foreseeable *purpose*";

2.  If the plaintiff's purpose was foreseeable, the court must decide "whether the product was defective" by evaluating "whether the plaintiff used the product in an objectively foreseeable *manner*";

3.  If the factfinder determines that "the plaintiff used the product in an objectively foreseeable manner," then it should determine "whether the defendant feasibly could have modified the product's design to prevent the injury or whether that modification would have either unreasonably impaired the utility of the product or excessively increased its cost."

*Id.* at 1319 (emphasis added).

Therefore, the first question is whether misuse is "an issue."  Then, if it is, the next question is how the claim fares under *Jurado*'s three-step defective-product evaluation.

### *1. VanDine's misuse*

New Jersey law "contemplates two kinds" of misuse.  *Jurado*, 619 A.2d at 1318.

One [kind of misuse] is the use of a product for an improper purpose.  If, for instance, a plaintiff undertakes to use his power saw as a nail clipper and thereby snips his digits, he will not be heard to complain.  For a plaintiff to recover, the purpose for which the product is used at the time of the accident must be objectively foreseeable.  When a plaintiff is injured while using the product for a purpose that is not objectively foreseeable, the injury does not establish that the product is defective.

The other kind of misuse concerns the manner in which the plaintiff used the product. When, for example, the operator of a high-lift forklift is injured while using the forklift on steep, instead of level, terrain, the emphasis should be on the manner, not the purpose, of the misuse.

---

[13] The NJPLA was not in effect at the time of the events that gave rise to *Jurado*.  The New Jersey Supreme Court has explained that NJPLA does not subsume the entire field of products liability, and any "interstices" that remain are filled by the common law.  *Jurado v. Western Gear Works*, 619 A.2d 1312, 1317 (N.J. 1993) (citing Senate Judiciary Committee Statement, L. 1987, c. 197; William A. Dreier, *Analysis: 1987 Products Liability Act*, 41 Rutgers L. Rev. 1279 (1989)).

*Id.* Here, Summit argues that VanDine misused the Viper in the second way (*i.e.*, in an improper manner), because he used it in ways that the warnings packaged with the Viper instructed users not to. Indeed, warnings and instructions included with a product can indicate the product's intended manner of use. *See Coffman v. Keene Corp.*, 628 A.2d 710, 718 (N.J. 1993) ("Warnings can be essential to assure that products are reasonably safe for their intended uses.") It is undisputed that the Viper's warnings and instructions directed users never to detach the Climbing Cable at elevation (as VanDine did), and always to wear a harness (as VanDine did not).[14] VanDine did misuse the Viper, as he unequivocally conceded at oral argument.

> 2. Jurado *evaluation: foreseeability of VanDine's misuse*

Because VanDine did use the Viper in a manner other than that intended by the manufacturer, the Court proceeds to the *Jurado* analysis.

### STEP 1: FORESEEABILITY OF PURPOSE

The first step in the *Jurado* analysis asks "whether the plaintiff used the product for an objectively foreseeable *purpose*." It is undisputed that VanDine was using the Viper to hunt from a tree. (As VanDine agreed in his deposition, the "whole purpose of using a tree stand is to get over and above the game" for "a better shot" and to "keep them from seeing you.")

---

[14] Summit contends that VanDine's failure to perform a visual inspection of the cable bracket after he reattached the Climbing Cable also constitutes misuse, but the evidence Summit adduces does not support the contention. First Summit cites a portion of the deposition of Plaintiffs' expert Bishop in which Bishop acknowledges that such an inspection is *possible*, and that it is "easy to see" whether the Climbing Cable is properly seated. Then Summit cites a portion of the deposition of Plaintiffs' expert Waters in which Waters acknowledges that the user is the person who sets up the Viper for use (and therefore, by apparent implication, is the one who *would* perform any such visual inspection). Waters also acknowledges that "it would be *good practice*" to inspect the cable bracket before climbing (emphasis added).

But Summit introduces no evidence indicating that the Viper's intended use included a visual inspection. For the other two alleged misuses (detaching and reattaching at height, and declining to wear a harness), Summit cites several product warnings and instructions.

Therefore, it is undisputed that VanDine was using the treestand for its foreseeable purpose.

STEP 2: FORESEEABILITY OF MANNER

The second step in the *Jurado* analysis is "whether the plaintiff used the product in an objectively foreseeable *manner*." This step is the heart of the parties' disagreement as to misuse.

Summit asserts that VanDine's misuse was unforeseeable but does not explain why. As to VanDine's detaching and reattaching the Climbing Cable at elevation, it declares, "This action was also an unforeseeable misuse." For support it cites the instructions that warn users not to detach the cable at elevation, but the fact that instructions warn against the behavior does not establish that Summit could not have foreseen the behavior. (It does help establish misuse, but as discussed, misuse alone is not enough). Summit repeats that VanDine's "intentional and purposeful action" is "considered an unforeseeable misuse" of the Viper. (Considered by whom?) And as to VanDine's not wearing a harness, Summit makes no foreseeability argument. It simply concludes that "it is undisputed that Plaintiff misused the subject Viper Climbing Treestand in repeated unforeseeable manners."

In response Plaintiffs supply more than "[t]he mere existence of a scintilla of evidence." *Anderson*, 477 U.S. at 252. Plaintiffs note that when Summit expert George M. Saunders was asked in deposition whether, in previous cases, he has "found that hunters have disconnected cables or the other attachment systems while at height," he responded, "It is something I've seen in the past." (Saunders also noted that "[i]t's pretty limited relative to the overall population"— the number of times he has seen it "in the single digits.") Plaintiffs correctly note as well that Saunders confirmed that "most of the 300+ cases he has investigated have involved a hunter falling from height where a harness was not being utilized." Plaintiffs also note that Lorne Smith, one of Summit's "oft[-]used" experts, testified in a previous case that "hunters have been

29

known to take cables outside the brackets to go around limbs or to go higher." Plaintiffs argue (and reiterated in oral argument) that Summit was likely aware of Smith's belief.[15, 16] And, last, as Plaintiffs reiterated at oral argument, Summit's patent for an earlier version of the treestand taught that "[p]referably, the cleats include Safety covers for preventing the cable ends from being accidentally dislodged from the cleats. Preferably, the safety covers can be moved from a position covering the keyhole-shaped openings to a position uncovering the openings." From this preference a reasonable juror could infer that Summit foresaw the need for a safety guard to protect even hunters who removed the treestand at elevation.

Regardless of the strength of these averments as to the prevalence of these behaviors among hunters, "at the summary judgment stage, the court is not entitled to weigh the evidence; that is solely the task of the fact-finder." *Berrier v. Simplicity Mfg., Inc.*, 563 F.3d 38, 64 (3d Cir. 2009). Instead, "the court must limit its inquiry to whether a genuine issue of fact exists." *Id.* Here, Summit has conclusorily stated that VanDine's behavior was not foreseeable,

---

[15] Summit argues that Smith's previous testimony is inadmissible. Its argument is opaque but appears to be rooted in hearsay, for it notes that Smith is "an out[-]of[-]court declarant." But Plaintiffs do not cite Smith's testimony that hunters sometimes remove their cables for the truth of the matter (in order to prove that hunters really do sometimes remove their cables)—they cite it as evidence that Summit knew of *Smith's understanding hunters sometimes remove their cables* (and, therefore, that if Smith's belief were to turn out to be true, Summit would have had reason to *foresee* its truth).

Plaintiffs also cite evidence that the Court cannot consider—a portion of the report of their expert Jarrett Waters in which Waters describes the results of certain hunter-behavior surveys. Waters' report is unsworn, and an unsworn statement not made under penalty of perjury cannot be considered on summary judgment. *United States ex rel. Doe v. Heart Sol., PC*, 923 F.3d 308, 315 (3d Cir. 2019); 28 U.S.C. § 1746.

[16] Smith is now deceased. On April 22, 2024, after Smith's death, Summit moved to substitute a new expert in Smith's place (ECF No. 54), and that motion was granted (ECF No. 57). The parties were given until July 1, 2024, to complete discovery of the new expert and for Plaintiffs to file any associated *Daubert* motion. Because no Summary Judgment issue raised by Summit turns on Smith's testimony, and because the new expert would not offer any new evidence (the Order granting Summit's Motion to Substitute having directed that the testimony and opinions of any substitute expert "shall be limited to the subject matter covered in LJ Smith's expert report"), the Court issues this Opinion and Order before the parties' July 1, 2024, deadline.

and Plaintiffs have offered enough evidence that it was foreseeable to demonstrate that a genuine issue of material fact exists.[17]

STEP 3: PROPOSED ALTERNATIVE DESIGN

In deposition Plaintiffs' expert Waters suggests at least two alternative designs—one that uses a locking pin, and one that uses a pivoting cover to block the open cable keyway.  Summit does not challenge any proposed alternative designs in its Motion.

c.   VanDine's Assumption of Risk

The knowing assumption of risk bars products-liability recovery in New Jersey.  *See Johansen v. Makita U.S.A., Inc.*, 607 A.2d 637, 642 (N.J. 1992).  Summit argues that VanDine "voluntarily assumed the risk of falling when, without wearing his full body harness, he elected to remove the treestand from the tree."  It contends that because VanDine "knew and understood the dangers associated with treestands and hunting at height," especially without a harness, he assumed the risk of falling and being injured.  It contends further that because VanDine did not read the Viper's warnings and because he detached and attempted to reattach the Climbing Cable at elevation, he knowingly assumed the risk of falling and being injured.

Plaintiffs do not dispute the facts alleged by Summit as to VanDine's assumption of risk. The parties' dispute is legal, not factual:  Plaintiffs argue that an assumption-of-risk defense requires a greater level of specific knowledge than Summit has alleged.  They contend that a product-user's understanding of the general danger associated with the particular use of a

---

[17] In oral argument Summit also suggested that, because under New Jersey law a factfinder must presume that a product user would heed a product's warnings, it is unforeseeable that VanDine would have acted contrary to the Viper's warnings.  Summit misstates the law.  In *Coffman*, 628 A.2d 710, the New Jersey Supreme Court held that a 'heeding presumption' applies in the failure-to-warn context, not a design-defect-foreseeability context.  *Coffman* explains that a failure-to-warn plaintiff "should be afforded the use of the presumption that he or she would have followed an adequate warning *had one been provided.*"  The 'heeding presumption' established in *Coffman* does not touch foreseeability in a design-defect case like this one.  *Id.* at 720.

31

product is not enough, and that "[i]t is only when the user of a product *knows of the defect*" and uses the product anyway that the user's assumption of risk bars recovery (quotations omitted and emphasis added).  This dispute reasserted itself at oral argument.

New Jersey law is not crystal clear as to the level of knowledge required to establish or defeat an assumption-of-risk defense.  *Lewis v. American Cyanamid Co.*, however, is instructive. In that case the New Jersey Supreme Court considered whether a plaintiff's knowledge of a general possibility of danger was enough to give rise to an assumption defense.  715 A.2d 967 (N.J. 1998).  The plaintiff in *Lewis* had been severely burned when automatic insecticide foggers manufactured by the defendants exploded after the plaintiff, disregarding the products' warnings, reentered the room during their use.  He brought various products-liability claims and among their defenses the defendants raised the plaintiff's assumption of risk.

The jury asked during deliberation "whether the plaintiff needed to know specifically that he might be burned if he misused the product."  *Id.* at 974.  The court responded that the plaintiff "needed to have known only that he was taking a general risk by reentering the room and need not have been aware of the specific risk that resulted in his injury."  *Id.*  The Appellate Division ruled that the trial court's instruction was wrong, and the Supreme Court upheld the Appellate Division's ruling.  It explained that an assumption defense can arise only when a plaintiff knew about the specific danger he faced:  "For plaintiff to be held comparatively negligent, he must have voluntarily and unreasonably encountered the known risk of being burned."  *Id.  See also Johansen*, 607 A.2d at 641-42 (Assumption of risk is unavailable as a defense "when a plaintiff's negligent conduct consists of merely failing to discover or guard against the possibility of a defect in a product"; it is available when "a plaintiff with actual knowledge of the danger *presented by a defective product* knowingly and voluntarily encounters that risk.") (emphasis

added).[18]  Thus *Lewis* and *Johansen* suggest that a defendant must show more than a plaintiff's

general appreciation of the danger associated with using (or misusing) a product whose use

inherently involves danger (like using a treestand at elevation)—he must understand the danger

"presented by a defective product."

The heart of Summit's argument is that VanDine appreciated the risks associated with

detaching and reattaching the cable at height, without wearing a harness and without having read

the product warnings and instructions.  The heart of Plaintiffs' argument is that "[t]here is zero

evidence that Mr. VanDine *knew of the defects* in the [treestand]" (emphasis added)—

specifically, the allegedly defective design "that allows the Climbing Cable to be positioned in a

manner that will temporarily support the weight of the climber and provide the user a false sense

of security that the cables are secure and the product is safe to use."

*Crumb v. Black & Decker (U.S., Inc.)*, 499 A.2d 530, (N.J. App. Div. 1985), *appeal*

*dismissed as improvidently granted*, 517 A.2d 424 (N.J. 1986), is strikingly analogous.  In that

case, Plaintiff Crumb had been using a circular saw to cut branches.  The saw had been designed

such that when a user retracted it from the material he was cutting, a spring-driven guard would

cover the blade.  Crumb had been sitting cross-legged on the ground in a manner that brought his

legs close to the saw.  At some point the spring became "wedged in the housing" and "kept the

guard in an open position," and the blade sliced through Crumb's leg and caused serious injury.

*Id.* at 531.  Crumb had used the saw for many years and on the occasion of his injury he "never

---

[18] The Appellate Division's opinion in *Lewis*, which Summit cites, puts it even more starkly:  "[W]here contributory negligence is a defense to strict liability, sustaining that defense requires proof that before plaintiff's injury he was consciously aware of the specific danger that injured him and, with that knowledge, voluntarily exposed himself to the danger."  *Lewis v. Am. Cyanamid Co.*, 682 A.2d 724, 737 (N.J. App. Div. 1996), *aff'd as modified*, 715 A.2d 967 (N.J. 1998).

noticed specifically whether the guard opened and closed, since he merely assumed that the guard would have performed its function as it always had since he purchased the saw." *Id.* The defendant raised the plaintiff's assumption of risk:  Crumb had been sitting cross-legged and voluntarily brought his legs near the spinning blade, the defendant argued, and thereby knowingly exposed himself to the danger.

The Appellate Division disagreed.  It held that "[a]n injury caused by mere inattention or ordinary carelessness is insufficient to reduce or bar [a] plaintiff's claim." *Crumb*, 499 A.2d at 534.  Crumb, "although sitting cross-legged and exposing himself to a danger of being injured by the saw," lacked the *specific knowledge* "that the safety guard would fail to operate by reason of the design defect" alleged by Crumb (and, in that case, established by the jury). *Id.*  Even if Crumb understood in general terms that it was dangerous to cut branches with a powerful saw while sitting cross-legged on the ground, that understanding did not bar his recovery because it did not amount to "actual knowledge of the danger posed by the defective product." *Id.* (quotations removed).  The court concluded that "[a]bsent such knowledge, [the] plaintiff's conduct in cutting the tree limbs as he did was irrelevant." *Id.*

VanDine's conduct is analogous.  As Crumb had used his circular saw for many years, VanDine had used the Viper for many years in a manner similar to that in which he used it the day he was injured.  Like Crumb, he understood well the general risks of using the subject product in particular ways:  As Crumb knew it was generally dangerous to operate a powerful saw in close proximity to his legs, VanDine "knew and understood the dangers associated with treestands and hunting at height," especially without a harness.  Further, as Summit correctly notes, VanDine knew that "any time a person climbed to height, the person could fall and suffer serious injury or death," and that "if he failed to properly install the cable into the cable bracket

assembly" he could potentially fall.

At least one case seems to reach the opposite conclusion.  As Summit urged in oral argument, in *Ladner v. Mercedes-Benz of N. Am., Inc.* (N.J. Super. App. Div. 1993), the Appellate Division explained that "[i]t is not knowledge of the defect" that must be proven, but rather "evidence that plaintiff voluntarily and unreasonably encountered a known danger." 630 A.2d 308, 315.  Puzzlingly, the *Ladner* court cites *Crumb* for the proposition, though, as discussed above, *Crumb* shows the opposite—in *Crumb*, even though the plaintiff voluntarily brought his leg close to the saw and thereby "encountered the risk of an improperly designed guard not working," his recovery was not barred because he did not know the defective safety guard would fail, and a defendant may not "benefit from the failure of a safety device when the injury was the very eventuality the safety device [was] . . . designed to guard against."  *Crumb*, 499 A.2d at 534.  The *Crumb* citation is not the end of *Ladner*'s confusing reasoning, either— *Ladner* also cites *Cintrone v. Hertz Truck Leasing*, 212 A.2d 769 (N.J. 1965), in which the New Jersey Supreme Court held that a jury could properly conclude the plaintiff assumed the risk of loading a vehicle with defective brakes *because there was evidence he knew about the defect in the brakes*.

But in any case, *Ladner* does not support granting summary judgment for Summit: The facts are analogous, but the court's conclusion is not.  The plaintiff in *Ladner* parked her car atop a hill and got out, the car began rolling downhill, the plaintiff tried to stop the car by opening the door and depressing the brake from outside the car, and she fell and was run over by the car's rear wheel.  The plaintiff argued that the car's gear-shift mechanism was defective because it could result in a "false park"—that is, that the shifter could give the impression it was placed in park when in fact it was not.  The defendant argued that the plaintiff had assumed the risk, by

failing to engage the parking brake or turn the wheels towards the curb before she got out, and by trying to depress the brake pedal from outside the car after it started rolling.  The trial court submitted the question of the plaintiff's assumption of risk to the jury, and on appeal the plaintiff argued that the trial court erred because she did not know "that the car was moving *because* the gear shift mechanism was defective."  *Ladner*, 630 A.2d at 314 (emphasis added).

The *Ladner* court explained that the relevant danger appreciated by the plaintiff was that the vehicle "roll[ed] a lot when you put it in park."  *Id.* at 315.  The court held that on the day the plaintiff was injured, her car's rolling forward was "a phenomenon she could well expect in view of her prior experience," and she reacted by "voluntarily and unreasonably le[aving] a position of safety thereby exposing herself to injury."  *Id.* at 316.  That is the main disanalogy to this case— here, there is no evidence that VanDine could have "well expected" the "phenomenon" of his Viper's Climbing Cable's releasing after appearing securely fastened.  And, maybe most importantly, the *Ladner* court did not conclude that the plaintiff's potential assumption of risk merited judgment in favor of the defendant—it held that the trial court was right to submit the question to the jury.  It cited the New Jersey Supreme Court's holding in *Johansen* that "when a plaintiff with actual knowledge of the danger presented by a defective product knowingly and voluntarily encounters that risk," a trial court "should submit the comparative-negligence defense to a jury."  *Johansen*, 607 A.2d at 642.[19]

---

[19] At oral argument Summit raised the statement in *Klimko ex rel. Klimko v. Vinyl Works Canada*, 2012 WL 5187919, at *4 (N.J. Super. App. Div. Oct. 22, 2012) that "[a] defendant need not show that the plaintiff had knowledge of the product's particular defect" to maintain an assumption-of-risk defense.  *Klimko* is an unpublished opinion, and in New Jersey,

> No unpublished opinion shall constitute precedent or be binding upon any court. Except for appellate opinions not approved for publication that have been reported in an authorized administrative law reporter, and except to the extent required by res judicata, collateral estoppel, the single[-]controversy doctrine or any other similar principle of law, no unpublished opinion shall be

In all, though close, the caselaw comes down on VanDine's side.  And so, because the facts do not demonstrate that VanDine understood the risk associated with the defect alleged by Plaintiffs (that VanDine's Viper's spring-driven lock would appear secure when it was not), on the facts supplied a reasonable juror might decline to conclude that VanDine knew that the cable would seem safely secured in the bracket assembly when in fact it was not.  Summary judgment on Summit's assumption-of-risk defense will therefore be denied.

### d.  Causal link between the product and VanDine's injuries

Under New Jersey law, a products-liability plaintiff must establish that the alleged defect caused his injuries.  *Coffman*, 628 A.2d at 716.  Summit argues that here Plaintiffs cannot.  Instead, Summit urges, it is "undisputed" that VanDine's injuries were caused not by any product defect but "by [VanDine] himself."  Plaintiffs respond that Summit mischaracterizes the evidence and confuses the standard—they argue that Summit would require them to prove the alleged defect was the "sole cause" of VanDine's injuries, when they need only show it was the "proximate cause."

Causation "generally consists of two elements.  First, a plaintiff must show that the defendant's act or omission was the factual, or 'but for,' cause of the injury.  Every occurrence related to an event such that, but for the event, the occurrence probably would not have happened is a factual cause of an injury."  *Cruz-Mendez v. ISU/Ins. Servs. of San Francisco*, 722 A.2d 515, 524 (N.J. 1999).  And "[s]econd, even under a strict-liability standard, a plaintiff must prove that this factual cause was a proximate cause of the injury."  *Id.*

---

cited by any court.

Rule 1:36-3 - Unpublished Opinions, N.J. Ct. R. 1:36-3.  Accordingly, the Court does not consider *Klimko* here.

A proximate cause "need not be the sole cause of harm"—it suffices "if it is a substantial contributing factor to the harm suffered." *Perez v. Wyeth Lab'ys Inc.*, 734 A.2d 1245, 1261 (N.J. 1999). Proximate cause is "an expression as much of policy as it is an expression of the effect of sequential events." *Id.*[20]

Summit argues that summary judgment in its favor is proper because "Plaintiff, his expert Waters, and his expert Bishop have all conceded that Plaintiff's purported fall event and the injuries that he allegedly sustained when he fell to the ground were proximately and solely caused by Plaintiff, himself." Summit's causation argument can be divided into two categories: First, that VanDine fell when he "removed the cable from the cable bracket assembly at height to move the treestand above a limb, failed to properly place the cable back into the cable bracket assembly, then failed to inspect the product to determine that [the] cable was properly inserted into the cable bracket assembly before placing weight upon it"; second, that "the entire fall event that caused [VanDine]'s purported physical injuries would have been avoid[ed] if [VanDine] merely wore the full body safety harness."

Summit first contends that VanDine did not properly replace the cable when he disconnected it at elevation. In support it puts forward Plaintiffs' experts' testimony and the physical evidence in the case. Plaintiff's expert Waters, for instance, testified that "[t]he physical evidence . . . is consistent with the cable being partially inserted into the keyway," in

---

[20] The line that delineates a proximate cause from a distal one is fuzzy. "Proximate or legal causation is that combination of logic, common sense, justice, policy and precedent that fixes a point in a chain of events, some foreseeable and some unforeseeable, beyond which the law will bar recovery." *Perez*, 734 A.2d at 1261 (citing *People Express Airlines, Inc. v. Consolidated Rail Corp.*, 495 A.2d 107 (N.J. 1985) (quotations removed); *Brown v. United States Stove Co.*, 484 A.2d 1234 (N.J. 1984) ("The assessment as to whether conduct can be considered sufficiently causally connected to accidental harm so as to justify the imposition of liability also implicates concerns for overall fairness and sound public policy.").

part because "[t]here is no evidence of a broken component."  Bishop's testimony is similar:
The cable, Bishop "hypothesize[d]," was "improperly placed in the top of the bracket."

As to whether VanDine was injured because he was not wearing a harness, Summit again
cites Plaintiffs' experts.  Bishop, asked whether it was possible VanDine could have been
rescued if suspended by a harness after the fall, responded, "[w]ell, that's speculation, but it
sounds reasonable."  And Waters testified, "I agree he should have been wearing a harness."
But, as Summit notes, Waters went further:  He also testified that in his opinion VanDine "would
not have fallen to the ground" if he had been wearing the harness attached to the tree.  If that is
what the jury concludes, VanDine's failure to use a harness was a but-for cause of his injuries.[21]
Taken together, Summit has supplied some evidence that events unrelated to any defect were
proximate causes of VanDine's injuries.

Plaintiffs dispute Summit's contention that their experts have "conceded that [VanDine]'s
purported fall event and the injuries that he allegedly sustained . . . were proximately and solely
caused by [VanDine], himself."  Plaintiffs raise additional testimony from Waters:  "The *root
cause* of the incident is the cable disconnecting from the cable bracket. . . .  Should that cable not
be—that cable stop not be fully positioned within the cable bracket there is a likelihood that it
will disconnect" (emphasis added).  Plaintiffs also raise evidence from Summit's expert
Saunders, who testified that "if . . . [there is] one singular action that would have prevented this
incident, . . . in terms of root cause, the thing that ultimately caused this event to happen, I would
go back to the cable assembly and cable bracket."

---

[21] Summit also argues throughout that VanDine's use of the Viper was contrary to its instructions and warnings.  As
discussed above, it is undisputed that VanDine's use did not to conform to the product's instructions in certain ways.
But VanDine's

The parties are talking past one another—the argument about causation is the argument about misuse recast. The parties do not dispute that VanDine removed and tried to reattach the cable at elevation, that he was not wearing a harness, that it was contrary to the Viper's warnings to remove the cable at elevation or climb without a harness, or that it is safer not to remove the cable at elevation or climb without a harness. And both parties put forth evidence that improper positioning of the Climbing Cable within the cable bracket was a substantial cause of VanDine's injuries. They differ just as to whether a defect in the Viper led proximately to VanDine's fall, or whether instead VanDine's manner of use renders any defect insufficiently proximal to support his claim.

A reasonable jury could reach either conclusion, so the Court cannot render this judgment for the parties. The parties have put forward several proximal causes. (For instance, even granting the certainty of the hypothetical case in which VanDine had worn a harness, his lack of a harness was not the *only* but-for cause of his injuries. It is likely that he would not have fallen in that moment if the Climbing Cable had not escaped from the bracket, either.) A reasonable jury could find that indeed the cable seemed secure but came out of the bracket when VanDine placed his weight on the climber, and that its coming out was "a substantial contributing factor to the harm suffered," *Perez*, 734 A.2d at 1261, even if it determined that VanDine increased the odds of an accident by removing the Climbing Cable at elevation or that VanDine's wearing a harness might have prevented some of the resulting injury.

"Ordinarily, issues of proximate cause are considered to be jury questions." *Perez v. Wyeth Lab'ys Inc.*, 734 A.2d 1245, 1261 (N.J. 1999) (citation removed).[22] So too here: A jury

---

[22] In oral argument, Plaintiffs contended that issues of proximate cause must *always* be left to the jury. They cited *Jurado*: "If the jury concludes that the product is defective, it must then determine whether the misuse proximately caused the injury." 619 A.2d at 1318. *Jurado* does not say courts may not grant summary judgment as to proximate

40

could conclude that the alleged defect existed and that it proximately caused VanDine's fall; accordingly, summary judgment on causation grounds will be denied.[23]

> e. Plaintiff Renee VanDine's loss-of-consortium claim

Last, Summit moves for summary judgment as to Plaintiff Renee VanDine's loss-of-consortium claim only on the grounds that loss of consortium is a derivative claim that must fail if the underlying tort claim is dismissed. For the reasons given above, summary judgment will not be granted as to Plaintiffs' products-liability claims. Therefore, it will not be granted as to Renee VanDine's loss-of-consortium claim, either.

## III. CONCLUSION

For these reasons, Summit's Motion for Summary Judgment is denied.

An appropriate order follows.

BY THE COURT:

/s/Wendy Beetlestone, J.

_____

**WENDY BEETLESTONE, J.**

---

causation—it just says that, in a case in which a product-defect question makes it to the jury, and the jury determines the product was defective, then the jury must also determine causation.

[23] Summit argues that "[w]hen a plaintiff fails to rule out other causes, summary judgment in favor of the defendant is proper." For support it cites *Lauder v. Teaneck Volunteer Ambulance Corps*, 845 A.2d 1271, 1278 (N.J. App. Div. 2004), but it overstates *Lauder*'s conclusions. In *Lauder* the plaintiff was injured when his hospital gurney collapsed, and his estate brought a suit so devoid of evidence that it would have required significant "speculat[ion]" as to the nature and cause of the gurney's collapse. Summit is correct that the *Lauder* court said that the plaintiff needed to "negat[e] other [potential] causes of the failure of the product," but the reasoning in that case does not apply to this one: In *Lauder* there was so little evidence that it was not "reasonable to infer that a dangerous condition existed at the time the [manufacturer] had control of the product." *Id*. at 1277-78. In this pure design-defect case, by contrast, there is no dispute as to the time the alleged defect began to exist.